**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 1:22-cv-3372 |
| v. ) | |
| ) | |
| WALMART INC., a corporation, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its complaint alleges:

1.     The FTC brings this action under Sections 5(m)(1)(A), 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101−6108, which authorize the FTC to seek, and the Court to order, permanent injunctive relief, monetary relief, civil penalties, and other relief for Defendant's acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), as amended, 16 C.F.R. Part 310, in connection with Defendant's failure to take timely, appropriate, and effective measures to detect and prevent fraud in the processing of money transfers sent and received by consumers at its store locations.

## SUMMARY OF CASE

2.     Money transfers are a common vehicle for fraud.  Walmart offers money transfers through its stores, and for many years, consumers have reported tens of millions of dollars

annually in fraud-induced money transfers processed by Walmart employees. These practices have harmed many consumers, including people struggling with debt, those threatened by imposters, and older Americans. Walmart is well aware that telemarketing and other mass marketing frauds, such as "grandparent" scams, lottery scams, and government agent impersonator scams, induce people to use Walmart's money transfer services to send money to domestic and international fraud rings. Nevertheless, Walmart has continued processing fraud-induced money transfers at its stores—funding telemarketing and other scams—without adopting policies and practices that effectively detect and prevent these transfers. In some cases, Walmart's practices have even made it easier for fraudsters to collect fraud-induced money transfers at a Walmart store. For example, for years, it was Walmart's policy or practice not to deny payouts to suspected fraudsters at its stores, but instead to have its employees complete those transactions. Even after it became illegal in June 2016 for cash-to-cash money transfers to be used to pay for telemarketing transactions, Walmart failed to take appropriate steps to prevent those types of transfers at its locations. As a result of Walmart's failure to take appropriate steps to mitigate the problem, consumers have lost substantial sums to frauds through money transfers effected at Walmart.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

4.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), and (c)(2), and 15 U.S.C. §§ 53(b) and 6105(b).

## PLAINTIFF

5.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own

attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC

also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108.  Pursuant to the Telemarketing

Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive

and abusive telemarketing acts or practices.

### DEFENDANT

6.     Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc. ("Walmart"),

is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville,

Arkansas 72716.  Walmart transacts or has transacted business in this District, as well as

throughout the United States and in other countries worldwide.

### COMMERCE

7.     At all times relevant to this Complaint, Defendant has maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

### DEFENDANT'S BUSINESS PRACTICES

8.     Walmart offers a variety of financial services to its customers at its Customer

Service Desks, which are located in all of its stores, and in its MoneyCenters, which are

dedicated spaces for financial services located in less than half of Walmart's stores.  Walmart's

advertisements boast that it is "trusted by millions of customers as their one-stop shop for

financial services."  Walmart's financial services include, but are not limited to, money transfers,

credit cards, reloadable debit cards, gift cards, check cashing, bill payment, and money orders.

These financial services play a role in driving customer traffic to Walmart's stores, thereby

generating significant retail sales for Walmart.

9.     Consumers can use Walmart's money transfer services to send and receive money from its locations.  Walmart relies on other companies' money transfer systems to provide these services.  These companies, also referred to as providers, principals, licensed partners, or vendors (hereinafter "providers"), include MoneyGram International, Inc. ("MoneyGram"), RIA Financial Services, a subsidiary of Euronet Worldwide, Inc. (together, "Ria"), and The Western Union Company ("Western Union").  Walmart acts as an agent of these providers, and Walmart itself has been licensed as a money services business ("MSB") in the United States since December 2001.  Walmart offers money transfer services to consumers at thousands of locations in the United States and Puerto Rico, as well as in many other countries around the world, including, but not limited to, Mexico, Canada, the United Kingdom, Argentina, Guatemala, and Costa Rica.

10.     Since at least 2005, Walmart has offered domestic and international money transfer services through MoneyGram at Walmart locations within the United States, Puerto Rico, and Mexico.  In 2018, Walmart began offering its own lower-cost money transfer service, called "Walmart2World Money Transfers Powered by MoneyGram," which allows consumers to send up to $2,500 from a Walmart location to be picked up at one of MoneyGram's agents that are located in 200 countries.

11.     In April 2014, in addition to providing traditional money transfer services through MoneyGram, Walmart began offering its own white-label money transfer service, referred to as "Walmart2Walmart Money Transfers Powered by Ria," at many of its locations.  This service originally allowed consumers to send money transfers from one Walmart location to be picked up at another Walmart location in the United States and Puerto Rico.  In October 2016, Walmart expanded Walmart2Walmart services to offer money transfers to and from its stores in Mexico. In June 2017, Walmart also began offering Walmart2Walmart services in the United Kingdom

through its subsidiary Asda Stores Ltd.  In November 2019, Walmart announced that it was adding Ria as an additional money transfer provider for its Walmart2World international money transfers.

12.     Walmart uses its own point-of-sale system to process money transfers that are sent and received from its locations through any money transfer company.  Walmart also uses this system to exchange information with its providers.  Walmart designed and controls the system in which its employees record information about money transfer senders and receivers, and whether and how its point-of-sale system can be used to stop fraud-induced transfers.

13.     Since 2007, Walmart has offered domestic and international money transfer services to consumers in Canada through Western Union.  Walmart also offers Western Union's money transfer services at its locations in other countries, such as Mexico, Great Britain (through Asda), Argentina, Guatemala, Costa Rica, Honduras, El Salvador, Nicaragua, Belgium, the Philippines, Nigeria, and Qatar.  In the spring of 2021, Walmart began offering money transfer services through Western Union at Walmart locations in the United States.

14.     For over a decade, fraudsters around the world have used money transfers to obtain money from their victims, especially U.S. consumers, and Walmart has long been aware that its locations have been used to perpetrate these frauds.  Walmart has known that these scams—including person-in-need scams, government agent impersonator scams, and lottery, sweepstakes, and prize scams, among others—often have involved telemarketing.  Despite its awareness of a substantial amount of fraud-induced money transfers involving Walmart, for many years, Walmart has failed to effectively detect and prevent consumer fraud involving money transfers at its locations.  This has been the case despite the fact that, as an agent of both MoneyGram and Western Union, Walmart's contracts with those providers and the stipulated court orders obtained by the FTC against MoneyGram and Western Union provided Walmart

with notice about its obligations to detect and prevent consumer fraud at its locations.  *FTC v. MoneyGram International, Inc.*, No. 09-cv-6576 (N.D. Ill. Oct. 19, 2009); and *FTC v. The Western Union Company*, No. 17-cv-0110 (M.D. Pa. Jan. 19, 2017).

15.     One of the ways in which Walmart's anti-fraud practices have been deficient is in the training of its frontline employees, as well as its supervisors and managers, referred to internally as associates (collectively "employees" or "associates").  In many cases, Walmart has failed to properly train and oversee employees responsible for detecting and preventing consumer fraud involving money transfers at its locations.  These deficiencies have included Walmart's failure to provide employees with adequate initial and ongoing training on detecting and preventing consumer fraud, including training about questioning and warning consumers, and rejecting and stopping suspected fraud-induced money transfers.  Walmart also failed to ensure that its employees providing money transfer services are knowledgeable about the policies and procedures necessary for detecting and preventing consumer fraud.  Until sometime in 2019, Walmart failed to provide any instructions to its employees or warnings to consumers that specifically addressed the June 2016 amendment to the TSR ("TSR Amendment"), which the FTC announced on December 14, 2015.  The TSR Amendment prohibits the use of "cash-to-cash" money transfers for goods or services offered or sold through telemarketing or charitable contributions solicited or sought through telemarketing.

16.     Walmart has also failed to adequately monitor money transfer activity and address suspicious money transfer activities at its locations, including by employees who have been complacent in detecting and preventing consumer frauds or, in some cases, were engaged in suspicious activities or even complicit in frauds.  In many cases, Walmart has facilitated scams by paying out fraud-induced money transfers in violation of its providers' anti-fraud or Anti-Money Laundering ("AML") policies and procedures, or by failing to implement and maintain

its own anti-fraud program designed to detect and prevent consumer fraud at its locations. For example, for many years, Walmart's decision not to train or instruct its employees to deny or reject payouts of money transfers that were suspicious and potentially due to fraud allowed fraudsters to more easily receive payouts of fraud-induced money transfers at Walmart locations. In addition, Walmart has failed to properly train and ensure that its employees are knowledgeable about other basic and important procedures, such as verifying and accurately recording IDs and other customer information and addressing suspicious activity. Walmart also has failed to ensure that its locations are routinely providing required consumer fraud warnings.

17. Over the years, compliance reviews and audits of Walmart stores by MoneyGram and Ria have documented some of the deficiencies in Walmart's anti-fraud program. For example, MoneyGram's reviews in 2018 and 2019 found that hundreds of Walmart associates lacked knowledge about basic and important procedures, such as ID acceptance and requirements and how to address suspicious activity. And between January and August 2019, Ria found that 39 percent of the Walmart stores it visited were missing fraud awareness materials and 24 percent of the stores were missing the send forms, which provide a consumer fraud warning on the front page. Similar problems with untrained associates and fraud awareness materials have existed for years and have been reported to Walmart by MoneyGram and Ria. As far back as 2014, for example, a MoneyGram audit of 397 Walmart locations revealed that 39 percent of Walmart locations had untrained primary employees providing money transfer services at its Customer Services Desks and MoneyCenters and 60 percent of the locations had untrained secondary or backup employees.

**Walmart's Money Transfer Services**

18. Consumers wishing to send or receive funds through a money transfer at a Walmart location can visit Walmart's Customer Service Desks and MoneyCenters. Consumers

can also initiate money transfers online at Walmart.com or through Walmart's Mobile Express Money Service App and finalize them at a Walmart location. In or around mid-2017, Walmart began installing kiosks at some of its Customer Service Desks and MoneyCenters as an option for consumers to initiate their money transfers. After using the kiosks to stage their money transfers, consumers are required to finalize the transactions at the counter with a Walmart associate.

19.     Money transfers sent or received by consumers through Walmart's providers are supposed to be for person-to-person use and not for businesses. Walmart does not limit the maximum amount a consumer can send or receive through a Walmart money transfer. Instead, it relies on its providers to impose the limits. For years, the maximum amount of money that could be sent through MoneyGram at a Walmart location in the United States was $20,000 per day, but the limit for a single transaction was $10,000 until early 2018, when that amount was lowered to $8,000. Originally, the maximum amount that could be sent through a domestic Walmart2Walmart money transfer through Ria was $900, but that was raised to $2,500 in October 2016. Until sometime in 2018, generally, there were no set limits on the amount of money that a customer could receive through MoneyGram or Ria in one day. In Canada, the maximum amount of a money transfer that can be sent from a Walmart location is $7,500 (CAD), while the maximum amount that can be received at a Walmart location in Canada is $5,000 (CAD). Regardless of location, consumers sending a money transfer from a Walmart store must pay with cash or a PIN-based debit card.

