**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-03372 |
| WALMART INC., | Hon. Manish S. Shah |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>WALMART INC.'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 5

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ...................................................................................................................... 8

I.     THE FTC LACKS CONSTITUTIONALLY VALID AUTHORITY TO INITIATE LITIGATION SEEKING MONETARY OR INJUNCTIVE RELIEF ............ 8

II.     THE TSR CLAIM MUST BE DISMISSED ............................................................ 14

    A.     The FTC Fails To Adequately Allege Underlying TSR Violations By Sellers Or Telemarketers ............................................................................ 15

    B.     The FTC Fails To Adequately Allege "Substantial Assistance" By Walmart ...................................................................................................... 17

        1.     Routine Processing Of Money Transfers Is Not "Substantial Assistance" ........................................................................................ 17

        2.     Not Adopting Additional FTC-Preferred Anti-Fraud Measures Is Not "Substantial Assistance" ...................................................... 20

    C.     The FTC Fails To Adequately Allege That Walmart Knew Or Consciously Avoided Knowing That Any Particular Transaction Violated The TSR ............. 22

    D.     At A Minimum, The TSR Claim For Penalties Must Be Dismissed Because The FTC Fails To Adequately Allege That Walmart Knew Its Own Conduct Violated The TSR ................................................................... 26

III.     THE SECTION 5 CLAIM MUST BE DISMISSED ................................................ 28

    A.     The FTC Fails To Adequately Allege Ongoing Or Imminent Misconduct ........... 28

    B.     The FTC Fails To Adequately Allege An "Unfair" Act Or Practice .................... 29

        1.     The FTC Fails To Allege That Walmart's Conduct Violates "Established Public Policy" ............................................................... 30

        2.     The FTC Fails To Adequately Allege That Walmart's Conduct Is "Immoral, Unethical, Oppressive, Unscrupulous Or Substantially Injurious To Consumers" ..................................................................... 34

    C.     Applying Section 5 Here Would Violate Due Process ........................................ 38

CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abrams v. McGuireWoods LLP*,
518 B.R. 491 (N.D. Ind. 2014) ......................................................................20

*In re Agape Litig.*,
773 F. Supp. 2d 298 (E.D.N.Y. 2011) ...............................................21, 24, 25, 33

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008).......................................................................................40

*Am. Fin. Servs. v. FTC*,
767 F.2d 957 (D.C. Cir. 1985)........................................................................37

*AMG Capital Mgmt., LLC v. FTC*,
141 S. Ct. 1341 (2021)...............................................................................2, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................................8

*Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.*,
888 F. Supp. 2d 508 (S.D.N.Y. 2012)...........................................................21, 25

*Barr v. American Ass'n of Political Consultants*,
140 S. Ct. 2335 (2020).............................................................................13, 14

*Beatrice Foods Co. v. FTC*,
540 F.2d 303 (7th Cir. 1976) .........................................................................40

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021)..........................................19, 20, 21, 26

*In re Borg-Warner Corp.*,
101 F.T.C. 863 (1983)....................................................................................40

*Bowsher v. Synar*,
478 U.S. 714 (1986)..................................................................................12, 13

*Buckley v. Valeo*,
424 U.S. 1 (1976)...........................................................................................11

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ......................................................................8, 16

*CFPB v. Prime Marketing Holdings, LLC*,
2016 WL 10516097 (C.D. Cal. Nov. 15, 2016).....................................................8

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*In re Chrysler Corp.*,
    87 F.T.C. 719 (1976) ........................................................................................................40

*Collins v. Yellen*,
    141 S. Ct. 1761 (2020) ...............................................................................................10, 13

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) .........................................................................................37

*Delany v. Blunt, Ellis & Loewi*,
    631 F. Supp. 175 (N.D. Ill. 1986) ..................................................................................19

*Doe v. GTE Corp.*,
    347 F.3d 655 (7th Cir. 2003) ...............................................................................19, 32, 33

*El Camino Res., LTD. v. Huntington Nat'l Bank*,
    722 F. Supp. 2d 875 (W.D. Mich. 2010), *aff'd*, 712 F.3d 917 (6th Cir. 2013) .......................19

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) .......................................................................................................38

*FTC v. AdvoCare Int'l, L.P.*,
    2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ...................................................................29

*FTC v. Chapman*,
    714 F.3d 1211 (10th Cir. 2013) ....................................................................................22, 23

*FTC v. Consumer Health Benefits Ass'n*,
    2011 WL 13254502 (E.D.N.Y. Oct. 12, 2011) ..................................................................22

*FTC v. Credit Bureau Ctr., LLC*,
    937 F.3d 764 (7th Cir. 2019) ...........................................................................................28

*FTC v. Elec. Payment Sols. of Am. Inc.*,
    2021 WL 3661138 (D. Ariz. Aug. 11, 2021) .....................................................................22

*FTC v. ELH Consulting, LLC*,
    2013 WL 4759267 (D. Ariz. Sept. 4, 2013) .......................................................................8

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021) ....................................................................................28

*FTC v. Facebook, Inc.*,
    2022 WL 103308 (D.D.C. Jan. 11, 2022) ..........................................................................28

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*FTC v. HES Merch. Servs. Co., Inc.*,
  2016 WL 10880223 (M.D. Fla. Oct. 26, 2016) .......................................................22

*FTC v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986)..........................................................................................38

*FTC v. Neovi, Inc.*,
  604 F.3d 1150 (9th Cir. 2010) ............................................................................35

*FTC v. Nudge, LLC*,
  2022 WL 2132695 (D. Utah June 14, 2022)..........................................................22

*FTC v. Shire ViroPharma, Inc.*,
  917 F.3d 147 (3d Cir. 2019)............................................................................28, 29

*FTC v. Swish Marketing*,
  2010 WL 653486 (N.D. Cal. Feb. 22, 2010) .........................................................17

*FTC v. Wells*,
  385 F. App'x 712 (9th Cir. 2010) .......................................................................35

*FTC v. Windward Mktg., Inc.*,
  1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) .....................................................35

*FTC v. WV Universal Mgmt., LLC*,
  877 F.3d 1234 (11th Cir. 2017) .........................................................................17

*Glob. Cash Network, Inc. v. Worldpay, US, Inc.*,
  148 F. Supp. 3d 716 (N.D. Ill. 2015) ..................................................................21

*Grijalva v. Kevin Mason, P.A.*,
  2019 WL 8221076 (C.D. Cal. Dec. 30, 2019) .......................................................20

*Heinert v. Bank of Am., N.A.*,
  410 F. Supp. 3d 544 (W.D.N.Y. 2019), *aff'd*, 835 F. App'x 627 (2d Cir. 2020) ...................19

*Hongying Zhao v. JPMorgan Chase & Co.*,
  2019 WL 1173010 (S.D.N.Y. Mar. 13, 2019) .......................................................21

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)..........................................................................3, 9, 10, 11, 12

*Hunte v. Safeguard Properties Mgmt., LLC*,
  255 F. Supp. 3d 722 (N.D. Ill. 2017) ..................................................................24

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Hutchison v. Fitzgerald Equip. Co., Inc.*,
  910 F.3d 1016 (7th Cir. 2018) .................................................................17, 20

*ICC v. Chatsworth Coop. Mktg. Ass'n*,
  347 F.2d 821 (1965)......................................................................................12

*In re Fed. Emps.' Distrib. Co., Inc.*,
  56 F.T.C. 550 (1959).....................................................................................40

*Interactive Intelligence, Inc. v. KeyCorp*,
  546 F.3d 897 (7th Cir. 2008) ........................................................................32

*Intergraph Corp. v. Intel Corp.*,
  253 F.3d 695 (Fed. Cir. 2001)........................................................................40

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
  559 U.S. 573 (2010).......................................................................................27

*Katharine Gibbs Sch. (Inc.) v. FTC*,
  612 F.2d 658 (2d Cir. 1979)...........................................................................38

*Kornea v. J.S.D Mgmt., Inc.*,
  366 F. Supp. 3d 660 (E.D. Pa. 2019) .........................................................15, 16

*Krys v. Pigott*,
  749 F.3d 117 (2d Cir. 2014)...........................................................................26

*LabMD, Inc. v. FTC*,
  894 F.3d 1221 (11th Cir. 2018) ........................................................5, 30, 31, 39

*Lamm v. State St. Bank & Tr.*,
  749 F.3d 938 (11th Cir. 2014) .......................................................................33

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
  478 U.S. 501 (1986).......................................................................................40

*Mazzaro de Abreu v. Bank of Am. Corp.*,
  525 F. Supp. 2d 381 (S.D.N.Y. 2007)............................................................21

*Mistretta v. United States*,
  488 U.S. 361 (1989).......................................................................................31

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021)...................................................................................25

v

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Premier Cap. Mgmt., LLC v. Cohen*,
  2008 WL 4378313 (N.D. Ill. Mar. 24, 2008) .............................................................. 19

*QDOS, Inc. v. Signature Fin., LLC*,
  225 Cal. Rptr. 3d 869 (Cal. Ct. App. 2017) ............................................................. 33

*Rosner v. Bank of China*,
  528 F. Supp. 2d 419 (S.D.N.Y. 2007) .................................................................... 21

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ............................................................................................... 27

*Samuels v. Old Kent Bank*,
  1997 WL 458434 (N.D. Ill. Aug. 1, 1997) .............................................................. 30

*Schatz v. Rosenberg*,
  943 F.2d 485 (4th Cir. 1991) ........................................................................... 17, 18

*Schlifke v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) ................................................................................ 19

*Seila Law LLC. v. CFPB*,
  140 S. Ct. 2183 (2020) ................................................................................... *passim*

*Skilling v. United States*,
  561 U.S. 358 (2010) ............................................................................................. 30

*Spiegel, Inc. v. FTC*,
  540 F.2d 287 (7th Cir. 1976) ............................................................... 4, 30, 34, 36

*Stander v. Fin. Clearing & Servs. Corp.*,
  730 F. Supp. 1282 (S.D.N.Y. 1990) ...................................................................... 19

*Taha v. Int'l Brotherhood of Teamsters, Local 781*,
  947 F.3d 464 (7th Cir. 2020) .................................................................................. 8

*In re TelexFree Sec. Litig.*,
  357 F. Supp. 3d 70 (D. Mass. 2019) ................................................................. 18, 19

*Thornock v. Kinderhill Corp.*,
  749 F. Supp. 513 (S.D.N.Y. 1990) ....................................................................... 19

*Tierney v. Advoc. Health & Hosps. Corp.*,
  797 F.3d 449 (7th Cir. 2015) ................................................................................ 17

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*United States v. Beech-Nut Nutrition Corp.*,
871 F.2d 1181 (2d Cir. 1989) ...............................................................23

*United States v. Dish Network L.L.C.*,
954 F.3d 970 (7th Cir. 2020) ...............................................................27

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) ...............................................................................40

*United States v. Jewell*,
532 F.2d 697 (9th Cir. 1976) ........................................................23, 26

*United States v. L.E. Myers Co.*,
562 F.3d 845 (7th Cir. 2009) ...............................................................26

*United States v. Ladish Malting Co.*,
135 F.3d 484 (7th Cir. 1998) ........................................................23, 25

*United States v. Williams*,
1994 WL 463430 (7th Cir. Aug. 26, 1994) ......................................23

*Vesely v. Armslist LLC*,
762 F.3d 661 (7th Cir. 2014) ........................................................21, 32

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ....................................................................2, 31

*Worsham v. Disc. Power, Inc.*,
2021 WL 50922 (D. Md. Jan. 6, 2021) ...............................................16

*Zablocki v. Merchants Credit Guide Co.*,
968 F.3d 620 (7th Cir. 2020) ........................................................30, 34

