**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-3372 |
| v. | ) | |
| | ) | Hon. Manish S. Shah |
| WALMART INC., a corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION
TO WALMART'S MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.     INTRODUCTION ..................................................................................................... 1

II.    FACTUAL BACKGROUND .................................................................................. 7

      A.    WALMART'S AWARENESS OF CONSUMER FRAUD ................................ 8

      B.    WALMART'S INEFFECTIVE ANTI-FRAUD PROGRAM ............................. 9

      C.    THE TSR VIOLATIONS ........................................................................ 13

      D.    CONSUMERS WERE HARMED ............................................................. 14

III.   ARGUMENT ........................................................................................................ 15

      A.    LEGAL STANDARDS .......................................................................... 15

      B.    THE FTC HAS THE AUTHORITY TO BRING THIS ACTION...................... 16

      C.    THE COMPLAINT PROVIDES MORE THAN FAIR NOTICE OF THE
           COMMISSION'S CLAIMS ................................................................... 22

          1.   Walmart Engaged in Unfair Acts and Practices in Violation
              of the FTC Act ....................................................................... 22

              a.  The Complaint Sufficiently Alleges Walmart's Actions Caused
                 Substantial Injury .............................................................24

              b. The Substantial Injury Walmart Caused was Not Reasonable
                Avoidable by Consumers..................................................25

              c. There are no Countervailing Benefits of Walmart's Deficient
                Anti-Fraud Program that Would Outweigh the Harm ..................27

              d. Walmart's Unfair Acts and Practices are Clear ...........................27

          2.   Walmart Assisted and Facilitated Violations of the TSR ............................. 29

              a. The FTC's Allegations of Telemarketers' Unlawful Conduct
                Support a Plausible TSR Claim Against Walmart.....................30

              b. The FTC's Detailed Allegations of Walmart's Midconduct Are
                More Than Adequate to Plead that Walmart Substantially Assisted
                and Faciliated TSR Violations .............................................32

              c. The Complaint Sufficiently Alleges Walmart Knew or
                Consciously Avoided Knowing About the TSR Violations ...................35

      D.    THE RELIEF THE FTC SEEKS IS AUTHORIZED AND APPROPRIATE ..... 37

          1.   Injunctive Relief is Warranted ................................................ 37

          2.   Civil Penalties are Warranted ................................................ 39

IV.   CONCLUSION .................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Agostini v. Felton*,
    521 U.S. 203 (1997) .......................................................................................... 16

*American Fin. Servs. Ass'n v. FTC*,
    767 F.2d 957 (D.C. Cir. 1985) ........................................................................ 23

*AMG Capital Mgmt. v. FTC*,
    141 S. Ct. 1341 (2021) ................................................................................. 3, 39

*AnchorBank, FSB v. Hofer*,
    649 F.3d 610 (7th Cir. 2011) ........................................................................... 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................... 15, 32

*Barr v. Am. Ass'n of Pol. Consultants*,
    140 S. Ct. 2335 (2020) ..................................................................................... 21

*Bowsher v. Synar*,
    478 U.S. 714 (1986) ................................................................................... 20, 21

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................................................................. 20

*Cal. Pac. Bank v. FDIC*,
    885 F.3d 560 (9th Cir. 2018) ............................................................................. 6

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
    761 F.3d 732 (7th Cir. 2014) ........................................................................... 16

*Capital Mgmt. v. FTC*,
    141 S. Ct. 1341 (2021) ................................................................................. 3, 39

*CFPB v. Daniel A. Rosen, Inc.*,
    2022 WL 1514439 (C.D. Cal. Apr. 5, 2022) ................................................... 34

*CFPB v. ITT Educ. Servs., Inc.*,
    219 F. Supp. 3d 878 (S.D. Ind. 2015) .............................................................. 23

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021) ......................................................................... 17, 18, 22

*Doe v. GTE Corp.*,
  347 F.3d 655 (7th Cir. 2003) ........................................................ 25

*Flores v. City of South Bend*,
  997 F.3d 725 (7th Cir. 2021) ........................................................ 15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)............................................................... 17, 20

*Freytag v. Commissioner*,
  501 U.S. 868 (1991)..................................................................... 18

*FTC v. AFD Advisors, LLC*,
  2014 WL 274097 (N.D. Ill. Jan. 24, 2014) ................................ 15, 16

*FTC v. Amazon.com, Inc.*,
  2016 WL 10654030 (W.D. Wash. July 22, 2016) ........................... 23

*FTC v. Chapman*,
  714 F.3d 1211 (10th Cir. 2013) .............................................. passim

*FTC v. Communidyne, Inc.*,
  1993 WL 558754 (N.D. Ill. 1993) .................................................. 16

*FTC v. Consumer Health Benefits Ass'n*,
  2012 WL 1890242 (E.D.N.Y. May 23, 2012) ............................ 29, 32

*FTC v. Cuban Exchange, Inc.*,
  No. 12-CV-5890 (E.D.N.Y. July 30, 2014) ..................................... 31

*FTC v. Elec. Payment Solutions of Am. Inc.*,
  2019 WL 4287298 (D. Ariz. Aug. 28, 2019).................................. 38

*FTC v. Figgie Int'l, Inc.*,
  994 F.2d 595 (9th Cir. 1993) ........................................................ 32

*FTC v. Global Mktg. Group, Inc.*,
  594 F. Supp. 2d 1281 (M.D. Fla. 2008)......................................... 32

*FTC v. HES Merchant Services Co., Inc.*,
  2016 WL 10880223 (M.D. Fla. Oct. 26, 2016) ............................... 30

*FTC v. HES*,
  2014 WL 6863506 (M.D. Fla. Nov. 18, 2014) ................................ 37

*FTC v. J.K. Publ'ns, Inc.*,
   99 F. Supp. 2d 1176 (C.D. Cal. 2000) .................................................................. 27

*FTC v. LendingClub Corp.*,
   2018 WL 11436309 (N.D. Cal. Oct. 3, 2018) ....................................................... 23

*FTC v. Neovi, Inc.*,
   604 F.3d 1150 (9th Cir. 2010) ....................................................... 23, 25, 26, 28

*FTC v. Pac. First Benefit, LLC*,
   472 F. Supp. 2d 974 (N.D. Ill. 2007) .................................................................. 31

*FTC v. Roca Labs, Inc.*,
   345 F. Supp. 3d 1375 (M.D. Fla. 2018) .............................................................. 27

*FTC v. Student Aid Ctr., Inc.*
   281 F. Supp. 3d. 1324 (S.D. Fla. 2016) ......................................................... 15, 16

*FTC v. Subscriberbase Holdings, Inc.*,
   2013 WL 5406225 (N.D. Ill. Sept. 24, 2013) ................................................ 15, 32

*FTC v. Triangle Media Corp.*,
   2018 WL 6305675 (S.D. Cal. Dec. 3, 2018) ........................................................ 38

*FTC v. Wells*,
   385 Fed. Appx. 712 (9th Cir. 2010) ..................................................................... 28

*FTC v. WV Universal Mgmt., LLC*,
   877 F.3d 1234 (11th Cir. 2017) ..................................................................... 33, 35

*FTC v. Wyndham Worldwide Corp.*,
   799 F.3d 236 (3d Cir. 2015) ........................................................... 23, 25, 28

*Grijalva v. Kevin Mason, P.A.*,
   2019 WL 8221076 (C.D. Cal. Dec. 30, 2019) ..................................................... 33

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935) .............................................................................. passim

*In re Aiken Cnty.*,
   645 F.3d 428 (D.C. Cir. 2011) ....................................................................... 17, 18

*In the Matter of Int'l Assoc. of Conf. Interpreters*,
   123 F.T.C. 465 (1997) ......................................................................................... 38

*LabMD, Inc. v. FTC,*
    894 F.3d 1221 (11th Cir. 2018) ........................................................ 24

*Mistretta v. United States,*
    488 U.S. 361 (1989) ........................................................................ 17

*Morrison v. Olson,*
    487 U.S. 654 (1988) ........................................................ 17, 18, 20, 21

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ........................................................................ 21

*Orkin Exterminating Co. v. FTC,*
    849 F.2d 1354 (11th Cir. 1988) ........................................................ 26

*PHH Corporation v. CFPB,*
    881 F.3d 75 (D.C. Cir. 2018) ........................................................... 18

*QDOS, Inc. v. Signature Fin., LLC,*
    225 Cal. Rptr. 3d 869 (Cal. Ct. App. 2017) ...................................... 25

*Schatz v. Rosenburg,*
    943 F.2d 485 (4th Cir. 1991) ........................................................... 34

*Seila Law LLC v. CFPB,*
    140 S. Ct. 2183 (2020) ............................................................. passim

*Spiegel, Inc. v. FTC,*
    540 F.2d 287 (7th Cir. 1976) ........................................................... 23

*U.S. v. Dish Network, L.L.C.,*
    667 F. Supp 2d 952 (C.D. Ill. 2009) ................................................. 39

*U.S. v. MyLife.com, Inc.,*
    499 F.Supp.3d 757 (C.D. Cal. 2020) ................................................ 38

*US v. National Fin. Servs., Inc.,*
    98 F.3d 131 (4th Cir. 1996) ............................................................. 39

*US v. Prochnow,*
    2005 WL 8154273 (N.D. Ga. Dec. 2, 2005) ...................................... 39

*Wiener v. United States,*
    357 U.S. 349 (1958) ........................................................................ 17

*Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.*,
    536 F.3d 663 (7th Cir. 2008) .................................................................. 16

**Statutes**

15 U.S.C. § 45 (FTC Act § 5) ....................................................... 3, 23, 24

15 U.S.C. § 45(n) ........................................................................ 23

15 U.S.C. § 56(a)(l) ....................................................................... 6

15 U.S.C. § 53(b) (FTC Act § 13(b)) ................................................ 3

15 U.S.C. §§ 53(b), 57b(a) (FTC Act §§ 13(b) and 19(a) ...................... 16

15 U.S.C. § 57b (FTC Act § 19) ....................................................... 5

31 U.S.C. §§ 1105(a)(21)(B), 1108 ................................................... 21

**Other Authorities**

Federal Trade Commission Act, P.L. 63-203, 38 Stat. 717 (1914) ............... 19

FTC 1980 Policy Statement on Unfairness .......................................... 24

K. Datla & R. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*,
    98 Cornell L. Rev. 769 (2013) ....................................................... 21

Ohlhausen, M., *Weigh the Label, Not the Tractor: What Goes on the Scale in an FTC Unfairness Cost-Benefit Analysis?*
    83 Geo. Wash. L. Rev. 1999, 2018-24 (2015) .................................... 27

Public Law 73-22 Chapter 38 § 20(b), 48 Stat. 74 (1933) ...................... 19

**Regulations**

16 C.F.R. § 0.8 ........................................................................ 21

16 C.F.R. § 310.3(b) .................................................................. 29

60 Fed. Reg. 43,842 (Aug. 23, 1995) .......................................... 33, 36

80 Fed. Reg. 77,520 (Dec. 14, 2015) ......................................... passim

## I.       INTRODUCTION

The Federal Trade Commission's ("FTC" or "Commission") detailed, 59-page Complaint describes with particularity how Walmart's deficient anti-fraud program relating to the handling of money transfers at its stores has for years enabled scammers, telemarketers, and sellers to easily obtain from consumers the proceeds of their frauds and telemarketing schemes.  For over a decade, Walmart has known that consumers pay fraudsters and telemarketers millions of dollars each year via money transfers at Walmart stores.  Scammers often prefer to be paid via money transfers because it enables them to get their victim's funds quickly while remaining largely anonymous.  Indeed, as early as 2010, Walmart became aware that MoneyGram, which offers its money transfer services in Walmart stores in the U.S., was charged by the FTC with having a deficient anti-fraud program.  To resolve those charges, MoneyGram agreed to an order outlining the steps the company must take to prevent fraudsters from continuing to use its systems to easily obtain fraud proceeds from their victims.  As an agent of MoneyGram that deals directly with consumers, Walmart was served with a copy of that court order.  It similarly was served with the FTC's 2017 order against Western Union and its 2018 modified order against MoneyGram.  The genesis for these latter two orders—as with the 2009 MoneyGram order—was the companies' ongoing failures to implement and maintain an effective anti-fraud program relating to money transfers.