20.     For many years, when initiating a money transfer at a Walmart location, the sender typically was required to complete a "send form," which contained certain consumer fraud warnings. The send form required the sender to provide his or her name, physical address, and telephone number, the name of the recipient, and the state/province and country to which the

money transfer was being sent. Repeat customers only had to provide their phone number (or rewards number) and were not required to complete the rest of the form. In or around late 2019, Walmart stopped requiring senders to complete send forms, but before completing their transactions, Walmart began providing senders with a printout containing consumer fraud warnings in small print.

21.     For years, Walmart did not ask senders to present identification ("ID") unless their transfers exceeded a certain dollar threshold set by Walmart's providers. For example, MoneyGram required its agents, including Walmart, to record the sender's ID information at $900 in the United States, while Western Union required its agents in Canada, including Walmart, to record the sender's ID information at $1,000 (CAD). For money transfers of $3,000 or more, in accordance with the Bank Secrecy Act ("BSA"), senders in the United States have also been required to provide their Social Security Number or Tax Identification Number, or if not available, alien ID or passport information to be recorded. Walmart did not begin requiring its associates to verify and record the sender's ID information for all transactions until late January 2018, and only did so because MoneyGram reduced its ID threshold to $1.

22.     In order to send a money transfer, consumers must pay a fee that varies depending on the platform (in person versus online), the destination, the amount, and the method of payment. Walmart also offers flat-fee money transfer services for consumers through Walmart2Walmart and Walmart2World money transfers, which Walmart touts as a lower-cost alternative. Walmart has earned millions of dollars in these fees to date. Consumers are provided with a unique reference number by Walmart to track their transfers. Typically, the money is available for pickup within minutes after the money transfer has been sent.

23.     For many years, before paying out a money transfer, Walmart's providers required Walmart locations to have recipients (also referred to as receivers or beneficiaries)

complete a "receive form" with the reference number, receive amount, recipient's name, physical address, and telephone number, sender's name, telephone number, and the city and state from which the transfer was sent. The recipient also was supposed to present his or her government-issued photo ID for verification in receiving the transfer, although the Walmart location was only required to record the recipient's ID at a certain dollar threshold. For example, for many years, Walmart was required to record the ID of a recipient who received a money transfer of $900 or more in the United States. In addition, when the recipient did not have an ID and the money transfer was less than a certain amount, such as $900, the sender sometimes had the option of using a preset answer to a test question. For money transfers of $3,000 or more, recipients in the United States also are required to provide their Social Security Number or Tax Identification Number, or if not available, alien ID or passport information to be recorded by the Walmart location. Beginning in or around May 2016, the ID threshold for recipients was lowered to $1, the test question was eliminated, and Walmart stopped using the receive forms.

24.     Once the cash funds have been paid out to the recipient, fraud victims usually have not been able to get their money back, either from Walmart or its providers. For example, for many years, senders typically could not get their money back unless they had asked for a refund before the money transfer had been picked up. As a result of agreements that MoneyGram and Western Union reached with the FTC, as well as most of the states, between 2016 and 2018, those refund policies have been expanded to provide refunds if the providers or their agents—including Walmart—have failed to follow certain anti-fraud policies and procedures, such as failing to provide the required consumer fraud warnings or to verify or accurately record IDs.

10

**Use of Walmart Money Transfers to Facilitate Fraud and Harm Consumers**

25.     Walmart has provided an essential service to fraudulent telemarketers, sellers, and con artists by permitting them access to its providers' money transfer systems at its locations while failing to have its own comprehensive and effective anti-fraud program, and, in some cases, failing to comply even with its providers' anti-fraud policies and procedures. Exploiting this access to its full potential, perpetrators of mass marketing and imposter scams have received, and continue to receive, at Walmart locations, millions of dollars from victimized consumers, including many elderly consumers.

26.     Fraudulent telemarketers and con artists have preferred to use money transfers at Walmart stores to facilitate their scams because, among other reasons, there are many convenient locations from which victims can send the money. In addition, unlike many agents that use other forms of payments, such as money orders, for large payouts, Walmart pays recipients in cash, even for large-dollar transfers. Fraudsters also have been able to pick up money transfers within minutes and at multiple locations, and, oftentimes, the perpetrators have been afforded anonymity because either no IDs were required or fake IDs were provided. For example, money transfers can be picked up at any location within a particular state or country; for many years, money transfers under $900 could be picked up without recipients having to present an ID; recipients have used fake names, addresses, and IDs; Walmart's employees in numerous instances have not been properly trained, or have not been knowledgeable, regarding the policies or procedures that are required to detect and prevent fraud; some employees have failed to comply with the policies and procedures in paying out money transfers; and employees have sometimes been complicit in the frauds. In some cases, Walmart has violated its providers' policies and procedures, while in others, Walmart has failed to implement and maintain its own effective policies or procedures to detect and prevent fraud. Walmart's failures on this front

often have made it easier for victims to unwittingly send money to fraudsters and for fraudsters to receive payments through money transfers at Walmart locations. At the same time, these failures have also made it more difficult for consumers and law enforcement to identify and locate the recipients of fraud-induced money transfers.

27. For years, Walmart has been aware that criminal fraud rings, including those perpetrating telemarketing scams, have picked up fraud-induced money transfers at Walmart. For example, in May 2016, Walmart became aware that five individuals had been arrested in connection with an Internal Revenue Service ("IRS") impersonation scam conducted over the telephone that bilked thousands of U.S. consumers out of millions of dollars through fraud-induced money transfers picked up at Walmart locations. Ultimately, at least fifteen individuals were indicted in connection with that scheme, most of whom have since pleaded guilty. *See U.S. v. Caballero*, No. 16-cr-0124 (E.D. Ark.), *U.S. v. Caballero*, No. 16-cr-0201 (D. Minn.), and *U.S. v. Mirabal*, No. 16-cr-0269 (N.D. Tex.); *see also U.S. v. Pando*, No. 17-cr-0046 (N.D. Miss.), and *U.S. v. Labra*, No. 17-cr-0314 (D. Md.). In 2017, Walmart became aware of arrests in at least two other IRS impersonation scams that involved the extensive use of fake IDs at Walmart locations. In one of those scams, four individuals were charged in connection with a scheme that used fake IDs to pick up $666,537 in money transfers from 784 victims from January through August 2017, often at Walmart locations, with another 6,530 transactions totaling $2,836,745 linked to the fake identities used by those "runners" (also known as money mules). *U.S. v. Gohil*, No. 17-cr-0212 (E.D. Wis.) (three of the defendants later pleaded guilty). In the other scam, two individuals pleaded guilty in connection with an India-based telemarketing scam, including one who later admitted to using 134 different fraudulent IDs to pick up over $1 million in fraud proceeds from September 2016 to May 2017, often at Walmart locations. *U.S. v. Patel*, No. 17-cr-0094 (E.D. Wis.).

28.     Criminal authorities across the United States have charged other individuals in connection with mass marketing and telemarketing schemes that obtained millions of dollars in fraud-induced money transfers that were sent from or received at Walmart locations.  *See*, *e.g.*, *U.S. v. Marcks*, No. 19-cr-0315 (D. Nev.) (five individuals charged in connection with India-based telemarketing and email marketing imposter scam targeting elderly consumers in the U.S. from June 2015 to April 2017 that falsely claimed consumers had outstanding taxes, open collection accounts, or other liabilities that required immediate payments to avoid adverse action; at least two defendants have pleaded guilty to conspiring with others in this scheme; internal documents show that Walmart later became aware that this scheme's runners picked up at least 874 fraud-induced transfers totaling over $545,000 at Walmart locations); *U.S. v. Parmar*, No. 19-cr-0160 (E.D. Va.) (six individuals charged in connection with international telemarketing scam involving government imposter and loan scams, including two individuals who pleaded guilty to working with others to pick up millions of dollars in fraud-induced money transfers from U.S. consumers, often at Walmart locations, from at least March 2017 until April 2019); and *U.S. v. Hines*, No. 17-cr-1038 (N.D. Iowa) (six individuals pleaded guilty to involvement in relative-in-need or "grandparent" telemarketing scam that used money transfers to bilk elderly consumers in the U.S. between December 2015 and September 2016; Walmart documents show the scheme used Walmart locations to pick up fraud-induced transfers); *see also U.S. v. Smith*, No. 21-cr-0372 (M.D. Pa.) (two individuals charged in connection with an advance-fee sweepstakes scam conducted from October 2016 to June 2018 in which Jamaica-based fraudsters contacted victims by telephone or through the Internet; the defendants regularly received fraud-induced money transfers from multiple Walmart locations, including from multiple Walmart locations in the same day); and *U.S. v. Budhadev*, No. 20-cr-0252 (M.D. Pa.) (individual charged in connection with various India-based mass marketing schemes, including an advance-fee

13

government grant scam, in which the fraudsters contacted victims by telephone or through the Internet; the defendant was charged with picking up over $500,000 in fraud-induced money transfers between October and December 2015, including over 300 money transfers totaling more than $407,000 from over 250 senders at seven Walmart locations). These schemes often involved suspicious money transfers for high-dollar amounts using fake IDs and/or money mules to pick up the proceeds of telemarketing and other frauds at Walmart locations.

29.     Consumers who use Walmart's money transfer system are often not in a position to prevent fraud-induced transfers. By the time they come to Walmart to send money transfers, they already have been deceived by fraudulent schemes. Often, based on false promises or even fear of financial or legal consequences, they feel compelled to complete the transactions. Many consumers are not aware of the heightened risks associated with money transfers, such as a dramatically diminished possibility of fraud detection or transaction reversal as compared to other payment mechanisms, such as credit card transactions.

30.     Walmart typically directs consumers to report fraud to its money transfer providers, which maintain databases of complaints and other reports they receive about fraud (hereinafter collectively "complaints"). For many years, those companies have shared complaints with Walmart about money transfers sent and/or received at its stores. Based on information in MoneyGram's, Ria's, and Western Union's databases, between January 1, 2013 and December 31, 2018, those companies received at least 226,679 complaints about fraud-induced money transfers that were sent from or received at a Walmart location, totaling at least $197,316,611 (including fees). Of those complaints, MoneyGram received at least 176,672 complaints totaling at least $159,594,760, Ria received at least 43,603 complaints totaling approximately $32,741,213, and Western Union received at least 6,404 complaints totaling approximately $4,980,638. The average individual consumer fraud loss reflected by those

complaints was approximately $870 from 2013 through 2018. These complaints represent only a small percentage of the actual fraud perpetrated through money transfers sent from or received at Walmart locations.