*Zamora v. FIT Int'l Grp. Corp.*,
834 F. App'x 622 (2d Cir. 2020) .........................................................26

*Zamora v. JPMorgan Chase Bank, N.A.*,
2015 WL 4653234 (S.D.N.Y. July 31, 2015) ......................................19

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V ..............................................................................38

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

**STATUTES, REGULATIONS, AND RULES**

15 U.S.C. § 41 ........................................................................................... 3, 9

15 U.S.C. § 45 .............................................................................................. 2

15 U.S.C. § 45(a) ........................................................................................ 30

15 U.S.C. § 45(b) ........................................................................................ 38

15 U.S.C. § 45(m) ............................................................................. 2, 9, 10, 13

15 U.S.C. § 45(m)(1)(A) ................................................................... 4, 15, 27

15 U.S.C. § 45(n) .................................................................................. 36, 37

15 U.S.C. § 53(b) ................................................................................ *passim*

15 U.S.C. § 57 ............................................................................................ 13

15 U.S.C. § 57a ..................................................................................... 36, 38

15 U.S.C. § 57a(a)(1)(B) ........................................................................... 38

15 U.S.C. § 57b .............................................................................. 2, 9, 10, 13

15 U.S.C. §§ 6101-6108 ............................................................................ 14

18 U.S.C. § 1346 ........................................................................................ 31

Pub. L. No. 63-203, ch. 311, 38 Stat. 717 (1914) ................................... 10

Pub. L. No. 93-153, 87 Stat. 576 (1973) .................................................. 10

Pub. L. No. 93-637, 88 Stat. 2183 (1975) ................................................ 10

16 C.F.R. § 310.2(dd) ................................................................................ 15

16 C.F.R. § 310.2(ff) ................................................................................. 15

16 C.F.R. § 310.2(gg) ................................................................... 15, 16, 17

16 C.F.R. § 310.3(a) .................................................................................. 14

16 C.F.R. § 310.3(b) ........................................................................... *passim*

## TABLE OF AUTHORITIES—Continued

**Page(s)**

16 C.F.R. § 310.4 ....................................................................................................14

60 Fed. Reg. 43,842 (Aug. 23, 1995).........................................................14, 17, 23, 25

80 Fed. Reg. 77,520 (Dec. 14, 2015) ......................................................5, 18, 22, 23, 25

Fed. R. Civ. P. 9(b) ....................................................................................................8

Fed. R. Civ. P. 12(b)(6)..............................................................................................8

## OTHER AUTHORITIES

FTC Statement of Policy on the Scope of the Consumer Unfairness Jurisdiction
(Dec. 17, 1980), *appended to In re Int'l Harvester*, 104 F.T.C. 949, 1070 (1984) ................36

H.R. Rep. No. 103-20 (1993)........................................................................................14

S. Rep. No. 74-1705 (1936)..........................................................................................34

S. Rep. No. 75-221 (1937)............................................................................................34

S. Rep. No. 93-1408 (1974)..........................................................................................38

Restatement (Second) of Torts (1977)......................................................................17, 32

Restatement (Third) of Torts: Liability for Economic Harm (2020)..........................17, 18, 19, 20

*Webster's Encyclopedic Dictionary* (1941) .................................................................34

*Webster's New International Dictionary* (2d ed. 1934)................................................34

*Webster's Third New International Dictionary* (1976) ................................................34

## INTRODUCTION

The Federal Trade Commission (FTC) is seeking to hold Walmart liable for the criminal actions of completely unrelated third-party fraudsters, in spite of Walmart's extensive efforts to prevent those very fraudsters from defrauding its customers, and despite lacking the constitutional or statutory authority to bring its lawsuit. This case should be dismissed.

Here is how the fraud at issue works: Unscrupulous scam artists use a wide variety of ruses—from posing as a grandchild needing bail, to impersonating an IRS agent demanding a tax payment—to trick victims into sending them money through channels such as the U.S. Postal Service or money-transfer services like MoneyGram or Western Union. Just as the Postal Service is overwhelmingly used for legitimate purposes even if scammers sometimes take advantage of it, the same is true for money transfers. Indeed, money transfers are an important and legitimate financial service, especially for unbanked and underbanked customers lacking ready access to the traditional financial system.

Over a decade ago, Walmart began offering money-transfer services to its own customers—initially services provided by MoneyGram, and eventually Ria and Western Union, too. These services are a convenient, affordable way for customers to send and receive money to and from family, friends, and others. By bringing more competition to the market, Walmart has lowered the cost of money transfers, saving its customers billions in fees. To protect customers from sending money transfers to fraudsters, Walmart has developed and implemented a host of anti-fraud measures—including customer warnings, employee trainings, and blocking protocols—adding an extra layer of defense to the measures adopted by MoneyGram, Ria, and Western Union. Walmart's anti-fraud program has evolved over time, and overall has been successful: Based on data available to Walmart, out of nearly 200 million money-transfer transactions processed at U.S. Walmart stores between 2015 and 2020, only a tiny fraction—less than 0.08%—were even

*reportedly* the product of fraud (and some of that reported fraud may not be fraud at all, making the actual fraud rate even smaller).

Walmart adopted these measures in the absence of Congress enacting any statute or the FTC promulgating any regulations telling Walmart and other companies what they must do to detect and block fraud in connection with money-transfer services. Yet the FTC is now engaging in post-hoc nitpicking of Walmart's anti-fraud program to try to punish Walmart for the actions of the third-party criminals who Walmart actively tried to thwart. Because the FTC cannot point to a violation of any statute specifically regulating money transfer anti-fraud programs, its complaint resorts to the broad and amorphous language of Section 5 of the FTC Act, 15 U.S.C. § 45, prohibiting "unfair" conduct. The FTC also attempts to shoehorn this case into the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310.3(b), relying on a novel aiding-and-abetting theory at odds with longstanding common-law principles.

No surprise, then, that the FTC was closely divided on whether to authorize this case in the first place, doing so over the dissents of two Commissioners—or that the Justice Department declined to pursue the case on the FTC's behalf. The skepticism about the FTC's case is well-founded: The complaint relies on expansive legal theories that contravene clear constitutional and statutory limits on its authority, making this case yet another example of FTC overreach. *See AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1347-49 (2021); *cf. West Virginia v. EPA*, 142 S. Ct. 2587, 2612-14 (2022). The case should be dismissed for at least three reasons.

*First*, the FTC lacks constitutionally valid authority to bring this suit. Its Section 5 and TSR claims rest on 15 U.S.C. §§ 45(m), 57b, and 53(b), which purport to grant the FTC the authority to file district court actions for monetary and permanent injunctive relief. When Congress enacted those provisions in the 1970s, however, it exceeded the limit on the powers that

may be constitutionally vested in the FTC, an independent agency whose Commissioners cannot be removed at will by the President. *See* 15 U.S.C. § 41; *Humphrey's Executor v. United States*, 295 U.S. 602, 625-26 (1935). As the Supreme Court recently emphasized, when *Humphrey's Executor* upheld the constitutionality of the FTC's independence, it reasoned that the FTC *as it existed in 1935* did not exercise *any* executive power. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2198-2200 (2020). And the Court also has repeatedly made clear that, by contrast, the power to file federal-court actions on behalf of the United States to enforce federal law through monetary penalties and injunctive relief—as the FTC is doing here—is a "quintessentially executive power." *See, e.g.*, *id.* at 2200. Because Congress's post-*Humphrey's* attempts to vest the independent FTC with executive litigation powers were unconstitutional and void, the FTC's suit must be dismissed.

*Second*, the FTC's claim that Walmart violated the TSR by knowingly providing "substantial assistance" to illegal telemarketing transactions fails on the merits. The TSR prohibits telemarketers from inducing payments for goods, services, or charitable donations using money transfers. The FTC does not allege that Walmart engaged in telemarketing in violation of the rule. Although the FTC relies on the substantial-assistance prong, it does not claim that Walmart interacted with illegal telemarketers, induced telemarketing transfers, encouraged telemarketing in any way, or had any knowledge of specific telemarketing transactions. Instead, the FTC advances a novel theory that Walmart is liable because it processed routine money transfers requested by Walmart customers, and a small sliver of those requested transfers allegedly turned out to have been induced by third-party telemarketing scams. But the FTC does not identify a *single* specific transaction that satisfies the TSR's multi-prong definition of "telemarketing."

The FTC's novel theory also flouts the traditional aiding-and-abetting principles underlying the TSR's substantial-assistance provision. Those principles make clear that

3

substantial assistance requires more than merely (1) providing routine transactional services for customers, and (2) failing to stop third-party misconduct. Were it otherwise, the nation's banks, telephone companies, delivery companies, and even the postal service would be legally responsible for customer misconduct simply by providing routine services and failing to affirmatively discover and thwart all such wrongdoing—even if they implemented measures designed to thwart that misconduct. That is not the law. Indeed, when the FTC amended the TSR it refused to require certain measures it now accuses Walmart of failing to undertake. And the FTC's TSR claim is further doomed by its inability to plausibly allege that Walmart knew or consciously ignored that any particular transaction was induced by a TSR violation as required under the TSR, or that Walmart knew that its conduct amounted to "substantial assistance" in violation of the TSR as required for civil penalties, 15 U.S.C. § 45(m)(1)(A). The TSR claim must be dismissed.

*Third*, the FTC's Section 5 "unfair" act or practice claim also fails for several reasons. First, although the FTC's authority to bring Section 5 claims is limited to seeking injunctive relief for ongoing or imminent violations of the law, 15 U.S.C. § 53(b), all of the FTC's concrete allegations focus on Walmart's *past* conduct. Second, the FTC does not allege any Walmart act or practice—past or present—falling within the Seventh Circuit's definition of "unfair," which requires conduct that both (1) violates "established public policy" *and* (2) is immoral or causes unavoidable substantial injury to consumers. *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976). The FTC fails to identify any public policy remotely on point, nor does it seriously assert that Walmart's conduct—processing money transfers requested by customers—is immoral. And its efforts to allege an unavoidable consumer injury fall flat. Ultimately, Walmart's robust anti-fraud program is designed to *prevent* such consumer exploitation by third-party fraudsters—the opposite of "unfair." While the FTC gestures towards anti-fraud measures that it wants Walmart

to implement, it has no authority to use Section 5 to second-guess Walmart's program.

To be clear, Walmart is now—and always has been—dedicated to its customers and shares the FTC's goal of protecting customers from fraudsters. But this lawsuit is an egregious instance of agency overreach. The FTC has no authority to act as a freewheeling compliance auditor or inspector general, "micromanaging" the details of Walmart's anti-fraud program "in accordance with [its] wishes." *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1237 (11th Cir. 2018). Rather, the FTC's authority is limited by the Constitution, by the FTC Act, and by its own regulations. None of those sources supports the FTC's claims. The case should be dismissed.

## BACKGROUND

Walmart is a retail company that, in addition to selling retail goods, offers customers services including a low-cost method of sending money transfers to other Walmart stores for pick-up by family, friends, and other recipients. Compl. ¶ 8. As the FTC has observed, consumers use money transfers for "numerous reasons," including to "pay their rent," to "send money to family to pay tuition and medical bills," to "transfer money to friends," and even to "help victims in areas devastated by disasters." 80 Fed. Reg. 77,520, 77,545, 77,550 (Dec. 14, 2015). Money transfers are particularly vital to Walmart's unbanked and underbanked customers, who need an affordable and reliable mechanism for transferring money.

Money transfers at Walmart are conducted through money-transfer systems operated by three "providers"—MoneyGram International, Inc., Ria Financial Services, and The Western Union Company. Compl. ¶ 9. Walmart has also developed, in partnership with MoneyGram and Ria, lower-cost options called Walmart2World and Walmart2Walmart. *Id.* ¶¶ 10-11.