Despite these complaints and court orders against its money transfer service providers, Walmart, which is obligated to maintain its own anti-fraud program,[1] still did not take basic, critical steps and necessary precautions to prevent fraud-induced money transfers from being

---

[1]       As a money services business, Walmart is required by the Bank Secrecy Act "to have an effective AML program to guard against money laundering, including, but not limited to, guarding against the flow of illicit funds, such as funds derived from fraud."  Compl. ¶ 39.

1

sent and received at its stores.  To the contrary, Walmart even adopted practices *that made it easier* for scammers to obtain the fruits of their frauds through money transfers at its stores.  One example described in the Complaint: by 2015, Walmart actually instructed its employees *not to stop, but to pay out*, money transfers that displayed obvious red flags of fraud (*e.g.*, "[i]f you suspect fraud, complete the transaction").  It implemented and maintained this problematic practice for years—first without the knowledge of its money transfer service providers, and later over the objections of MoneyGram.  Tellingly, there is no mention of this problematic payout practice in Walmart's motion.  A second example described in the Complaint: after the FTC amended its Telemarketing Sales Rule ("TSR") in 2016 to ban cash-to-cash money transfers in telemarketing transactions precisely because of the historical record showing that such transfers were often fraud-induced,[2] Walmart *did nothing whatsoever to attempt to comply* with that ban. Instead, it was only at MoneyGram's direction several years later that Walmart finally began asking senders of money transfers whether their transfer is related to a telemarketing call and warning them that those transfers are illegal.

Due to these and other deficiencies in its anti-fraud program, Walmart has been responsible for sending and receiving hundreds of millions, and potentially billions, of dollars in fraud-induced money transfers—more than any other money transfer agent worldwide.  In fact, from 2013 through 2018, Walmart was responsible for processing over $197 million in money transfers that were the subject of fraud complaints and an additional $1.3 billion in transfers that its own money transfer service providers determined were related to those complaints, in that

---

[2]    In the Commission's December 14, 2015, Statement of Basis and Purpose for the amended rule, the Commission explained that "[t]he rulemaking record confirms that perpetrators of telemarketing fraud—not legitimate telemarketers and sellers—depend on the speed, convenience, anonymity, and irrevocability of [money transfers] to siphon millions from consumer victims each year."  80 Fed. Reg. 77520, 77547 (Dec. 14, 2015).

they involved the same senders or receivers or other suspicious characteristics. Walmart also has had employees who were actually complicit in the frauds, including employees who received cash tips for processing fraud-induced money transfers or who allowed customers to use different names or IDs to pick up multiple transfers. And some Walmart stores were so rife with money transfer fraud that their fraud rates exceeded 25, 50, or even 75 percent of the total money transfer activity at those locations.

Against this backdrop, Walmart feigns indignation in its motion that the Commission would dare attempt to hold the company responsible for the hundreds of millions of dollars in consumer injury *that often resulted from its own deficient practices*. Far from being the least bit novel, the Commission's Complaint alleges the same counts that were alleged first against MoneyGram in 2009, and then against Western Union in 2017.[3] For instance, Count I alleges that Walmart engaged in unfair acts and practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. As in the complaints against MoneyGram and Western Union, the Commission's Complaint here alleges that Walmart's failure to implement basic and effective anti-fraud measures resulted in substantial consumer injury, without any countervailing benefits to consumers.[4] As detailed below, the Commission's Complaint alleges specific facts about the many shortcomings in Walmart's program that support the unfairness claim in Count I.[5]

---

[3]    As an agent and in offering its own self-branded money transfer services (Walmart2Walmart and Wamart2World), Walmart has obligations to maintain an effective anti-fraud program.

[4]    Surprisingly, Walmart attempts to defend its own actions, in part, by arguing that the fraud-induced transfers were reasonably avoidable by its own customers. This is simply wrong, as those customers often were not aware of the heightened risks posed by money transfers or the deficiencies in Walmart's program, including that Walmart instructed its employees to pay out transfers even when they suspected fraud.

[5]    After the Supreme Court's decision in *AMG Capital Mgmt. v. FTC*, 141 S. Ct. 1341 (2021), the Commission seeks only a permanent injunction pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for the conduct alleged in Count I.

Count II of the Complaint then alleges that Walmart assisted and facilitated violations of three provisions of the TSR, 16 C.F.R. Part 310; telemarketing transactions involving: (1) false or misleading statements; (2) payments for advance-fee loans; and (3) cash-to-cash payments for goods, services, or charitable contributions. The first two are longstanding TSR prohibitions, and like the prior MoneyGram and Western Union complaints, the Complaint here alleges that Walmart substantially assisted violations of those provisions by making it easier for telemarketing fraudsters to obtain money from their victims.

The third provision addresses the Commission's amendment to the TSR in June 2016 (the "2016 TSR Amendment"), which banned all cash-to-cash money transfers in telemarketing transactions. The Complaint alleges that even though Walmart has known for years that it was processing fraud-induced money transfers related to telemarketing, it *did nothing* to even attempt to comply with the 2016 TSR Amendment until March 2019, when MoneyGram effectively forced it to do so. As the Commission made clear in the TSR's 2015 Statement of Basis and Purpose ("2015 SBP"), which explains the basis for banning cash-to-cash money transfers in telemarketing, that ban imposes affirmative obligations on money transfer businesses like Walmart to ensure they are complying.[6] Yet as alleged, Walmart did nothing. That did not change even after Walmart received the Commission's January 2017 order with Western Union, which detailed the steps Western Union was required to take to comply with the cash-to-cash ban, including asking customers whether their transfers relate to telemarketing and warning them that those types of transfers are illegal. At the same time, moreover, Walmart continued

---

[6] The Commission specifically declined to provide an exemption or safe harbor for money service businesses like Walmart but instead directed them to "[p]ast law enforcement actions by the Commission and others [to] provide detailed information about how money transfer providers can operate within the bounds of the law." 80 Fed. Reg. at 77552.

instructing its employees to complete suspicious transactions by making payouts to suspected fraudsters, which would have included payouts to telemarketers and those working with them.[7]

In the face of the Complaint's well-supported allegations, Walmart first claims that the entire case should be dismissed because the FTC purportedly lacks the constitutional authority to sue the company in federal court given the removal protections Congress provided for its Commissioners. But the problem with this argument is that it conflicts with *87 years of Supreme Court precedent* holding that the FTC is constitutionally structured. *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935) (upholding for-cause removal protections for multimember FTC); *see also Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) (recognizing the continued viability of *Humphrey's Executor*). Given this argument, it is ironic that Walmart is the one accusing the FTC of "overreach." Defendant's Memorandum in Support ("D. Br.") at 2, 5, 21.

Walmart goes even further out on a limb in arguing that it cannot be liable under the FTC Act or the TSR because, as a money transfer business, it is nothing more than a passive "intermediary," like a delivery service (*e.g.,* the Postal Service or FedEx), a telephone company, or a bank. But that argument ignores the fact that the 2016 TSR Amendment itself imposed affirmative obligations on money transfer businesses—like Walmart—precisely because they are best positioned to stop pernicious telemarketing frauds from exploiting the particularly vulnerable payment mechanisms they operate. Unlike delivery services or telephone companies, which merely transport sealed envelopes or calls from one place to another, the transfers at issue here are conducted at Walmart stores, where the senders and receivers interact directly with Walmart associates, exchanging money and information that could reveal whether a transaction is fraud-induced or illegal under the TSR. Unlike a bank, moreover, which requires its

---

[7] As a result of the TSR violations, the Commission seeks consumer redress and civil penalties against Walmart, which are appropriate remedies under Section 19 of the FTC Act, 15 U.S.C. § 57b.

customers to establish accounts, thereby enabling the bank to track funds, Walmart allows individuals to send thousands of dollars instantaneously, without accounts, and often without accurately capturing identifying information from the sender or receiver, thereby rendering the transfers untraceable. Walmart seems to believe that it can—without financial consequences— offer a risky payment mechanism like money transfers in its stores, without implementing any safeguards to address those inherent risks, even while affirmatively directing its employees not to stop—but instead to pay out—suspicious transfers.[8] Unfortunately for Walmart, the law confers no such immunity on money transfer companies. Walmart certainly can be held liable, as alleged, for maintaining an ineffective anti-fraud program that provides bad actors with access to a quick, easy, and untraceable method of collecting fraud proceeds from their victims.[9]

Last but not least, Walmart goes outside the four corners of the Complaint to falsely imply that the Department of Justice ("DOJ") declined the Commission's referral here purportedly due to concerns about its merits. But the Commission's referral to DOJ and DOJ's declination *was affirmatively required* to enable the Commission to pursue civil penalties in its own name for Walmart's TSR violations. *See* 15 U.S.C. § 56(a)(l). Walmart's off-base speculation also ignores that its own Annual Report has disclosed that the company has been receiving and responding to grand jury subpoenas from an arm of the very same DOJ (the U.S.

---

[8]     Despite Walmart's suggestions, this case does not involve "routine" money transfers—the illegal transactions at the core of this case are anything but routine. They are money transfers exhibiting obvious red flags that should be easily distinguishable with an adequate anti-fraud program.

[9]     The FTC does not have jurisdiction over banks, but even they have been held accountable by other agencies for failing to adopt sound and safe practices. *See, e.g.*, https://www.occ.gov/news-issuances/news-releases/2008/nr-occ-2008-48.html (Office of the Comptroller of the Currency required Wachovia Bank to pay up to $125 million in restitution for unfair practice of processing of telemarketers' remotely created checks despite high return rates); *Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 566 (9th Cir. 2018) (denying petition to review FDIC cease and desist order finding that bank violated the Bank Secrecy Act by failing "to establish and maintain procedures designed to ensure adequate internal controls, independent testing, administration, and training" and ordering bank "to implement a corresponding plan to bring the [b]ank into compliance").