31.　　Walmart is responsible for a significant proportion of the complained-about fraud-induced money transfers flowing through its providers' money transfer systems. In fact, historically, Walmart has been responsible for more complaints about fraud-induced money transfers than any other agent worldwide. For example, for MoneyGram, between January 1, 2013 and December 31, 2018, Walmart was responsible for approximately 56 percent of all complaints about fraud-induced money transfers through MoneyGram worldwide. For Ria, from 2015 through 2018, Walmart was responsible for between approximately 80 to 93 percent of all of the complaints about fraud-induced money transfers through Ria worldwide. For Western Union, between January 1, 2013 and December 31, 2018, Walmart was responsible for approximately 22 percent of all complaints about fraud-induced money transfers in Canada, where Walmart is one of its agents.

**Walmart's Role in Detecting and Preventing Fraud**

32.　　As an agent dealing directly with consumers who send and receive money transfers through one or more providers, Walmart is well positioned to detect and prevent fraud-induced transfers.

33.　　Walmart's role as a large agent offering multiple money transfer services makes it integral to that effort because Walmart controls whether to: implement and maintain policies and procedures concerning fraud-induced transfers, educate and train its employees on consumer fraud, supervise its employees to ensure that they are complying with anti-fraud policies and procedures, provide fraud warnings to consumers, monitor and investigate money transfer activity to identify unusual or suspicious activity, and take actions to prevent consumers from

sending or receiving fraud-induced money transfers, including those related to telemarketing. Indeed, Walmart is in fact obligated to do many of these things by contract or court order.

34. Walmart has entered into written agreements with MoneyGram, Ria, and Western Union to provide money transfer services. These agreements require Walmart to comply with its providers' policies and procedures, maintain records of money transfers it processes, and train its employees about compliance and the prevention of fraud and money laundering involving money transfer services at its locations. These agreements also require Walmart to allow only authorized persons to access their systems and to prevent unauthorized use by providing access credentials, including passwords. Walmart's agreement with MoneyGram, for example, requires it to maintain its own effective policies and procedures designed to detect and prevent consumer fraud, monitor all transactions conducted by Walmart, investigate activity consistent with money laundering and financial crimes, and take measures to prevent its services from being used to facilitate fraud and money laundering. Walmart's agreement with Western Union requires it to monitor its personnel's performance of responsibilities under the contract and to notify Western Union and remedy any deficiencies. Walmart's agreement with Ria provides that both parties are responsible for their own fraud prevention programs and Walmart also is responsible for training its employees and assumes full responsibility for supervising its employees' conduct. Under their agreements, Walmart's providers have the right to audit Walmart's records, compliance, and training of employees, but only with advance written notice. Walmart has commission, fee, and bonus arrangements with its providers that are based on the transactions it processes.

35. Since in or around October 2009, MoneyGram and its agents, including Walmart, were subject to the Stipulated Order for Permanent Injunction and Final Judgment in *FTC v. MoneyGram*, No. 09-cv-6576 (N.D. Ill. Oct. 19, 2009) ("2009 Order"). Among other things, the

2009 Order enjoined violations of any provision of the TSR, as promulgated or later amended, by providing substantial assistance or support to any seller or telemarketer, and also enjoined MoneyGram and its agents from failing to establish, implement, and maintain a comprehensive anti-fraud program designed to protect U.S. and Canadian consumers from fraud-induced money transfers worldwide. The 2009 Order's requirements included, but were not limited to, providing warnings to consumers, providing appropriate and adequate ongoing education and training on consumer fraud at all locations, taking reasonable steps to monitor and investigate activity at locations to detect and prevent fraud, taking reasonable steps to identify locations that are involved or complicit in frauds, and routinely reviewing and analyzing data regarding money transfer activities that are unusual or suspicious. On February 1, 2010, Walmart acknowledged receipt of the 2009 Order. In several presentations made to FTC staff, beginning in or around April 2010, Walmart representatives committed to developing a plan to reduce fraud that would focus on associate training and consumer education. Walmart also represented that it had already implemented a comprehensive anti-fraud program.

36.     On December 14, 2015, the FTC published a notice that it had adopted amendments to the TSR, including a prohibition against using "cash-to-cash" money transfers for outbound and inbound telemarketing transactions. 80 Fed. Reg. 77520 (Dec. 14, 2015). This amendment became effective on June 13, 2016, and it prohibits the use of such money transfers for goods or services offered or sold through telemarketing or charitable contributions solicited or sought through telemarketing.

37.     In or around January 2017, Western Union and its agents, including Walmart, became subject to the Stipulated Order for Permanent Injunction and Final Judgment in *FTC v. Western Union*, No. 17-cv-0110 (M.D. Pa. Jan. 19, 2017) ("2017 Western Union Order"). Under that order, Western Union and its agents must establish, implement, and maintain a

comprehensive anti-fraud program designed to protect consumers worldwide by detecting and preventing fraud-induced money transfers. The order's requirements also include, but are not limited to, providing warnings to consumers, appropriate and adequate education and training to front line employees, monitoring of activity to prevent fraud-induced money transfers, investigation of and disciplinary action against agents, and adequate systematic controls to detect and prevent fraud-induced money transfers. The order also addresses compliance with the TSR Amendment's prohibition of cash-to-cash money transfers and requires Western Union and its agents to identify, prevent, and stop cash-to-cash money transfers initiated or received in the U.S. from being used as a form of payment in telemarketing transactions. These requirements include asking consumers before they transfer money whether their transfers are to pay for goods or services offered or sold through telemarketing and declining to process such money transfers. Finally, the order mandates that Western Union and its agents warn consumers that it is illegal for any seller or telemarketer to accept money transfers as payment for goods or services sold through telemarketing. On January 27, 2017, Western Union provided Walmart with a copy of the 2017 Western Union Order.

38.     In November 2018, a Stipulated Order for Compensatory Relief and Modified Order for Permanent Injunction ("Modified Order") was entered against MoneyGram. That Modified Order expanded the anti-fraud requirements of the 2009 Order to protect consumers worldwide and has similar requirements to the 2017 Western Union Order. It also required MoneyGram to pay $125 million in compensatory relief. On December 5, 2018, Walmart acknowledged receipt of that order.

39.     Walmart's agreements with its providers require it to comply with any orders, judgments, or decrees that apply to its providers, as well as any applicable laws. As an MSB, Walmart is required by the BSA to have an effective AML program to guard against money

laundering, including, but not limited to, guarding against the flow of illicit funds, such as funds derived from fraud.

40.     Even in the face of these independent obligations to detect and prevent consumer fraud and money laundering, for many years, Walmart has failed to: (a) establish, implement, and maintain a comprehensive and effective anti-fraud program designed to detect and prevent consumer fraud; (b) properly train and ensure that its employees are knowledgeable about anti-fraud and AML policies and procedures designed to prevent consumer fraud; (c) adequately oversee and supervise employees responsible for providing money transfer services at its locations; (d) adequately monitor and investigate unusual or suspicious activity at its locations to prevent fraud-induced money transfers; (e) stop money transfers that Walmart or its employees should know or suspect are fraud-induced; (f) adequately collect, record, and report consumer fraud involving money transfers at its locations; and (g) take other reasonable steps to prevent fraudulent telemarketers, sellers, and con artists from using money transfer services offered by Walmart to perpetrate their frauds.  In some cases, Walmart has failed to adopt effective policies concerning these practices, while in others, Walmart has failed to adhere to, or has violated, its providers' policies and procedures or its own anti-fraud and AML programs, policies, and procedures.

## WALMART HAS REGULARLY PROCESSED FRAUDULENT MONEY TRANSFERS

41.     Perpetrators of many different types of mass marketing and imposter scams have relied on money transfer systems, including MoneyGram's, Ria's, and Western Union's systems, as a means of fraudulently obtaining money from consumers around the world—especially U.S. consumers.  The types of scams include, but are not limited to, online or Internet purchase scams, person-in-need (including grandparent) scams, Good Samaritan or charity scams, investment scams, employment scams, rent scams, romance scams, advance fee loan scams, debt relief

scams, lottery or prize scams, imposter scams, and cyber or malware scams. All of these scams operate deceptively in violation of Section 5 of the FTC Act, and many of the scams also involve fraudulent telemarketing in violation of the TSR. In these scams, consumers often are instructed over the telephone, through text message, by email, or over the Internet to send money transfers. The telemarketers and con artists use false or misleading statements to induce consumers either to pay for purported goods or services, such as loans or large cash awards, or to make payments as a result of purported circumstances, such as emergencies, that do not exist.

42.     Victims of fraud-induced money transfers often send their money transfers from Walmart locations. In some cases, fraudsters even direct consumers to send their money transfers from a Walmart location. In many cases, older consumers (ages 65 and older) have been financially exploited by sending money transfers in connection with common telemarketing scams, such as grandparent scams, Good Samaritan scams, lottery or prize scams, and romance scams, from Walmart locations. The average loss suffered by older consumers is usually greater than for younger consumers. In addition, perpetrators of the scams, or those acting on their behalf, including fraud rings and money mules, frequently collect the proceeds of the frauds from Walmart locations, and in some instances, those individuals have even been employees of Walmart.

43.     MoneyGram's, Ria's, and Western Union's records show that Walmart has been responsible for a substantial amount of fraud-induced money transfers through their money transfer systems. As Walmart is aware, many fraud-induced money transfers described in those records involve telemarketing scams. Between January 1, 2013 and December 31, 2018, Walmart locations were responsible for processing at least $197,316,611 in money transfers that were the subject of complaints and over $1.3 billion money transfers that were related to those complaints and therefore could have been fraud-induced.

a. Information from MoneyGram indicates that between January 1, 2013 and December 31, 2018:

1) MoneyGram received a total of at least 176,672 complaints reporting losses of $159,594,760 (including fees) involving Walmart, including complaints about the following scams, which typically involve telemarketing:

a) at least 19,035 complaints with losses of $19,386,770 about person-in-need or grandparent scams;

b) at least 15,401 complaints with losses of $7,749,949 about advance fee, loan-grant, or other loan scams;

c) at least 10,192 complaints with losses of $7,844,700 about romance scams;

d) at least 8,375 complaints with losses of $5,879,474 about lottery scams;

e) at least 1,590 complaints with losses of $1,971,761 about IRS and utility scams, including investment scams involving IRS imposters; and

f) at least 355 complaints with losses of $351,857 about cyber, malware, or other tech support scams.

2) An additional 695,404 money transfers with total losses of $376,322,686 (including fees) were linked to complaints received by MoneyGram about fraud-induced money transfers involving Walmart.