Fraudsters and con artists sometimes carry out their scams by inducing victims to transfer money to them using platforms like those offered at Walmart. *Id.* ¶ 2. Walmart, of course, is not a fraudster, and the alleged scams are not affiliated with Walmart—indeed, the victims are tricked

long before they set foot into a Walmart. *Id.* ¶ 29. Walmart's only alleged connection to such scams is that its employees "processed" some money transfers—at the direct request of its customers—that happen to have been induced by fraud. *Id.* ¶ 2.

Reports of fraud-induced money transfers comprise only a tiny fraction of all money transfers processed at Walmart locations. Nevertheless, Walmart has invested significant resources to develop an "anti-fraud and consumer protection program" for money transfers, adding extra protection beyond the anti-fraud measures implemented by MoneyGram, Ria, and Western Union. Walmart's program is designed "to educate, detect, investigate, respond, and deter consumer fraud against [its] customers." *Id.* ¶¶ 51, 55. Walmart has had and continually improved its anti-fraud program for many years, including "significant changes" to many of its policies and procedures. *Id.* ¶¶ 51, 105. The FTC's complaint recognizes many of these measures, including:

- ***Consumer Warnings***: Walmart provides customers with "consumer fraud warnings" before they may initiate a money transfer. *Id.* ¶ 20. It also requires its locations to carry "consumer education and awareness materials" that warn consumers about money-transfer scams. *Id.* ¶ 52. As of March 2019, Walmart employees "ask senders whether they are 'sending money for something a telemarketer sold' to them, and if the answer is 'yes,' to cancel and report the transaction." *Id*. ¶ 80; *see id.* ¶ 69.

- ***Employee Training***: Walmart provides its employees with training and materials on how to respond to consumers whom they suspect to be victims of fraud. *Id.* ¶¶ 53, 57-63, 72, 78. This training includes information about detecting and preventing consumer fraud on both the send-side and the receive-side, and it instructs employees to refuse to send money transfers if they believe the sender is a victim of fraud. *Id.* ¶¶ 55, 57-63, 78. Walmart also trains employees to report potential fraud to Walmart's Home Office

and to call the providers to report suspicious transactions.  *Id.* ¶¶ 55, 58-59.  And in 2018, Walmart instituted point-of-sale register lockouts to prevent untrained employees from processing money transfers.  *Id.* ¶ 76.

- *__Stopping Transactions__*:  Walmart has used various methods to detect and block potentially fraudulent money transfers.  *See id.* ¶¶ 55, 58, 94-95.  For example, for all transfers greater than $1.00, Walmart requires the recipient to show government-issued photo identification.  *Id.* ¶ 23.  In 2017, Walmart created a proprietary electronic system ("eMSAR") enabling employees to cancel and report suspicious money-transfer activity, including suspected fraud.  *Id.* ¶¶ 55, 58-60.  And since at least 2018, Walmart has implemented a mechanism to "promptly" share information about a blocked transaction with the providers, which allows the providers to block these consumers from their systems and prevent future fraud.  *Id.* ¶ 95.

Despite Walmart's extensive anti-fraud efforts, a closely divided FTC voted to file this lawsuit, over dissents from Commissioners Phillips and Wilson.  The complaint asserts that Walmart "fail[ed] to take" *additional* anti-fraud measures that the FTC believes would have been more "timely, appropriate, and effective."  *Id.* ¶ 1.  The complaint flyspecks the historical details of Walmart's anti-fraud program—criticizing, for instance, the precise content of consumer warnings, the content and timing of employee trainings, and even the text of the buttons on Walmart's electronic money-transfer interface.  *See, e.g., id.* ¶¶ 20, 58-59, 61-62, 69, 72.

The FTC's complaint does not identify a single law or rule that requires—or even mentions—*any* of the additional anti-fraud measures Walmart allegedly failed to take.  Nonetheless, it offers two theories under which Walmart's failure to implement these additional measures is allegedly unlawful.  First, the FTC alleges that some of the money transfers were

7

initiated at the request of customers victimized by unlawful "telemarketing" scams. *Id.* ¶ 80. According to the FTC, Walmart's processing of such transfers violates the TSR's prohibition on knowingly providing "substantial assistance" to illegal telemarketers. *Id.* ¶¶ 119-20. Second, the FTC asserts that Walmart's anti-fraud program is so defective as to constitute "unfair acts or practices" in violation of Section 5 of the FTC Act. *Id.* ¶¶ 108-10. The FTC seeks permanent injunctive relief for both claims, as well as monetary relief and civil penalties for the TSR claim.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do "'legal conclusion[s] couched as . . . factual allegation[s].'" *Id.* "[W]hen considering the viability of a claim," the Court "reject[s] sheer speculation, bald assertions, and unsupported conclusory statements." *Taha v. Int'l Brotherhood of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020).

Because the FTC's TSR allegations sound in fraud, they are subject to Federal Rule of Civil Procedure 9(b). *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014); *see, e.g.*, *CFPB v. Prime Marketing Holdings, LLC*, 2016 WL 10516097, at *6 (C.D. Cal. Nov. 15, 2016); *FTC v. ELH Consulting, LLC*, 2013 WL 4759267, at *1 (D. Ariz. Sept. 4, 2013). Rule 9(b) requires fraud to be alleged with "particularity"—i.e., the "who, what, when, where, and how of the [alleged] fraud." *Camasta*, 761 F.3d at 737 (citations omitted).

## ARGUMENT

## I. THE FTC LACKS CONSTITUTIONALLY VALID AUTHORITY TO INITIATE LITIGATION SEEKING MONETARY OR INJUNCTIVE RELIEF

The FTC is bringing this case under three statutory provisions that purport to authorize the

agency to enforce the FTC Act by suing violators in district court for monetary and permanent injunctive relief. *See* 15 U.S.C. §§ 45(m), 57b, 53(b). But when Congress in the 1970s gave the independent FTC such quintessentially executive law-enforcement power, it exceeded the scope of powers that can be constitutionally vested in an agency whose members are not removable at will by the President. The unconstitutionality of the FTC's litigation authority is compelled by the Supreme Court's interpretation of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).

**1.** Under Article II of the Constitution, "the 'executive Power'—all of it—is 'vested in [the] President.'" *Seila Law*, 140 S. Ct. at 2191. Because principal executive officers "must remain accountable to the President, whose authority they wield," the President's executive power includes "appointing, overseeing, and controlling" such officers. *Id.* at 2197. And "[t]hat power, in turn, generally includes the ability to remove" such officers on an "unrestricted" basis, as "has long been confirmed by history and precedent." *Id.* at 2197-98.

In 1935, the Supreme Court held in *Humphrey's Executor* that the FTC may act independently of the President. The Court upheld the constitutionality of 15 U.S.C. § 41, which allows the President to remove an FTC Commissioner only for "inefficiency, neglect of duty, or malfeasance." *Humphrey's Executor*, 295 U.S. at 618-20, 625-32 (rejecting President Roosevelt's argument that he had Article II power to remove a Commissioner based on policy disagreements). As *Seila Law* emphasized, that holding rested on the Court's "view[ing] the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Seila Law*, 140 S. Ct. at 2198 (quoting *Humphrey's Executor*, 295 U.S. at 628); *accord Humphrey's Executor*, 295 U.S. at 624, 628 (asserting that the 1935 FTC's powers were "neither political nor executive," such that it could not "in any proper sense be characterized as an arm or an eye of the executive"). The *Humphrey's*

*Executor* Court reasoned that the 1935 FTC was, instead, an "administrative body" that exercised *only* "quasi-legislative or quasi-judicial powers"—i.e., conducting administrative adjudications, making investigations and reports for Congress, and serving as a master in chancery for courts of equity. 295 U.S. at 628 (referencing Pub. L. No. 63-203, ch. 311, §§ 5-7, 38 Stat. 717, 719-22 (1914)). Accordingly, in *Seila Law*, the Supreme Court clarified that *Humphrey's Executor* establishes only a narrow exception "for multimember expert agencies that *do not wield substantial executive power*." *Seila Law*, 140 S. Ct. at 2199-2200 (emphasis added); *see also id.* at 2200-07 (refusing to extend *Humphrey's Executor* to the Consumer Financial Protection Bureau, a single-headed agency wielding substantial executive power); *Collins v. Yellen*, 141 S. Ct. 1761, 1783-87 (2020) (same for the Federal Housing Finance Agency).

**2.** Decades after *Humphrey's Executor*, Congress for the first time purported to grant the FTC the litigation powers the agency invokes in this suit. In 1973, Congress gave the FTC power to seek permanent injunctive relief in the absence of an agency adjudication. *See* 15 U.S.C. § 53(b) (amended in Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973)). And in 1975, Congress gave the FTC power to seek monetary relief, in the form of civil penalties or consumer redress. *See* 15 U.S.C. §§ 45(m), 57b (enacted in Pub. L. No. 93-637, §§ 205-06, 88 Stat. 2183, 2200-02 (1975)).

Each of these grants of authority, however, is incompatible with the FTC's status as a valid independent agency. Given that the FTC's independence was upheld because the agency in 1935 exercised "only . . . quasi-legislative or quasi-judicial powers," *Seila Law*, 140 S. Ct. at 2198, Congress cannot later give the FTC indisputably executive powers. Yet that is precisely what Congress purported to do with the *law-enforcement powers* at issue here.

Indeed, *Seila Law* specifically recognized that the power of federal officers "to seek daunting monetary penalties against private parties on behalf of the United States in federal court"

10

is "a quintessentially executive power not considered in *Humphrey's Executor*." 140 S. Ct. at 2200. As the Justice Department correctly told the Court in that case, "the ability to bring enforcement suits in federal court seeking retrospective relief . . . 'cannot possibly be regarded' as anything other than an exercise of the executive power and duty vested solely in the President." Gov't Br. 32, *Seila Law*, *supra* (No. 19-7), 2019 WL 6727094 (citation omitted).

More generally, the power of federal officers to enforce federal law by suing alleged violators in federal court on behalf of the United States is part of the President's executive power. The Supreme Court made this clear in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), where it held that Article II precluded the Federal Election Commission as constituted at the time—a majority of whose members were appointed by Congress—from exercising the "discretionary power to seek judicial relief" against election-law violators in court. *Id.* at 113, 137-38. The Court explained that "[a] lawsuit is the ultimate remedy for a breach of the law, and it is to the President . . . that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* at 138. Just as "conducting civil litigation in the courts of the United States for vindicating public rights" is an "'executive power'" that may not be granted to principal officers whom the President cannot appoint, *see id.* at 139-40, such litigation authority may not be granted to principal officers whom the President cannot remove, in order to ensure "control[] [of] those who execute the laws," *see Seila Law*, 140 S. Ct. at 2197; *see also id.* at 2199-2200 (recognizing that for-cause removal restrictions for purely executive officials have been upheld only for certain "inferior officers with limited duties").[1]

---

[1] In *Humphrey's Executor*, the Court noted that the FTC could petition a court of appeals to enforce its adjudicative orders, evidently viewing that authority as among the FTC's "quasi-judicial" powers. *See* 295 U.S. at 620-21, 628. That power is quite different from the FTC's later-granted power to seek judicial relief directly—independent of any agency adjudication—which "cannot possibly be regarded as merely in aid of" the FTC's adjudicative functions. *Cf. Buckley*,

This case thus parallels *Bowsher v. Synar*, 478 U.S. 714 (1986). There, because the Comptroller General was a legislative agent removable by Congress rather than the President, *see id.* at 727-32, Congress violated Article II by purporting to give the Comptroller General new executive budgetary powers, *see id.* at 717-18, 726-27, 732-34. Likewise, here, because the FTC was an independent agency under *Humphrey's Executor*, Congress violated Article II by purporting to give the FTC new executive litigation powers.[2]

**3.** The FTC may try to extend *Humphrey's Executor* beyond its facts and rationale as support for the constitutionality of the independent agency's later-granted executive litigation powers. *Seila Law*, however, squarely forecloses any such argument.