Attorney's Office for the Middle District of Pennsylvania) regarding the same type of conduct.[10]

This is one of the same offices that entered into Deferred Prosecution Agreements ("DPAs")

with MoneyGram in 2012 and 2018 and Western Union in 2017, for similar conduct.[11]

In the end, as further demonstrated below, the Commission's Complaint adequately states

a claim for relief under both Section 5 of the FTC Act and various provisions of the TSR. And

there can be no question under settled Supreme Court precedent about the Commission's

authority to bring this case. Walmart's Motion to Dismiss should therefore be denied.

## II.     FACTUAL BACKGROUND

The Complaint meticulously details the obvious inadequacies in Walmart's anti-fraud

program and how *Walmart's own practices* have facilitated fraud by making it easier for

telemarketing fraudsters and other scammers to obtain money from their victims. The

Complaint, which must be taken as true at this stage, includes the allegations described below.

For years, Walmart has offered a variety of financial services to customers at its stores,

including money transfers, money orders, credit cards, and reloadable gift cards, to name a few.

In its advertising, Walmart boasts that it is "trusted by millions of customers as their one-stop

shop for financial services." Compl. ¶ 8. Walmart's financial service offerings help to drive

customer traffic to its stores and thereby generate significant retail sales. *Id.*

Since at least 2005, Walmart has offered domestic and international money transfer

services at its stores, and since 2014, Walmart has offered money transfer services through two

---

[10]     *See* https://corporate.walmart.com/media-library/document/walmart-inc-2022-annual-report/_proxyDocument?id=00000180-4cfc-d3b6-afe6-6dfdc89a0000 at p. 31.

[11]     *See* https://www.justice.gov/opa/pr/moneygram-international-inc-admits-anti-money-laundering-and-wire-fraud-violations-forfeits (2012 DPA requiring MoneyGram to pay $100 million); https://www.justice.gov/opa/pr/moneygram-international-inc-agrees-extend-deferred-prosecution-agreement-forfeits-125-million ( 2012 extension of DPA requiring MoneyGram to pay $125 million); and https://www.justice.gov/usao-mdpa/pr/western-union-admits-anti-money-laundering-and-consumer-fraud-violations-forfeits-586 (2017 DPA requiring Western Union to pay $586 million).

different providers, MoneyGram and RIA Financial Services ("Ria"), at its stores in the U.S. Walmart also offers its own white-label money transfer services, referred to as "Walmart2Walmart" and "Walmart2World." *Id*. ¶¶ 10-11. As an agent of more than one service provider, Walmart stores pose a heightened risk of consumer fraud because consumers are able to send and scammers are able to pick up money transfers through the two separate systems without being detected by either company. *Id*. ¶ 48. In the spring of 2021, moreover, Walmart heightened those risks further by enabling its customers to also send and receive money transfers through Western Union at its U.S. stores. *Id*. ¶ 13. Because Walmart's service providers are not able to monitor the other providers' money transfer systems, Walmart is the only entity that has visibility into all of the transactions at its stores. *Id*. ¶ 92.

Walmart's role is especially important given the serious risks associated with money transfers, which are akin to sending cash and—unlike credit card transactions—can rarely be reversed. *Id*. ¶¶ 24, 29. Indeed, scam artists have preferred to use money transfers for a variety of reasons, including that the money can be picked up in minutes anywhere in the world, with the transfers often being untraceable, thereby affording the perpetrators a measure of anonymity. *Id*. ¶ 26. Walmart's locations also have been particularly attractive to fraudsters because "Walmart pays recipients in cash, even for large-dollar transfers" and due to Walmart's ineffective anti-fraud program. *Id*. Walmart is aware of the heightened fraud risks that money transfers pose, but consumers typically are not. *Id*. ¶¶ 29, 48.

## A. WALMART'S AWARENESS OF CONSUMER FRAUD

Walmart has long been aware of consumer fraud and suspicious activities involving money transfers at its stores. Compl. ¶¶ 2, 14, 27-28, 30, 43, 46, 48, 65, 79, 96. For example, Walmart has directed consumers to report fraud to its service providers, and the providers have

8

then shared information with Walmart about those complaints and about Walmart locations with suspicious practices and high fraud rates, including rates as high as even 50 or 75 percent of the store's money transfer activity. *Id.* ¶¶ 30, 46. Walmart also has been on notice that it has important responsibilities and obligations in detecting and preventing fraud-induced money transfers. In fact, Walmart and its providers have recognized the important role Walmart plays because its employees provide the first line of defense against fraud-induced money transfers. *Id.* ¶ 70 ("Walmart's providers have relied on Walmart to train its own employees in the policies and procedures required for detecting and preventing fraud."). In addition to its contractual obligations with its providers—which, among other things, require it to comply with any court orders that apply to its providers—Walmart also received copies of the FTC's stipulated court orders with MoneyGram and Western Union. *Id.* ¶¶ 14, 34-35, 37-39. These orders require that those companies and their agents, including Walmart, have comprehensive anti-fraud programs designed to protect consumers from fraud-induced money transfers, that they provide fraud training to employees, and provide warnings to consumers before they complete their transfers.

### B. WALMART'S INEFFECTIVE ANTI-FRAUD PROGRAM

As far back as 2010, following the entry of the 2009 MoneyGram order, Walmart committed to FTC staff that it would reduce fraud through associate training and consumer education, and it represented then that it already had a comprehensive anti-fraud program. Compl. ¶ 35. Those claims turned out to be false. In fact, Walmart did not even have a written anti-fraud program until 2014, and it also did not bother to train many of the employees tasked with processing money transfers. *Id.* ¶¶ 51, 71 ("Walmart has failed to ensure that its employees responsible for providing money transfer services have taken the required training, are up to date on their training, or taken relevant training before providing money transfer services."). Walmart

9

also was slow to make improvements to its anti-fraud program. *See, e.g.*, *id*. ¶ 76 ("it took several years—until at least in or around mid to late 2018—for Walmart to finally implement the [training] lockouts"). Moreover, even after Walmart finally established a written anti-fraud program, it often violated its own program requirements and did not incorporate important policies and procedures for preventing fraud at its stores. *Id*. ¶¶ 51-53, 55. Walmart also has violated its providers' policies and procedures. *Id*. ¶¶ 25-26, 40, 50, 71, 86 (*e.g.*, by failing to ensure that its employees were properly trained and knowledgeable about detecting and preventing fraud). And by implementing practices that essentially ignored fraud-induced and telemarketing-related transfers, Walmart created an environment that lent itself to abuse by fraudsters and illegal telemarketers. *Id*. ¶¶ 22, 26.

By 2015, Walmart deliberately chose not to instruct its employees during its annual trainings to stop payouts to suspected fraudsters. *Id*. ¶¶ 2, 55. The Complaint alleges that "[a]lthough Walmart trained its employees to refuse to send money transfers if they believed the sender was a victim of fraud (referred to as 'send-side fraud'), it did not direct its employees to deny or reject payouts to receivers of suspected fraud-induced transfers (referred to as 'receive-side fraud.'"). In a Quick Reference Guide used by Walmart employees, the company instead directed its employees to complete transfers they suspected were due to fraud. *Id*. ¶ 55 ("[i]f you suspect fraud, complete the transaction"). Walmart adopted this practice despite knowing that once the transfers were paid out, fraud victims typically could not get their money back. *Id*. ¶¶ 24, 55. And it continued this practice even after being told by MoneyGram that it expected Walmart and its employees not to pay out money transfers to suspected fraudsters. *Id*. ¶ 55. Not surprisingly, after conducting a review of Walmart's anti-fraud program in 2017, MoneyGram

concluded that the program as a whole was ineffective because Walmart was "'not reject[ing] potential consumer fraud related transactions on the receive end.'" *Id*. ¶ 54.

Overall, the Complaint is replete with painstaking details about the many ways in which Walmart's anti-fraud program was ineffective. For example, it includes descriptions of Walmart stores with high amounts of fraud—as high as 25, 50, or even 75 percent of the overall money transfers—and repeat problems (*id*. ¶¶ 46-47, 98 (providing details on specific Walmart locations that paid out hundreds of thousands in fraud-induced money transfers), complicit employees (*id*. ¶¶ 26, 50, 90), and suspicious activities (*id*. ¶¶ 28, 90, 95-96, 102). The Complaint also provides other details about the various ways in which the deficiencies in Walmart's anti-fraud program contributed to consumer fraud at Walmart stores, including:

- Deficient practices related to receive-side fraud (*id*. ¶¶ 55-65) (*e.g.*, ¶ 55, Walmart "did not direct its employees to deny or reject payouts to receivers of suspected fraud-induced money transfers. . . . Instead, Walmart's training instructed employees not to deny those transfers[.]");

- Deficient practices related to send-side fraud (*id*. ¶¶ 66-69) (*e.g.*, ¶ 67, Walmart failed to take adequate steps to prevent consumers from sending transfers with characteristics indicative of fraud, such as multiple transfers in short periods of time, to high-risk countries known for fraud, in amounts that far exceed the average money transfer, and to different individuals);

- Not having properly trained employees (*id*. ¶¶ 70-80) (*e.g.*, ¶ 71, until mid to late 2018, Walmart did not even assign all relevant training to employees with responsibilities for processing money transfers);

- Not properly overseeing employees (*id*. ¶¶ 81-90) (*e.g.*, ¶ 90, Walmart's failure to properly oversee its employees has allowed them to become complicit in frauds, including instances where Walmart employees "received cash tips for their assistance in processing fraud-

11

induced money transfers" and allowed individuals "to use multiple names and/or IDs in picking up money transfers.");

- <u>Not adequately monitoring, investigating, and mitigating suspicious activities and consumer fraud at Walmart stores</u> (*id.* ¶¶ 91-98) (*e.g.*, ¶ 96, "For years, Walmart has frequently processed transactions that had suspicious characteristics, including: (1) high-dollar money transfers; (2) patterned activity, such as multiple transfers involving similar dollar amounts; (3) one-to-many or many-to-one transactional activity; (4) high-frequency money transfers; (5) transactions with data integrity issues (issues relating to ID numbers, addresses, dates of birth, or other information about recipients); (6) same IDs or addresses used by multiple receivers; (7) money transfers picked up using fake out-of-state IDs; (8) flipping; (9) structuring of transactions; (10) back-to-back transfers; (11) substantial transfers to high-risk countries known for fraud; (12) transactions where the sender and receiver do not appear to have a relationship; and (13) transactions with indications of elder financial exploitation due to the senders' age.");

- <u>Not providing warnings to consumers</u> (*id.* ¶¶ 99-101) (*e.g.*, ¶¶ 100-101, despite advance notice,  reviews "routinely revealed that some of Walmart's locations were missing send forms and consumer fraud signs, brochures or pamphlets, and other warnings");

- <u>Not reporting all consumer fraud involving its locations to its providers</u> (*id.* ¶¶ 102-03) (*e.g.*, ¶ 102, despite receiving complaints and reports that some of its own employees have been involved in sending or receiving thousands of dollars of suspicious money transfers at its locations, "Walmart has not routinely provided that information to its providers"); and

- <u>Not taking other reasonable measures to mitigate fraud</u> (*id.* ¶ 104, *e.g.*, not taking more effective measures to verify and validate the legitimacy of IDs presented on the receive-side of transfers and limiting the amount of cash that can be paid out to recipients of money transfers).