3)      Although Walmart has accounted for approximately 26 percent of MoneyGram's money transfers based on volume and approximately 24 percent based on dollar amount, Walmart was responsible for sending or paying out approximately 56 percent of all complained-about fraud-induced money transfers worldwide through MoneyGram.

b.      Information from Ria indicates that between April 24, 2014 and December 31, 2018:

1)      Ria received a total of at least 43,603 complaints reporting losses of $32,741,212.93 (including fees) that were sent from or received at a Walmart location, including complaints about the following scams, which typically involve telemarketing:

a)      at least 4,815 complaints with losses of $2,525,065 about prize and lottery scams;

b)      at least 3,092 complaints with losses of $1,809,725 about Good Samaritan scams;

c)      at least 1,641 complaints with losses of $884,413 about romance and online dating scams;

d)      at least 1,514 complaints with losses of $2,035,382 about emergency or grandparent scams;

e)      at least 924 complaints with losses of $623,907 about advance-fee loan scams;

f)      at least 855 complaints with losses of $565,062 about elder abuse scams;

g)      at least 385 complaints with losses of $256,270 about debt relief scams; and

h)      at least 54 complaints with losses of $62,532 about IRS imposter scams.

2)      An additional 2,056,697 money transfers totaling $878,383,329.49 (without fees) were transactions conducted by senders or recipients of fraud-induced money transfers, and therefore, were potentially related to fraud.

3)      Walmart has accounted for approximately 36 percent of Ria's money transfers based on volume and approximately 27 percent of Ria's money transfers based on dollar amount, but in 2017 alone, Walmart accounted for approximately 93 percent of Ria's fraud cases based on volume and approximately 89 percent of Ria fraud cases based on dollars. In 2018, Walmart accounted for approximately 87 percent of Ria's fraud cases based on volume and approximately 90 percent of Ria fraud cases based on dollars.

c.      Information from Western Union indicates that between January 1, 2013 and December 31, 2018:

1)      Western Union received a total of at least 6,404 complaints reporting losses of $4,980,638.36 (including fees) involving Walmart in Canada, including 1,889 complaints totaling $1,228,446 about transfers that originated from or were paid out in the United States.

2) An additional 146,213 money transfers totaling approximately $93,270,569.72 (including fees) were identified by Western Union as being related to senders or receivers of confirmed fraud transactions, transactions considered to be potential fraud after an investigation of a Walmart location, or transactions associated with risky typologies associated with consumer fraud scams.

3) Altogether, Walmart was responsible for sending or paying out approximately 22.1 percent of all complained-about fraud-induced money transfers in Canada through Western Union.

44. After the maximum dollar amount for Walmart2Walmart money transfers increased from $900 to $2,500 in October 2016, there was a significant increase in fraud transactions involving Ria. In fact, between August 2016 and August 2017, the volume of fraud involving Walmart2Walmart money transfers increased by 374 percent, even though the transaction volume of such transfers had only increased by 54 percent. In September 2016, a month before Ria increased the limit of a Walmart2Walmart transaction, Ria received 574 fraud reports totaling $293,249.87 for that month. Six months later, in March 2017, Ria received 1,336 fraud reports totaling $1,318,138.19—more than four times the reported fraud amount from September 2016. Moreover, after increasing the maximum dollar amount of a Walmart2Walmart transfer, the number of annual fraud reports to Ria more than doubled between 2016 and 2017 from 8,112 to 16,922 fraud cases, and the amount of reported fraud loss more than tripled from $4,659,930.43 to $14,371,085.60. Those fraud report numbers remained high throughout 2017, with the average monthly fraud volume at 1,410 complaints totaling $1,197,590.47 in losses. By March 2018, the monthly reported fraud volume involving Walmart2Walmart transfers reached a peak of 1,751 complaints totaling $1,578,412.95.

45.     In March 2017, at least 4,974 fraud-induced money transfers totaling $5,081,268.62 were reported to MoneyGram and Ria concerning transactions that were either sent from or paid out at a Walmart location, or both.  These were the largest monthly totals of reported fraud-induced transfers since February and March 2016, when MoneyGram experienced technical problems with its interdiction system, as described below.

46.     For many years, Walmart also has been aware of consumer fraud involving its stores, including particular locations that had very high levels of consumer fraud and suspicious activities.  In fact, MoneyGram and Western Union have provided information to Walmart about certain locations in the United States and Canada that had fraud rates of more than 25 percent, 50 percent, or even 75 percent of their money transfer activity (based on the number or dollar amount of transactions) when taking into account confirmed fraud and linked or potential fraud.  Although Ria did not provide Walmart with similar information about fraud rates at its locations based on confirmed and linked or potential fraud, it did provide Walmart with information about confirmed fraud at locations, as well as unusual or suspicious activity, such as transactions that had bad addresses, including addresses that were P.O. boxes, incomplete, or listed as "anywhere," "unknown," or "not given."

47.     In May 2018, Walmart conducted an analysis of Walmart locations in the United States that would be classified as an Elevated Fraud Risk Agent Location ("EFRAL") under the 2017 Western Union Order, and determined that, from January 2017 through January 2018, there were 317 instances in which Walmart stores met the EFRAL criteria, including 12 stores that had 15 or more complaints in a two-month period.  The remaining 305 stores had five or more complaints that amounted to five percent or more of money transfers received at those locations.  Those 317 separate instances involved 190 unique Walmart store locations because some of the stores had met the criteria more than once.

**Walmart has Failed to Effectively Detect and Prevent Fraud-Induced Money Transfers**

48.     For many years, perpetrators of frauds, including fraudulent telemarketers, sellers, and con artists, have accessed and exploited Walmart's money transfer services, and Walmart's locations have played an integral role in the scams. Walmart's locations have been more susceptible to fraud-induced money transfers in part due to the thousands of associates authorized to provide money transfer services at its locations, the high turnover rate of associates, heavy customer traffic, and/or various shifts of associates working at a single location. In addition, as a dual agent for MoneyGram and Ria in the United States, there is a heightened risk of consumer fraud at its locations because consumers can send and receive money transfers through two different money transfer companies without being detected by those companies. Walmart has been, or should have been, well aware of these facts.

49.     Walmart nonetheless has failed to take basic and important steps to address consumer fraud, including by failing to implement and maintain effective policies and procedures to detect and prevent fraud, provide education and training that included clear directions to its employees about detecting and preventing consumer fraud, supervise and oversee its employees to ensure that they are complying with anti-fraud and AML policies and procedures, routinely provide fraud warnings to consumers, adequately monitor and investigate money transfer activity to determine if there is any unusual or suspicious activity, and take effective actions to prevent consumers from sending or receiving fraud-induced money transfers, including those related to telemarketing.

50.     In many instances, Walmart's locations have not complied with Walmart's providers' anti-fraud or AML policies and procedures. Walmart also has not taken adequate and timely steps to address the deficiencies and inconsistencies in its own anti-fraud program, policies, and procedures and to address consumer fraud at its locations. In addition, in some

cases, Walmart has had corrupt or complicit employees at its locations that have facilitated the payments of fraud-induced money transfers. As a result of Walmart's failure to implement and maintain a comprehensive anti-fraud program to detect and prevent consumer fraud, it has played a significant role in sending and receiving fraud-induced money transfers through its providers' money transfer systems. These failures have caused many millions of dollars in consumer losses, without providing benefits to consumers or competition that has outweighed the harm suffered by defrauded consumers.

### *Walmart has Failed to have a Comprehensive Anti-Fraud Program*

51.     For many years, Walmart has failed to establish, implement, and maintain its own comprehensive anti-fraud program, policies, procedures, and controls designed to detect and prevent consumer fraud even though Walmart has been aware that there was a substantial amount of fraud-induced money transfers moving through the money transfer systems at Walmart's locations. Until in or around November 2014, Walmart did not even have a written anti-fraud and consumer protection program documenting its policies and procedures for detecting and preventing consumer fraud at its locations.

52.     Even after establishing a written anti-fraud program, in some cases, Walmart violated its own program requirements. For example, although Walmart's anti-fraud program required stores that had been identified by its providers as having higher incidents of fraud received at their locations to complete "Receive Fraud Training" within seven days of when the training was assigned, in many cases, those locations did not comply with that requirement. In some cases, the training required by MoneyGram at particular locations was not completed for months after Walmart's policies required it. In addition, even though Walmart's anti-fraud program required Walmart stores to have certain consumer education and awareness materials,

including consumer fraud warnings and pamphlets, in many cases, Walmart locations have not complied with those requirements.

53.     For many years, Walmart's anti-fraud program also had no written procedures for its associates to prevent suspected or known fraud-induced money transfers from being paid out at its locations.  For example, in Walmart's July 2014 and November 2017 programs, although there were written procedures on how Walmart associates should respond when they suspected that senders of money transfers may be victims of fraud, there were no written procedures for how Walmart associates should respond when they suspected that receivers of money transfers may be potential fraudsters.

54.     On April 19, 2017, MoneyGram conducted a Home Office Review of Walmart's anti-fraud program and found that: (1) Walmart had not effectively prevented fraud transactions; (2) Walmart had not properly completed required information on transaction records; and (3) Walmart had not reported, filed, or referred all Suspicious Activity Reports ("SARs") as required.  In an August 10, 2017 letter to Walmart, MoneyGram explained that the main concern for the finding that Walmart had not effectively prevented fraud transactions was because, "at the policy level," Walmart was "not reject[ing] potential consumer fraud related transactions on the receive end."

### Walmart's Deficient Practices Related to Receive-Side Fraud

55.     According to Walmart's written anti-fraud program, Walmart's goal was "to educate, detect, investigate, respond, and deter consumer fraud against our customers."  Despite that stated goal, Walmart failed to implement practices designed to effectively detect and prevent fraud-induced money transfers received at its stores, and instead assisted and facilitated fraud by adopting practices that were harmful to consumers.  For example, in 2015, Walmart adopted a practice of not training its employees to deny or reject payouts to suspected fraudsters at the

28

point of sale. Although Walmart trained its employees to refuse to send money transfers if they believed the sender was a victim of fraud (referred to as "send-side fraud"), it did not direct its employees to deny or reject payouts to receivers of suspected fraud-induced money transfers (referred to as "receive-side fraud"). Instead, Walmart's training instructed employees not to deny those transfers, but instead to report them by faxing a paper Money Services Activity Report ("MSAR") to Walmart's Home Office. In May 2017, Walmart replaced this paper MSAR system with an Electronic Money Services Activity Report ("eMSAR"), as described below. In addition, the Quick Reference Guide for employees that was in use from in or around November 2016 until sometime in 2018, stated, "If you suspect fraud, complete the transaction," and report it to MoneyGram and Walmart's Home Office. Walmart adopted this practice despite knowing that once the money transfers were paid out to suspected fraudsters, fraud victims typically could not get their money back. Walmart continued this practice despite being told by MoneyGram, after MoneyGram learned about this practice in 2015, that it expected Walmart and its employees not to pay out money transfers to suspected fraudsters.

56.     By failing to have consistent policies, procedures, and practices requiring its employees at its stores to deny and not pay out money transfers to suspected fraudsters, Walmart's locations were more susceptible to consumer fraud, thereby substantially assisting fraudsters, including telemarketers and sellers, and causing significant financial injury to victims of fraud-induced money transfers. From September 2015 through October 2018 and again from December 2018 through May 2019, Walmart's receive-side fraud rate by volume for domestic transfers through MoneyGram was higher than the rates for the rest of MoneyGram's agent network in the United States. In March 2017 alone, Walmart's fraud rate for receive-side fraud based on the dollar value was approximately three to four times higher than the rest of MoneyGram's U.S. agents.