The Supreme Court repeatedly emphasized that *Humphrey's Executor* is limited to the powers the FTC possessed in 1935. The Court observed that the case "limited its holding 'to officers of the kind here under consideration,'" and based that holding on the "'quasi-legislative or quasi-judicial powers'" possessed by the agency "as it existed in 1935." *Seila Law*, 140 S. Ct. at 2198 (quoting *Humphrey's Executor*, 295 U.S. at 628, 632); *see id.* at 2200 (discussing powers of "the 1935 FTC" and "the New Deal-era FTC"). Indeed, the Court went out of its way to stress that "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court [is] a quintessentially executive power *not considered* in *Humphrey's Executor*." *Id.* at 2200 (emphasis added).

Moreover, the Court expressly admonished that *Humphrey's Executor* should not be

---

424 U.S. at 138.

[2] More than fifty years ago, the Seventh Circuit held that the Interstate Commerce Commission could sue for an "injunction" despite being an independent agency, reasoning that "the powers of law enforcement are not wholly assigned to the executive department." *ICC v. Chatsworth Coop. Mktg. Ass'n*, 347 F.2d 821, 822 (1965). But that holding, concerning a now-defunct agency, does not survive *Seila Law* and *Buckley*, and it does not address claims for monetary relief in any event.

extended. It described the case as an "exception[]" that "represent[s] what up to now ha[s] been the outmost constitutional limit[] of permissible congressional restriction[] on the President's removal power" over principal officers. *Id.* at 2199-2200. And it further recognized that the case's characterization of the 1935 FTC as not exercising substantial executive power "has not withstood the test of time," insisted that the decision should be confined to "the set of powers the Court considered as the basis for its decision," and even acknowledged that it was calling into question "the present FTC" given that "the 1935 FTC may have had lesser responsibilities." *Id.* at 2198 n.2, 2200 n.4. Simply put, the Court made crystal clear that it "decline[s] to elevate [*Humphrey's Executor*] into a freestanding invitation for Congress" to go beyond the 1935 FTC in removing execution of the law from Presidential control. *Id.* at 2206.

In sum, Congress violated the Constitution when it amended the FTC Act to grant the independent FTC the executive litigation powers set forth in 15 U.S.C. §§ 45(m), 57b, and 53(b). Each of those "unconstitutional statutory amendment[s] 'is a nullity' and 'void' when enacted," and thus grants no power that can be exercised here. *Barr v. American Ass'n of Political Consultants*, 140 S. Ct. 2335, 2353 (2020) (*AAPC*) (plurality op.) (citations omitted); *see Bowsher*, 478 U.S. at 734-35 (invalidating executive powers unconstitutionally granted to the Comptroller General); 15 U.S.C. § 57 (FTC Act's severability clause). As the FTC lacks constitutionally valid authority to bring this suit, the case must be dismissed.[3]

---

[3] Because the FTC, under *Humphrey's Executor*, was a valid independent agency *before* Congress unconstitutionally purported to grant it executive powers, this case is unlike others where the agency had executive powers from the outset and thus the removal restriction was never constitutionally enforceable. *See, e.g.*, *Seila Law*, 140 S. Ct. at 2207-11. Likewise inapposite is the remedial holding in *Collins* that the agency action at issue could not be set aside unless the challenger showed prejudicial harm from the unconstitutional removal restriction. 141 S. Ct. at 1789. Whereas the FHFA Director lawfully possessed "the authority to carry out the functions of his office" because the removal restriction was unenforceable and severable, *id.* at 1788 & n.23, the FTC's suit here "involve[s] a Government actor's exercise of power that the actor did not

## II.        THE TSR CLAIM MUST BE DISMISSED

This Court should dismiss the FTC's claim that Walmart violated the TSR.  Compl. ¶¶ 119-20.  The TSR was promulgated under the Telemarketing and Consumer Fraud and Abuse Prevention Act of 1994, 15 U.S.C. §§ 6101-6108, which charges the FTC with prescribing "rules prohibiting deceptive . . . and other abusive telemarketing acts or practices."  *Id.* § 6102(a); *see* H.R. Rep. No. 103-20, at 7-8 (1993) (noting that the rules should provide "'bright line' guidance").  It prohibits "any seller or telemarketer" from engaging in a highly detailed list of "deceptive" and "abusive telemarketing act[s] or practice[s]."   16 C.F.R.  §§ 310.3(a), 310.4; *see* 60 Fed. Reg. 43,842 (Aug. 23, 1995) (final rule).

The FTC does not claim that Walmart is itself a "seller" or "telemarketer" or that Walmart uses sellers or telemarketers in its business.  Instead, the FTC invokes an ancillary provision in the TSR in an effort to impose secondary liability on Walmart for knowingly and substantially assisting telemarketers that violate the TSR:

> It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

16 C.F.R. § 310.3(b).

As the text indicates, to state a Section 310.3(b) claim, the FTC must allege (1) that a "seller or telemarketer" was "engaged in an[] act or practice that violates [the TSR]"; (2) that Walmart provided "substantial assistance or support" to that seller or telemarketer; and (3) that Walmart did so while "know[ing] or consciously avoid[ing] knowing" that the seller or telemarketer was

---

lawfully possess," as Congress's attempts to vest the independent FTC with executive litigation powers were "void ab initio," *id.* at 1787-88; *accord AAPC*, 140 S. Ct. at 2353 (plurality op.).

engaged in the prohibited conduct.  And to recover civil penalties for the alleged TSR violations, the FTC must further allege that Walmart had "actual knowledge or knowledge fairly implied on the basis of objective criteria" that its conduct actually violated the TSR's substantial-assistance provision.  15 U.S.C. § 45(m)(1)(A).  The complaint falls short across the board.

### A.      The FTC Fails To Adequately Allege Underlying TSR Violations By Sellers Or Telemarketers

The TSR claim fails at the threshold because the FTC has not sufficiently alleged a primary TSR violation—i.e., a "seller or telemarketer" who was "engaged in an[] act or practice that violates" the TSR.  16 C.F.R. § 310.3(b); *see, e.g.*, *Kornea v. J.S.D Mgmt., Inc.*, 366 F. Supp. 3d 660, 669 n.33 (E.D. Pa. 2019) ("[A] claim of assisting or supporting a violation of the [TSR] requires that there be an underlying violation of the [TSR].").

The TSR defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration," 16 C.F.R. § 310.2(dd), and defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor," *id.* § 310.2(ff).  Both definitions thus require the actor to engage in "telemarketing," which the TSR defines as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."  *Id.* § 310.2(gg).

Thus, to sufficiently allege a "seller or telemarketer," *id.* § 310.3(b), the FTC must allege not only who the purported primary actors are, but also that they (1) operated "in connection with" a "plan, program, or campaign" that (2) was "conducted to induce the purchase of goods or services or a charitable contribution," (3) made "use of one or more telephones," and (4) "involve[d] more than one interstate telephone call," *id.* § 310.2(gg).  A failure to adequately allege facts supporting

15

any of these elements requires dismissal. *See, e.g.*, *Kornea*, 366 F. Supp. 3d at 668-69 & n.32 (dismissing TSR claim for failure to allege "[a] 'plan, program, or campaign' or 'more than one interstate telephone call'"); *Worsham v. Disc. Power, Inc.*, 2021 WL 50922, at *6 (D. Md. Jan. 6, 2021) (same, for failure to allege a scheme inducing the purchase of "goods or services").

The FTC fails to adequately allege that Walmart processed any "telemarketing" transaction. Despite gesturing at "fraud-induced money transfers" that "involve telemarketing," Compl. ¶ 43, the complaint does not identify the specifics for a single concrete instance of telemarketing fraud, flouting Rule 9(b)'s particularity requirement. *See Camasta*, 761 F.3d at 737.

Indeed, while the complaint references "sellers," "telemarketers," and "telemarketing," Compl. ¶ 112, the FTC does not explain how the alleged facts satisfy the TSR's definitions of those terms. The FTC never explains who the telemarketers are or how their conduct involved a "plan, program, or campaign," how it "induce[d] the purchase of goods or services or a charitable contribution," or how it involved "more than one interstate telephone call." Several of the FTC's allegations reflect its view that "telemarketing" simply requires a "phone call[]." *Id.* ¶ 80; *see id.* ¶¶ 27, 98(a). But the TSR's definitions make clear that merely alleging that a transaction "was a product of a [telephone] call" is not enough. *Kornea*, 366 F. Supp. 3d at 669 n.32.

The few instances in which the FTC attempts a high-level description of "telemarketing" scams confirm its misguided understanding of that term. For example, the FTC equates "IRS impersonation scams" and "government imposter" scams with "telemarketing scam[s]," Compl. ¶¶ 27-28, without ever explaining how such scams—which presumably involve some sort of request to satisfy a fictitious government debt—involve efforts "to induce the purchase of goods or services or a charitable contribution." 16 C.F.R. § 310.2(gg). The same is true of the FTC's vague references to "'grandparent' scams" and "emergency" scams, Compl. ¶¶ 2, 41-43, which

have no evident connection to telemarketing as defined in the TSR.  The FTC's inability to plead the basic components of "telemarketing" with anything more than "conclusory allegations" that are "untethered to virtually any supportive facts" warrants dismissal.  *FTC v. Swish Marketing*, 2010 WL 653486, at \*5-6 (N.D. Cal. Feb. 22, 2010); *see Tierney v. Advoc. Health & Hosps. Corp.*, 797 F.3d 449, 451-52 (7th Cir. 2015).

## B.  The FTC Fails To Adequately Allege "Substantial Assistance" By Walmart

The FTC also fails to adequately allege that Walmart provided "substantial assistance" to telemarketers or sellers engaged in unlawful telemarketing.  16 C.F.R. § 310.3(b).

### 1.  Routine Processing Of Money Transfers Is Not "Substantial Assistance"

Although the TSR does not define the term "substantial assistance," the FTC made clear in promulgating Section 310.3(b) that this element incorporates standard aiding-and-abetting principles from tort and securities law.  60 Fed. Reg. at 43,851-52 & nn.96-98 (invoking Restatement (Second) of Torts § 876(b) (1977) (Second Restatement) as well as tort and securities cases); *see FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017).  As explained in the lead case the FTC cited in promulgating the rule, "substantial assistance" requires "*actively* participat[ing]" in the unlawful conduct.  *Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991) (emphasis added) (cited at 60 Fed. Reg. at 43,851 n.97); *see also, e.g.*, *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018) (to provide "substantial assistance" under tort law, defendant "must actively participate in the tortious conduct of another").

Critically, "active participation" requires "something *more* than routine professional services provided to the primary wrongdoer."  Restatement (Third) of Torts: Liability for Economic Harm § 28 cmt. d (2020) (Third Restatement) (emphasis added); *see also* Second Restatement § 876 cmt. d.  That is because providing routine services, like processing transactions

17

as an intermediary, is at most "passive" conduct that does not amount to "active" participation. *In re TelexFree Sec. Litig.*, 357 F. Supp. 3d 70, 76 (D. Mass. 2019). Performing routine transactional services that "'constitute the daily grist of the mill'" is not substantial assistance as a matter of law, even if it happens to facilitate another's misconduct. *Schatz*, 943 F.2d at 497.