### C.     THE TSR VIOLATIONS

The Complaint also alleges sufficient facts to support the underlying TSR violations by "sellers" or "telemarketers" involved with "telemarketing."  For example, the Complaint includes facts about criminal cases that involved organized telemarketing schemes that used money transfers at Walmart locations (Compl. ¶¶ 27-28), complaints from providers that identified scams typically involving telemarketing, such as grandparent, lottery, advance-fee loan, romance, IRS and other imposters, and tech support scams (*Id*. ¶ 43), and information provided by Ria to Walmart about fraud-induced money transfers that involve telephone calls (*Id*. ¶ 80 ("the source of approximately 83 to 88 percent of fraud-induced money transfers through Walmart were schemes perpetrated over the phone")).  There also are sufficient facts demonstrating that Walmart was aware that money transfers at its locations were being used in connection with telemarketing frauds.  As alleged in the Complaint, Walmart has been aware for years that criminal fraud rings perpetrating telemarketing scams have picked up fraud-induced money transfers at Walmart stores.  *Id*. ¶ 27 (*e.g.*, in May 2016, Walmart became aware that five individuals had been arrested in connection with an IRS imposter scam that obtained millions of dollars from U.S. consumers at Walmart stores).  Moreover, Walmart's practices relating to receive-side payouts (*Id*. ¶¶ 55-65) and its failure to ask consumers questions relating to the TSR prohibition on cash-to-cash transfers (*Id*. ¶¶ 15, 65, 69, 80) enabled Walmart to consciously avoid knowing *more* about these types of transfers.

In June 2016, when the Commission amended the TSR to prohibit "cash-to-cash" money transfers in telemarketing transactions and made it clear that money transfer businesses like Walmart were responsible for compling with the new rule, Walmart did not do anything in response.  *Id*. ¶¶ 15, 69, 80.  Until March 2019, Walmart did not "take steps to ensure that its

13

associates asked senders questions about whether their transfers were related to telemarketing" or to warn consumers "that the TSR prohibits cash-to-cash money transfers as a form of payment for telemarketing transactions." *Id.* ¶ 69. Walmart failed to take these steps despite having received a copy of the January 2017 Western Union order, which imposed these very requirements to ensure compliance with the 2016 TSR Amendment. *Id.* ¶¶ 2, 14-15, 35, 37, 65, 69, 80, 99.

Moreover, even after March 2019, required consumer fraud warnings were still missing from some Walmart stores. *See*, *e.g.*, *id.* ¶ 17 ("between January and August 2019, Ria found that 39 percent of the Walmart stores it visited were missing fraud awareness materials and 24 percent of the stores were missing the send forms, which provide a consumer fraud warning on the front page").

### D. CONSUMERS WERE HARMED

Finally, the Complaint alleges specific facts on the substantial financial harms suffered by consumers because of Walmart's deficient practices. For example, the Complaint alleges that between January 1, 2013 and December 31, 2018, Walmart was the most-complained-about money transfer agent in the world; Walmart was responsible for approximately 56 percent of all fraud complaints through MoneyGram and between approximately 80 to 93 percent of all fraud complaints through Ria. *Id.* ¶ 31. Moreover, during that period, Walmart locations were responsible for processing at least 226,679 money transfers totaling $197,316,611 (including fees) that were the subject of fraud complaints received by MoneyGram, Ria, and Western Union. *Id.* ¶¶ 30, 43. The complained-about transfers represent only a small percentage of the actual fraud perpetrated through fraud-induced money transfers at Walmart locations. *Id.* ¶ 30.

Walmart's own money service providers have linked an additional $1.3 billion in money transfers to the complained-about transfers at Walmart stores. *Id*. ¶ 43.

## III.    ARGUMENT

### A.    LEGAL STANDARDS

In considering a motion to dismiss, the Court "must take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Flores v. City of South Bend*, 997 F.3d 725, 728-29 (7th Cir. 2021).  "A 12(b)(6) motion does not evaluate 'whether a plaintiff will ultimately prevail,' but, instead, whether the plaintiff is entitled to present evidence in support of the claims."  *FTC v. Subscriberbase Holdings, Inc.*, No. 13-cv-1527, 2013 WL 5406225, at *1 (N.D. Ill. Sept. 24, 2013) (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011)).

Under Rule 8, only "a short and plain statement of the claim showing that the pleader is entitled to relief" is required.  That rule does not require "detailed factual allegations," just something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *see also FTC v. AFD Advisors, LLC*, No. 13 CV 6420, 2014 WL 274097, at *1 (N.D. Ill. Jan. 24, 2014).  "To meet the plausibility standard [described in *Iqbal*], the plaintiff must put forth enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations."  *Subscriberbase*, 2013 WL 5406225 at *1 (cleaned up); *see also FTC v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324, 1331 (S.D. Fla. 2016) (Section 5 and TSR allegations satisfied "exceedingly low notice pleading standard of Rule 8").

Walmart concedes by its silence that the ordinary pleading standard of Rule 8 applies to the FTC's Section 5 unfairness claim (Count I) and cites no authority from this Circuit holding that the Rule 9(b) standard for pleading fraud applies to assisting and facilitating allegations under the TSR (Count II).[12]  Accordingly, the FTC must only satisfy Rule 8 in order to move forward on both Counts in the Complaint, and it has done so.  Regardless, the Complaint contains more than sufficient detail to provide Walmart with fair notice of the FTC's Section 5 and TSR claims under any pleading standard.

## B.    THE FTC HAS THE AUTHORITY TO BRING THIS ACTION

The FTC filed this case under express authority granted in Sections 13(b) and 19(a) of the FTC Act, 15 U.S.C. §§ 53(b), 57b(a), to enforce the FTC Act in federal court against those who violate that Act or FTC rules, and to seek injunctive and monetary remedies.  Walmart's contention that this express grant of authority violates separation of powers principles must fail because it rests on a series of mistaken premises and, essentially, amounts to an attack on *Humphrey's Executor*, a binding Supreme Court decision which only that Court has the "prerogative of overruling."  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

---

[12]    As explained by Judge Zagel, "[t]he 7th Circuit . . . has applied the Rule 8 general pleading standard to a claim for unfair conduct," rather than the heightened standard for fraud or mistake under Rule 9(b).  *AFD Advisors, LLC*, 2014 WL 274097, at *2 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008)); *see also FTC v. Communidyne, Inc.*, No. 93 C 6043, 1993 WL 558754, at *1 (N.D. Ill. Dec. 3, 1993) ("A claim under section 5(a) of the FTC Act is not a claim for fraud or mistake, so Rule 9(b) does not apply.").  "Similarly, because neither fraud nor mistake is an element of deceptive conduct under the . . . TSR, allegations that provide notice under the relaxed pleading standard of Rule 8 are sufficient" for TSR claims.  *AFD Advisors, LLC*, 2014 WL 274097, at *2.  The only Seventh Circuit opinion Walmart cites regarding Rule 9(b) concerns a class action brought by a private plaintiff pursuant to different statutes regarding claims of direct deception. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) (applying Rule 9(b) to deceptive retail advertising claims).  Although some courts have applied Rule 9(b) to deception claims under the FTC Act or the TSR, that minority view has not been followed by courts in this district.  *See, e.g.*, *AFD Advisors, LLC*, 2014 WL 274097, at *2; *Student Aid Ctr., Inc.*, 281 F. Supp. 3d at 1331-32.

The Supreme Court held 87 years ago that Congress could, consistent with the Constitution, protect FTC Commissioners through a for-cause removal restriction. *Humphrey's Executor*, 295 U.S. at 632. Since then, the Court has addressed presidential removal power multiple times, and each time the Court has cited *Humphrey's Executor* and declined to overrule it. *See Collins v. Yellen*, 141 S. Ct. 1761, 1786-87 & n.21 (2021); *Seila Law*, 140 S. Ct. at 2192, 2198-200; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010); *Mistretta v. United States*, 488 U.S. 361, 410-11, 423-24 (1989); *Morrison v. Olson*, 487 U.S. 654, 686-90, 706-07 (1988); *Bowsher v. Synar*, 478 U.S. 714, 724-26 (1986); *Wiener v. United States*, 357 U.S. 349, 353-54 (1958). As then-Judge Kavanaugh put it, "*Humphrey's Executor* is an entrenched Supreme Court precedent, protected by stare decisis." *In re Aiken Cnty.*, 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring). *Humphrey's Executor* remains a binding precedent for this Court today, and only the Supreme Court can overrule it.

Both *Humphrey's Executor* itself and the Supreme Court's post-*Humphrey's Executor* decisions "identified several organizational features" of the FTC that render its removal restrictions constitutionally permissible. *See Seila Law*, 140 S. Ct. at 2198-99. The FTC is composed of five members, no more than three of which can be from the same political party, yielding a "nonpartisan," impartial body. *See Humphrey's Executor*, 295 U.S. at 624. The Commissioners serve staggered, seven-year terms, enabling them to develop "trained judgment" and expertise. *Id.* at 624-25. These features, which still characterize today's FTC, effectuated Congress's goal of creating a body of experts whose decision-making is informed by their experience and knowledge of the industries they regulate. *See id.* at 625-26. The Supreme Court has "bless[ed]" this bipartisan, multimember agency structure, *Free Enterprise Fund*, 537 F.3d at 695 (Kavanaugh, J., dissenting), and Congress has established many other multimember expert

17

bodies with similar enforcement powers and removal protections that are regarded as lawful. These include, for example, the Consumer Products Safety Commission, *see Morrison*, 487 U.S. at 724-25 (Scalia, J., dissenting), the Securities and Exchange Commission ("SEC"), *see Freytag v. Commissioner*, 501 U.S. 868, 916, 920 (1991) (Scalia, J., concurring), the National Labor Relations Board, *In re Aiken County*, 645 F.3d at 441 (Kavanaugh, J., concurring), and the Federal Energy Regulatory Commission, *PHH Corporation v. CFPB*, 881 F.3d 75, 164 (D.C. Cir. 2018). (Kavanaugh, J., dissenting).

By contrast, the Supreme Court has repeatedly distinguished the FTC's constitutionally permissible multimember structure from the constitutionally defective structures of agencies run by a single officer with removal protections. For instance, the Court voided removal protections for the Directors of the Federal Housing Finance Authority and the CFPB, emphasizing that those agencies were led by single administrators as opposed to multimember bodies. *See Collins*, 141 S. Ct. at 1783-84; *Seila Law*, 140 S. Ct. at 2192. In *Seila Law*, the Court observed that the CFPB's structure "deviated from [that] of nearly every other independent administrative agency in our history," which was a "telling indication of a severe constitutional problem." *Seila Law*, S. Ct.. at 2191. It specifically contrasted the CFPB's structure with that of the FTC, which the Court described as "a traditional independent agenc[y] headed by a multimember . . . commission," comprised of a "body of experts" that is "non-partisan." *Id*. at 2192, 2200. Indeed, the Court suggested that Congress could remedy the CFPB's constitutional flaw by converting it to a multimember commission. *See id.* at 2211.