57.     Walmart did not begin to adjust its practice of not training its employees to reject suspected receive-side fraud transfers at the point of sale until May 2017—after MoneyGram began suspending Walmart locations for the first time.  Even then, this remedial training was only provided to some Walmart employees at problematic locations that MoneyGram required to have additional training because the locations had been suspended or identified as having higher incidents of consumer fraud.

58.     Walmart's remedial training included instructions about the company's new eMSAR process for canceling and reporting transactions to Walmart's Home Office, which did not effectively address Walmart's handling of receive-side fraud.  For example, from May through at least October 2017, Walmart's remedial training instructed associates to reject certain suspected receive-side fraud transactions at the point of sale by using the "Scam" option in eMSAR—but the eMSAR menu interface contradicted this, stating instead that the option was to be used *only* for fraud against Walmart customers who may be victims of a scam or against Walmart itself, rather than for potential fraudsters.  In addition, although there was an option in eMSAR for "Suspicious Behavior During a Money Transfer Receive," the eMSAR menu indicated that associates should only use that option when the customer had received *more than* five different transactions in a single day—five fraud-induced money transfers per day would not qualify.  And even worse, the direction in eMSAR was only to report, but not to cancel, those transactions.

59.     In or around November 2017, Walmart finally changed its remedial training, as well as its eMSAR menu, to instruct associates to use the "Suspicious Behavior During a Money Transfer Receive" to cancel certain suspicious transactions on the receive side at the point of sale.  However, Walmart still directed its associates to use that option only in two very limited circumstances: (1) when a customer had multiple high-dollar amount receives during the same

day or multiple times a week, or (2) when a customer presented different IDs during different visits, such as IDs with different names. The only other eMSAR option that could apply to suspected receive-side fraud, "Conversation (Customer said something suspicious to you or another customer)," only instructed employees to report the transaction to Walmart's Home Office, but did not instruct them to cancel it.

60.     From May 2017 until late 2018, regardless of whether associates used the "Scam" or "Suspicious Behavior During a Money Transfer Receive" option to cancel transactions, those eMSAR options only reported the transactions to Walmart's Home Office. That meant suspected fraudsters could go to another Walmart employee or to a different location to pick up their transfers, because information about those customers and their cancelled transactions were not necessarily reported to MoneyGram or Ria in a timely fashion. Although Walmart's remedial training at this point also instructed associates to call the provider (MoneyGram or Ria) to report their suspicions after the customer left, so that the provider could systematically block the transfer from being picked up elsewhere, Walmart associates often failed to do so.

61.     In addition, Walmart's regular annual training and resource materials for employees in Walmart's Customer Service Desks and MoneyCenters gave contradictory guidance regarding the handling of receive-side fraud—they continued to direct employees not to deny and to "complete" the suspected fraud transactions, and only then to report them as suspicious. Walmart's annual training for salaried managers also provided more limited content on consumer fraud overall and only focused on refusing to send, but not refusing to pay out, potential fraud-induced money transfers.

62.     Walmart did not update its annual training to instruct associates that if they "have identified a potential fraudster," they should refuse the transaction and report it using the eMSAR process until at least late 2018. Even then, however, Walmart still gave its associates

mixed signals, telling them elsewhere in the training that they should not deny a suspicious transaction when a customer has received "large dollar amounts, multiple times a day," and he "appears nervous and has gone to different registers each time." Because this was an annual training, moreover, many Walmart associates did not have to complete this training until sometime in 2019.

63. Although the updated annual training for both associates and supervisors instructed that "managers and supervisors should not override your decision to reject a financial service transaction when you suspect the customer may be a victim of a fraud or scam," it did not provide the same instruction for a payout to a potential fraudster. The updated annual training for salaried managers also continued to focus only on refusing the transactions of customers who may be victims of fraud. Therefore, this updated annual training continued to provide inconsistent instructions for employees regarding the handling of suspected receive-side fraud.

64. It was only in late 2018 that Walmart's eMSAR process became automated so that it could transmit information directly to Walmart's providers without Walmart associates having to make a phone call to the provider to report suspected fraudsters. Despite that, in many cases, the eMSAR process for preventing payouts of fraud-induced money transfers and training has continued to be ineffective because (1) Walmart's annual training has provided inconsistent instructions on the handling of suspected receive-side fraud; (2) as described more fully below, Walmart has failed to ensure that its employees are properly trained and knowledgeable about the use of Walmart's eMSAR process for stopping suspected receive-side fraud; (3) Walmart's eMSAR menu options relating to receive-side fraud continue to be too limited, and include only such circumstances as multiple high-dollar money transfers received during the same day or over multiple weeks, or customers presenting different IDs during different visits; and (4) managers at Walmart locations have sometimes overridden associates' decisions not to complete transfers

even when associates have detected unusual or suspicious activity. As of at least August 2018, Walmart also had not implemented the eMSAR process at its locations in Mexico even though it was known to be one of the top five destinations for international fraud-induced money transfers.

65. For many years, despite Walmart's awareness that its locations have been used by known and suspected fraudsters to receive funds for scams, many of which have been executed through telemarketing, Walmart did not routinely train or instruct its associates to ask consumers receiving suspicious money transfers questions about the nature or purpose of their money transfers. Since the TSR Amendment went into effect in June 2016, Walmart also has not trained or instructed its associates to ask questions about whether consumers are receiving funds as payments for goods or services sold over the phone or for charitable contributions solicited or sought over the phone.

### *Walmart's Deficient Practices Related to Send-Side Fraud*

66. Walmart also has failed for many years to effectively prevent consumers from sending fraud-induced money transfers, including those related to fraudulent telemarketing sales and illegal telemarketing payments, from Walmart locations. Despite Walmart's awareness that its locations were often used to send fraud-induced money transfers, for years, Walmart failed to provide clear and consistent instructions to its associates in its annual and remedial training, as well as in some of its resource materials, about the necessary steps to effectively report and stop those transfers. As a result of Walmart's lax practices, in many cases, it has failed to prevent senders of fraud-induced money transfers, particularly the elderly, who are frequently defrauded through telemarketing schemes, from being victimized in a variety of scams, including, but not limited to, grandparent scams, Good Samaritan scams, lottery or prize scams, and romance scams. In some cases, fraudsters have even directed consumers to send their money transfers from Walmart locations due to Walmart's lack of safeguards.

67.     In many cases, Walmart has failed to take adequate measures to prevent consumers from sending money transfers that have characteristics indicative of fraud, such as multiple money transfers in relatively short periods of time, transfers to high-risk countries known for fraud, transfers in amounts that far exceed the average money transfer, and transfers to different individuals.  For example, from February to March 2017, Walmart sent 52 transfers totaling $51,000 for one potential victim of elder financial exploitation to seven different receivers in Ghana and the United States.  Similarly, in March to April 2017, Walmart sent 33 transfers totaling $54,550 for another such victim to a recipient in Ghana.  Only after these numerous suspicious transfers and huge dollar losses were these matters finally referred to law enforcement and Walmart's providers.  From May to July 2017, moreover, Walmart sent 42 transfers totaling $71,235.16 for another customer to ten different receivers in Ghana, the United States, and Turkey before Walmart finally referred the matter to law enforcement and the provider after receiving multiple referrals from Walmart associates.  According to one referral from a Walmart associate, the customer indicated he was sending the money to buy millions of dollars in gold.

68.     In many cases, Walmart locations have also not provided required warnings to senders about common money transfer frauds sent or received through its stores.  For example, even though FTC orders have required Walmart to use send forms that include a consumer fraud warning on the front page, in some cases, Walmart stores were missing the required send forms, or have used send forms that omitted the required consumer fraud warnings.  In other cases, Walmart stores have not displayed consumer fraud warning signs or had consumer fraud brochures or pamphlets available.  For example, in a presentation provided to Walmart in October 2019, Ria expressed concern that 39 percent of the Walmart stores it visited between

January and August 2019 were missing fraud awareness materials, and it also noted that 24 percent of the stores were missing send forms.

69.     Signs and send-form warnings alone are not enough, however, because consumers are not generally aware of the risks associated with money transfers, including the possibility that recipients can use false information or fake IDs to pick up money transfers.  Despite being well aware of these risks, Walmart for years failed to take adequate steps to address them.  Until at least March 2019, Walmart did not even take steps to ensure that its associates asked senders questions about whether their transfers were related to telemarketing or warned them about the fact that the TSR prohibits cash-to-cash money transfers as a form of payment for telemarketing transactions.

### *Walmart has Failed to Properly Train its Employees about Anti-Fraud and AML Policies and Procedures*

70.     Walmart and its providers have historically recognized that employees responsible for processing money transfers are the first line of defense in detecting and preventing consumer fraud, and Walmart's providers have relied on Walmart to train its own employees in the policies and procedures required for detecting and preventing fraud.  Although Walmart has long been aware of the importance of training employees responsible for providing or supervising money transfer services, it has failed to ensure that its employees are properly trained and are sufficiently knowledgeable about anti-fraud and AML policies and procedures. These employees may perform up to hundreds of thousands of dollars in financial transactions for consumers during a single shift.  On numerous occasions, Walmart also has failed to promptly provide mandatory consumer fraud training as a remedial action for all employees at its high or higher fraud locations identified by its providers.  For years, although MoneyGram

required Walmart to provide remedial training to employees at high-fraud locations, Walmart failed to ensure that all employees at those locations had promptly received the required training.

71.     Walmart's written policy, as well as Walmart's contractual obligations with its providers, recognize the importance of training and require that all Walmart employees responsible for providing money transfer services receive initial and ongoing training.  Walmart has primarily provided this training through annual computer-based learning.  For many years, however, Walmart has failed to ensure that its employees responsible for providing money transfer services have taken the required training, are up to date on their training, or taken relevant training before providing money transfer services.  For example, until at least September 2015, Walmart did not even begin providing required training for the tens of thousands of secondary employees, who fill in for the primary employees responsible for providing money transfer services.  Moreover, Walmart's Home Office did not have the ability to assign all of the relevant training relating to providing money transfer services to its secondary employees at Walmart locations until sometime in mid to late 2018.

72.     For many years, Walmart's annual training for associates, supervisors, and managers with responsibilities for providing money transfer services have included limited information about detecting and preventing consumer fraud involving money transfers.  For example, Walmart's annual training, which takes between 20 to 45 minutes to complete, has primarily covered AML topics, while providing only limited directions on the handling of suspected fraud-induced money transfers.  As described above, for many years, Walmart's annual trainings did not even direct its associates to reject paying out money transfers if they suspected that the customers were fraudsters.  In addition, Walmart's trainings for its managers provided very little information about detecting and preventing fraud-induced money transfers.