The only affirmative conduct alleged in the complaint is that Walmart "processed" money transfers for consumers who had been victimized by unlawful third-party telemarketers. *See* Compl. ¶¶ 2, 112. But as the FTC acknowledges, money transfers are generally routine and legitimate transactions—one of the many forms of financial services used by "'millions of customers'" to send money "around the world." *Id.* ¶¶ 8-9. Customers use money transfers for "numerous reasons," including to "pay their rent," to "send money to family to pay tuition and medical bills," to "transfer money to friends," and even to "help victims in areas devastated by disasters." 80 Fed. Reg. at 77,545, 77,550. And as the FTC appears to recognize, Walmart processed the allegedly unlawful transactions at issue on precisely the same terms—and in precisely the same way—that it processed transactions for all other customers. In all cases, Walmart merely followed the directions of its customers.

Under standard tort principles, Walmart's provision of "routine professional services" to customers targeted by third-party fraud does not count as "substantial assistance" to the fraudsters. Third Restatement § 28 cmt. d. Indeed, the Third Restatement illustrates this principle with a hypothetical example that plainly exculpates Walmart here:

> Swindler establishes a fraudulent investment firm. Customer, unaware of the fraud, wires money to Swindler in hopes of making a profit. Swindler disappears with Customer's money. Customer sues Bank for aiding and abetting Swindler's misconduct. Customer offers evidence that Bank had documents revealing that Swindler's enterprise was fraudulent, and that Bank nevertheless processed customer's wire transfer. ***Customer's claim fails*** because Bank's possession of revealing documents is not "knowledge," and ***because***

18

> ***processing a routine wire transfer, without more, is not substantial
> assistance of Swindler's wrongdoing.***

*Id.* § 28 illust. 5 (emphasis added). If anything, Walmart's alleged conduct here is even less
culpable than the hypothesized bank, which possessed documents specifically showing that the
Swindler's enterprise was unlawful. The FTC alleges nothing like that here.

The Restatement's example tracks the legion of cases holding that "[t]he provision of
routine banking services to alleged fraudsters, even if it aids in the commission of the fraud, simply
does not qualify as substantial assistance." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 416
& n.35 (S.D.N.Y. 2021) (collecting cases).[4] The same is true in the analogous securities context—
processing "an entirely routine transaction" does not constitute substantial assistance. *Thornock
v. Kinderhill Corp.*, 749 F. Supp. 513, 517 (S.D.N.Y. 1990).[5] And these cases reflect the broader
point, explained by Judge Easterbrook for the Seventh Circuit, that passively providing routine
intermediary services to consumers does not fall within the "ordinary understanding of culpable
assistance to a wrongdoer." *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003); *see infra* at 32-

---

[4] *See also, e.g.*, *Heinert v. Bank of Am., N.A.*, 410 F. Supp. 3d 544, 552 (W.D.N.Y. 2019)
("providing banking services, including making wire transfers, opening accounts, and clearing
account holds" does not "allege substantial assistance as a matter of law"), *aff'd*, 835 F. App'x 627
(2d Cir. 2020); *TelexFree*, 357 F. Supp. 3d at 76-77 (same); *Zamora v. JPMorgan Chase Bank,
N.A.*, 2015 WL 4653234, at *3 (S.D.N.Y. July 31, 2015) (same); *El Camino Res., LTD. v.
Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 911 (W.D. Mich. 2010) (same), *aff'd*, 712 F.3d 917
(6th Cir. 2013); *Premier Cap. Mgmt., LLC v. Cohen*, 2008 WL 4378313, at *6 (N.D. Ill. Mar. 24,
2008) (bank did not "substantially assist" fraudster by having "extended overdrafts, set up escrow
accounts, provided debit cards, and processed fund transfers").

[5] *See also, e.g.*, *Stander v. Fin. Clearing & Servs. Corp.*, 730 F. Supp. 1282, 1287-88
(S.D.N.Y. 1990) (dismissing claim that broker "substantially assisted in [fraudsters'] illegal
activity" by "clearing and servicing [customer] account"); *Delany v. Blunt, Ellis & Loewi*, 631 F.
Supp. 175, 181 (N.D. Ill. 1986) (allegations that bank engaged in "ordinary commercial
transaction" of "extending financing does not form the basis for an implication of the 'substantial
assistance' required for aiding and abetting liability"); *cf. Schlifke v. Seafirst Corp.*, 866 F.2d 935,
947 n.13 (7th Cir. 1989) (noting rulings that a bank's "extension of loans to investors . . . was not
evidence of 'substantial assistance' because banks routinely engage in such transactions").

33.   In short, allegations that a business performed routine transactions for its customers—including "'recei[ving] and transferr[ing] funds'" and processing "wire transfers"—are "patently insufficient to plead substantial assistance." *Berdeaux*, 561 F. Supp. 3d at 416 & n.35.

These principles fully control here.  Walmart's processing of millions of money transfers is precisely the sort of routine transactional conduct that is patently insufficient to plead substantial assistance.  *See, e.g.*, *Grijalva v. Kevin Mason, P.A.*, 2019 WL 8221076, at *5 (C.D. Cal. Dec. 30, 2019) (dismissing claim that a payment processor had "substantially assisted in violations of the TSR[]" by "merely acting as a payment processor and accepting, for a fee, monthly payments before remitting them to [the alleged telemarketers]").

### 2.   Not Adopting Additional FTC-Preferred Anti-Fraud Measures Is Not "Substantial Assistance"

The FTC also claims that Walmart "substantially assist[ed] fraudsters, including telemarketers and sellers" "[b]y *failing* to have [certain] policies, procedures, and practices." Compl. ¶ 56 (emphasis added).  Indeed, the entire complaint is built on Walmart's alleged "failure" to implement certain vaguely specified additional anti-fraud measures.  *Id.* ¶ 1; *see, e.g.*, *id.* ¶¶ 49-51, 55-56, 66-69, 70, 80, 81, 91, 99, 102, 104.  Of course, nothing in the TSR itself expressly requires any of the FTC's preferred measures.  The FTC's theory that the absence of such measures amounts to "substantial assistance" runs headlong into the well-settled rule that, because "'[s]ubstantial assistance' means *active* participation," it does not include a *failure* to act.  Third Restatement § 28 cmt. d (emphasis added); *see, e.g.*, *Hutchison*, 910 F.3d at 1026 (applying Restatement and noting that "failing to act" does not "amount to substantial assistance").  Liability for substantial assistance "must be based on affirmative acts, not acts that should have been taken." *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 503 (N.D. Ind. 2014) (collecting cases).  "[F]ailing to prevent certain conduct" is not substantial assistance, *Hutchinson*, 910 F.3d at 1026 (citation

omitted), nor is "simply *enabling* consumers to use a legal service," *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014).

Cases in the transaction-processing context are again instructive. They firmly hold that, absent a preexisting "fiduciary duty" (which is not alleged here), the "failure to act may not serve as the basis for claiming that the defendant provided substantial assistance" as a matter of law. *Berdeaux*, 561 F. Supp. 3d at 417 (quoting *In re Agape Litig.*, 773 F. Supp. 2d 298, 322 (E.D.N.Y. 2011)). Courts often apply this principle in dismissing substantial-assistance claims based on a service provider's failure to implement preventive measures against misconduct by third parties.[6]

The FTC's failure-to-act theory of substantial assistance cannot be reconciled with these longstanding principles. And the FTC's overreach is especially egregious given that the agency *refused* to require one of the very acts that it now blames Walmart for failing to undertake. The FTC alleges that "[u]ntil at least March 2019, Walmart did not even take steps to ensure that its associates asked senders questions about whether their transfers were related to telemarketing or warned them about the fact that the TSR prohibits cash-to-cash money transfers as a form of payment for telemarketing transactions." Compl. ¶ 69. But in its most recent amendments to the TSR, the FTC considered "whether money transfer providers 'will be required to ask consumers

---

[6] *See also Berdeaux*, 561 F. Supp. 3d at 417 (bank's alleged "failure to take more exhaustive or efficacious measures following its investigation of [a suspected fraudster]"); *Glob. Cash Network, Inc. v. Worldpay, US, Inc.*, 148 F. Supp. 3d 716, 725 & n.15 (N.D. Ill. 2015) (processor's alleged "failure 'to employ proper and reasonable security measures'"); *Hongying Zhao v. JPMorgan Chase & Co.*, 2019 WL 1173010, at *7 (S.D.N.Y. Mar. 13, 2019) (bank's alleged "failure to report allegedly suspicious or illegal activity"); *Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F. Supp. 2d 508, 516 (S.D.N.Y. 2012) (vendor's alleged "fail[ure]" to stop orders with a "suspicious nature"); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007) (bank's alleged "fail[ure] to comply with domestic and international bank secrecy, know-your-customer, and anti-money laundering laws, decrees, and regulations"); *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 392 (S.D.N.Y. 2007) (bank's alleged "fail[ure] to prevent itself 'from being used to both defraud [customers] and to launder money'").

several questions at the point of sale in order to ascertain whether they are sending money related to a telemarketing call.'" 80 Fed. Reg. at 77,545. Despite commentators favoring such a rule, *id.* at 77,544, the FTC declined to adopt it. The FTC cannot now turn around and claim Walmart has violated a phantom requirement appearing nowhere in the TSR.

The FTC's theory of substantial assistance in this case is unprecedented. As far as Walmart is aware, no court has ever used the TSR's substantial-assistance provision to impose liability on good-faith actors engaged in the routine provision of lawful intermediary services to consumers, simply because they failed to take additional measures to prevent TSR violations by third-party criminals. Instead, the TSR's substantial-assistance provision has been applied to target actors who are intimately involved in affirmatively abetting an established, consistent telemarketing scheme.[7] The FTC's dramatic departure from past practice confirms that the agency is stretching the concept of substantial assistance beyond its breaking point.

### C. The FTC Fails To Adequately Allege That Walmart Knew Or Consciously Avoided Knowing That Any Particular Transaction Violated The TSR

The complaint also fails to adequately allege that Walmart provided substantial assistance to a seller or telemarketer when it "kn[ew] or consciously avoid[ed] knowing" that the seller or

---

[7] *See, e.g.*, *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) ("helping develop the questionnaire the telemarketers used to obtain information," providing "training," responding to consumer inquiries and complaints, and "brainstorming ways for [telemarketers] to collectively expand their business"); *FTC v. Nudge, LLC*, 2022 WL 2132695, at *57 (D. Utah June 14, 2022) (acting as "celebrity endorsers" to market the telemarketer's programs and working "closely with [telemarketer] to monitor and improve" its business); *FTC v. Elec. Payment Sols. of Am. Inc.*, 2021 WL 3661138, at *12-13 (D. Ariz. Aug. 11, 2021) (underwriting and approving merchant accounts for telemarketer's fictitious companies); *FTC v. HES Merch. Servs. Co., Inc.*, 2016 WL 10880223, at *3-5 (M.D. Fla. Oct. 26, 2016) (providing telemarketers with merchant accounts after reviewing detailed applications and working closely with the telemarketers to ensure high sales); *FTC v. Consumer Health Benefits Ass'n*, 2011 WL 13254502, at *4 (E.D.N.Y. Oct. 12, 2011) (reviewing telemarketers' "sales materials," assisting with "responding to consumer complaints regarding the marketing," and operating a "call center to manage customer service calls").

telemarketer was engaged in an unlawful practice. 16 C.F.R. § 310.3(b). Like the substantial-assistance requirement, this knowledge element is grounded in a "substantial body" of aiding-and-abetting principles set forth in the Restatement and case law, and it requires the FTC to show "actual knowledge" or a "conscious avoidance" of knowledge at the time of the alleged substantial assistance. 60 Fed. Reg. at 43,852; *see* 80 Fed. Reg. at 77,547, 77,552 (reaffirming this standard).