Walmart does not directly challenge *Humphrey's Executor*. Instead, it contends that Congress could not later constitutionally delegate executive law-enforcement powers to an

agency whose members enjoy for-cause removal protection. Although clever, the argument rests on a series of incorrect assumptions which, at bottom, still is an attack on *Humphrey's Executor*.

First, Walmart's argument proceeds from the premise that the Court in *Humphrey's Executor* considered an agency without authority to enforce the law. In reality, the FTC has always had the authority to enforce the FTC Act, including in federal court, and the Supreme Court in *Humphrey's Executor* therefore approved of such authority even as it upheld the Commission's structure. As originally enacted in 1914, and as it was on the books in 1935 (and still today), the FTC Act "empowered and directed" the agency to "prevent" unfair methods of competition by enforcing the FTC Act in the FTC's administrative forum and to order violators to "cease and desist" from their unlawful conduct. The FTC Act further granted the Commission power to enforce its cease-and-desist orders in federal courts of appeals and to defend those orders against challenge in the same courts. *See* Federal Trade Commission Act, P.L. 63-203, 38 Stat. 717, 720 (1914).[13] That Congress later expanded the Commission's enforcement power does not alter the basic constitutional calculus of *Humphrey's Executor*. That much is clear from the Supreme Court's recent decisions declining to overrule *Humphrey's Executor*, including in cases decided long after Congress conferred additional enforcement authority on the FTC.

Walmart also is mistaken in contending that Supreme Court decisions striking down single-member enforcement agencies somehow limit Congress's authority to delegate enforcement authority. In considering constitutional restraints on the President's removal power,

---

[13]     Additionally, in 1933, Congress granted the FTC the authority to enforce the Securities Act, which authorized the Commission to seek preliminary and permanent injunctions against violations in federal court, much like Section 13(b) does today. *See* Public Law 73-22 Chapter 38 § 20(b), 48 Stat. 74, 86 (1933). Congress later transferred that enforcement authority to the SEC, another multimember agency that exercises substantial enforcement authority and that would have been familiar to the Court that decided *Humphrey's Executor*.

19

the Court did not conclude that Congress lacks constitutional authority to confer executive enforcement authority on a department head protected by for-cause removal protection. To the contrary, in *Seila Law*, the Court indicated that the CFPB, to which Congress had delegated extensive enforcement power, could be rendered constitutional by becoming a multimember commission (like the FTC). *Seila Law*, 140 S. Ct. at 2211.

In other words, the constitutional problem with single-member agencies exercising enforcement authority is not that authority itself, but restrictions on the President's power of removal. In *Free Enterprise Fund*, the Court declined to vacate an officer's regulatory authority on the ground that the authority "does not violate the separation of powers, but the substantive removal restrictions . . . do." 561 U.S. at 508-9. The Supreme Court has never suggested in the 87 years since *Humphrey's Executor* that enforcement authority by itself is subject to constitutional restraint. Indeed, in *Morrison*, the Supreme Court upheld the grant of criminal prosecution authority to an independent counsel not removeable at will by the President. 487 U.S. at 696-97. The Supreme Court later described *Morrison* as the Court's having "[b]ack[ed] away from the reliance in *Humphrey's Executor* on the concepts of 'quasi-legislative' and 'quasi-judicial' power" in favor of examining "the ultimate question as whether a removal restriction is of such a nature that it impedes the President's ability to perform his constitutional duty." *Seila Law*, 140 S. Ct. at 2199 (cleaned up); *see Morrison*, 487 U.S. at 689-90.

Walmart's principal cases are not to the contrary. In *Bowsher* and *Buckley*, the Court struck down grants of executive power to officers over which Congress retained appointment or removal authority. *See Bowsher*, 478 U.S. at 726-32; *Buckley v. Valeo*, 424 U.S. 1, 138-39 (1976). The constitutional defect in both cases was congressional aggrandizement; neither decision suggests that a for-cause removal protection limits the statutory powers that Congress

20

can delegate to an agency. The Constitution, not any statute, provides the limits on Congress's

lawmaking authority. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537-38 (2012).

Indeed, in the cases cited by Walmart, the Court voided delegation of authority due to

*constitutional* limits on Congressional powers—not limitations imposed by a pre-existing

statutory provision. *See Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2353 (2020)

(First Amendment violation); *Bowsher*, 478 U.S. at 734-35 (Congressional aggrandizement).

When it comes to the grant of enforcement authority to an administrative agency, the

principal constitutional concern is presidential removal power, a matter long settled when it

comes to the FTC. The "ultimate question" in assessing whether authority of an agency with

removal protection is consistent with the separation of powers is whether its structure "impedes

the President's ability to perform his constitutional duty" to "take Care that the Laws be

faithfully executed," Art. II, § 3. *Seila Law*, 140 S. Ct. at 2199 (quoting *Morrison*, 487 U.S. at

691). The FTC's structure, upheld in *Humphrey's Executor* and not substantially modified since,

does not.[14]

At bottom, Walmart's claim that Congress may not delegate enforcement authority to an

agency whose structure was constitutionally blessed long ago amounts to a request that this

---

[14]    The FTC is subject to a significant degree of presidential accountability. The President controls
the agency's budget, 31 U.S.C. §§ 1105(a)(21)(B), 1108, which has a "direct relation" to policymaking,
*see* K. Datla & R. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 Cornell L.
Rev. 769, 806 (2013). The President also selects the Chair, who serves as the "executive and
administrative head of the agency," 16 C.F.R. § 0.8, controls the agency's expenditures, and selects the of
heads of its major policy-making divisions. Furthermore, the Commissioners' seven-year terms are
staggered, enabling frequent presidential appointments, which provide "the opportunity to shape [the
agency's] leadership and thereby influence its activities." *Seila Law*, 140 S. Ct. at 2294. Together, these
features create sufficient presidential accountability and control to comply with separation of powers
principles.

Court find that *Humphrey's Executor* is no longer good law. As discussed above, however, the Supreme Court itself has repeatedly declined to do so.

In any event, even if Walmart could successfully challenge the FTC Commissioners' removal protection, that still would not invalidate this enforcement action. Because the FTC's Commissioners were appointed consistent with the requirements of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2., even an unconstitutional removal restriction would provide "no reason" to void their actions. *Collins*, 141 S. Ct. at 1787. "Settled precedent . . . confirms that the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the . . . responsibilities of his office." *Id.* at 1787-88 & n.23.

### C. THE COMPLAINT PROVIDES MORE THAN FAIR NOTICE OF THE COMMISSION'S CLAIMS

The substance of the Commission's Complaint easily satisfies Rule 8 and is more than sufficient to defeat Defendant's motion. First, as alleged in detail, Walmart's failure to implement basic and effective anti-fraud measures, resulting in millions of dollars of consumer losses, constitute unfair acts and practices in violation of the FTC Act (Count I). Second, the Complaint sufficiently alleges that Walmart assisted and facilitated violations of the TSR (Count II) in the course of processing millions of dollars in telemarketing-related money transfers.

#### 1. Walmart Engaged in Unfair Acts and Practices in Violation of the FTC Act

The FTC alleges that Walmart repeatedly failed to take timely, appropriate, and effective action to detect and prevent fraud-induced money transfers and illegal telemarketing-related transfers at its stores. Walmart even adopted practices that enabled fraudsters and telemarketers to pick up the proceeds of their illegal activities more easily. These actions caused many millions of dollars of otherwise preventable consumer harm. *See* Compl. ¶¶ 2, 25, 108-10. As

22

explained below, the Commission's allegations easily satisfy the unfairness standard in Section 5(n), which requires that an act or practice: (1) cause or be likely to cause substantial injury to consumers, (2) which is not reasonably avoidable by consumers themselves, and (3) not outweighed by countervailing benefits to consumers or to competition.  15 U.S.C. § 45(n); *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010).

As a preliminary matter, the Court should disregard Walmart's attempts to distract from and add additional elements to the statutory test in Section 5(n).  *See, e.g.*, D. Br. at 30 (arguing that the FTC must also allege that Walmart's conduct violates "established public policy").  Courts have repeatedly and appropriately rejected such efforts.  *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244-45 (3d Cir. 2015) (unfair practices need not be unscrupulous or unethical); *American Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 982 (D.C. Cir. 1985) (rejecting argument that unfairness requires deception, coercion, or the withholding of material information); *FTC v. LendingClub Corp.*, No. 18-cv-02454-JSC, 2018 WL 11436309, at *12 (N.D. Cal. Oct. 3, 2018) (refusing to incorporate proximate cause into the unfairness analysis); *FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030, at *6 (W.D. Wash. July 22, 2016) (rejecting expansion and noting that "[t]he three-part test" for unfairness is "found in the statute itself").

Walmart's reliance on *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976), does not change the analysis, as that decision predates the statutory three-part test that was added to the FTC Act in 1994.  As explained in *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 903 (S.D. Ind. 2015), the 1980 FTC Unfairness Policy Statement and the 1994 congressional amendment resulting in the three-part Section 5(n) test have "provided more robust—and quantitative—guidance on the meaning" of the unfairness standard in Section 5(a).  Indeed, the

23

1994 amendment itself left no doubt about the limited role public policy should play in an unfairness determination, providing that "the Commission *may* consider established public policies as evidence to be considered with all other evidence," but that "such public policy considerations *may not* serve as a primary basis" for the unfairness determination."  15 U.S.C. § 45(n) (emphasis added); *see also* FTC 1980 Policy Statement on Unfairness (explaining that neither lack of a clearly established policy nor conflicting policies would preclude Commission action alleging unfairness).[15]

Put simply, there is no need to search beyond the clear terms of Section 5(n) for guidance about the factors relevant to the FTC's valid unfairness claim.