73. Despite receiving advance notice from its providers that they were going to be conducting compliance reviews or audits of certain Walmart locations, for many years, the providers have found that Walmart's employees lack the proper training and knowledge about anti-fraud and AML policies and procedures relating to money transfers, including with respect to detecting and preventing fraud, accurately recording customers' biographical information and IDs, and reporting, stopping, or otherwise addressing suspicious activities at those locations.

74. A 2014 audit conducted by MoneyGram found that numerous Walmart locations had untrained or undertrained employees providing or supervising money transfer services in Walmart's Customer Service Desks and MoneyCenters. MoneyGram informed Walmart that an audit of 397 Walmart locations disclosed that 1,863 "primary and secondary" employees responsible for processing money transfers had not had either initial or ongoing training, and 68 percent of them were secondary employees who had never taken the required training. Walmart's internal documents indicate that MoneyGram's 2014 audit found that overall, 39 percent of Walmart locations had untrained primary employees and 60 percent had untrained secondary employees.

75. Even after Walmart implemented a new audit preparation protocol in early 2015, which involved corporate communications, conference calls, and webinars with the stores in advance of audits, Walmart still continued to have untrained or undertrained employees who provided, or supervised the provision of, money transfer services. For example, in March 2015, MoneyGram identified a Walmart store in Houston, Texas as having the largest number of untrained employees ever found in a MoneyGram audit. By May 2015, Walmart was aware that at least 15 percent of its stores continued to have untrained or undertrained employees working in, or supervising, money transfer services. Moreover, between January 2015 and July 2016, MoneyGram's review of 323 Walmart locations across the country revealed that 61 (or

approximately 19 percent) of them had employees who had not completed either initial or ongoing compliance-related training. Similarly, from July through September 2017, MoneyGram's reviews of 87 stores in 14 states revealed that 30 stores (or 34 percent) had employees who had not completed ongoing compliance-related training. Ria's reviews of stores resulted in similar findings. For example, in September and October 2018, Ria's reviews of 95 stores revealed that Walmart had at least 600 associates at those locations who were past due on training.

76.     Although Walmart recognized the need to implement point-of-sale register lockouts as a control to prevent employees who were not properly trained or knowledgeable about anti-fraud and AML procedures from processing money transfers, it took several years— until at least in or around mid to late 2018—for Walmart to finally implement the lockouts. However, even with the lockouts, Walmart's providers have continued to find locations that had untrained, undertrained, or unknowledgeable employees providing money transfer services. For example, in July 2019, Ria's reviews of 48 Walmart locations in four states continued to uncover associates with incomplete training and insufficient knowledge on a variety of anti-fraud and AML topics and procedures. Ten of those stores had unsatisfactory reviews, including two stores with repeat unsatisfactory reviews, and the findings included employees with little or no training, poor knowledge about anti-fraud and AML requirements (including Walmart's eMSAR process), and associates even sharing User or Operator ID numbers and passwords—a tactic Walmart's providers prohibit because it allows unauthorized users to access their money transfer systems.

77.     In addition to failing to conduct the required initial and ongoing training for employees, in many cases, Walmart also failed to provide prompt mandatory training when necessary for its employees. The 2009 Order required, among other things, that MoneyGram

and its agents take "[p]rompt disciplinary action…, including [by] requiring mandatory fraud training" against any location or person authorized to sell money transfer services to prevent fraud-induced money transfers.  Despite that requirement, in many cases, Walmart has not promptly trained its employees when MoneyGram identified particular locations that had high levels of fraud and required such training.  For example, in some cases, Walmart has failed to conduct prompt consumer fraud training and has had locations with outstanding mandatory trainings of more than 30, 60, or even 90 days.  For the reasons explained above, Walmart's remedial fraud training also has been deficient in many respects.

78.    For many years, the training and resource materials used by Walmart to educate its employees about anti-fraud policies and procedures also have been deficient.  For example, as explained above, while Walmart's training typically directed employees to refuse to send money transfers when they identified red flags indicating a sender may be a victim of fraud, until at least mid to late 2018, that training directed employees only to complete paper MSARs, but not to refuse payouts, when they identified red flags indicating a receiver may be a suspected fraudster. For many years, Walmart's resource materials also only focused on preventing fraud when employees suspected customers may be the victims of fraud, not the perpetrators.  A Walmart Quick Reference Guide even directed employees to complete transactions when they identified red flags indicating that customers may be receiving funds because they are committing consumer fraud.

79.    Even though Walmart has been aware for many years that consumers often use fake IDs when receiving fraud-induced money transfers, for years, Walmart has provided inadequate training and resource materials to its employees in detecting and preventing the use of fake IDs at its locations.

80.     For years, Walmart has failed to provide training to its employees about detecting and preventing money transfers that are being used to pay for goods or services offered or sold through telemarketing or for charitable contributions solicited through telemarketing, even though it has been aware that phone calls are commonly used to defraud consumers and the TSR Amendment has prohibited "cash-to-cash" money transfers for outbound and inbound telemarketing transactions since June 13, 2016.  For example, Ria has provided information to Walmart about fraud-induced money transfers involving telemarketing, including that from January to September 2018, the source of approximately 83 to 88 percent of fraud-induced money transfers through Walmart were schemes perpetrated over the phone, yet Walmart did not train its employees to detect and prevent money transfers from being used to pay for telemarketing transactions.  It was not until in or around March 2019, months after the 2018 MoneyGram order went into effect, that Walmart, at MoneyGram's request, began prompting its associates at the point of sale to ask senders whether they are "sending money for something a telemarketer sold" to them, and if the answer is "yes," to cancel and report the transaction.  At the same time, however, Walmart has failed to train its employees about what constitutes telemarketing.  Walmart also has not instructed its associates to ask recipients of money transfers questions about whether they are being paid for a telemarketing transaction, and if so, to cancel those transactions.  Since the TSR Amendment went into effect, phone calls have continued to be a large source of fraud-induced money transfers at Walmart locations.

### *Walmart has Failed to Properly Oversee its Employees Responsible for Providing Money Transfer Services*

81.     For many years, Walmart has failed to properly supervise the employees at its Customer Service Desk and in its MoneyCenters in the provision of money transfer services.  As an agent, Walmart has control over whether to conduct due diligence and background checks on

its employees, assign employees authorized to process money transfers with unique User or Operator ID numbers and passwords for their individual use, give employees resource materials containing information about policies and procedures relating to money transfer services, ensure that its employees are complying with all policies and procedures, and monitor the activities involving its Customer Service Desks and MoneyCenters to ensure compliance with all anti-fraud and AML policies and procedures. Indeed, Walmart's providers require Walmart to perform these oversight responsibilities.

82. Walmart's oversight of its employees at its Customer Service Desks and in its MoneyCenters is especially important because of the large number of employees responsible for providing money transfer services and the high volume of money transfers conducted at Walmart's locations. For example, in 2014, Walmart had approximately 2.2 million employees worldwide, of which approximately 1.3 million were based in the United States. Walmart has over 4,700 locations in the United States at which money transfer services are provided, and at any given time, over 60,000 employees provide money transfer services to consumers. These employees are responsible for handling over one billion financial transactions annually, which include tens of millions of money transfers sent from Walmart locations each year. In 2016 alone, Walmart sent approximately 43 million money transfers on behalf of its customers.

83. From 2017 through 2019, Ria's compliance reviews of Walmart locations have identified that a significant number of Walmart's stores are high risk for fraud (based on various risk factors) or have unsatisfactory reviews. For example, from January through September 2017, Ria's reviews of 731 stores revealed that 399 stores were considered "critical high risk," 192 stores were considered "high risk," and 61 stores had unsatisfactory reviews. From January through October 2018, Ria's reviews of 635 stores revealed that 230 stores were "critical high risk," 140 stores were considered "high risk," and 81 stores had unsatisfactory reviews. From

January through August 2019, Ria's reviews of 473 stores revealed that 188 stores were considered "critical high risk," 96 stores were considered "high risk," and 77 stores had unsatisfactory reviews. Overall, from January 2017 through August 2019, approximately 11 percent of the Walmart stores reviewed by Ria had unsatisfactory ratings.

84. Walmart is solely responsible for conducting background checks on its employees and assigning those associates authorized to process money transfers at its locations with unique User or Operator ID numbers. Walmart does not routinely share with its providers the names of or information about those employees unless they request that information. Nevertheless, Walmart has primarily relied on its providers for identifying corrupt or complicit employees at its locations, even though those individuals are employed and supervised by Walmart.

85. Walmart has failed to ensure that all of its Customer Service Desks and MoneyCenters have the required resource materials available to assist its employees in providing money transfer services. For example, even though Walmart requires its Customer Service Desks and MoneyCenters to have a Money Service Business Book, also referred to as an MSB Binder, and certain job aids, such as a Quick Reference Guide and an AML Infographic ("Infographic"), which include information about the procedures Walmart employees must follow when processing money transfers, including procedures relating to consumer fraud, compliance reviews by Walmart's providers have revealed that many Walmart locations were missing these materials. For example, in 2014, Ria's reviews of 298 high-risk stores revealed that nearly a quarter were missing the Quick Reference Guide. In February 2018, Ria's reviews of 65 stores in five states revealed that 12 percent were missing the Infographic and six percent were missing the Quick Reference Guide. More recently, in a July 2019 review conducted by Ria of 48 Walmart locations in four states, at least 14 stores were missing the required job aid, while an additional eight stores were missing certain materials that were supposed to be

contained in the MSB Binder. In addition, as described below, for many years, Walmart's providers have found that some Walmart stores did not have the required send forms (with consumer fraud warnings), fraud awareness brochures or pamphlets, or consumer fraud warning signs.

86. For many years, both MoneyGram's and Ria's compliance reviews of Walmart locations have also found that Walmart's employees have not been complying with the providers' and/or Walmart's policies and procedures for providing money transfer services. For example, in 2015 and 2016, MoneyGram's compliance reviews of hundreds of Walmart locations routinely found that Walmart's employees had failed to properly complete required information for transaction records, report or escalate suspicious activities as required, and verify customers' identities when required. In 2017, MoneyGram informed Walmart that throughout its monthly reviews of locations, it had repeatedly found that Walmart's locations were not properly completing required information in transaction records, and that "[c]apturing incomplete or incorrect data directly not only impacts MoneyGram's capacity to monitor and interdict customers efficiently, but it also affects Wal-Mart since it keeps bringing suspicious customers to Wal-Mart locations." For example, during MoneyGram's monthly call with Walmart on July 6, 2017, MoneyGram included information about its May reviews of 29 stores and highlighted that at least five of those stores had significant data integrity issues for money transfers sent from those stores. In fact, no physical address or an incomplete address (with no street name or house number) had been recorded for between 9 and 28 percent of all money transfers sent from those locations.