The FTC has made clear that conscious avoidance of knowledge does *not* permit the FTC to merely claim that a defendant "should [have] know[n]" of TSR violations. 60 Fed. Reg. at 43,852. Rather, the FTC must show "*deliberate* ignorance on the part of a person that the seller or telemarketer is engaged in an act or practice that violates [the TSR]." *Id.* at 43,852 (footnote omitted); *see Chapman*, 714 F.3d at 1219 (conscious avoidance means taking "*deliberate* steps to *ensure* one's own ignorance of a seller or telemarketer's [TSR] violations" (emphasis added)).

That is consistent with the traditional aiding-and-abetting principles the FTC invoked when promulgating Section 310.3(b). As the Seventh Circuit has explained, "actual knowledge and deliberate avoidance of knowledge are the same thing," *United States v. Ladish Malting Co.*, 135 F.3d 484, 488 (7th Cir. 1998), and the latter simply accounts for a defendant that has a "strong suspicion" of wrongdoing and "consciously" "attempt[s] to insulate [itself] from guilty knowledge," *United States v. Williams*, 1994 WL 463430, at *6-7 (7th Cir. Aug. 26, 1994) (cited at 60 Fed. Reg. at 43,852 n.106). Conscious avoidance thus requires the defendant to have "deliberately closed his eyes to what otherwise would have been obvious to him," *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1196 (2d Cir. 1989) (cited at 60 Fed. Reg. at 43,852 n.105), such that the lack of actual knowledge results "solely and entirely" from "a conscious purpose to avoid learning the truth," *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) (en banc) (cited at 60 Fed. Reg. at 43,852 n.105). Especially in the context of a service provider

23

processing routine transactions, "alleging actual knowledge through conscious avoidance is a very high bar." *Agape*, 773 F. Supp. 2d at 319.

The FTC fails to clear that bar. None of its allegations plausibly suggests that Walmart deliberately closed its eyes to obvious telemarketing-based fraud as a means of avoiding actual knowledge. The FTC alleges precisely the opposite, admitting that Walmart has increasingly tried to *detect* and *prevent* fraud by voluntarily implementing an "anti-fraud and consumer protection program" that dates back to at least November 2014. Compl. ¶ 51. And the "goal" of this program "was 'to educate, detect, investigate, respond, and deter consumer fraud against our customers.'" *Id.* ¶ 55. While the FTC claims that this program was not, in its view, perfectly "effective[]," *id.*, Walmart's various efforts to detect and prevent fraud undermine any suggestion that Walmart was deliberately seeking to avoid actual knowledge.

The FTC's main theory seems to rely on Walmart's supposed general "awareness" that some customers may have requested money transfers in response to "telemarketing." *Id.* ¶ 65. According to the FTC, Walmart "has been aware" that "telemarketing scams" have occurred "at Walmart," *id.* ¶ 27, and Walmart "has been aware that phone calls are commonly used to defraud consumers," *id.* ¶ 80. But the FTC's reliance on Walmart's generalized "awareness" runs afoul of the TSR's text, which prohibits the provision of "substantial assistance" to a "seller or telemarketer" only "when [the defendant] knows or consciously avoids knowing that *the* seller or telemarketer is engaged in any act or practice that violates [the TSR]." 16 C.F.R. § 310.3(b) (emphasis added). The regulation's use of the definite article—knowledge about what "*the* seller or telemarketer is engaged in"—makes clear that the requisite knowledge must exist for each particular transaction alleged to be unlawful. *See, e.g.*, *Hunte v. Safeguard Properties Mgmt., LLC*, 255 F. Supp. 3d 722, 726 (N.D. Ill. 2017) ("[I]t is a rule of law well established that the definite

24

article 'the' particularizes the subject which it precedes." (citation omitted)); *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1483 (2021).  The FTC itself has similarly stated that what matters is "knowledge that *the* transfer is related to telemarketing."  80 Fed. Reg. at 77,552 (emphasis added).

So the FTC cannot simply point to some generalized awareness by Walmart that, out of the millions of money transfers processed across thousands of locations, a tiny percentage may have been induced by a telemarketing scam.  The TSR demands knowledge (or conscious avoidance) on a transaction- or telemarketer-specific basis.  Otherwise, every telephone company in the country would be deemed to have knowledge of every TSR violation committed over its network simply based on a general awareness that its services are sometimes "used by known and suspected fraudsters" to commit TSR violations.  Compl. ¶ 65.  That is not the law.

Also meritless is the FTC's suggestion that Walmart "had reason to believe" that some unspecified number of transactions were "related to consumer frauds" based on their supposedly "suspicious characteristics."  *Id.* ¶ 96.  Again, the FTC points to no specific transactions; nor does it attempt to connect any supposedly "suspicious characteristics" to telemarketing or the TSR.

In any event, this theory at most suggests that Walmart *should have known* of unlawful conduct.  But the FTC expressly disavowed a "should [have] know[n]" standard when promulgating the TSR.  60 Fed. Reg. at 43,852; *accord Ladish Malting*, 135 F.3d at 488 (explaining that "deliberate avoidance of knowledge" is not satisfied by "what a person 'should have known'").  That tracks the traditional rule often applied in the analogous banking context: Claims that a defendant "should have known" about fraud based on "red flags indicating unauthorized and fraudulent activity" do not "rise to the level of conscious avoidance."  *Banco Indus. de Venezuela*, 888 F. Supp. 2d at 514-15; *see, e.g.*, *Agape*, 773 F. Supp. 2d at 320 (failing "to investigate a potential fraud," even "when faced with 'red flags,'" "does not constitute

25

conscious avoidance"). That limitation is particularly important when, as here, many of the supposedly "suspicious" characteristics—things like the sender's "age," the number and "dollar amounts" of their transactions, the recipient's "countr[y]," or their use of "out-of-state, including foreign, IDs," Compl. ¶ 96-97—are also "entirely consistent with normal, lawful business practices," *Krys v. Pigott*, 749 F.3d 117, 132 (2d Cir. 2014).

Finally, the FTC clings to Walmart's alleged failure to do more, such as interrogate its customers about the "nature or purpose of their money transfers." Compl. ¶ 65; *see id.* ¶¶ 80, 99. This is also insufficient as a matter of law. "Failing to display curiosity" or uncover wrongdoing "is not enough" to "support an inference of 'deliberate ignorance.'" *United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th Cir. 2009). Rather, "the defendant must affirmatively 'act *to avoid learning the truth*.'" *Id.* (emphasis altered). So even if (as the FTC seems to think) Walmart's supposed failure to ask customers intrusive questions about the purpose of their money transfers meant that Walmart did not uncover specific TSR violations, that failure could count as "conscious avoidance" only if it was motivated "*specifically to avoid knowledge of*" the TSR violations. *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 628 (2d Cir. 2020) (emphasis added); *see, e.g.*, *Agape*, 773 F. Supp. 2d at 320 (same point); *Berdeaux*, 561 F. Supp. 3d at 416 (same).

The FTC does not—and cannot—allege that the "purpose" of Walmart's supposed failures was "solely and entirely" to "avoid learning" of TSR violations. *Jewell*, 532 F.2d at 704. Nor do the alleged facts support any inference along these lines, especially given the obvious burdens additional measures would impose on Walmart, its customers, and their privacy.

**D.     At A Minimum, The TSR Claim For Penalties Must Be Dismissed Because The FTC Fails To Adequately Allege That Walmart Knew Its Own Conduct Violated The TSR**

The FTC's TSR claim for civil monetary penalties also independently fails. The FTC seeks "monetary civil penalties for each violation of the TSR" pursuant to Section 5(m)(1)(A) of the

FTC Act. Compl. ¶¶ 1, 118. That provision authorizes the FTC to seek civil penalties against anyone who "violates any rule under this subchapter . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive *and is prohibited by such rule*." 15 U.S.C. § 45(m)(1)(A) (emphasis added). Thus, the FTC needs to allege not only Walmart's knowledge or deliberate ignorance of an underlying TSR violation (which it has failed to do, *supra* at 22-26), but also that Walmart acted "with actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its *own* conduct violated the TSR's substantial-assistance provision. *Id.*

The FTC does not come close to meeting that standard. It does not even try to allege that Walmart actually knew it was violating the TSR. As the Seventh Circuit has explained, "knowledge" is "fairly implied" under Section 5(m) only when the defendant "should have known [its] act was unlawful" based on "the text" of the law itself. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 978-79 (7th Cir. 2020); *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583-84 (2010) (confirming that defendant's mistake or uncertainty as to law precludes liability). The FTC cannot satisfy that prong: None of the supposed deficiencies in Walmart's anti-fraud program is mentioned in, or directly implied by, "[t]he [TSR's] text." *Dish Network*, 954 F.3d. at 979. And as the FTC has acknowledged, the agency cannot "impose a monetary penalty" unless the law provided the defendant with notice of "the specific . . . measures it needed to take [to comply]." FTC Br. 20, *LabMD*, *supra* (No. 16-16270), 2017 WL 562771.

Moreover, the strong arguments above showing that Walmart's conduct does not qualify as substantial assistance—and that Walmart did not possess the requisite degree of knowledge of underlying TSR violations—refute any fair implication that Walmart knew it was violating the law. *Cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007) ("Where, as here, the statutory

text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator."). Thus, even if the FTC could somehow shoehorn its theory into the substantial-assistance provision, the FTC cannot plausibly allege that Walmart knew or should have known, based on the TSR's text, that its failure to undertake the myriad measures identified by the FTC to root out telemarketing-based transactions was unlawful. The FTC's claim for civil penalties under the TSR accordingly fails.

## III. THE SECTION 5 CLAIM MUST BE DISMISSED

The FTC also seeks to enjoin Walmart's alleged "unfair acts or practices" under Section 5 of the FTC Act. *See* Compl. ¶¶ 108-10. That claim likewise fails on multiple grounds.

### A. The FTC Fails To Adequately Allege Ongoing Or Imminent Misconduct

The FTC brings its Section 5 claim for injunctive relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). *See* Compl. ¶ 1. But that provision allows the FTC to obtain an injunction only if the defendant "*is violating*, or *is about to violate*, any provision of law enforced by the [FTC]." 15 U.S.C. § 53(b) (emphasis added). By "requir[ing] that the defendant must be 'violating' or 'about to violate' the law," Section 13(b)'s text "require[s]" the FTC to demonstrate "the existence of *ongoing* or *imminent* unlawful conduct." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772-73 (7th Cir. 2019) (emphasis added); *see also AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021). At the pleading stage, this requires more than simply alleging "a violation in the distant past and a vague and generalized likelihood of recurrent conduct." *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158-59 (3d Cir. 2019); *see also, e.g.*, *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 26-27 (D.D.C. 2021) ("conclusory allegation" that "Facebook is likely to reinstitute [unlawful] policies" based on its past conduct is "insufficient to establish the requisite imminence"), *reiterated in FTC v. Facebook, Inc.*, 2022 WL 103308, at *16 (D.D.C. Jan. 11,

2022). That is particularly true when the alleged "channel of misconduct" is either "defunct" or "reformed." *FTC v. AdvoCare Int'l, L.P.*, 2020 WL 6741968, at *6 (E.D. Tex. Nov. 16, 2020).

Here, the FTC has not adequately alleged that Walmart "is violating, or is about to violate" Section 5. 15 U.S.C. § 53(b). Instead, virtually all of the FTC's allegations about Walmart's anti-fraud program concern *past* conduct—specifically, Walmart's alleged failure to take certain specific anti-fraud measures years ago. *See* Compl. ¶¶ 51-103. The FTC then tacks on a general allegation that it "has reason to believe that Walmart is violating or is about to violate laws enforced by the FTC because, among other things, it engaged in its unlawful acts and practices repeatedly for several years." *Id.* ¶ 105. This assertion is conclusory and insufficient. It is also implausible, given that—as the FTC itself repeatedly acknowledges—Walmart has made "significant changes to certain of its practices" over the years. *Id.*; *see also, e.g.*, *id.* ¶¶ 57, 62, 64, 76. All of these changes are structural changes that Walmart embedded into its anti-fraud program at significant expense. The FTC offers no reason to believe Walmart is on the verge of abandoning all of the structural improvements it has made to its anti-fraud program.