### a.   The Complaint Sufficiently Alleges Walmart's Actions Caused Substantial Injury

As alleged in the Complaint, Walmart's failure to implement reasonable and effective anti-fraud measures caused consumers substantial harm.  Between January 1, 2013 and December 31, 2018, Walmart was *the most-complained-about money transfer agent in the world*; it was responsible for approximately 56 percent of all fraud complaints through MoneyGram and between approximately 80 to 93 percent of all fraud complaints through Ria.  Compl. ¶ 31. Those complained-about transfers resulted in consumer losses of at least $197,316,611.  *Id*. ¶¶ 30, 43.  And those consumer complaints and corresponding millions of dollars of losses

---

[15]   Walmart also cites *LabMD, Inc. v. FTC*, where the Eleventh Circuit observed in dicta that an unfairness count alleging cybersecurity failures should find support in public policy, such as the law of negligence.  *See* D. Br. at 30-31; 894 F.3d 1221, 1231 (11th Cir. 2018).  While the law of negligence is equally supportive of the FTC's claims, dicta from an out-of-circuit case like *LabMD* does not control here.  In any event, Walmart does not and would be hard-pressed to suggest that any established public policy supports the practices challenged in the Complaint.  Even if the FTC were required to allege and prove a violation of such a public policy as part of an unfairness claim, the Complaint details acts and practices that would satisfy such a requirement, including Walmart's decision by 2015 to direct its employees to pay out money transfers even when they suspected fraud.  *See* Compl. ¶ 55.  Certainly, this practice contradicts established public policy (*see, e.g.,* D. Br. at 31-32 (negligence arises where "actor's own affirmative act created or exposed the victim to a high degree of risk of harm")).

represent only a small percentage of the actual fraud perpetrated through fraud-induced money transfers at Walmart locations. *Id.* ¶ 30. Walmart's money transfer providers have linked an additional $1.3 billion in money transfers to the complained-about transfers, meaning that those transfers were also potentially fraud-induced. *Id.* ¶ 43. There can thus be no question that the FTC has adequately alleged "substantial injury."[16]

### b. The Substantial Injury Walmart Caused was Not Reasonably Avoidable by Consumers

The Commission's allegations also describe why the substantial harm consumers suffered was unavoidable. To begin, Walmart employees have frequently been complacent, or even complicit, in processing fraud-induced money transfers. *See* Compl. ¶¶ 50, 55. Walmart does not and cannot claim that the fraud-induced money transfers were reasonably avoidable in such instances. Moreover, people simply do not choose to transfer large sums of cash to fraudsters using a high-risk system that leaves them no recourse after the damage occurs. Rather, the consumers are deceived by fraudsters, who pressure them through false promises or fear of legal or financial consequences to send money transfers. *Id.* ¶ 29. That is why it is critical for businesses that offer money transfers to implement robust, effective anti-fraud measures; they are in the best position to intercede by doing simple things like educating and training employees, providing warnings, and monitoring and spotting suspicious activity. *Id.* ¶ 33. But

---

[16] Walmart does not meaningfully contest that consumers who used Walmart's money transfer services have suffered substantial harm, but insists that other parties—fraudsters and the consumers themselves—are to blame. However, the existence of other culpable parties is not a defense to an unfairness claim and provides no basis to dismiss the Complaint. *See, e.g.*, *Neovi*, 604 F.3d at 1160 (a party may violate the FTC Act even where it is one of multiple causes of substantial harm). Walmart further cites cases that do not involve unfairness or Section 5 at all and attempts to distill from these inapplicable cases a sweeping policy against holding "intermediary" service providers liable for harm to consumers, but this is hyperbole. *See, e.g.*, *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003); *QDOS, Inc. v. Signature Fin., LLC*, 225 Cal. Rptr. 3d 869 (Cal. Ct. App. 2017). The court in *Wyndham* rejected a similar "*reductio ad absurdum*" argument, *see* 799 F.3d at 246-47, and the Court should do so here.

Walmart did not even have a written anti-fraud program until 2014, and it also did not bother to train many of the employees tasked with processing money transfers. *Id.* ¶¶ 51-52, 71. Even after Walmart finally established a written anti-fraud program, it violated its own program requirements and did not incorporate important policies and procedures for preventing fraud at its stores. *Id.* ¶¶ 51-53, 55. It also violated its service providers' policies and procedures. *Id.* ¶¶ 25-26, 40, 50, 71, 86

Despite its own misconduct, Walmart resorts to blaming its customers for their own injuries, coldly proclaiming that "consumers who send money to unverified recipients *despite warnings from Walmart* have consciously chosen to engage in the transaction." D. Br. at 37 (emphasis added). Of course, the Complaint alleges that Walmart *failed to provide those very warnings in many instances*. *See, e.g.*, Compl. ¶ 68. But injury also is not reasonably avoidable unless consumers have the information they need to prevent it and nonetheless choose not to. *Neovi*, 604 F.3d at 1158; *Orkin Exterminating Co.*, 108 FTC 263, at *80 (1986), *aff'd*, *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988); *see also* 2015 SBP, 80 Fed. Reg. at 77550 ("[c]onsumers . . . are under no duty to ferret out the truthfulness of marketing claims," and general warnings alone do not render losses reasonably avoidable). When consumers go to their local Walmart to send a money transfer at the direction of a fraudster, that consumer often has no idea about the heightened risks that money transfers pose. Nor are they aware of the enumerated deficiencies in Walmart's anti-fraud program, including Walmart's directive to its employees to "complete the transaction" even if they suspect fraud. In those circumstances, it is simply wrong for a business like Walmart to try to place the blame on its own customers, many of whom are seniors. Just as the company cannot point the finger at fraudsters and disclaim all responsibility for facilitating their scams, it cannot blame injured consumers for its own failures.

26

> **c.** **There are no Countervailing Benefits of Walmart's Deficient Anti-Fraud Program that Would Outweigh the Harm**

Walmart's failure to take necessary steps to prevent fraud and illegal telemarketing-related transfers came with no corresponding benefits to consumers, much less benefits that would outweigh the millions of dollars consumers lost at Walmart stores. The cost-benefit prong of the unfairness test is "easily satisfied" where, as here, "a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000) (citation omitted). As alleged in the Complaint, "Walmart's failure to implement and maintain a comprehensive anti-fraud program to detect and prevent consumer fraud" has "caused many millions of dollars in consumer losses, without providing benefits to consumers or competition that has outweighed the harm suffered by defrauded consumers." Compl. ¶ 50. Walmart does not contest that those allegations are sufficient on the third prong.[17]

> **d.** **Walmart's Unfair Acts and Practices are Clear**

Walmart purports to be astonished that it could be held responsible for the conduct described in the Complaint, when in fact the company has had ample notice for years that the types of practices it had implemented—or failed to implement—were unfair and violated the

---

[17] Alluding to an argument it acknowledges cannot be made in the present motion without improperly relying on matter beyond the pleadings, Walmart incorrectly frames the issue as balancing the benefits of its money transfer programs generally against the costs of preventing fraud. *See* D. Br. at 36. That is not the relevant comparison. The proper focus here is on whether maintaining a deficient anti-fraud program provides countervailing benefits that outweigh any consumer harms. *See FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1396 (M.D. Fla. 2018) (argument that purported benefits of weight loss supplement should be balanced against harms of prohibition against customers posting negative reviews "ignores the issue presented . . . which is whether Defendants' gag clause *practices*, not their products and services, presented a countervailing benefit") (emphasis in original); *see also* Ohlhausen, M., "Weigh the Label, Not the Tractor: What Goes on the Scale in an FTC Unfairness Cost-Benefit Analysis?" 83 Geo. Wash. L. Rev. 1999, 2018-24 (2015) (if a large company could defeat the substantial injury requirement simply because its "extensive line of products benefited consumers overall," such companies "would be free to inflict a significant amount of consumer harm with impunity").

FTC Act. As explained in *Wyndham*, "for civil statutes that regulate economic activities," such as the FTC Act, "[f]air notice is satisfied ... as long as the company can reasonably foresee that a court could construe its conduct as falling within the meaning of the statute." 799 F.3d at 250, 256 (cleaned up). Considering the alleged deficiencies in Wyndham's cybersecurity practices, which had failed to prevent three data breaches, the court held that Wyndham had fair notice that its conduct could violate the FTC Act. *Id.* at 256. The court further found that an FTC guidebook on cybersecurity and FTC complaints and consent decrees in similar cases, available on the FTC's website, also provided fair notice to the company. *Id.* at 256-57.

Walmart had even more substantial notice here. The company was fully aware that it was failing to stop millions of dollars in fraud-induced and illegal money transfers, and that the FTC had filed complaints and obtained court-ordered consent decrees against Walmart's own money transfer providers, MoneyGram (in 2009 and 2018) and Western Union (in 2017), for having similarly ineffective anti-fraud programs. As their agent (MoneyGram's largest agent, in fact), Walmart was served with the consent decrees, which the FTC also posted with the complaints on its website. It is clear that the Commission's complaints against MoneyGram and Western Union provided Walmart with more than adequate notice of the conduct the Commission considered to be unlawful. Even in settled cases, the Commission's simultaneously filed complaints "certainly help[] companies with similar practices apprehend" their potential liability. *Wyndham*, 799 F.3d at 257.[18]

---

[18] In addition to the nearly identical cases against MoneyGram and Western Union, the FTC's numerous litigated cases over the years also provided Walmart fair notice that facilitating the collection of fraud-related payments is an unfair practice under Section 5. *See, e.g.*, *FTC v. Wells*, 385 Fed. Appx. 712, 713 (9th Cir. 2010) (affirming liability of payment processor that processed unauthorized transactions despite reports of fraud, notice of excessive chargebacks, and failure to conduct due diligence about transactions); *Neovi*, 604 F.3d at 1157 (upholding unfairness liability where company received complaints and was on notice that its system was vulnerable to fraud, yet failed to properly verify account information before delivering online checks).

Even more significantly, in 2015, the Commission announced that it was amending the TSR to ban cash-to-cash money transfers in telemarketing, and confirmed in the 2015 SBP that "after careful consideration of the entire rulemaking record," such transfers meet the Section 5(n) test for unfairness. 80 Fed. Reg. at 77547. The 2015 SBP, in fact, details the precise ways in which cash-to-cash transfers satisfy each of the three Section 5(n) elements. *See id.* at 77547-52. The Commission also left no doubt that the 2016 TSR Amendment imposed particular obligations on money transfer businesses like Walmart. *See id.* at 77552 (declining money transfer industry group request "to amend the proposed Rule to provide an exemption or safe harbor for providers of cash-to-cash money transfers"). Walmart cannot credibly argue that it did not have fair notice that it would be liable for violations of the FTC Act or assisting and facilitating TSR violations in connection with money transfers thereafter.

## 2. Walmart Assisted and Facilitated Violations of the TSR

To state a claim for assisting and facilitating violations of the TSR, the FTC must allege that Walmart provided "substantial assistance or support to any seller or telemarketer when [Walmart] kn[ew] or consciously avoid[ed] knowing that the seller or telemarketer [was] engaged in any act or practice that violates" the TSR. 16 C.F.R. § 310.3(b). The Commission and courts have repeatedly recognized that although an assistor and facilitator *may* be directly involved in the underlying violation, such as when Walmart employees were complicit in the underlying frauds, the claim ultimately requires only more than "casual or incidental" help beyond something like delivering a telemarketer lunch, or "other activity with little or no relation to the conduct that violates the Rule." *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013); *see also FTC v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551, 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012) ("the threshold for what constitutes 'substantial assistance' is low").

29

Providing fraudsters and telemarketers with an "essential" service by processing their ill-gotten payments is substantial assistance. *See FTC v. HES Merchant Services Co., Inc.*, No. 6:12-cv-1618, 2016 WL 10880223, at \*5 (M.D. Fla. Oct. 26, 2016). The FTC's allegations that Walmart enabled a variety of different telemarketing schemes to obtain millions of dollars of illegal transfers are more than sufficient to allege such a claim.