87. In addition, although Walmart's employees have been required to report suspicious activities through MSARs, and then eMSARs beginning in May 2017, they often have failed to do so. For example, from July through September 2017, MoneyGram's reviews of 87

stores in 14 states revealed that 64 percent of the locations were not knowledgeable about eMSARs or were not escalating or referring eMSARs as required.  In January 2018, a MoneyGram audit of 24 stores in Florida and Texas, which had over 50,000 money transfers sent and over 19,000 money transfers received in a three-month period, revealed that: (1) 25 percent of the stores were not executing eMSARs—which meant they were not stopping fraud at the location; (2) 58 percent of the stores were executing eMSARs, but then not calling MoneyGram to ensure that the consumers' money transfers were stopped; (3) 33 percent of the stores had secondary associates who were authorized to provide money transfer services, but were not experienced or knowledgeable about how to execute eMSARs; and (4) 16 percent of the stores had associates who were identified as needing to be removed from their roles in financial services.

88.     MoneyGram's reviews in 2018 and 2019 continued to find that Walmart associates lacked knowledge about the eMSAR process, as well as other basic and important procedures.  For example, from April to July 2018, MoneyGram's reviews of 1,586 associates at 219 stores in 16 states, the District of Columbia, and Puerto Rico found that between 404 and 1,019 associates needed training on suspicious activity, fraud examples, eMSAR usage, and ID acceptance.  From March to May 2019, MoneyGram's reviews of 155 stores in 16 states and the District of Columbia found that hundreds of associates needed training about ID requirements and acceptance, and eMSAR usage and knowledge.  Moreover, for 2019 overall, MoneyGram's reviews of 476 stores in numerous states found that at least 40 percent of associates needed training on potentially suspicious activity, 36 percent of associates needed training about eMSAR knowledge, and 18 percent of associates needed training on ID acceptance and requirements.

89.     Ria's reviews of Walmart stores made findings similar to those in MoneyGram's reviews.  For example, from January through August 2019, Ria's reviews of 473 Walmart stores in 30 states found that a substantial number of Walmart associates—between 414 and 1,400— needed training about eMSAR usage and knowledge, fraud, suspicious activity, ID requirements and acceptance, structuring (breaking up transactions into smaller dollar amounts) and flipping (shortly after receiving funds, sending a large portion to another recipient).

90.     Walmart's failure to properly supervise and monitor employees at its Customer Service Desks and MoneyCenters has also allowed employees to become complicit in the frauds. Walmart's internal records show numerous instances in which employees have been complicit, or possibly complicit, in the frauds.  These records demonstrate that, for many years, employees have, among other things, received cash tips for their assistance in processing fraud-induced money transfers, allowed individuals to use multiple names and/or IDs in picking up money transfers, used the same personally identifiable information for different customers, structured transfers for customers to avoid ID requirements, made up fictitious information for customers, or conducted suspicious money transfers themselves.  For example, in 2013, a Customer Service Department associate engaged in flipping, where she received money transfers from multiple senders in the United States, kept a portion for herself, and sent a portion of the funds to receivers in other countries.  She also had other associates facilitate her activity by going to different coworkers in her department in order to try to avoid detection.  In 2014, a MoneyCenter associate admitted she had received several hundred dollars on multiple occasions from customers using different names and performing fraudulent transactions.  In 2015, a different MoneyCenter associate, who was the subject of three complaints received by MoneyGram in 2014, received at least 12 transfers totaling $13,860.35 and sent at least 32 transfers totaling $32,059 to Nigeria and Ghana in approximately six and a half months.  In 2016 and early 2017,

at least two associates allowed a manager from another department, who sent or received over $35,000 in suspicious transfers in a six-month period, to use the ID information of three other associates to complete her transfers. In 2017, a MoneyCenter associate, who used another associate's Operator ID, processed at least 28 money transfers totaling $22,472.50 over a ten-day period when no customer was even present. In another instance, in 2018, an associate admitted to keying in fraudulent information for 93 individual transactions. In 2019, an associate entered/recorded the same false phone number as the customer's number for 177 transactions involving different customers in a 90-day period, which represented 22 percent of the money transfers she processed.

### *Walmart has Failed to Adequately Monitor, Investigate, and Mitigate Suspicious Money Transfer Activity and Consumer Fraud at its Locations*

91.    For many years, Walmart has failed to adequately monitor, investigate, and address suspicious money transfer activity to detect and prevent consumer fraud at its locations. Instead, Walmart has relied heavily upon its providers to mitigate consumer fraud at its locations while failing to take basic and important steps to detect and prevent consumer fraud.

92.    Beginning in April 2014, Walmart became a dual agent when it began offering Walmart2Walmart money transfers through Ria at the same locations in the United States where it offered money transfer services through MoneyGram. Because MoneyGram and Ria are not able to monitor the activity through the other provider's money transfer system, Walmart is the only party with visibility at its locations into the money transfers flowing through both money transfer systems. Notwithstanding, Walmart has failed to effectively detect and prevent fraud-induced money transfers through both MoneyGram's and Ria's money transfer systems.

93.    In many cases, fraudsters have been able to exploit Walmart's many vulnerabilities to consumer fraud, including those related to: number of shifts, workforce size,

and high turnover of associates responsible for processing money transfers; heavy customer traffic at its MoneyCenters and Customer Service Desks; deficiencies in Walmart's anti-fraud program, including with respect to the training, knowledge, and oversight of its associates responsible for providing money transfer services; and Walmart's dual agency in offering money transfers through two money transfer systems.

94.    Walmart has primarily relied on its providers to block certain money transfer activity, including money transfers of individuals who have been the subject of complaints, even though Walmart has been aware of weaknesses and deficiencies in its providers' interdiction (blocking) systems that make those systems susceptible to use by fraudsters, as well as the inherent risks that come with having more than one provider.  For example, Walmart has been aware that these interdiction systems can be circumvented by consumers simply by changing certain pieces of biographical information, such as names, addresses, or dates of birth, or by using fake IDs or switching to another money transfer provider at Walmart.  In addition, from approximately April 2015 through October 2016, MoneyGram experienced some technical problems with its interdiction system, which is used to block consumers, including suspected fraudsters, in its network.  Walmart did not become aware of MoneyGram's interdiction system difficulties until mid-2016, even though Walmart's own monitoring of money transfers should have alerted it sooner that MoneyGram was not properly blocking suspected fraudsters and repeat victims.  Because Walmart relied on its providers' blocking systems, instead of having its own, and its practice was not to train its employees to reject payouts of money transfers that were suspicious and potentially fraudulent, Walmart's failures on these fronts made fraud-induced money transfers through its stores more likely.

95.    Walmart has had inadequate and ineffective policies and procedures for submitting information to its providers and requesting that certain consumers be blocked from

sending or receiving money transfers due to their suspicious money transfer activity. Walmart did not even begin providing Ria with lists of consumers to be blocked in its network until mid to late 2016. In addition, for years, when employees faxed MSARs or submitted eMSARs regarding potential victims or suspected fraudsters to Walmart's Home Office, Walmart did not promptly submit requests to its providers that those individuals be blocked from using their money transfer systems. Walmart also has not provided the third party responsible for preparing Walmart's blocking requests with the resources, such as the consumer fraud reports and transaction data provided by Walmart's providers, to enable them to identify customers who should be blocked. In addition, for many years, when it identified customers with suspicious activity in one of its provider's systems, it only sent blocking requests to that provider, even though the customers could use the other money transfer system available at Walmart locations. Up until late 2018, Walmart also did not have any mechanism in place to ensure that when associates at its Customer Service Desks and in its MoneyCenters rejected a transfer at the point of sale, that information was promptly transmitted to Walmart's providers to prevent customers from going to another employee or location to send or receive their transfers.

96. Walmart also failed to adequately monitor suspicious money transfer activity at its locations, such as consumers receiving money transfers at multiple different Walmart locations in the same geographic area or visiting Walmart locations in different states. Instead, for many years, Walmart has primarily relied on its providers for addressing those suspicious activities, including for purposes of restricting or suspending Walmart locations, while failing to adequately address consumer fraud at its locations. In many cases, Walmart has not prevented consumers, including its own employees, from sending or receiving highly suspicious money transfers that it knew or had reason to believe were related to consumer frauds. In other cases, Walmart has continued to process fraud-induced money transfers while turning a blind eye to

48

suspicious characteristics or other indicators that the transfers were induced by fraud. For years, Walmart has frequently processed transactions that had suspicious characteristics, including: (1) high-dollar money transfers; (2) patterned activity, such as multiple transfers involving similar dollar amounts; (3) one-to-many or many-to-one transactional activity; (4) high-frequency money transfers; (5) transactions with data integrity issues (issues relating to ID numbers, addresses, dates of birth, or other information about recipients); (6) same IDs or addresses used by multiple receivers; (7) money transfers picked up using fake out-of-state IDs; (8) flipping; (9) structuring of transactions; (10) back-to-back transfers; (11) substantial transfers to high-risk countries known for fraud; (12) transactions where the sender and receiver do not appear to have a relationship; and (13) transactions with indications of elder financial exploitation due to the senders' age.

97.     Based on information contained in MoneyGram's complaint database, fraud-induced money transfers at Walmart often have involved high-dollar amounts and have been picked up using out-of-state, including foreign, IDs. From 2013 to 2018, money transfers of $900 or more accounted for over 47 percent of the total number of complaints involving Walmart. Of the reported fraud transfers paid out at Walmart where the receiver's ID information was recorded, a majority (over 53 percent) of the transfers of $900 or more were picked up using an out-of-state ID.