In short, the FTC's Section 5 claim rests on "long-past conduct" plus a conclusory allegation "that a violation could recur at some future point." *Shire*, 917 F.3d at 156, 159. That is insufficient under Section 13(b). The Section 5 injunctive-relief claim should be dismissed.[8]

### B. The FTC Fails To Adequately Allege An "Unfair" Act Or Practice

Section 13(b)'s ongoing-or-imminent requirement means that the only allegations relevant to the Section 5 claim are allegations about Walmart's *current* conduct and practices. In any event, the FTC fails to identify *any* Walmart "act or practice"—past or present—qualifying as "unfair"

---

[8] The FTC has also failed to allege an ongoing or imminent TSR violation , which precludes any injunctive relief under Section 13(b) based on the TSR claim. *See supra* at 14-28.

under Section 5.  15 U.S.C. § 45(a).

As the Seventh Circuit has observed, "statutory terms like 'unfair'" are "'as vague as they come.'"  *Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 625-26 (7th Cir. 2020) (citation omitted).  The Seventh Circuit, however, has clarified—and narrowed—the scope of Section 5 liability by holding that "a practice is unfair [1] when it offends established public policy and [2] when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976); *see also Samuels v. Old Kent Bank*, 1997 WL 458434, at *9 (N.D. Ill. Aug. 1, 1997) (noting that *Spiegel* reflects the Seventh Circuit's "interpret[ation] [of] the meaning of the term 'unfair practice' in the context of [Section 5]").  Here, the FTC's complaint does not adequately allege facts meeting either required prong of *Spiegel*'s "unfair" practice definition.

### 1.  The FTC Fails To Allege That Walmart's Conduct Violates "Established Public Policy"

The FTC's theory of unfairness in this case fails *Spiegel*'s first prong because it has no support in "established public policy."  *Spiegel*, 540 F.2d at 293.  As the Eleventh Circuit has elaborated on the "public policy" requirement, an "act or practice's 'unfairness' must be grounded in" a "well-established legal policy" embodied in a "statute, judicial decisions—i.e., the common law—or the Constitution."  *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 (11th Cir. 2018).  "An act or practice that . . . lacks such grounding is not unfair within Section 5(a)'s meaning."  *Id.*

The public-policy requirement not only reins in "the limits of the unfairness doctrine," *id.* at 1228-29 (citation omitted), but also helps ensure that regulated parties have fair notice of the law's meaning.  Grounding Section 5(a)'s unfairness prohibition in well-established legal policies thus reduces the risk that Section 5 will be applied in unfair or unexpected ways.  *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 405-06 (2010) (courts must interpret statutes to "'avoid

30

constitutional difficulties,'" including "impermissibl[e] vague[ness]").[9]  And because the FTC's interpretation of "unfairness" would empower the agency to assert highly consequential power to bring Section 5 cases against Walmart and other companies without a clear congressional statement of what conduct is actually prohibited, a narrower construction requiring the agency to point to "established public policy" avoids running headlong into the major questions doctrine. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).[10]

Here, the FTC's theory is that Walmart's conduct is "unfair" because it provides intermediary money-transfer services allowing consumers to send money to recipients of their choice without implementing a sufficiently "effective" anti-fraud program.  Compl. ¶¶ 1, 108-10. That theory has no support in any "'clear and well-established' policies that are expressed in the Constitution, statutes, or the common law."  *LabMD*, 894 F.3d at 1231.  The complaint does not identify any settled constitutional, statutory, or common law policy supporting its position.

If anything, settled legal policies like the "common law of negligence," *id.*, underscore the *flaws* of the FTC's theory.  Under traditional negligence principles, an actor has no duty to guard against intentional or criminal misconduct of others unless (1) there is a special responsibility owed to the victim created through a special relationship of trust, or (2) the actor's own affirmative act

---

[9] In *Skilling*, the Supreme Court narrowed the facially vague statute prohibiting "honest services" fraud, 18 U.S.C. § 1346, to apply only to those who violated their fiduciary duties by engaging in "bribes and kickbacks."  561 U.S. at 407-09.  In doing so, the Court relied on external legal sources—including the law of fiduciary duty, as well as "federal statutes proscribing—and defining—similar crimes"—to give concrete and objective guidance as to the scope of "honest services" fraud.  *Id.* at 412-13.  *Spiegel* and *LabMD*'s public policy requirement does much the same thing with respect to Section 5's prohibition of "unfair" conduct.

[10] A narrow interpretation of "unfair" also avoids constitutional difficulties under the non-delegation doctrine, *see Mistretta v. United States*, 488 U.S. 361, 371-73 (1989), because Congress could not constitutionally delegate near-limitless authority to the FTC to determine that a company is acting "unfair[ly]."  Here, for example, there is no reason to think Congress's decision to prohibit "unfair" conduct empowers the FTC to sue companies when their customers suffer harm inflicted by third parties—despite the companies' efforts to prevent that harm.

created or exposed the victim to a high degree of risk of harm. *See* Second Restatement § 302B cmt. e. Although Walmart has voluntarily gone to great lengths to help its customers avoid fraud, it has no responsibility to protect against the criminal conduct of third parties. *See, e.g.*, *Interactive Intelligence, Inc. v. KeyCorp*, 546 F.3d 897, 901 (7th Cir. 2008) (noting that "a commercial relationship" with a customer "'does not create a special relationship'"). Nor did Walmart—by allowing customers to transfer money to others—affirmatively risk harming consumers. "[S]imply enabling consumers to use a legal service" does not create a risk of harm or give rise to a duty to protect consumers from such harm. *Vesely*, 762 F.3d at 666 (rejecting liability of online retailer for selling firearms later used in criminal activities).

Judge Easterbrook's opinion for the Seventh Circuit in *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003), explains why intermediary services—like Walmart's money-transfer service—are not liable for third-party criminal activity. In *GTE*, internet service providers were sued for providing web-hosting services to a video producer who sold unauthorized videos of the plaintiffs. After observing that the plaintiffs could not identify "any case in any jurisdiction holding that a service provider must take reasonable care to prevent injury to third parties," *id.* at 661, the court persuasively explained why such a boundless theory of liability does not exist: "Consider the Postal Service or Federal Express, which sell transportation services that could be used to carry harmful articles. As far as we can discover, no court has held such a carrier liable for failure to detect and remove harmful items from shipments." *Id.* "Similarly," the court continued, "telephone companies are free to sell phone lines . . . without endeavoring to find out what use the customers make of the service." *Id.* The court applied that same common-sense reasoning to the defendant service providers, observing that "[a] web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits." *Id.* at

659. "Just as the telephone company is not liable . . . for [unlawful] tapes or narcotics sold by phone, and the Postal Service is not liable for tapes sold (and delivered) by mail," the fact that "web hosting services likewise may be used to carry out illegal activities does not justify condemning their provision whenever a given customer turns out to be crooked." *Id.*

These principles are also reflected in the law's treatment of banks and other providers of financial services. An "unequivocal line of authority" holds that banks "have no independent duty to supervise transactions on a customer's account" or "to investigate transactions made by authorized agents of the account holder" to determine whether the customer is committing fraud or other unlawful activity. *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947-48 & n.7 (11th Cir. 2014). Indeed, courts have held that a bank has "no affirmative duty to detect and thwart [a customer's] fraud" "even where . . . the bank receives an explicit report of the fraud." *Agape*, 773 F. Supp. 2d at 323 (collecting cases). The reason banks and merchants are not typically liable for serving as conduits for unlawful activity is straightforward: Imposing a "duty to investigate the suspicious activities of the bank's or merchant's customers" not only "run[s] the risk of violating the bank's or merchant's customers' right to privacy," but also "forc[es] the bank or merchant to act as the guarantor of their customers' transactions." *QDOS, Inc. v. Signature Fin., LLC*, 225 Cal. Rptr. 3d 869, 876 n.3 (Cal. Ct. App. 2017).

The reasoning of these cases fully applies here—and refutes the existence of any settled policy condemning Walmart's conduct. Walmart is dedicated to its customers and has implemented measures to help them avoid fraud. But the fact that otherwise-legal money transfers "may be used to carry out illegal activities does not justify condemning their provision whenever a given customer turns out to be crooked." *GTE*, 347 F.3d at 659. Holding Walmart responsible for the criminal misconduct of third-party fraudsters would force it to act as the guarantor of money

transfers without any legal duty supporting that obligation. It would also force Walmart to invade consumer privacy—and potentially violate anti-discrimination law—by inquiring into their customers' reasons for sending or receiving a money transfer, evidently by profiling customers based on such "suspicious characteristics" as their "age." Compl. ¶ 96. The FTC's theory flunks *Spiegel*'s "established public policy" requirement.

> **2.     The FTC Fails To Adequately Allege That Walmart's Conduct Is "Immoral, Unethical, Oppressive, Unscrupulous Or Substantially Injurious To Consumers"**

The FTC also fails to allege that Walmart's conduct satisfies *Spiegel*'s additional requirement that Section 5 "unfair" conduct be either "immoral, unethical, oppressive, unscrupulous," or "substantially injurious to consumers." 540 F.2d at 293.

*First*, the complaint does not allege that Walmart's conduct is "immoral," "unethical," "oppressive," or "unscrupulous." This portion of the Seventh Circuit's test requires morally blameworthy conduct by Walmart, in keeping with the ordinary meaning of the statutory term "unfair." *See Zablocki*, 968 F.3d at 627 ("The ordinary meaning of 'unfair' is 'marked by injustice, partiality, or deception: unjust, dishonest.'" (quoting *Webster's Third New International Dictionary* 2494 (1976))).[11]

No such blameworthy conduct is alleged here. The complaint does not claim that Walmart tricks, lies to, or takes advantage of consumers, nor that Walmart acts unjustly or corruptly. The absence of such allegations sets this case far apart from the few unfairness cases previously brought

---

[11] *See also, e.g.*, *Webster's New International Dictionary* 2773 (2d ed. 1934) (defining "unfair" to mean "disingenuous," "using or involving trick or artifice," "dishonest," and "unjust"); *Webster's Encyclopedic Dictionary* 788 (1941) ("[n]ot honest; not impartial; disingenuous; using trick or artifice; proceeding from trick or dishonesty"); S. Rep. No. 75-221, at 3 (1937) (indicating that Congress understood "unfair" to mean "exploitation . . . of the public"); S. Rep. No. 74-1705, at 2 (1936) ("acts and practices which deceive and defraud the public").

against platforms that process transactions, all of which involved defendants who actively participated in well-defined fraudulent schemes.[12]  Indeed, the FTC does not dispute that each money transfer processed at Walmart is authorized by the sender and is—on its face—legitimate and legal.  Walmart did not create fraudulent documents or process unauthorized transactions.  And the FTC concedes the alleged fraud occurred well before anyone—fraudster or victim—set foot into a Walmart location.  *See* Compl. ¶ 29 ("By the time they come to Walmart to send money transfers, they have already been deceived by fraudulent schemes.").