### a. The FTC's Allegations of Telemarketers' Unlawful Conduct Support a Plausible TSR Claim Against Walmart

Count II asserts that Walmart violated Section 310.3(b) of the TSR, 16 C.F.R. §310.3(b), by assisting and facilitating three types of TSR violations. The Commission alleges that Walmart knew or consciously avoided knowing it was processing money transfers that (1) were induced by false or misleading statements (Compl. ¶ 119(a) (alleging underlying violations of 16 C.F.R. § 310.3(a)(4)), (2) were induced by the telemarketer's request for an advance fee in exchange for obtaining or arranging a loan (*Id.* ¶ 119(b) (alleging underlying violations of 16 C.F.R. § 310.4(a)(4)), and (3) involved a seller or telemarketer accepting payment for goods or services offered or sold through telemarketing via a cash-to-cash money transfer (*Id.* ¶ 119(c) (alleging underlying violations of 16 C.F.R. § 310.4(a)(10)).

The Complaint alleges sufficient facts to establish each type of underlying violation. To begin, Walmart's own documents confirm it was processing fraud-induced money transfers—in fact, it specifically instructed its associates to do so. *Id.* ¶ 55 (Walmart's Quick Reference Guide: "[i]f you suspect fraud, complete the transaction"). And the Complaint sets out numerous specific examples of criminal telemarketing fraud rings that extracted from consumers millions of dollars in fraud-induced money transfers that were sent from or received at Walmart locations. *Id.* ¶¶ 27-28. In addition, the Complaint alleges that MoneyGram, Ria, and Western Union routinely provided detailed information about fraud complaints to Walmart that identified

specific telemarketing scams.[19]  *Id*. ¶ 43.  The Complaint further includes specific allegations about money transfers sent or received at Walmart locations that constituted payment for advance-fee loans.  *See, e.g.*, *id.* ¶ 43(a) (15,401 complaints to MoneyGram with losses of over $7.7 million concerning advance-fee and other loan scams); ¶ 43(b) (924 complaints to Ria with losses of over $623,000 concerning advance-fee loan scams).

The Complaint also details the scope of the underlying telemarketing violations at Walmart stores.  For example, from September 24, 2016 to September 24, 2018, 93 percent of the Ria reported fraud-induced transfers paid out at a Walmart location in Teterboro, New Jersey involved a phone call to the victim, and 85 percent involved the grandparent or emergency scam. *Id*. ¶ 98(a).  One of its providers even notified Walmart that during a 9-month period in 2018, approximately 83 to 88 percent of fraud-induced money transfers through all Walmart stores involved schemes perpetrated over the telephone.  *Id.* ¶ 80.  Telephone calls continue to be the precipitating cause of a large number of fraud-induced money transfers at Walmart locations.  *Id.* Allegations about criminal fraud rings and fraudulent telemarketing calls that lead to fraud-induced money transfers at Walmart more than adequately allege underlying TSR violations.

---

[19]     In such situations, the fraudsters often call consumers and make false or misleading statements to induce them to make a payment for a good or service.  For example, in a government imposter scam, the fraudster might insist on payment to satisfy a government debt, such as a tax debt.  In a romance scam, the fraudster might solicit a payment for a plane ticket to visit, for emergency surgery, or for something else purportedly urgent.  In a "grandparent" scam, the fraudster might purport to need money for bail or to pay a bill.  And in a prize, sweepstakes, or lottery scam, which Walmart ignores, the fraudster demands money in exchange for the prize.  These are typical telemarketing schemes, and Walmart is wrong in suggesting that they somehow do not involve a good or service under the TSR.  *See, e.g., FTC v. Cuban Exchange, Inc.*, No. 12-CV-5890, 2014 WL 3756358, at *4 (E.D.N.Y. July 30, 2014) (scheme to deceive people into providing personal and banking information by falsely promising expedited refunds violated TSR); *FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974, 977, 980 (N.D. Ill. 2007) (deceptively pitching purported credit cards and then actually sending "consumers who fell victim to the scam an essentially worthless packet of material" violated the TSR); *see also* 2015 SBP, 80 Fed. Reg. at 77549 ("As is true in other telemarketing contexts, the ability of consumers to identify and avoid the risk of injury is substantially diminished when telemarketers engage in deceit to sell sham goods or services.").

*See Subscriberbase*, 2013 WL 5406225 at *1 (complaint need only "raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations").

Walmart is simply wrong in suggesting that, in addition to the above allegations, the FTC also must allege the specifics of each of the tens of thousands of telemarketing transactions that it facilitated to provide fair notice of the FTC's claims. A complaint need not set out such "detailed factual allegations" in order to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. The FTC's allegations are more than sufficient to plead that Walmart stores processed an enormous volume of illegal money transfers related to telemarketing, and to give Walmart fair notice of its claims.[20] Indeed, proof of the individualized circumstances of each of the tens of thousands of potentially relevant transactions is not even necessary for the FTC to *prevail* on its TSR claims. *See, e.g.*, *FTC v. Global Mktg. Group, Inc.*, 594 F. Supp. 2d 1281, 1290 (M.D. Fla. 2008) (in substantial assistance case under TSR, FTC required to show reasonable approximation of customers' net losses, and then the burden shifts to defendant); *cf. FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993) (FTC need not prove individual reliance to prevail).

> **b.** **The FTC's Detailed Allegations of Walmart's Misconduct Are More Than Adequate to Plead that Walmart Substantially Assisted and Facilitated TSR Violations**

The Complaint also adequately alleges that Walmart provided substantial assistance or support to the telemarketers conducting the underlying schemes. Again, "the threshold for what constitutes 'substantial assistance' is low." *Consumer Health Benefits Ass'n*, 2012 WL 1890242 at *6. As discussed in *Chapman*, in promulgating the rule, the FTC declined to limit substantial assistance to actions "related to the commission or furtherance" of practices violating the TSR.

---

[20] The pleading requirements of Rule 9 do not apply here, but even if they did, the allegations related to telemarketing violations meet that standard as well. *See, e.g.*, Compl. ¶¶ 27-28 (specifying particular criminal scam rings that collected proceeds of fraudulently induced transfers at Walmart stores).

32

714 F.3d at 1216. Under the TSR—which unlike securities laws *expressly* contemplates assisting-and-facilitating violations (60 Fed. Reg. 43,842, 43852, n.98 (August 23, 1995))—courts find substantial assistance where a defendant's conduct non-tangentially contributes to the underlying TSR violation. *See, e.g.*, *Chapman*, 714 F.3d at 1216-17.

Helping telemarketers collect money transfers from their victims, as Walmart is alleged to have done here, is substantial assistance. In *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1239 (11th Cir. 2017), a payment processor similarly substantially assisted TSR violations "by providing two merchant accounts to [the defendant telemarketer] despite a slew of red flags indicating [the telemarketer] was engaged in a fraudulent telemarketing scheme." In those circumstances, the Eleventh Circuit found substantial assistance "as a matter of law." *Id.* [21]

In addition to providing fraudsters and telemarketers with an "essential" service by processing their ill-gotten payments, as in *WV Universal*, the Complaint alleges that Walmart did much more. There can be no clearer instance of ignoring "red flags" and assisting and facilitating fraudsters than Walmart's receive-side instruction to its employees—"[i]f you suspect fraud, complete the transaction." Compl. ¶ 55. Furthermore, Walmart routinely received but did not meaningfully address complaints and reports about fraud-related transfers associated with telemarketing, and Walmart employees have even been complicit in some of the underlying frauds. *Id.* ¶¶ 50, 55. Walmart's deficient anti-fraud program also has enabled fraudsters and telemarketers to pick up the proceeds of their schemes anonymously (without having to provide

---

[21] The appeal in *WV Universal* arose out of the *HES* matter, discussed *supra* and *infra*. *Grijalva v. Kevin Mason, P.A.*, No. 8:18-CV-02010-JLS-DFM, 2019 WL 8221076 (C.D. Cal. Dec. 30, 2019), cited by Walmart, is distinguishable and unpersuasive. In *Grijalva*, the complaint was "permeated with conclusory allegations," and "there [we]re no allegations that [the company] did anything other than act 'as the sole and exclusive payment processor' for the other Defendants." 2019 WL 8221076, at *5. Those conclusory allegations starkly contrast with the detailed allegations in the Commission's Complaint about Walmart's own conduct that made it easier for fraudulent telemarketers to obtain the proceeds of their schemes from consumer victims.

valid IDs)—leaving consumers without any recourse. *Id.* ¶¶ 24, 26. And processing *any* cash-to-cash money transfers while knowing or consciously avoiding knowing that they related to telemarketing amounts to substantial assistance after the 2016 TSR Amendment.

For its part, however, Walmart urges the Court to adopt a remarkably narrow, inaccurate definition of "substantial assistance," but Walmart is not a bank, telephone company, or delivery service, and assisting and facilitating under the TSR is not the same as aiding and abetting under a different law or rule. The FTC need not allege that Walmart itself participated in the underlying telemarketing violations (*e.g.*, wrote deceptive scripts) or actively covered them up (*e.g.*, destroyed deceptive scripts) in order for Walmart to be liable. If that were the rule, it would turn all such claims into direct TSR violations. To the contrary, the very purpose of assisting and facilitating liability is to capture actors that might not participate in the underlying TSR violation, but were instrumental to its success.[22]

Walmart nevertheless disclaims responsibility for *any* prohibited transfers at its stores, and attempts to exploit the Commission's decision when instituting the ban to allow money transfer businesses "the flexibility to comply with the requirements of a rule in ways that are consistent with their business practices," rather than dictate specific practices. 2015 SBP, 80 Fed. Reg. at 77551. But this flexibility certainly does not mean those businesses can just ignore the rule altogether, which is what Walmart did here. Walmart also conveniently ignores that the Commission provided important insights into what money transfer businesses might do to

---

[22]    *Schatz v. Rosenberg*, 943 F.2d 485, 495 (4th Cir. 1991), *cert. denied,* 503 U.S. 936 (1992), a securities case cited by Walmart, is of no assistance. In another recent TSR case, the court rejected a similar argument, explaining that "reliance on aider-abettor principles under securities laws is misplaced" in the context of assisting and facilitating claims. *CFPB v. Daniel A. Rosen, Inc.*, No. 2:21-cv-07492-VAP, 2022 WL 1514439, at *4-*5 (C.D. Cal. Apr. 5, 2022). Denying the defendant's motion to dismiss, the court noted that "although the [Commission] invoked securities laws in promulgating the TSR," it "also rejected any requirement that the assistance be 'related to the commission or furtherance' of a core rule violation" to be a violation of the TSR.

comply in the 2015 SBP (which were later outlined in the *Western Union* order). *Id.* at 77551. For example, the SBP explicitly contemplated that they could ask consumers questions about the transaction—because many businesses were already doing that. *Id*. at 77551 & n. 394 ("money transfer providers already are trained in how to detect fraud," including in how to "ask questions to determine the consumer's relationship with the receiver and reasons for sending the money"). The SBP also indicated that the TSR ban on cash-to-cash transfers would enable those providing money transfer services to provide a clear and concise warning to consumers that: "It is illegal for telemarketers [to] ask consumers to wire cash." *Id.* In addition, the Commission directed money transfer businesses to the FTC's prior enforcement actions and the business guidance regularly provided by FTC staff. *See id.* at 77551-52.