98.     Between January 2015 and February 2019, at least 101 Walmart locations have been responsible for paying out over $100,000 in fraud-induced money transfers that were the subjects of complaints, including at least 11 locations that paid out over $200,000 in transfers that were the subject of complaints. These locations include the following:

    a.      Walmart location #3159 in Teterboro, New Jersey paid out at least 150 reported fraud-induced money transfers totaling $272,945.50. Of the 101

Walmart locations responsible for paying out over $100,000 in reported fraud-induced transfers, this location had the highest average reported fraud amount at $1,819.64.  This location paid out 63 reported fraud-induced transfers totaling $111,480.79 through MoneyGram and 87 reported fraud-induced transfers totaling $161,464.71 through Ria.  A majority of the total complaints (72.6 percent) involved the grandparent or emergency scam.  From May 9, 2017 until July 27, 2017, the location paid out 34 reported fraud-induced transfers through MoneyGram totaling $73,923.17, of which 88.2 percent (or 30 of the 34 transfers) involved receivers using an out-of-state ID to pick up the transfer.  Over a two-year period, from September 24, 2016 to September 24, 2018, 93 percent of the Ria reported fraud-induced transfers paid out by the location involved a phone call to the victim, and 85 percent involved the grandparent or emergency scam.  MoneyGram and Ria have restricted receives at this location at least three times, including two restrictions by MoneyGram, from July to December 2017 and April to July 2018, and a more recent restriction by Ria, from October 2019 to January 2020.

b.      Walmart location #5293 in Valley Stream, New York paid out at least 358 reported fraud-induced money transfers totaling $424,213.81.  This location had the highest reported fraud by amount in the Walmart chain, of which, 141 fraud-induced transfers totaling $198,389.11 involved MoneyGram, and 217 fraud-induced transfers totaling $225,824.70 involved Ria.  In 2017 alone, the location paid out 156 complaints totaling $197,455.80, of which 113 complaints totaling $136,546.68 were through Ria's system.  MoneyGram and Ria have restricted receives at this location at least four times, including a restriction by MoneyGram,

from November 2018 to August 2019, and three restrictions by Ria, from January to March 2018, from August 2019 to January 2020, and more recently, in February 2020.

c.  Walmart location #4383 in Dearborn, Michigan paid out at least 799 reported fraud-induced money transfers totaling $277,601.06, which was the largest volume of complaints in the Walmart chain.  The location has paid out at least 322 fraud-induced transfers totaling $111,861.72 through MoneyGram and 477 fraud-induced transfers totaling $165,739.34 with Ria.  Together, MoneyGram and Ria have disciplined this location at least nine times. MoneyGram has disciplined this location at least five times, including two restrictions on receives that were imposed in October 2015 and January 2017, and three suspensions, including two short suspensions in December 2017 and December 2018, and a thirteen-month suspension that began in January 2019.  Ria has disciplined this agent at least four times, including at least three suspensions on receives, consisting of a four-month suspension in November 2017, a week-and-a-half suspension in December 2018, and a thirteen-month suspension beginning in January 2019, as well as at least one restriction on receives for a two-month period beginning in March 2018.

d.  Walmart location #5129 in Landover Hills, Maryland has paid out at least 368 reported fraud-induced money transfers totaling $233,897.28, of which 162 reported fraud-induced transfers totaling $123,134.28 went through MoneyGram and 206 reported fraud-induced transfers totaling $110,763 involved Ria. MoneyGram and Ria have taken disciplinary actions against this location at least six times.  MoneyGram restricted receives at this location at least twice, in

November 2015 and October 2016, and imposed a ten-day suspension in January 2019. Ria restricted receives at this location at least twice, from February to April 2018 and July to December 2019, and suspended receives at this location at least once, from January to February 2019.

***Walmart has Failed to Adequately Warn Consumers about Fraud-Induced Money Transfers***

99.     Despite its awareness of a significant amount of consumer fraud involving Walmart locations, for many years, Walmart has failed to properly warn consumers about fraud-induced money transfers, including by ensuring that its locations consistently had visible warning signs and brochures or pamphlets about consumer fraud, asking consumers whether their money transfers were related to telemarketing, and warning consumers that "cash-to-cash" money transfers for outbound and inbound telemarketing transactions were prohibited under the TSR since June 2016. In addition, although for years Walmart's providers provided some general warnings on the first page of send forms located at some of its agent locations, in many cases, Walmart locations did not even have send forms. Therefore, consumers often have been unaware of the risks associated with sending money through the money transfer system.

100.     Despite advance notice of reviews by Walmart's providers, the reviews routinely revealed that some of Walmart's locations were missing send forms and consumer fraud signs, brochures or pamphlets, and other warnings. For example, in January 2018, Ria's reviews of 62 stores in four states revealed that 24 percent did not have send forms, 23 percent did not have consumer fraud warning signs, and 15 percent did not have fraud awareness brochures. In February 2018, Ria's reviews of 65 stores in five states revealed that 31 percent did not have send forms, 17 percent did not have consumer fraud warning signs, and 23 percent did not have fraud awareness brochures. From January through August 2019, Ria conducted 473 reviews of

Walmart stores in 30 states and found that 114 stores (24 percent) of those stores did not have

send forms and 186 stores (39 percent) of them were missing fraud awareness materials.

101.     Like Ria, MoneyGram also routinely found that some of Walmart's stores were

missing required materials relating to consumer fraud warnings.  For example, in MoneyGram's

April 2018 reviews of 47 stores in five states, MoneyGram found that four stores (nine percent)

were missing send forms, five stores (11 percent) were missing fraud signs, and nine stores (19

percent) were missing fraud pamphlets.  From April to July 2018, MoneyGram's reviews of 219

stores in 16 states, the District of Columbia, and Puerto Rico found that 18 stores (eight percent)

were missing the consumer complaint notice, 21 stores (ten percent) were missing send forms, 29

stores (13 percent) were missing fraud signs, and 32 stores (15 percent) stores were missing

fraud pamphlets.

### *Walmart has Failed to Report All Consumer Fraud Involving its Locations*

102.     For many years, although Walmart has primarily relied on its providers to address

and mitigate consumer fraud involving its locations, Walmart has failed to provide information

to them about all of the complaints and reports it has received about fraud-induced money

transfers involving its locations.  For example, despite receiving complaints and reports that

some of Walmart's own employees have been involved in sending or receiving thousands, or

even tens of thousands, of dollars in suspicious money transfers at its locations, Walmart has not

routinely provided that information to its providers—even in cases when it has determined that

those employees have been the victims of, or participants in, fraud-induced money transfers.

103.     Walmart's providers record information about fraud-induced money transfers in

their complaint databases, which they use to administer their anti-fraud programs.  For example,

Walmart's providers have used that information to: (a) monitor and identify agent locations and

employees that have not been taking adequate steps to address consumer fraud, or may even be

complicit in frauds; (b) create automated rules regarding particular corridors (e.g., limiting the number and amount of money transfers to receivers); (c) interdict individuals who are the victims or the perpetrators of frauds; and (d) take corrective actions against locations with elevated levels of fraud. Therefore, Walmart's failure to report all fraud-induced money transfers it becomes aware of has impeded its providers' efforts to mitigate consumer fraud involving Walmart.

### Walmart has Failed to Take Other Reasonable Measures to Mitigate Fraud in Connection with its Processing of Money Transfers

104. For many years, Walmart has failed to take other reasonable measures to mitigate consumer fraud in connection with providing money transfer services, such as taking more effective measures to properly verify and validate the legitimacy of consumers' IDs, limiting the associates responsible for providing money transfer services to only those with proper training and knowledge about how to detect and prevent fraud-induced money transfers, providing its associates with a point-of-sale system that allows them to more effectively address suspicious activities by consumers, and imposing a limit on the amount of money that can be paid out in cash, as opposed to other more traceable forms of payments, to recipients of money transfers.

105. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Walmart is violating or is about to violate laws enforced by the FTC because, among other things, it engaged in its unlawful acts and practices repeatedly for several years. Walmart persisted in these practices even after it had received notice of its obligations under the FTC's *MoneyGram* and *Western Union* orders, and despite its contractual obligations with its providers and its awareness of the TSR Amendment. It was not until Walmart had received two Civil Investigative Demands from the FTC in 2017 and became aware that it was the subject of an FTC investigation that it made significant changes to certain of its practices.

## **VIOLATIONS OF THE FTC ACT**

106.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce," including acts or practices involving foreign commerce that "cause or are likely to cause reasonably foreseeable injury within the United States" or "involve material conduct occurring within the United States."

107.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

### *Unfair Acts or Practices*

108.     In numerous instances, in connection with providing money transfer services at its locations, Defendant has failed to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers.

109.     Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

110.     Therefore, Defendant's acts or practices as set forth in Paragraph 108 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), 45(n).

## **VIOLATIONS OF THE TSR**

111.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101–6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

112.    Defendant and its employees have processed money transfers and provided related services on behalf of persons who are "sellers" or "telemarketers" engaged in "telemarketing," as those terms are defined in Sections 310.2 (dd), (ff), and (gg) of the TSR. A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(dd). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

113.    The TSR prohibits telemarketers and sellers from making a false or misleading statement to induce any person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

114.    The TSR also prohibits telemarketers and sellers from requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit. 16 C.F.R. § 310.4(a)(4).

115.    On December 14, 2015, the FTC published a notice that it had adopted amendments to the TSR, including a prohibition against using "cash-to-cash" money transfers for outbound and inbound telemarketing transactions. 80 Fed. Reg. 77520 (Dec. 14, 2015). Since June 13, 2016, the TSR has prohibited the use of "cash-to-cash" money transfers as payments for goods or services offered or sold through telemarketing or charitable contributions solicited or sought through telemarketing. 16 C.F.R. § 310.4(a)(10).

116.    It is a violation of the TSR for any person to provide "substantial assistance or support" to any seller or telemarketer when that person "knows or consciously avoids knowing"

that the seller or telemarketer is engaged in any act or practice that violates Sections 310.3(a), (c), or (d), or 310.4 of the TSR.  16 C.F.R. § 310.3(b).

117.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

118.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and Section 1.98(d) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(d) (2021), authorizes the Court to award monetary civil penalties of up to $46,517 for each violation of the TSR committed with actual knowledge or knowledge fairly implied.  The Defendant's TSR violations were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT II

### *Assisting and Facilitating TSR Violations*

119.    In numerous instances, in the course of processing money transfers, Defendant and its employees have provided substantial assistance or support to sellers or telemarketers who Defendant or its employees knew or consciously avoided knowing:

    a.    Induced consumers to pay for goods or services or charitable contributions through the use of false or misleading statements in violation of Section 310.3(a)(4) of the TSR, 16 C.F.R. § 310.3(a)(4);

    b.    Requested or received payment of a fee or consideration in advance of consumers obtaining a loan when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan for a

person in violation of Section 310.4(a)(4) of the TSR, 16 C.F.R. § 310.4(a)(4); and

 c. Accepted cash-to-cash money transfers as payments for goods or services offered or sold through telemarketing or for charitable contributions solicited or sought through telemarketing in violation of Section 310.4(a)(10) of the TSR, 16 C.F.R. § 310.4(a)(10).

120. Therefore, Defendant's acts or practices, as set forth in Paragraph 119 violate the TSR, 16 C.F.R. §310.3(b).

## CONSUMER INJURY

121. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the TSR. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendant;

B. Award Plaintiff monetary civil penalties for each violation of the TSR;

C. Award monetary and other relief within the Court's power to grant, including rescission or reformation of contracts, the refund of money, the return of property, the payment of damages, public notification, or other relief necessary to redress injury to consumers; and

D.     Award any additional relief as the Court determines to be just and proper.

Dated:  June 28, 2022                  Respectfully Submitted,

*/s/ Karen D. Dodge*
KAREN D. DODGE
PURBA MUKERJEE
MATTHEW G. SCHILTZ
Attorneys for Plaintiff
Federal Trade Commission
230 South Dearborn Street, Suite 3030
Chicago, Illinois 60604
(312) 960-5634 (telephone)
(312) 960-5600 (facsimile)