If anything, Walmart's conduct is the *opposite* of "unfair" because Walmart has implemented a comprehensive "anti-fraud and consumer protection program," the "goal" of which "was 'to educate, detect, investigate, respond, and deter consumer fraud against our customers.'" *Id.* ¶¶ 51, 55.  As the FTC admits, Walmart has repeatedly updated its own anti-fraud procedures to increase consumer protection while simultaneously urging the money-transfer principals to implement heightened anti-fraud controls.  *See, e.g.*, *id.* ¶¶ 23, 58-60, 76 (discussing revised training policies, revised protocols, and $1 ID requirement); *id.* ¶ 105 (admitting that Walmart has made "significant changes" to improve its program).  The FTC's view that it is "unfair" for Walmart to process money transfers without doing *more* to investigate consumers' motivations for sending or receiving those transfers—on the slim chance that a consumer might have been

---

[12] *See, e.g.*, *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155-57 (9th Cir. 2010) (defendant, which operated a website for creating checks, "expected the site would be used for fraudulent purposes" and was "on notice as to the high [nearly 50%] rate of fraud," yet affirmatively "made [the checks] appear legitimate and credible in the eyes of consumers" "without proper verification" or any other safeguards); *FTC v. Wells*, 385 F. App'x 712, 713 (9th Cir. 2010) (defendant "process[ed] debit transactions to consumers' bank accounts" even though the "debit transactions were unauthorized by consumers" and even though the defendant "received immediate reports of fraud" indicating "10 to 20 times the rates generally permitted for credit card and direct deposit transactions"); *FTC v. Windward Mktg., Inc.*, 1997 WL 33642380, at *12-13 (N.D. Ga. Sept. 30, 1997) (defendant maintained collection accounts "in the names of the fictitious" entities as part of a telemarketing scam while knowing that "approximately 40% of the bank drafts were returned unauthorized").

defrauded by a third-party fraudster—drains the word "unfair" of meaning.

The FTC's failure to allege "immoral, unethical, oppressive, [or] unscrupulous" conduct by Walmart means that the complaint does not allege that Walmart's conduct was "unfair" under the ordinary meaning of that term. That failure warrants dismissal of the FTC's Section 5 claim.

*Second*, the FTC also fails to adequately allege that Walmart's conduct is "substantially injurious to consumers." *Spiegel*, 540 F.2d at 293. Two decades after *Spiegel* was decided, Congress enacted Section 5(n) of the FTC Act to clarify the meaning of the "substantial injury" requirement and thereby limit the FTC's authority to "declare" conduct unfair in rulemaking and agency adjudication. 15 U.S.C. § 45(n). Section 5(n) states:

> The Commission shall have no authority under [15 U.S.C. §§ 45 or 57a] to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is [1] not reasonably avoidable by consumers themselves and [2] not outweighed by countervailing benefits to consumers or to competition.

*Id.* Although Section 5(n) by its terms does not apply to this case—because here the Court, not "[t]he Commission," is adjudicating whether Walmart's conduct is unfair—its statutory requirements nonetheless inform proper application of the *Spiegel* test.

If this case moves past the pleading stage, Walmart will show that the benefits of its robust anti-fraud program far exceed any alleged harm to consumers, especially given the low rate of reported fraud and the substantial benefits of Walmart's money-transfer services to unbanked and underbanked consumers. For present purposes, however, what matters is the FTC's failure to adequately plead that the "substantial injury" allegedly suffered by consumers is "not reasonably avoidable by consumers themselves." *Id.* As the FTC has explained, this requirement preserves the default rule that "consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—[will] govern the market." FTC

Statement of Policy on the Scope of the Consumer Unfairness Jurisdiction (Dec. 17, 1980), *appended to In re Int'l Harvester*, 104 F.T.C. 949, 1070, 1074 (1984) (*1980 Policy Statement*). Liability for "unfair" acts thus requires "some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking." *Id.*; *see Am. Fin. Servs. v. FTC*, 767 F.2d 957, 976 (D.C. Cir. 1985) (an injury is "reasonably avoidable" if consumers can make a "free and informed" choice to avoid it).

The FTC fails to plausibly allege that the alleged injury is not "reasonably avoidable" by consumers. 15 U.S.C. § 45(n). Nowhere does the FTC claim that Walmart's conduct creates an "obstacle to the free exercise of consumer decision-making." *1980 Policy Statement*, 104 F.T.C. at 1074. To the contrary, the FTC's core theory is that Walmart did not sufficiently *inhibit* consumer decisionmaking, by blocking its customers from sending money transfers. And the FTC admits that Walmart currently "provid[es] senders with a printout containing consumer fraud warnings." Compl. ¶ 20. These warnings promote "free and informed" choice, *Am. Fin. Servs.*, 767 F.2d at 976, and "[a]re enough to give a reasonable consumer 'reason to anticipate' the possibility" that their transfer might be the product of fraud, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168-69 (9th Cir. 2012).

Consumers who send money to unverified recipients despite warnings from Walmart have consciously chosen to engage in the transaction. The vast majority of consumers do not send money to scammers—reinforcing that scam-inflicted harms are indeed "reasonably avoidable by consumers themselves," 15 U.S.C. § 45(n). Of course, it is unfortunate that even a tiny percentage of Walmart customers are reportedly tricked into sending money to fraudsters, despite Walmart's anti-fraud measures. But by insisting that Walmart is liable, the FTC ignores the statute's emphasis on consumer choice and penalizes Walmart for not overruling customers and blocking transfers

they have freely chosen to undertake. The FTC's failure to satisfy Section 5(n)'s "reasonably avoidable" element provides yet another independent reason to reject its Section 5 claim.

### C. Applying Section 5 Here Would Violate Due Process

Applying the FTC's broad theory of "unfair" conduct to Walmart in this case would violate the fair notice requirement of the Constitution's Due Process Clause. *See* U.S. Const. amend. V. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This principle forbids finding a legal violation "if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited.'" *Id.* (citation omitted). The principle applies with particular force to regulatory agencies enforcing broad statutory terms: "[T]he [agency's] policy" must provide private parties with "fair notice" that the conduct at issue will be treated as "a violation of [the statute] as interpreted and enforced by the agency." *Id.* at 254.

Neither Section 5 nor any FTC regulation or guidance provided fair notice that Walmart's money-transfer practices are "unfair" simply because the Company's anti-fraud program is, in the FTC's view, insufficiently protective. Because the statutory term "unfair" is "elusive," *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 454 (1986), Congress gave the FTC the authority to develop its meaning through rulemaking and agency adjudication, *see* 15 U.S.C. §§ 45(b), 57a. Indeed, Congress wanted the FTC to promulgate "rules which define *with specificity* acts or practices which are unfair," 15 U.S.C. § 57a(a)(1)(B) (emphasis added), precisely because of Section 5's uncertain breadth. *See Katharine Gibbs Sch. (Inc.) v. FTC*, 612 F.2d 658, 662 (2d Cir. 1979) (vacating FTC rule for not defining unfair acts with specificity); S. Rep. No. 93-1408, at 31 (1974) (Conf. Rep.). Yet the FTC has not done so. The FTC has failed to provide fair notice that the term "unfair" encompasses the alleged shortcomings in Walmart's anti-fraud program.

Nor does the FTC's sprawling complaint explain what the FTC thinks Walmart had to do to avoid Section 5 liability. Rather than commanding Walmart to stop a specific act or practice that clearly violates the law, the complaint reads like an internal audit report, identifying various alleged "deficiencies" in the minutiae of Walmart's anti-fraud program that the FTC believes should be more "reasonable" or "effective." *See, e.g.*, Compl. ¶ 40 (alleging that Walmart failed to "properly" train; "adequately" monitor; "adequately" oversee employees; adopt "effective" policies; or take "other reasonable steps").

Nothing in any statute or rule gave Walmart notice that these supposed "deficiencies"— which criticize, for instance, the specific content on Walmart's eMSAR interface, the length and specificity of its employee training programs, the specific content and size of the warnings provided to consumers—violate the FTC Act. Indeed, the agency seems to be making it up as it goes along, now blaming Walmart for not "limiting" the number of "associates responsible for providing money transfer services," building a new "point-of-sale system" with some undefined set of features that "more effectively address suspicious activities," or "imposing a limit on the amount of money that can be paid out in cash." *Id.* ¶ 104. The FTC is retrospectively trying to overhaul Walmart's anti-fraud program "to meet an indeterminable standard of reasonableness" without identifying "any meaningful standard" in any law that would give Walmart notice "of what constitutes a 'reasonably designed' [anti-fraud] program." *LabMD*, 894 F.3d at 1236.

The complaint implies notice was provided by the FTC's settlements with MoneyGram and Western Union. *See* Compl. ¶¶ 35, 37-38. But the due process question is whether Walmart had sufficient notice of what *the law* proscribes. Those settlements—negotiated consent orders between the FTC and MoneyGram and Western Union—are by definition *not* the law. To the contrary, in a consent order, "it is the agreement of the parties, rather than the force of the law

upon which the complaint was originally based, that creates the obligations embodied in [the order]." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986) (*Firefighters*); *see Beatrice Foods Co. v. FTC*, 540 F.2d 303, 312 (7th Cir. 1976) (FTC consent order "is not a decision on the merits and therefore does not adjudicate the legality of any action by a party thereto"). As a result, consent orders "cannot be persuasively cited in a litigation context" at all, *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 330 n.12 (1961), and do not serve as "precedent for later Commission action," *Beatrice Foods*, 540 F.2d at 312, or otherwise "establish illegal conduct," *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed. Cir. 2001). The FTC has itself repeatedly stressed these same points.[13] In any event, the provisions in these consent orders are just as vague as the FTC's complaint, requiring MoneyGram and Western Union to take "reasonable steps" to prevent fraud such as providing "appropriate and adequate" training and implementing "adequate systematic controls." Compl. ¶¶ 35, 37.[14]

In sum, even if Section 5 could be interpreted to render Walmart's failure to implement specific anti-fraud measures as an "unfair" act or practice, Walmart lacked the constitutionally required notice of that result. Either way, the Section 5 claim fails.

## CONCLUSION

For the foregoing reasons, the FTC's claims against Walmart should be dismissed.

---

[13] *See In re Borg-Warner Corp.*, 101 F.T.C. 863, 939 n.27 (1983) ("[C]onsent orders are the product of negotiation and compromise and do not establish the criteria against which litigated cases are to be measured."); *In re Chrysler Corp.*, 87 F.T.C. 719, 742 n.12 (1976) ("[Consent] orders are negotiated by the parties, and although they are ultimately approved by the Commission, they are not based on any finding of violation . . . ."); *In re Fed. Emps.' Distrib. Co., Inc.*, 56 F.T.C. 550, 574 (1959) ("[A] consent order . . . is not a precedent in other cases for any purpose.").

[14] Contrary to the FTC, Walmart does not have "obligations" enforceable by the FTC under the *MoneyGram* and *Western Union* consent orders, Compl. ¶ 105, because Walmart was not a party to those proceedings. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 89 n.13 (2008) (FTC consent order is "only binding on the parties to the agreement"); *Firefighters*, 478 U.S. at 529 (consent order cannot impose obligations on non-consenting parties).

Dated:  August 29, 2022

Respectfully submitted,

/s/ Sean M. Berkowitz

Roman Martinez (*pro hac vice*)
Drew R. Wisniewski (ARDC No. 1016351)
Jessica L. Saba (*pro hac vice*)
Blake E. Stafford (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004
(202) 637-2200
roman.martinez@lw.com
drew.wisniewski@lw.com
jessica.saba@lw.com
blake.stafford@lw.com

Sean M. Berkowitz (ARDC No. 6209701)
Johanna M. Spellman (ARDC No. 6293851)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
sean.berkowitz@lw.com
johanna.spellman@lw.com

Hashim M. Mooppan (*pro hac vice* pending)
Krista Perry Heckmann (*pro hac vice* pending)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
hmmooppan@jonesday.com
kperryheckmann@jonesday.com

*Counsel for Defendant Walmart Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2022, I filed the foregoing document with the Court through the Court's electronic filing system. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.

 */s/ Sean M. Berkowitz*
Sean M. Berkowitz