The Commission's assisting-and-facilitating claim here is consistent with *WV Universal*, *Chapman*, and other cases holding that third parties (including payment processors) are liable where they substantially assist others violating the TSR. The Complaint allegations are more than sufficient to support a claim that Walmart provided substantial assistance to telemarketers and scammers, offering an easy mechanism for them to collect the proceeds of their schemes.

### c. The Complaint Sufficiently Alleges Walmart Knew or Consciously Avoided Knowing About the TSR Violations

The Complaint also sufficiently details Walmart's knowledge that it was processing millions of dollars related to telemarketing scams and prohibited cash-to-cash transfers. *See, e.g.*, Compl. ¶¶ 55 (Walmart's Quick Reference Guide: "[i]f you suspect fraud, complete the transaction"); 27-28 (Walmart was aware that numerous criminal telemarketing fraud rings have continued to collect proceeds of fraud-induced transfers at Walmart for years, including while Quick Reference Guide was being used). Walmart also received copies of the Commission's orders against MoneyGram and Western Union, which confirmed that money transfers were

being used in connection with telemarketing fraud and, since January 2017, included prohibitions specifically related to the cash-to-cash prohibition in the 2016 TSR Amendment. *Id*. ¶¶ 37, 105.

Further, the 2015 SBP confirmed that "the perpetrators of telemarketing fraud—not legitimate telemarketers and sellers—depend on the speed, convenience, anonymity and irrevocability of [cash-to-cash transfers] to siphon millions from consumer victims each year." 80 Fed. Reg. at 77547. It also left no doubt that telemarketing fraudsters were using cash-to-cash transfers and that money transfer businesses like Walmart are subject to liability for assisting and facilitating those transactions.[23] *See* 80 Fed. Reg. at 77547, 77552. In light of the information Walmart had about the use of cash-to-cash transfers for telemarketing schemes, it should have taken steps to comply with the 2016 TSR Amendment, but it did nothing in response for years.

Although the Complaint allegations demonstrate Walmart's direct awareness that it was processing illegal money transfers in its stores, they also show Walmart's conscious avoidance. "The 'conscious avoidance' standard is intended to capture the situation where actual knowledge cannot be proven, but there are facts and evidence that support an inference of deliberate ignorance on the part of a person that the seller or telemarketer is engaged in an act or practice that violates §§ 310.3(a) or (c), or § 310.4 of this Rule." 60 Fed. Reg. at 43852. "As the FTC has explained in its Compliance Guide, taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability." *Chapman*, 714 F.3d at 1219 (cleaned up). In *HES*, the court held that a payment processor and its president's failure to follow up on "red flags" was "enough to show, at a minimum, that [the

---

[23]     The discussion in the 2015 SBP about the prevalence of *telemarketing* fraudsters relying on cash-to-cash transfers to steal from consumers directly rebuts Walmart's dubious suggestion that it may have known that a tremendous amount of the fraud-induced money transfers at its stores involved telephone calls, but it somehow did not know *any* of those transactions were related to telemarketing and therefore prohibited under the 2016 TSR Amendment.

president] consciously avoided knowing about the [telemarketers'] TSR violations." 2014 WL 6863506 at *8 n.5 (M.D. Fla. Nov. 18, 2014).

Even beyond Walmart's receive-side practice of paying out to suspected fraudsters, the Complaint describes how Walmart did *nothing* for years in response to the 2016 TSR Amendment, failing even to take basic steps like training its associates to ask simple questions to try to root out telemarketing payments. *See, e.g.*, Compl. ¶ 65. That is, "at a minimum," conscious avoidance. *See HES*, 2014 WL 6863506 at *8 n.5; *see also Chapman*, 714 F.3d at 1219.

### D. THE RELIEF THE FTC SEEKS IS AUTHORIZED AND APPROPRIATE

The well-supported allegations in the Complaint also demonstrate why an injunction, monetary relief, and civil penalties are necessary and proper here.

#### 1. Injunctive Relief is Warranted

Because the Complaint establishes that Walmart's law violations continue, the FTC's claim for injunctive relief under Section 5 is proper. Section 13(b) of the FTC Act authorizes a permanent injunction against anyone who "is violating, or is about to violate, any provision of law" that the Commission enforces.[24] 15 U.S.C. § 53(b). The Commission's Complaint adequately alleges that Walmart's violative conduct is ongoing. For example, it alleges that recent reviews of Walmart locations by MoneyGram and Ria reveal persistent issues with fraud prevention at Walmart stores, including untrained, undertrained, and unknowledgeable employees, missing resource materials and job aids, and lack of fraud awareness materials for consumers. *See, e.g.*, Compl. ¶¶ 17, 68, 85, 100. And after Walmart finally made changes to address the 2016 TSR Amendment in March 2019, stores were found to be missing required

---

[24] Section 19 (15 U.S.C. § 57b), which governs the FTC's TSR claims, contains no such language.

warnings and fraud awareness materials. *See, e.g.*, *id.* ¶ 68. Walmart also more recently has transitioned to printouts—which Walmart employees have a role in providing to consumers— that contain fraud warnings in small print, which are much less conspicuous to consumers. *See id.* ¶ 20.

Even if Walmart could show that it ceased any of the alleged conduct during the FTC's investigation, an injunction would still be warranted. "[C]ourts have repeatedly held that defendants' cessation of violations as a direct result of government intervention is treated as if the violations never stopped—or, at a minimum, are imminently about to recur." *U.S. v. MyLife.com, Inc.*, 499 F.Supp.3d 757, 767 (C.D. Cal. 2020) (citing *FTC v. Triangle Media Corp.*, No. 18cv1388-LAB(LL), 2018 WL 6305675, at *1 (S.D. Cal. Dec. 3, 2018)); *see also FTC v. Elec. Payment Solutions of Am. Inc.*, No. CV-17-02535, 2019 WL 4287298, at *9 (D. Ariz. Aug. 28, 2019) ("courts should be wary of a defendant's termination of illegal conduct when a defendant voluntarily ceases unlawful conduct in anticipation of formal intervention"); *In the Matter of Int'l Assoc. of Conf. Interpreters*, 123 F.T.C. 465, 658 (1997) (defense that one abandoned practices "rarely sustainable" where the alleged "discontinuance occurred only after the Commission's hand was on the respondent's shoulder") (citation omitted).

Any changes Walmart may have made after the FTC began looking into its conduct were too late and did not adequately address the misconduct. *See, e.g.*, Comp. ¶¶ 85, 100 (noting missing employee resources, send forms, and fraud awareness materials during audits). Absent injunctive relief, there are no assurances that Walmart will implement or maintain an effective anti-fraud program, as Walmart's past conduct indicates otherwise. As described in the Complaint, Walmart previously made commitments to FTC staff—about reducing fraud, training its employees, and educating consumers—that it did not keep. *Id.* ¶ 35. Walmart also has taken

the alarming position that even as a large and influential agent of both MoneyGram and Western Union, it does not have any obligations under the FTC's prior court orders with those companies (*see* D. Br. at 40, n. 14), plainly illustrating the need for injunctive relief.

### 2.     Civil Penalties are Warranted

The allegations in the Complaint also support the FTC's claim for civil penalties.[25] Pursuant to Section 5(m)(1)(A), a defendant is liable for civil penalties for a rule violation when it has "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that such act is unfair or deceptive and is prohibited by such rule.  In other words, civil penalties are warranted "where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision."  *US v. National Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996) (cleaned up); *see also U.S. v. Dish Network, L.L.C.*, 667 F. Supp 2d 952, 961-62 (C. D. Ill. 2009) (denying motion to dismiss penalties claim); *US v. Prochnow*, No. 1:02-CV-0917-JOF, 2005 WL 8154273, at *6 (N.D. Ga. Dec. 2, 2005) (evidence of actual knowledge and knowledge reasonably imputed to defendant regarding consent decree and TSR violations supported penalties).

The Complaint contains detailed allegations demonstrating that Walmart had actual knowledge of, or deliberately ignored, conduct violating the TSR, thereby violating the TSR itself.  *See, e.g.*, Compl. ¶¶ 27-28 (Walmart aware criminal fraud rings conducted telemarketing scams via Walmart stores over period of years); ¶¶ 36-37, 80, 105 (Walmart aware of 2016 TSR

---

[25]     Walmart does not appear to challenge the FTC's right to seek consumer redress for TSR violations pursuant to Section 19.  Once TSR violations are established, Section 19(b) authorizes the Court "to grant such relief as the court finds necessary to redress injury to consumers … resulting from the rule violation," including without limitation "the refund of money." 15 U.S.C. § 57b(b).  This authority was explicitly acknowledged by the Supreme Court in *AMG Capital Mgmt. v. FTC*, 141 S. Ct. 1341, 1352 (2021) ("Nothing we say today … prohibits the Commission from using its authority under § 5 and § 19 to obtain restitution on behalf of consumers.").

Amendment and its obligations thereunder); ¶¶ 43, 80, 98 (Walmart aware of complaints to its partners regarding scams associated with telemarketing, partner reported over 80 percent of fraud-induced money transfers at Walmart locations involved telephone calls). Nevertheless, Walmart did not instruct its employees to stop suspicious transactions, but to do the opposite. *Id.* ¶¶ 2, 55. Walmart also failed to provide any instructions to its employees or warnings to consumers addressing the 2016 TSR Amendment. *Id.* ¶ 15. Indeed, it was not until over two years after the Western Union order and four months after the second MoneyGram order that Walmart finally began instructing associates to ask consumers questions about telemarketing and provide them with warnings—and then, it did so only at MoneyGram's request. *Id.* ¶ 80. These and other allegations in the Complaint support the Commission's civil penalties claim.

## IV.  CONCLUSION

The Complaint allegations—taken in any light, let alone one most favorable to the Commission—meet or exceed applicable federal pleading standards. Walmart's other challenges—to the agency's structure, and to the relief it seeks here—are similarly meritless. The Motion to Dismiss the Complaint should be denied.

Dated:  October 5, 2022                 Respectfully submitted,

                                        */s/ Karen D. Dodge*
                                        KAREN D. DODGE
                                        PURBA MUKERJEE
                                        MATTHEW G. SCHILTZ
                                        RACHEL F. SIFUENTES
                                        Attorneys for Plaintiff
                                        Federal Trade Commission
                                        230 South Dearborn Street, Suite 3030
                                        Chicago, Illinois 60604
                                        (312) 960-5634 (telephone)
                                        (312) 960-5600 (facsimile)