**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FEDERAL TRADE COMMISSION,

        Plaintiff,

      v.

WALMART INC.,

        Defendant.

No. 22 CV 3372

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Walmart Inc. provided money transfer services, allowing customers to send and receive funds from its stores. Telemarketers conned consumers into sending money using Walmart's services. The Federal Trade Commission alleges that Walmart knew that it was processing fraudulent money transfers and failed to do enough to protect consumers. The FTC claims that Walmart failed to implement and maintain effective policies, properly train and oversee its employees, warn consumers, or address suspicious transactions. The agency brings claims against Walmart for violations of the Federal Trade Commission Act and the Telemarketing Sales Rule. Defendant moves to dismiss under Rule 12(b)(6). For the reasons discussed below, the motion is granted in part and denied in part.

## I. Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018) (citing *Deppe v. NCAA*, 893 F.3d 498, 499 (7th Cir. 2018)).

A plaintiff alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted) (Claims that sound in fraud—meaning premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011) (citation omitted) (Rule 9(b) applies to "allegations of fraud, not claims of fraud."). They must describe the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

## II.  Background

### A.    Walmart's Money Transfer Services

Walmart offered a variety of financial products to its customers, driving traffic to the company's stores and generating significant revenue. [1] ¶¶ 6, 8, 22.[1] Among those products were money transfer services. *Id.* ¶ 8. Walmart relied on other companies' systems—including those belonging to MoneyGram International, Inc.,

---

[1] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the complaint. [1].

RIA Financial Services, and The Western Union Company—to facilitate money transfers. *Id.* ¶¶ 9–11, 13. Walmart acted as an agent of those companies. *Id.* ¶ 9.

Consumers who wanted to send or receive money at Walmart visited the company's Customer Service Desks and MoneyCenters. [1] ¶ 18. Customers could also begin a money transfer online and then finalize the transaction at a Walmart store. *Id.* For some time, money transfer senders at Walmart were required to complete a "send form." *Id.* ¶ 20.[2] In 2019, however, Walmart stopped using the forms, and instead provided senders with a printout including consumer fraud warnings in small print. *Id.* For years, Walmart didn't ask senders to present identification unless their transfers exceeded limits set by the money transfer provider. *Id.* ¶ 21. Walmart began verifying and recording sender ID information for all transactions in January 2018. *Id.* Customers who sent $3,000 or more were required to provide their social security number, tax identification number, or other identifying information. *Id.*

Walmart's money transfers were intended to be person-to-person, and weren't meant for business transactions. [1] ¶ 19. The company didn't limit the amount that a consumer could send or receive, and instead relied on its money transfer providers—MoneyGram, Ria, and Western Union—to impose limits. *Id.*[3] Consumers sending a

---

[2] First-time senders had to give their name, address, telephone number, the name of the recipient, and the state or province and country where the money was headed, but repeat customers weren't required to complete the full form. [1] ¶ 20.

[3] Before 2018, the most a customer could send through MoneyGram was $20,000 per day, with a maximum single transaction of $10,000. [1] ¶ 19. In early 2018, MoneyGram lowered the single transaction limit to $8,000. *Id.* Ria money transfers through the Walmart2Walmart service were capped at $900, but that limit was raised to $2,500 in October 2016. *Id.* Before 2018, there were no limits on the amount of money that a customer

money transfer from Walmart had to pay with cash or a PIN-based debit card. *Id.* Consumers also had to pay either a variable or flat fee to Walmart. *See id.* ¶ 22. Money transfer senders at Walmart were given a unique reference number to track their transfers, and the money being sent was typically available within minutes. *Id.*

Walmart's providers required that money transfer recipients complete a "receive form" before accessing transferred funds. [1] ¶ 23. Recipients had to provide the transaction reference number, the receive amount, their name, address, telephone number, and information about the sender. *Id.* Recipients were also required to present government-issued photo ID, but Walmart recorded recipient ID information only for certain transactions. *Id.* For transfers of $3,000 or more, U.S. recipients were required to provide a social security number, tax identification number, or other identifying information. *Id.* In 2016, Walmart began requiring ID for all recipients, and the company stopped using the receive forms. *Id.*

Walmart used its own point-of-sale system to process money transfers and to communicate with its providers. [1] ¶ 12. Walmart also designed and controlled the systems that its employees used to record information about money transfers and to prevent fraud-induced transactions. *Id.*

## B. Fraudulent Money Transfers at Walmart

For more than a decade, fraudsters used money transfers to steal from their victims, especially U.S. customers. [1] ¶ 14; *see id.* ¶ 48. Victims of fraud often sent

---

could receive in a single day through either MoneyGram or Ria. *Id.* In Canada, Walmart customers could send a maximum of $7,500 (CAD) in a single transfer, and could receive no more than $5,000 (CAD). *Id.*

their money from Walmart, *id.* ¶ 42, and fraud-induced money transfers at Walmart often involved large amounts of money picked up using out-of-state IDs. *Id.* ¶ 97. Using Walmart's money transfer services, perpetrators of common telemarketing scams (including, in some cases, Walmart employees) received millions of dollars from victimized consumers, many of whom were elderly. *See id.* ¶¶ 25, 42. By allowing them access to its providers' money transfer systems, Walmart provided an essential service to fraudulent telemarketers, sellers, and con artists. *Id.* ¶ 25; *see id.* ¶¶ 41, 48. Fraudsters liked using Walmart because the company's many locations made it convenient for victims, Walmart paid recipients in cash, transferred funds were available within minutes, and recipients could operate anonymously, either because Walmart didn't require an ID check or because fraudsters used fake IDs. *Id.* ¶ 26.

Consumers who had been deceived by a fraudulent scheme weren't usually in a position to prevent fraud. [1] ¶ 29. Based on false promises or fear of financial or legal consequences, victims felt compelled to complete money transfers. *Id.* Many consumers also weren't aware that fraud detection and transaction reversal were less likely with money transfers than with other payment mechanisms. *Id.* Once cash was paid to a money transfer recipient, fraud victims were usually unable to get their money back. *Id.* ¶ 24. After MoneyGram and Western Union reached agreement with the FTC and many states in 2016 and 2018, customers could receive refunds on fraudulent transactions if money transfer providers or their agents (including Walmart) failed to follow certain anti-fraud policies and procedures. *Id.*

5

Walmart told consumers to report fraud to its money transfer providers, who maintained databases of complaints. [1] ¶ 30. Ria, Western Union, and MoneyGram shared complaints with Walmart. *Id.* Between 2013 and 2018, those companies received at least 226,679 complaints about fraud-induced money transfers sent or received at Walmart, transactions involving at least $197,316,611. *See id.* ¶¶ 30, 43–45.[4] Many of those complaints involved telemarketing scams. *Id.* ¶ 43. The complaints made to Walmart's providers represented only a small percentage of the actual fraud perpetrated through money transfers at Walmart. *Id.* ¶ 30. There were more complaints about fraud-induced money transfers at Walmart than at any of the money transfer providers' other agents. *Id.* ¶ 31.

Walmart knew that its services were used by fraudsters. *See* [1] ¶¶ 14, 27, 46, 48. MoneyGram, Ria, and Western Union told Walmart about suspicious activity, and alerted the company to certain Walmart stores where twenty-five, fifty, or even seventy-five percent of money transfer activity was fraudulent. *See id.* ¶ 46.[5] Between 2015 and 2019, at least 101 Walmart stores were responsible for paying out over $100,000 in fraudulent transfers that were complained about, including at least eleven stores that paid out more than $200,000. *Id.* ¶ 98. The company also knew that many scams that made use of its services—including person-in-need, government

---

[4] Money transfers that were related to complaints (and could have been fraud-induced) totaled over $1.3 billion. [1] ¶ 43.

[5] A 2018 Walmart analysis identified 317 instances when Walmart stores met a court-established criteria for an Elevated Fraud Risk Agent Location based on the number of complaints made at certain Walmart stores. [1] ¶ 47; *see FTC v. The Western Union Co.*, 17-cv-0110, at Dkt. 12, ¶ F (M.D. Pa. Jan. 1, 2017).

agent impersonator, and lottery, sweepstakes, and prize scams—often involved telemarketing. *See id* ¶¶ 14, 41.[6]

Walmart learned about prosecutions involving fraud perpetrated in its stores. Criminal authorities across the country charged individuals in connection with mass marketing and telemarketing schemes that obtained millions of dollars sent or received at Walmart. [1] ¶ 28; *United States v. Caballero*, No. 16-cr-0124 (E.D. Ark.); *United States v. Caballero*, No. 16-cr-0201 (D. Minn); *United States v. Mirabel*, No. 16-cr-0269 (N.D. Tex.); *United States v. Pando*, No. 17-cr-0046 (N.D. Miss); *United States v. Labra*, No. 17-cr-0314 (D. Md.); *United States v. Gohill*, No. 17-cr-0212 (E.D. Wis.); *United States v. Patel*, No. 17-cr-0094 (E.D. Wis.); *United States v. Marcks*, No. 19-cr-0315 (D. Nev.); *United States v. Parmar*, No. 19-cr-0160 (E.D. Va.); *United States v. Hines*, No. 17-cr-1038 (N.D. Iowa); *United States v. Smith*, No. 21-cr-0372 (M.D. Pa.); *United States v. Budhadev*, No. 20-cr-0252 (M.D. Pa.). For instance, in May 2016, Walmart learned about an Internal Revenue Service impersonation scam conducted over the telephone that made use of the defendant's money transfer services. [1] ¶ 27. That scam ultimately resulted in at least fifteen prosecutions. *See id.*

Walmart knew or should have known that its stores were susceptible to fraud because the company had thousands of associates authorized to provide money

---

[6] There's an allegation that these and similar scams violated 15 U.S.C. § 45(a), and that many of the same scams violated 16 C.F.R. § 310. *See* [1] ¶ 41. Consumers in such scams were instructed to send money transfers, and were induced to pay for goods or services or to make payments as a result of circumstances that did not actually exist. *See id.*

transfers, associate turnover rates were high, the company had heavy customer traffic, and multiple shifts of associates worked at a single store. [1] ¶ 48. There's an allegation that Walmart's contracts with Western Union and MoneyGram, along with court orders obtained by the FTC against those companies, gave Walmart notice about its obligations to detect and prevent fraud. *Id.* ¶ 14; *see FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12 (M.D. Pa. Jan. 20, 2017).

## C. Walmart's Fraud Prevention Efforts

As the agent of money transfer providers dealing directly with consumers, Walmart was well positioned to detect and prevent fraud. [1] ¶ 32. Walmart controlled its own fraud policies and procedures, the training and supervision of its employees, warnings provided to consumers, monitoring and investigation of suspicious activity, and other actions designed to prevent fraudulent transfers. *Id.* ¶ 33.

Walmart's written agreements with MoneyGram, Ria, and Western Union required Walmart to comply with the providers' policies and procedures, maintain records, train its employees, allow only authorized persons to access money transfer systems, and prevent unauthorized use. [1] ¶ 34. The agreements also said that Walmart was to maintain its own anti-fraud policies and procedures, and that the company needed to comply with any court orders that applied to its money transfer providers. *Id.* ¶¶ 34, 39.

The FTC entered into consent orders with MoneyGram in 2009 and 2018. *See* [1] ¶¶ 35, 38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20 (N.D. Ill. Nov. 13, 2018). The Commission also entered into a consent order with Western Union in 2017. [1] ¶ 37; *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12 (M.D. Pa. Jan. 20, 2017). The orders bound Western Union, MoneyGram and their agents (including Walmart). *See* [1] ¶¶ 35, 37–38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13, p. 5 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20, p. 7 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 6 (M.D. Pa. Jan. 20, 2017).[7] Walmart was required to implement and maintain a comprehensive anti-fraud program designed to prevent fraudulent money transfers. *See FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13, p. 7 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20, p. 11 (N.D.

---

[7] The cases cited by defendant don't show that a consent order can never bind—either explicitly (by applying through its terms to the agents of a signatory) or through the operation of contracts law—a non-party to the consent order. In *Altria Group, Inc.*, the Supreme Court noted that "a consent order is ... only binding on the parties to the agreement," but didn't consider the situation alleged in this case: a consent order that allegedly ran to the agent of a party to the order. *Altria Group, Inc. v. Good*, 555 U.S. 70, 89 n.13 (2008). *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland* doesn't disagree, because the Court in that case reasoned that parties to a consent decree could not impose obligations on a third party "without that party's agreement." 478 U.S. 501, 529 (1986). In this case, the complaint says that Walmart entered contracts that required Walmart to comply with orders that applied to MoneyGram and Western Union. *See* [1] ¶¶ 34, 39. At this point in the case, it's reasonable to infer that these consent orders applied to Walmart as the agent of its money transfer providers. *See also Consumer Fin. Prot. Bureau v. TransUnion*, No. 22 C 1880, 2022 WL 17082529, at *5–7 (N.D. Ill. Nov. 18, 2022) (holding that an officer of a corporation was bound by a consent order binding the corporation); *Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir. 1984) (citation omitted) (noting that contract principles apply to the interpretation of a consent decree).

Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 11 (M.D. Pa. Jan. 20, 2017). The Western Union order also required Walmart to identify and prevent cash-to-cash money transfers from being used as a form of payment in telemarketing transactions. *See FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 7 (M.D. Pa. Jan. 20, 2017). Walmart received all three orders, and told the FTC that the company had implemented a comprehensive anti-fraud program. *See* [1] ¶¶ 35, 37–38.[8]

Despite its obligations, Walmart failed to effectively detect and prevent fraud at its stores. *See* [1] ¶¶ 14, 40, 49. Walmart didn't have a written anti-fraud and consumer protection plan until November 2014. *Id.* ¶ 51. The company failed to implement and maintain a comprehensive and effective anti-fraud program, properly train and supervise its employees, warn consumers, adequately monitor and investigate unusual or suspicious activity, stop transfers that Walmart should have known or suspected were fraud-induced, adequately collect, record, and report consumer fraud, or take other reasonable steps to prevent fraudulent use of Walmart's money transfer services. *Id.* ¶¶ 15–16, 40, 51.[9]

Walmart failed to adopt effective policies, failed to adhere to existing policies, and didn't fix those problems in a timely manner. *See* [1] ¶¶ 40, 50. For example,

---

[8] As a licensed money service business, Walmart was subject to the Bank Secrecy Act, which required the company to prevent certain types of fraud. *See* [1] ¶ 39; 31 U.S.C. § 5311 *et seq.*

[9] A 2017 MoneyGram review of Walmart's anti-fraud program identified several problems, including that defendant hadn't effectively prevented fraud, kept required transaction records, and had failed to report, file, or refer suspicious activity reports. [1] ¶ 54. MoneyGram told Walmart that its main concern was that Walmart wasn't rejecting potentially fraudulent transactions at the receive end of the transaction. *Id.*

while Walmart's anti-fraud program said that employees who worked at stores with a heightened risk of fraud were to receive special training, many stores failed to offer that training on time. *Id.* ¶ 52. Similarly, the company's program called for consumer warnings and pamphlets, but many Walmart stores didn't offer those materials, and versions of Walmart's anti-fraud systems included no instructions for associates who suspected that money transfer recipients were fraudsters. *Id.* ¶¶ 52–53.

### 1. *Receive-Side Fraud*

In 2015, Walmart employees who suspected that the recipient of a money transfer was involved in fraud were supposed to complete the transaction, not deny or reject payouts. [1] ¶ 55.[10] Walmart's employees were to report suspected receive-side fraud by faxing a report to the company's home office. *Id.* Without consistent policies and procedures requiring employees to deny suspected receive-side fraud, Walmart money transfers were more susceptible to consumer fraud, including by telemarketers and sellers. *Id.* ¶ 56. For much of the period between September 2015 and May 2019, Walmart's receive-side fraud rate by volume using MoneyGram's systems was higher than the rates for the rest of MoneyGram's combined agent network. *Id.*

Walmart changed course with respect to receive-side fraud in May 2017, after MoneyGram began suspending Walmart stores from its services. [1] ¶ 57.

---

[10] A quick reference guide for Walmart associates said that if associates suspected fraud on the receiving end, they should complete the transaction. *See* [45-1] at 26. Employees were then to immediately report the fraud. *Id.* Elsewhere in the guide, employees were told not to process suspicious transactions. *Id.* at 24, 27.

MoneyGram required the company to offer remedial training to Walmart employees at stores with higher rates of fraud. *Id.* This remedial training included instructions about Walmart's new fraud reporting system, but didn't solve the problem. *Id.* ¶ 58. For instance, the company's new reporting system included a "scam" button, but the scam button was only to be used during the send-side of the transaction, not for potential fraudsters collecting a payment. *Id.* Walmart's fraud-monitoring system included an option for "Suspicious Behavior During a Money Transfer Receive," but indicated that associates were only to use that option when a recipient had received more than five different transactions in a day. *Id.* The company's system also didn't instruct employees to cancel suspected receive-side fraud, merely to report it. *Id.*

In November 2017, Walmart changed its systems again, instructing some associates to cancel suspicious transactions on the receive-side of a money transfer. [1] ¶ 59. Walmart told associates to cancel transactions when a customer received multiple large money transfers or when a customer presented different IDs during different visits. *Id.* Employees who suspected fraud that didn't fit those parameters were instructed to report the suspicious transaction, but not to cancel it. *Id.* Even after it made this change, however, Walmart continued to tell other employees to complete fraudulent transactions. *Id.* ¶ 61. The company didn't update its annual associate training on receive-side fraud until late 2018, and even then gave mixed signals about when transactions were to be cancelled. *Id.* ¶ 62.

Even when a transaction was cancelled, Walmart sometimes failed to do so effectively. *See* [1] ¶ 60. From May 2017 until late 2018, even if a Walmart employee

cancelled a transaction, suspected fraudsters could go to another Walmart employee or to a different location to complete the transaction. *Id.* Although Walmart told associates to call the money transfer provider about the fraud—which would have killed a transaction once and for all—many Walmart employees failed to make those calls. *Id.*

When Walmart's system became better at automatically cancelling transactions, Walmart's fraud prevention continued to be ineffective because the company provided inconsistent training on how to handle receive-side fraud and use the fraud-prevention system, the company's prevention efforts didn't capture certain frauds, and managers sometimes overrode associate decisions not to complete a transaction. [1] ¶ 64. Walmart also didn't routinely train its employees to ask questions about the nature of money transfer transactions and whether consumers were receiving telemarketing-related payments. *Id.* ¶ 65.

### 2.    *Send-Side Fraud*

Walmart failed to provide clear and consistent instructions to its employees about how to effectively report and stop fraudulent telemarketing-related money transfers. [1] ¶ 66. As a result, Walmart failed to prevent fraud victims, especially the elderly, from being victimized through various scams, including grandparent, Good Samaritan, lottery, prize, and romance scams. *Id.* In some cases, fraudsters specifically directed consumers to use Walmart's money transfer services because of the company's lack of safeguards. *Id.*

13

Certain characteristics of money transfers suggested fraud, including when multiple transfers were made in a short period of time, transfers were sent to high-risk countries, transfers of above average amounts of money, and transfers that were sent to different individuals. *See* [1] ¶ 67. In many cases when these characteristics were present, however, Walmart failed to step in. *Id.* For example, from February to March 2017, Walmart sent fifty-two transfers totaling $51,000 for one older consumer to seven different receivers in Ghana and the United States. *Id.* In March and April 2017, Walmart sent $54,550 in thirty-three transfers on behalf of another consumer to a recipient in Ghana. *Id.* In a third example, Walmart sent forty-two transfers totaling $71,235.16 for a customer to ten recipients in Ghana, the United States and Turkey, despite the customer saying that he was sending money to buy millions of dollars in gold. *Id.* Walmart waited until all of these transfers were completed to report the incidents to law enforcement and Walmart's providers. *Id.*

Walmart failed in many cases to provide warnings to senders about common money transfer frauds. [1] ¶¶ 68, 99–101. While FTC orders required Walmart to use send forms with a warning on the front page, Walmart stores were often missing those forms, or used forms without warnings. *Id*. In other cases, Walmart stores didn't have fraud warning signs and failed to provide consumers with brochures or pamphlets. *Id*. Until at least March 2019, Walmart employees didn't ask senders whether their transfers were related to telemarketing, or warn consumers that cash-to-cash money transfers were illegal as a form of payment for telemarketing

transactions. *Id.* ¶¶ 69, 99. As a result, consumers were often unaware of the risks associated with money transfers. *Id.* ¶ 99.

### 3. Employee Training and Oversight

Walmart employees could process hundreds of thousands of dollars in money transfers during a single shift. [1] ¶ 70. Walmart and its money transfer providers knew that employees processing transactions were the first line of defense to detect and prevent fraud. *Id.* Yet the company failed to ensure that its employees were trained and knowledgeable about anti-fraud and anti-money-laundering policies and procedures. *Id.*

Walmart's written policies and contracts said that training was important and that all Walmart associates who processed money transfers would be trained. [1] ¶ 71. The company primarily trained employees through annual computer learning sessions. *Id.* For years, however, Walmart failed to ensure that its employees actually completed the training. *Id.* ¶¶ 15, 71. Although MoneyGram required Walmart to provide remedial training at high-risk locations, Walmart failed to ensure that all employees at those locations promptly received the training. *Id.* ¶ 70.[11]

The training itself was inadequate, too. *See* [1] ¶ 72. For years, Walmart's annual training included limited information about how to detect and prevent fraudulent money transfers. *Id.* Walmart's materials focused only on preventing send-side fraud (protecting victims), rather than stopping fraudsters, and while the

---

[11] Along the same lines, MoneyGram's 2009 consent order with the FTC required its agents to offer mandatory training at high-risk locations. [1] ¶ 77. Yet in many cases Walmart didn't promptly train employees after MoneyGram identified stores where fraud was prevalent. *Id.*

company knew that fraudsters often used fake IDs, Walmart didn't adequately train its employees on how to detect or prevent that practice. *Id.* ¶¶ 78–79. Until 2019, Walmart didn't train its employees about telemarketing rules, or advise associates to ask consumers whether they were sending money as a result of telemarketing. *Id.* ¶¶ 15, 80.

During audits and reviews of Walmart stores, money transfer providers found that Walmart employees lacked proper training and knowledge about how to prevent fraud and money laundering. [1] ¶ 73. For instance, a 2014 MoneyGram audit found that 1,863 employees at 397 stores had not received either initial or ongoing fraud-prevention training, and that overall thirty-nine percent of Walmart locations had untrained primary employees, with sixty percent of stores having untrained secondary employees (those who filled in for those primarily responsible for providing money transfer services). *See id.* ¶¶ 71, 74. Subsequent MoneyGram and Ria reviews continued to find significant percentages of stores with untrained or undertrained employees. *See id.* ¶ 75. Even after Walmart locked untrained employees out of the money transfer system, Walmart's providers continued to find untrained, undertrained, or unknowledgeable employees providing money transfer services at Walmart. *Id.* ¶ 76.[12]

---

[12] Ria identified many Walmart stores from 2017 to 2019 as being at a high risk for fraud. [1] ¶ 83. Some Walmart stores didn't have the right resources for employees. *Id.* ¶ 85. And compliance reviews by MoneyGram and Ria found other problems: Walmart employees weren't properly trained and didn't accurately keep records, report suspicious actives, or verify customer identities. *Id.* ¶¶ 86–89.

Walmart had control over background checks on its employees, the credentials for the money transfer systems, which resource materials employees received, whether employees complied with policies and procedures, and how the company monitored the areas in Walmart stores where money transfers were provided. [1] ¶ 81; *see id.* ¶ 84. Because some 60,000 Walmart employees processed tens of millions of money transfers each year at more than 4,700 stores, oversight was important. *Id.* ¶ 82.

Walmart's failure to properly supervise and monitor employees at its Customer Service Desks and MoneyCenters allowed Walmart associates to become complicit in fraud. [1] ¶ 90. For years, employees received cash tips for their assistance in processing fraud, allowed individuals to use multiple names or IDs to receive money transfers, used the same personal information for different customers, structured transfers for customers to avoid ID requirements, made up fictitious information, or conducted suspicious money transfers themselves. *Id.* While Walmart didn't routinely share information about its employees with its providers, Walmart relied on MoneyGram, Ria, and Western Union to identify corrupt or complicit Walmart employees. *Id.* ¶ 84.

### 4.    *Walmart's Fraud Monitoring, Investigation, and Mitigation*

Walmart failed to adequately monitor, investigate, or address suspicious money transfers. [1] ¶¶ 16, 91. Instead, the company relied on its money transfer providers. *Id.* ¶ 91. Because Walmart used both MoneyGram and Ria for its money transfer services, however, Walmart was the only party able to see money transfers

that went through both systems. *Id.* ¶ 92. Fraudsters exploited Walmart's use of two money transfers systems, along with the company's shift structure, workforce size, high turnover of associates, heavy customer traffic, and lax anti-fraud program. *Id.* ¶ 93.

MoneyGram, Ria, and Western Union had security systems that blocked use by fraudsters. *See* [1] ¶ 94. But those systems, as Walmart knew, were vulnerable: they sometimes broke down, could be circumvented by consumers changing biographical information, using fake IDs, or switching to another money transfer provider at Walmart. *Id.* Instead of using its own blocking system, however, Walmart relied on those of its providers, making fraud-induced money transfers at Walmart more likely. *Id.*

Walmart didn't effectively use its providers' blocking systems, either. *See* [1] ¶ 95. The company didn't give Ria lists of consumers to be blocked until 2016. *Id.* And while Walmart maintained an internal list of potential victims or fraudsters and could cancel transactions at the point of sale, the company didn't promptly communicate that information to its providers so that future fraud could be stopped. *Id.* Rather than tell all of its providers about a suspected fraudster, Walmart only identified suspicious customers to the provider who had been used by that customer. *Id.*[13]

---

[13] Walmart didn't provide information to its money transfer providers about all of the fraud complaints and reports it received. [1] ¶ 102. By failing to report some fraud to Ria, MoneyGram, and Western Union, Walmart made it harder for those companies to mitigate consumer fraud. *Id.* ¶ 103.

Walmart didn't monitor certain suspicious behaviors, including consumers receiving money transfers at multiple Walmart stores in the same area or visiting stores across state lines. [1] ¶ 96. The company didn't stop consumers or even its own employees from sending or receiving money transfers that it knew or had reason to believe were related to consumer fraud, or that had suspicious characteristics. *Id.* Walmart also didn't take other measures to mitigate consumer fraud, such as verifying and validating consumer IDs, limiting the associates responsible for providing money transfer services, providing a point-of-sale system that could effectively address suspicious activities, or imposing a limit on the amount of money that could be paid out in cash. *Id.* ¶ 104. The FTC alleges that Walmart is violating or is about to violate the laws enforced by the FTC. *Id.* ¶ 105.

## III.  Analysis

### A.    Substantial Assistance Under the Telemarketing Sales Rule

The Telemarketing Sales Rule prohibits sellers and telemarketers from (1) making false or misleading statements to induce someone to pay for goods, services, or a charitable contribution, (2) requesting or receiving payment in advance of obtaining credit when the seller or telemarketer has guaranteed or represented a high likelihood of success of obtaining credit, and (3) accepting a "cash-to-cash money transfer"[14] as payment for goods or services offered or sold through telemarketing or

---

[14] A cash-to-cash money transfer is the electronic transfer of cash from one person to another "sent by a money transfer provider and received in the form of cash." 16 C.F.R. § 310.2(f).

"as a charitable contribution solicited or sought through telemarketing." 16 C.F.R. §§ 310.3(a)(4), 310.4(a)(4), (10).

The FTC doesn't allege that Walmart directly violated these prohibitions, but instead invokes the TSR's accessory liability provision. *See* [1] at 57–58. That part of the rule says that a person violates the TSR by providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer" is violating the rule. 16 C.F.R. § 310.3(b). The FTC claims that by processing ill-gotten payments despite many red flags, failing to institute an effective anti-fraud program, and allowing some of its employees to participate in fraudulent schemes, Walmart provided an essential service—and substantial assistance or support—to telemarketers. *See* [43] at 39–42. The FTC also alleges that Walmart knew or consciously avoided knowing about the underlying violations. *See id.* at 42–44.

Some of the FTC's theories of underlying TSR violations require deceptive conduct, *see* 16 C.F.R. § 310.3(a)(4), and the complaint itself repeatedly alleges that Walmart processed fraud-induced money transfers. A plaintiff alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted) (holding that claims that sound in fraud—meaning premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011) (citation

20

omitted) (Rule 9(b) applies to "allegations of fraud, not claims of fraud.").[15] They must describe the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

To state a claim for assisting and facilitating under the TSR, the FTC must allege an underlying violation of the rule by a seller or telemarketer. *See* 16 C.F.R. § 310.3(b). The TSR includes definitions of seller, telemarketer, and telemarketing. A seller is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). A telemarketer is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). Telemarketing is "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

This is a case about a lot of fraud: hundreds of thousands of allegedly fraudulent money transfers involving many millions of dollars. *See* [1] ¶¶ 30, 43–45. And while the complaint lays out the breadth of the alleged misconduct by fraudsters

---

[15] *AFD Advisors, LLC* is distinguishable, because the allegations in that case didn't involve fraud. *See FTC v. AFD Advisors, LLC*, No. 13 CV 6420, 2014 WL 274097, at *2 (N.D. Ill. Jan. 24, 2014). The complaint in this case sounds repeatedly in fraud. Because plaintiff's TSR claims are premised on a course of deceptive or fraudulent conduct, I disagree with *FTC v. Student Aid Center, Inc.* insofar as that case suggests that Rule 9 can never apply to a TSR claim. 281 F.Supp.3d 1324, 1331–32 (S.D. Fla. 2016); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019) (allegations of deception trigger Rule 9(b)).

making use of Walmart's services, the FTC hasn't plausibly alleged that any of this fraud fits the TSR's definitions of seller, telemarketer, and telemarketing.

For instance, while the complaint says that Walmart processed money transfers on behalf of criminal fraud rings that perpetrated telemarketing scams, *see* [1] ¶ 27, the FTC hasn't alleged the details of those scams: whether they involved a "a plan, program, or campaign" using telephones, involved more than one interstate call, or whether the scams traded in goods, services, or charitable contributions. *See* 16 C.F.R. § 310.2(gg). That thousands of complaints about money transfers at Walmart were filed by consumers, and that consumers complained they were swindled by common telemarketing schemes (such as "grandparent," "loan-grant," and "romance" scams), *see* [1] ¶¶ 43, 98, doesn't show that the fraud at issue fits a pattern of prohibited conduct under the TSR. Plaintiff points to criminal cases involving telemarketing fraud at Walmart, *see id.* ¶¶ 27–28, but those cases don't show that the transactions *in this case* were made by telemarketers or sellers and involved telemarketing.[16] The TSR doesn't prohibit fraud generally or all fraud involving phone calls, and so it's not enough that a large number of fraudulent transfers at Walmart made use of phones, or that Walmart associates were told to process some suspicious transactions. *See id.* ¶¶ 55, 80, 98. Allegations about

---

[16] *See United States v. Caballero*, No. 16-cr-0124 (E.D. Ark.); *United States v. Caballero*, No. 16-cr-0201 (D. Minn); *United States v. Mirabel*, No. 16-cr-0269 (N.D. Tex.); *United States v. Pand*o, No. 17-cr-0046 (N.D. Miss); *United States v. Labra*, No. 17-cr-0314 (D. Md.); *United States v. Gohil*, No. 17-cr-0212 (E.D. Wis.); *United States v. Patel*, No. 17-cr-0094 (E.D. Wis.); *United States v. Marcks*, No. 19-cr-0315 (D. Nev.); *U.S. v. Parmar*, No. 19-cr-0160 (E.D. Va.); *United States v. Hines*, No. 17-cr-1038 (N.D. Iowa); *United States v. Smith*, No. 21-cr-0372 (M.D. Pa.); *United States v. Budhadev*, No. 20-cr-0252 (M.D. Pa.).

allegations make it difficult to know what it is the FTC intends to prove—that people complained about or were accused of telemarketing fraud, or that specific telemarketing fraud occurred in fact? The former does not prove a TSR violation, and the latter is not alleged with particularity.

That's not to say that the FTC must allege the details of thousands of TSR violations to state a claim. The agency could have plausibly alleged underlying TSR violations through examples of transactions that fit the TSR's definitions, or by describing in more detail categories of fraud that hit all the elements of a TSR violation perpetrated using Walmart's services. But repeatedly using the words telemarketer, seller, and telemarketing, and making conclusory allegations of underlying TSR violations, isn't enough. *See* [1] ¶¶ 112, 119; 16 C.F.R. § 310.3(b); *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 279–80 (7th Cir. 2016) (calling statements "injurious" doesn't make them injurious); *Tierney v. Advoc. Health and Hospitals Corp.*, 797 F.3d 449, 451–52 (7th Cir. 2015) (finding that a plaintiff must plausibly allege that conduct fits within the meaning of terms defined in a statute).[17] The FTC hasn't plausibly alleged an underlying violation of the TSR such that a claim for accessory liability will lie. Even if the agency had overcome this initial hurdle, the

---

[17] The cases cited by the FTC are distinguishable. *Glob. Mktg. Grp., Inc.*, involved the evidence supporting a monetary judgment under the TSR, not the pleading standard for a violation of the rule. *FTC v. Glob. Mktg. Grp., Inc.*, 594 F.Supp.2d 1281, 1290 (M.D. Fla. 2008). The court in *Figgie Int'l Inc.* found that a showing of individual reliance on misrepresentations wasn't required to secure an injunction to prevent unfair practices, but didn't assess what was required to allege a violation of the TSR. *FTC v. Figgie Int'l Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993).

23

complaint also fails to allege either the knowledge or substantial assistance required to state a claim.

### 1.    Knowledge

The TSR prohibits giving substantial assistance to a seller or telemarketer when someone "knows or consciously avoids knowing" about an underlying TSR violation. 16 C.F.R. § 310.3(b). A person consciously avoids knowing about a violation when "there are facts and evidence that support an inference of deliberate ignorance." Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,852 n.106 (Aug. 23, 1995) (citing *United States v. Williams*, 32 F.3d 570, at *6 (7th Cir. 1994)); *see FTC v. Chapman*, 714 F.3d 1211, 1219 (10th Cir. 2013) (quoting *FTC, Complying with the Telemarketing Sales Rule*, available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (Feb. 2011)) ("[T]aking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability."). Knowledge can be inferred from a combination of suspicion and indifference to the truth. *See United States v. Salinas*, 763 F.3d 869, 875 (7th Cir. 2014) (discussing the "ostrich instruction"); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (finding that a willfully blind defendant takes deliberate actions to avoid confirming a high probability of wrongdoing).

The FTC argues that Walmart had both direct knowledge of and consciously avoided knowing about TSR violations. *See* [43] at 42–44. First, the FTC points to an instruction Walmart gave to some of its employees, telling them to complete

transactions even when they suspected fraud. *See* [1] ¶ 55. Walmart also knew that fraudsters involved in telemarketing used the company's money transfer system. *See id.* ¶¶ 27–28, 37, 105. Plaintiff contends that Walmart consciously avoided knowing about violations of the TSR by failing to take basic steps to detect fraud, like training its associates to ask for IDs. *See* [1] ¶ 16.

To support an inference of the requisite knowledge, the complaint must suggest that Walmart consciously avoided facts about an identifiable telemarketer's fraudulent act or practice: substantial assistance liability attaches to one who consciously avoids knowing that "*the* seller or telemarketer" is violating the TSR. 16 C.F.R. § 310.3(b) (emphasis added). In this case, the FTC hasn't alleged enough about the circumstances of the money transfers at issue to show that Walmart knew or consciously avoided knowing about TSR violations. For one thing, as discussed above, the complaint doesn't allege that any of the alleged fraud fell within the prohibitions of the TSR. A second problem is that the FTC hasn't alleged the kinds of details about the majority of transactions in this case that would show that Walmart knew or consciously avoided knowing about underlying TSR violations. For instance, while the complaint says that the company processed "tens of millions of money transfers" each year, [1] ¶ 82, and hundreds of thousands of complaints were filed about Walmart's money transfers, *see id.* ¶¶ 43–45, there's no allegation suggesting how many of these transactions may have raised red flags, such as when customers presented different IDs during different visits, received multiple large transfers in a short period of time, or when a transaction involved suspicious statements, patterned

25

activity, or other indications of fraud. *See id.* ¶¶ 59, 96.[18] Without more information about why Walmart should have suspected specific transactions, Walmart's failure to ask questions and processing of suspected fraud, *see id.* ¶¶ 55, 65, isn't evidence of conscious avoidance of TSR violations. *See United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th Cir. 2009) (quoting *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990)).[19]

Without an allegation of an underlying violation and more detail about why Walmart knew or consciously avoided knowledge that a subset of its money transfer business involved TSR violations, the complaint hasn't alleged the knowledge required.

### 2.    *Substantial Assistance*

Substantial assistance requires more than casual or incidental help to a telemarketer. *See* 16 C.F.R. § 310.3(b); *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) (quoting *FTC, Complying with the Telemarketing Sales Rule*, available at http://business.ftc.gov/documents/bus27-complying-telemarketing-sales-rule#assisting (Feb. 2011)); *Consumer Financial Protection Bureau v. Nesheiwat*, No.

---

[18] That Walmart associates were told to process certain suspicious transactions, [1] ¶ 55, doesn't show that the company knew that those transactions were violating the TSR. Similarly, Walmart's general awareness of criminal prosecutions involving money transfers at its stores, *id.* ¶¶ 27–28, receipt of consent orders, *id.* ¶¶ 35, 37–38, 105, and the language of the TSR's preamble—describing the general use of money transfers by telemarketers—aren't sufficient, either.

[19] The facts here aren't like those in *HES* and *Chapman*, cases involving detailed awareness of red flags related to particular set of accounts and transactions. *See FTC v. HES Merch. Services Co., Inc.*, No. 6:12-cv-1618-ORL-22KRS, 2014 WL 6863506, at *8 n.5 (M.D. Fla. Nov. 18, 2014); *FTC v. Chapman*, 714 F.3d 1211, 1217–19 (10th Cir. 2013). Here, by contrast, Walmart isn't alleged to have had reason to suspect any particular transactions or subset of transactions, but was generally aware of fraud in its (extensive) money transfer business.

21-56052, 2022 WL 17958636, at *1 (9th Cir. Dec. 27, 2022); *FTC v. Consumer Health Benefits Ass'n*, No. 10-CV-3551 (ILG), 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011) (quoting Telemarketing Sales Rule, 60 Fed. Reg. 43842-01, 43852 (Aug 23, 1995)). There must be some link between the third party's actions and the telemarketer's, but not necessarily a direct connection. *See Chapman*, 714 F.3d at 1216 (citations omitted).[20]

Agency guidance includes some examples of what conduct is and isn't enough to constitute substantial assistance. On the one hand, someone who provides lists of contacts to a seller or telemarketer, drafts the language used for telemarketing, or makes available incentives to be used in the telemarketing, provides substantial assistance. *See* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995). On the other hand, providing services like cleaning or food delivery to telemarketers, "or engaging in some other activity with little or no relation to the conduct that violates the Rule" would not be enough to show substantial assistance. *See FTC, Complying with the Telemarketing Sales Rule* (Feb. 2011), available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.

---

[20] In its original version of the rule, the FTC would have required more of a direct connection between a third party's assistance and an underlying violation, but the FTC rejected that requirement in the final rule. *See* Revised Notice of Proposed Rulemaking, Telemarketing Sales Rule, 60 Fed. Reg. 30,406, 30,414 (June 8, 1995); Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995). Explaining the change, the FTC cited a concern that the additional element of proof "would burden law enforcement." Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995).

Aiding and abetting principles (as seen in tort and securities case law) are relevant in understanding substantial assistance under the TSR. *See FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) (In a dispute about joint and several liability under the TSR, the FTC argued and the Eleventh Circuit agreed that the TSR emerged from "comparable tort and securities concepts."); Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851–52 & nn.96–98 (Aug. 23, 1995) (comparing substantial assistance under the TSR with substantial assistance in tort and securities cases, and noting that "the ordinary understanding of the qualifying word 'substantial'" should apply under the TSR). *But see C.F.P.B. v. Daniel A. Rosen, Inc.*, Case No. 2:21-cv-07492-VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022).[21]

Walmart processed large numbers of fraud-induced money transfers, and it knew that the proceeds of fraud were being transferred using its services. *See* [1] ¶¶ 42–43, 46, 50. Walmart made it easier for fraudulent transactions to succeed by failing to provide consumer fraud warnings, verify or accurately record the IDs of money transfer recipients, and by processing some suspicious transactions. *Id.* ¶¶ 24–

---

[21] Because the FTC rejected a direct-relation requirement for substantial assistance, the *Rosen* court concluded that aider-abettor principles under securities law weren't persuasive as to what constitutes substantial assistance under the TSR. *See C.F.P.B. v. Daniel A. Rosen, Inc.*, Case No. 2:21-cv-07492-VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) (citations omitted). I disagree with *Rosen*'s conclusion that these background principles aren't relevant. The agency removed the direct-connection requirement to avoid burdening law enforcement (not to signal deviation from aiding-and-abetting principles) and, in the same explanation for the rule, cited tort and securities laws and referenced an "ordinary" understanding of the word "substantial." *See* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851–52 & nn.96–98 (Aug. 23, 1995).

26, 55. The complaint also says that some Walmart associates were complicit in fraudulent transactions. *See id.* ¶ 50.

Processing routine transactions isn't substantial assistance. *See Grijalva v. Kevin Mason, P.A.*, Case No. 8:18-cv-02010-JLS-DFM, 2019 WL 8221076, at *5 (C.D. Cal. Dec. 30, 2019) (deciding that processing payments for other defendants and accepting a fee for those transactions was not substantial assistance under the TSR); *Berdeaux v. OneCoin Ltd.*, 561 F.Supp.3d 379, 416 n.35 (S.D.N.Y. 2021) (considering a claim for aiding and abetting fraud and gathering cases); *PLB Investments LLC v. Heartland Bank and Tr. Co.*, No. 20 C 1023, 2021 WL 492901, at *9 (N.D. Ill. Feb. 9, 2021) (discussing a claim of aiding and abetting fraud and breach of fiduciary duty); *Bane v. Sigmundr Expl. Corp.*, 848 F.2d 579, 582 (5th Cir. 1988) (discussing aider and abettor liability under Rule 10b-5); *Rosner v. Bank of China*, 528 F.Supp.2d 419, 426–27 (S.D.N.Y. 2007) (considering a common-law fraud claim against a bank); *see also Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (citing *United States v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989)) (noting that the ordinary understanding of culpable assistance requires a desire to promote the wrongful venture's success).

But an ordinary transaction becomes extraordinary—and processing it can constitute substantial assistance—if a defendant knows enough about the underlying fraud. *See S.E.C. v. Apuzzo*, 689 F.3d 204, 212–14 (2d Cir. 2012) (holding that a chief financial officer of a corporation provided substantial assistance when he participated in extraordinary transactions and knew of underlying violations of the securities laws); *In re First All. Mortg. Co.*, 471 F.3d 977, 995–96 (9th Cir. 2006) (considering a

29

state-law fraud claim); *Damian v. Heartland Bank and Tr. Co.*, No. 20 C 7819, 2021 WL 5937153, at *11 (N.D. Ill. Dec. 15, 2021) (citations omitted) (finding that a bank that processed payments provided substantial assistance in breaching a fiduciary duty when the bank knew of a Ponzi scheme underlying the transactions and its inaction allowed a fraudster to continue the scheme); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F.Supp.2d 875, 910–14 (W.D. Mich. 2010) (holding that a bank's provision of routine banking services wasn't enough to show substantial assistance of fraud and conversion "unless the bank actually knew that those services were assisting the customer in committing a specific tort"); Restatement (2d) Torts § 876(b), comment d (noting that assistance can be tortious depending on (1) the nature of the act encouraged, (2) the amount of assistance given, (3) a defendant's presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind).[22]

Walmart may have known enough about transactions at stores where a large majority of money transfers were fraudulent, such that defendant's continued

---

[22] Processing extraordinary transactions, given the right amount of knowledge, can be active participation in the underlying fraud. *See Hutchinson v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025–26 (7th Cir. 2018) (citations omitted) (applying Illinois law and noting that, under Restatement (2d) of Torts § 876, in-concert liability requires active participation in the tortious conduct of another); *JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 257 (S.D.N.Y. 2005) (citation omitted) (executing an ordinary transaction can be substantial assistance if it "made a substantial contribution to the perpetration of the fraud"); *see also Aluminicaste Fundicion De Mex. S. De RL CV v. Shen*, Case No. 2:17-cv-002255-CAS(JCx), 2017 WL 6453276, at *10 (C.D. Cal. Dec. 11, 2017) (deciding that performance of an ordinary business transaction when a bank knows it's assisting in the commission of a tort is active participation).

processing constituted substantial assistance. *See* [1] ¶ 46.[23] But, as discussed above, the complaint doesn't connect Walmart's general awareness of red flags and fraud with its specific knowledge about the vast majority of money transfers at issue in this case, such that processing those transactions became something other than routine. *Cf. Damian*, 2021 WL 5937153, at *11; *Apuzzo*, 689 F.3d at 214–15; *FTC v. HES Merch. Services Co., Inc.*, No. 6:12-cv-1618-Orl-22KRS, 2014 WL 6863506, at *8 n.5 (M.D. Fla. Nov. 18, 2014); *FTC v. Chapman*, 714 F.3d 1211, 1216–17 (10th Cir. 2013). While Walmart may have provided an essential service to fraudsters by delivering the proceeds of their misconduct, the FTC hasn't alleged that Walmart's awareness of fraud rose to the level that would transform the processing of money transfers into substantial assistance of TSR violations.

Without a showing of underlying TSR violations or details about how Walmart knew that the majority of transactions at issue were extraordinary, the complaint doesn't state a claim for substantial assistance.

Count Two is dismissed without prejudice.

### B.    Unfair Acts or Practices

The FTC alleges that Walmart violated § 5(a) of the Federal Trade Commission Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1); *see FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 768 (7th Cir. 2019); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–44 (1972). Plaintiff claims

---

[23] When Walmart employees actively participated in fraud, *see* [1] ¶ 50, Walmart may have crossed the culpability line, but those transactions need to be alleged with particularity.

that Walmart violated § 5 in two ways: by failing to effectively prevent fraudulent money transfers and by violating the TSR. *See* [1] ¶¶ 108–18. Because the FTC hasn't stated a claim for a violation of the TSR, as discussed above, it cannot pursue that theory of liability under § 5.[24] The parties disagree about the elements of a § 5 claim as applied to Walmart's failure to stop consumer injury.

### 1.   *The Unfairness Standard*

The FTC Act of 1914 prohibited "unfair methods of competition in commerce." Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (codified as amended at 15 U.S.C. § 45(a)). In drafting that provision, Congress declined to specify the meaning of "unfair methods of competition." *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40 (1972) (citing S. Rep. No. 63-597, at 13 (1914)); *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015). Instead, unfairness was left as a "flexible concept with evolving content," one whose development was intentionally left to the Commission. *FTC v. Bunte Bros.*, 312 U.S. 349, 353 (1941); *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 367 (1965).

In 1964, the Commission issued a statement describing three factors relevant to deciding whether an act or practice was unfair. Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (July 2, 1964). While the FTC drafted those factors to assess conduct by the tobacco

---

[24] Any violation of the TSR would constitute a violation of Section 5. *See* 15 U.S.C. §§ 6102(c), 57a(d)(3).

industry, the Supreme Court in *Sperry* appeared to approve of the more general use of that three-part analysis to decide whether any act or practice was unfair. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972).

The Seventh Circuit addressed § 5's prohibition on unfair conduct in *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976). The FTC brought suit against a corporation, alleging unfair practices. *Id.* at 290. Approving of the FTC's conclusion that the conduct at issue was unfair, the court noted that the Commission's analysis of unfairness "remained faithful to its previously announced criteria," and (repeating that criteria, as cited in *Sperry*) that a practice is unfair "when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel*, 540 F.2d at 293–94.

In 1980, the FTC issued a second policy statement that changed the Commission's approach to § 5. *See* FTC Policy Statement on Unfairness, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. on Commerce, Sci., and Transp. (Dec. 17, 1980) (available at https://www.ftc.gov/legal-library/browse/ftc-policy-statement-unfairness) (hereinafter 1980 FTC Unfairness Policy Statement). The Commission wrote that public policy considerations were relevant, abandoned reliance on "immoral or unscrupulous conduct" as an independent basis for an unfairness finding, and said that unjustified consumer injury was the "primary focus" of the Act and could by itself "warrant a finding of unfairness." *Id.*

In 1994, Congress codified the FTC's 1980 approach to unfairness in 15 U.S.C. § 45(n):

> The Commission shall have no authority under this section ... to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

Walmart argues that in this circuit, *Spiegel* provides the applicable standard for unfair practices under § 5. *See* [24] at 40. *Spiegel* remains good law, but neither that case nor *Sperry* adopted a test for § 5 liability. "*Sperry* did not adopt [a test for unfair conduct], but rather was merely quoting, in a footnote, the test that the FTC uses to determine whether a practice that is neither in violation of the antitrust laws nor deceptive could still be unfair." *McMillan v. Collection Professionals Inc.*, 455 F.3d 754, 764 n.13 (7th Cir. 2006). Similarly, the *Spiegel* court reviewed an unfairness finding made by the Commission and paraphrased the FTC's then-approach to § 5, as quoted in *Sperry*. *See Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 & n.8 (7th Cir. 1976); *see also CFPB v. ITT Educ. Services, Inc.*, 219 F.Supp.3d 878, 903 (S.D. Ind. 2015) (discussing *Spiegel*, 540 F.2d at 293); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945 (N.D. Ill. 2008) (applying a three-part test derived from 15 U.S.C. § 45(n), not the FTC's earlier standard); *United States v. Dish Network LLC*, 256 F.Supp.3d 810, 965–66 (C.D. Ill. 2017) *aff'd in part, vacated in part, remanded on other grounds sub nom*, 954 F.3d 970 (7th Cir. 2020) (recognizing the same three-part test as the current rule

for unfair conduct under § 5). Like *Sperry*, *Spiegel* described the FTC's approach but did not settle on an exclusive definition of unfairness (and seems to have rested its decision not on any articulable public policy but on the substantial harm to debtors from cost-prohibitive but lawful debt-collection suits filed in a distant forum). *Spiegel*, 540 F.2d at 293–94.[25]

Both the *Sperry* and *Spiegel* courts looked to the FTC's interpretation of unfairness at that time. But in 1994, Congress offered further guidance. It's true that § 5(n) is a limitation on the FTC's power to "declare unlawful an act or practice" because it is unfair, not an explicit definition of unfairness under § 5(a). *See* 15 U.S.C. § 45(n). But the FTC's exclusive role in enforcing the Act, the text of the statute, and the history of the prohibition on unfair conduct show that § 5(n) sets the standard for unfairness, both for the court and for the Commission.

There is no private right of action under the Act. *See Marquette Cement Mfg. Co. v. FTC*, 147 F.2d 589, 594 (7th Cir. 1945) (holding that only the FTC has the power to protect the public against unfair methods of competition); *Moore v. New York Cotton Exch.*, 270 U.S. 593, 603 (1926) (noting that relief for unfair methods of competition "must be afforded in the first instance by the commission"); *J.R. v. Walgreens Boots All., Inc.*, No. 20-1767, 2021 WL 4859603, at *8 (4th Cir. Oct. 19,

---

[25] *Samuels* is distinguishable because that case involved Illinois law, which applies the factors from *Sperry* (and *Spiegel*). *See Samuels v. Old Kent Bank*, No. 96 C 6667, 1997 WL 458434, at *9 (N.D. Ill. Aug. 1, 1997); *see also Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) (citing *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417–18 (2002)). Insofar as *Samuels* or other cases applying Illinois law suggest that *Spiegel* or *Sperry* define the test under the Federal Trade Commission Act, I disagree.

2021) (gathering cases). That means that the FTC is the only party capable of bringing suit based on an unfair act or practice. *See Sperry*, 405 U.S. at 249 ("A court cannot label a practice 'unfair' under 15 U.S.C. § 45(a)(1). It can only affirm or vacate an agency's judgment to that effect."). Limitations imposed by Congress on the agency's power to declare an act unfair, then, also restrict the circumstances when an act can be found unfair in court. Of course, after the FTC has brought suit in federal court, it is the court—not the agency—that decides whether a practice violates § 5. But an unfair practice only arrives in federal court if the agency brings suit. *See Marquette Cement Mfg. Co.*, 147 F.2d at 594. A limitation on the FTC's power to bring suit under § 5, then, is in effect a limitation on the court's power to find a practice unfair.

Through § 5(n), Congress told the FTC that the Commission had no power to declare conduct unfair unless certain conditions were met. *See* 15 U.S.C. § 45(n). One implication of that restriction is that, when the conditions under § 5(n) *are* met, the FTC *has* power to find unfairness. And when the FTC has power to find unfairness under § 5(n), it makes sense that the act or practice at issue is also unfair under § 5(a). In other words, given the FTC's unique power to enforce § 5, Congress did not authorize the FTC to declare an act unfair under § 5(n) that wasn't also unfair under § 5(a). *See* 15 U.S.C. § 45; *see also White v. United Airlines, Inc.*, 987 F.3d 616, 623 (7th Cir. 2021) (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)) (discussing the

presumption that "identical words used in different parts of the same act are intended to have the same meaning").[26]

The history of § 5 supports this approach, and perhaps explains why Congress declined to define unfairness in a more direct way. When Congress first banned unfair competition in commerce, it considered and decided against identifying particular practices that were unfair. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40 (1972) (citing S. Rep. No. 63-597, at 13 (1914)). Instead, Congress chose to make unfairness a flexible concept, and left its development to the Commission. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015) (quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 353 (1941) and *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 367 (1965)). Given that legislative history, it's unsurprising that Congress provided further guidance on the meaning of unfairness in 1994 by codifying the FTC's flexible cost-benefit approach, rather than (for instance) enumerating a list of prohibited practices or using definitional language. *See id.* at 244.

Relying on *Spiegel*, Walmart argues that § 5(n) clarifies only the substantial injury requirement under § 5(a), and also that § 5(n)'s requirements are necessary but not sufficient conditions to find unfairness. *See* [44] at 22–23; *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 259 (3d Cir. 2015); *LabMD, Inc. v. FTC*,

---

[26] That the Supreme Court in *Sperry* referred to the FTC's approach to unfairness underscores the one-to-one relationship between how the FTC must approach unfairness under § 5 and how that term is reviewed in a court. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972). In arguing that § 5(n)'s requirements are necessary conditions for a finding of unfairness, *see* [44] at 22, Walmart admits that there's overlap between § 5(n)'s approach and the definition of unfairness under § 5(a).

894 F.3d 1221, 1229 & n.24 (11th Cir. 2018). In addition to the requirements of § 5(n), Walmart argues that the FTC must show that conduct violates established public policy, and that a showing of immoral, unethical, oppressive, or unscrupulous conduct is also relevant. *See* [24] at 40–46.

Behind Walmart's interpretation is the assumption that *Spiegel* and *Sperry* set a standard for unfairness, one that wasn't fundamentally altered by the addition of § 5(n). As discussed above, however, neither of those cases established a test. *See also Wyndham Worldwide Corp.*, 799 F.3d at 244–45, 255–56 (treating the § 5(n) factors as the test for unfairness under § 5(a)); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009) (same); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (same).

Section 5(n) is more than an elaboration of the substantial injury requirement: it also addresses the importance of public policy. *See* 15 U.S.C. § 45(n). And while one might understand *Spiegel* to mean that conduct must violate established public policy to be unfair, *see Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976), Congress in § 5(n) directed that "public policy considerations may not serve as a primary basis for [an unfairness] determination." *Id.* Public policy considerations can be relevant to an unfairness finding, but § 5(n) (and the FTC's 1980 policy statement) show that offending public policy isn't necessary to violate of § 5(a). *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement.[27]

---

[27] The *LabMD* court understood the FTC's 1980 policy statement, combined with *Sperry*, to establish a requirement that to be unfair an act must violate an established public policy. *See LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 & n.24, 1231 & n.28 (11th Cir. 2018). I decline to follow the Eleventh Circuit's approach. While acknowledging that public policy

Walmart contends that without a requirement that unfair conduct violate public policy, § 5 might run afoul of the void-for-vagueness, non-delegation, or major-questions doctrines. *See* [24] at 40–41 & nn.9–10 (citing *Skilling v. United States*, 561 U.S. 358, 405–06, 407–09, 412–13 (2010), *Mistretta v. United States*, 488 U.S. 361, 371–73 (1989), and *West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2609 (2022)). But limiting public policy to a relevant, but not sole or primary ground for an unfairness determination does not leave defendants or courts at sea in uncharted waters. Unfairness tied to substantial consumer injury is a knowable, judicially administrable concept. In any event, as discussed below at 50–57, § 5 isn't unconstitutionally vague as applied in this case, which is all that need be said here. *See also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255–59 (3d Cir. 2015) (citation omitted) ("While far from precise, [the standard in § 5(n)] informs parties that the relevant inquiry here is a cost-benefit analysis ... that considers a number of relevant factors."). And even before Congress further defined § 5's coverage, the

---

considerations were relevant, neither *Sperry* nor the 1980 policy statement specified that a violation of public policy was required to find unfairness. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972); 1980 FTC Unfairness Policy Statement. The *LabMD* court found § 5(n)'s discussion of public policy to be "ambiguous." *LabMD, Inc.*, 894 F.3d at 1229 n.24. While § 5(n) could perhaps have been clearer about the role of public policy considerations, it undermines the proposition that a violation of an established public policy is a requirement for finding unfairness. In fact, § 5(n) suggests that public policy considerations are an optional analysis. *See* 15 U.S.C. § 45(n) (emphasis added) ("[T]he Commission *may* consider established public policies as evidence."); *see also Sperry & Hutchinson Co.*, 405 U.S. at 245 n.5 (discussing the possibility that an act or practice could be unfair based only on a finding of substantial injury); *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015) ("[Section 5(n)] acknowledges the potential significance of public policy."); *Miner v. Gov't Payment Serv., Inc.*, Case No. 1:14-cv-07474, 2015 WL 3528243, at *6 (N.D. Ill. June 4, 2014). A public policy analysis under § 5 began with the FTC's 1964 approach, as discussed in *Sperry*. But Congress has now addressed the subject, and under § 5(n) a violation of public policy is no longer required.

Supreme Court held that the FTC did not "arrogate excessive power to itself" by assessing unfair conduct under a broad and flexible standard. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).

That Congress in § 5(n) chose to omit reference to immoral, unethical, oppressive, or unscrupulous conduct means that such a showing isn't necessary, either. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement (finding that this requirement was duplicative and noting that the Commission would no longer rely on it as an independent basis for a finding of unfairness); *Wyndham*, 799 F.3d at 244–45 (rejecting a requirement that unfair conduct must be unscrupulous or unethical). Even under the FTC's earlier approach, as discussed in *Spiegel*, evidence that conduct was wrongful wasn't required because the FTC could also show that the practice was "substantially injurious to consumers." *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976).[28]

The conditions of § 5(n) are sufficient and necessary for a finding of unfairness. Section 5(n) implicitly authorizes the Commission to find unfairness when conduct meets certain requirements. Congress would not have authorized the FTC to declare conduct unfair that was not, in fact, unfair under § 5(a). Given the expression of four requirements in § 5(n) and considering the 1980 policy statement that it grew from, Congress excluded additional requirements. *See Nat'l Lab. Relations Bd. v. SW Gen.*,

---

[28] That the word unfair sometimes means injustice or wrongfulness, *see, e.g., Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 627 (7th Cir. 2020), isn't a reason to import additional requirements into the § 5 standard. Congress may define terms outside their usual meanings, and § 5(n) adequately defines unfairness without excluding wrongfulness as a relevant consideration.

*Inc.*, 580 U.S. 288, 302 (2017) (quoting *Chevron USA Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)) (discussing the canon of *expressio unius est exclusio alterius*).[29]

Under § 5, then, an act or practice is unfair when it (1) causes or is likely to cause, (2) substantial injury to consumers, (3) which is not reasonably avoidable by consumers themselves, and (4) not outweighed by countervailing benefits to consumers or to competition. *See* 15 U.S.C. § 45(a), (n); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244–45, 255–56 (3d Cir. 2015); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010). Whether an act or practice violates an established public policy or is wrongful are relevant, but not necessary conditions to finding unfairness. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. Public policy can inform the kind or degree of injury at issue—an expression of the types of harms or burdens that ought not to be borne by consumers. Or, public policy can express some of the costs or benefits of an act or practice. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. But the statute's focus remains on whether a practice causes substantial injury to consumers.

---

[29] The *Wyndham* court discussed the possibility that § 5(n)'s conditions may be necessary, rather than sufficient conditions for finding unfairness. *See FTC v. Wyndham Worldwide Corp*, 799 F.3d 236, 259 (3d Cir. 2015). The Third Circuit declined to decide the issue, and was unpersuaded by additional requirements proposed by a defendant. *See id.* Here, Walmart has failed to show additional requirements (beyond those specified in § 5(n)) that must be met before conduct qualifies as unfair. As discussed above, the two requirements that defendant proposes—a violation of established public policy and some version of wrongfulness—run counter to the text of § 5(n) and the FTC's 1980 policy statement.

2. *Walmart's Fraud-Prevention Practices*

The FTC's theory of § 5 liability in this case is that Walmart's failure to effectively prevent fraud caused consumers to lose millions of dollars to fraudsters. *See* [43] at 29–30. Walmart waived argument as to causation, substantial injury, and whether the injury to consumers was outweighed by countervailing benefits. *See* [24] at 39–48; [43] at 31–34; [44] at 21–24. The FTC waived argument that Walmart's fraud-prevention practices were immoral, unethical, oppressive, or unscrupulous. *See* [43] at 29–34. The only public policy the FTC invokes is negligence, *see* [43] at 31 n.15, but negligence liability is predicated on a cost-benefit analysis, and so negligence policy doesn't provide any additional evidence of unfairness beyond what's already considered under § 5(n). *See Navarro v. Fuji Heavy Indus., Ltd.*, 117 F.3d 1027, 1029 (7th Cir. 1997) (discussing negligence and cost-benefit analysis). The only issue remaining, then, is whether the injury to consumers caused by inadequacies in Walmart's fraud-prevention program was reasonably avoidable by consumers. *See* 15 U.S.C. § 45(n).

If consumers had a free and informed choice in the matter, an injury is reasonably avoidable. *See American Fin. Services Ass'n v. FTC*, 767 F.2d 957, 976–78 (D.C. Cir. 1985); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945 (N.D. Ill. 2008). "Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Orkin Exterminating Co., Inc. v. FTC*,

42

849 F.2d 1354, 1365 (11th Cir. 1988) (quoting *FTC v. Orkin Exterminating Co.*, 108 F.T.C. 263, 1986 WL 722153, at \*8 (1986)); *see Neovi, Inc.*, 604 F.3d at 1158; *IFC Credit Corp.*, 543 F.Supp.2d at 945. The requirement that a substantial injury not be reasonably avoidable preserves the default rule that consumer choice governs the market. *See* 1980 FTC Unfairness Policy Statement. But when someone "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer [decision-making]," an injury isn't reasonably avoidable. *See id.*

Consumers complained of nearly $200 million they lost through fraud-related money transfers processed at Walmart, and there's reason to believe that the total harm may have been much higher. [1] ¶¶ 30, 43. The complaint lays out a series of failings in Walmart's fraud prevention and mitigation systems. Walmart either didn't establish or failed to follow an effective antifraud program, didn't train or adequately supervise its employees, failed to adequately monitor suspicious activity, and didn't adequately report fraud to others. *See, e.g.*, [1] ¶¶ 40, 50–53, 71, 86. Victims of fraud who used Walmart's services felt compelled—based on false promises or fear of financial or legal consequences—to send money to fraudsters. *Id.* ¶ 29. Consumers didn't know that money transfers were riskier than other forms of payment, *id.* ¶¶ 29, 69, 99, and Walmart routinely either didn't warn consumers about fraud at all or provided insufficient warnings. *See id.* ¶¶ 15–16, 24, 49, 52, 68, 85, 99–101.[30] Getting

---

[30] Walmart argues that because the FTC is seeking an injunction to remedy violations of § 5, past conduct isn't relevant. *See* [44] at 24 n.8. But past violations of § 5 matter here because they can show that there remains a risk of future violations. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275–76 (7th Cir. 2009).

the money back after it had been transferred was hard, too, because fraud detection and transaction reversals were more challenging with money transfers, Walmart didn't do enough to stop fraudsters from picking up money, and the company didn't communicate well with its money transfer providers (which meant fraudsters weren't effectively blocked from using money transfer systems). *Id.* ¶¶ 29, 55–65, 91–96.

It's reasonable to infer that victims of fraud who used Walmart's services were not making fully informed choices. *See Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ( "Fraud is an intentional tort, and victims need not take precautions against such torts in order to preserve their rights."); *Ellis v. DHL Express Inc. (USA)*, 633 F.3d 522, 527 (7th Cir. 2011) (quoting *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828–29 (7th Cir. 1987)) (finding that, in the context of early retirement officers, the voluntariness of a choice turned on (among other things) whether "the choice [was] free from fraud or other misconduct"); Restatement (2d) of Torts § 481 (1965) (noting that a plaintiff's contributory negligence does not bar recovery for damages associated with an intentional tort).[31] Walmart didn't warn or adequately warn consumers about the possibility of fraud, and so victims didn't have reason to anticipate the loss, either. *See Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (affirming a finding that an injury was not reasonably avoidable when contracts gave consumers no warning of impending harm); *FTC v. Neovi, Inc.*,

---

[31] That victims consciously chose to send money and that other people didn't send funds to fraudsters doesn't show that the injuries in this case were reasonably avoidable. *See Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("Tolerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense. Society is better off with less fraud and fewer precautions against it.").

604 F.3d 1150, 1158 (9th Cir. 2010) (finding that an issue of material fact existed as to whether injuries were reasonably avoidable when it was likely that some consumers never noticed unauthorized withdrawals and, even if they had noticed, recovering the lost funds "required a substantial investment of time, trouble, aggravation, and money"); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945–48 (N.D. Ill. 2008). *Cf. Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (holding that an injury was avoidable when an advertisement included a disclaimer which would have motivated a reasonable consumer to consult the terms and conditions, giving consumers reason to anticipate a potential loss).[32] And because it was hard to recover funds sent through money transfers and difficult to trace fraudsters, consumers didn't have the means to avoid the injury. *See Orkin Exterminating Co., Inc.*, 849 F.2d at 1365; *Neovi, Inc.*, 604 F.3d at 1158.

Relying on the FTC's 1980 policy statement, Walmart argues that the injuries in this case weren't reasonably avoidable unless Walmart's conduct created an obstacle to the free exercise of consumer decision-making. *See* [24] at 47 (citing 1980 FTC Unfairness Policy Statement). But the policy statement says that injuries aren't reasonably avoidable when someone either "unreasonably creates *or takes advantage of* an obstacle to the free exercise of consumer [decision-making]." 1980 FTC Unfairness Policy Statement (emphasis added). In this case, the complaint says that Walmart took advantage of an obstacle in the market—scams that caused consumers

---

[32] That Walmart provided some warnings to consumers, *see* [1] ¶ 20, doesn't show that consumers had an informed choice. The FTC has alleged that Walmart's warnings were non-existent or insufficient in many circumstances. *See id.* ¶¶ 15–16, 49, 52, 68, 85, 99–101.

(lacking the knowledge or ability to protect themselves) to send money to fraudsters. Put differently, by failing to warn consumers or provide avenues to mitigate their losses, Walmart withheld crucial information from consumers, leaving fraud victims with insufficient information. *See id.* (noting that a seller may unjustifiably hinder a free-market decision by failing to give buyers critical information). Walmart wasn't required to overrule consumer choices, and the Commission may ultimately fail to demonstrate that inserting more detailed and onerous fraud prevention would be reasonably successful. But for now, it's plausible that the company took advantage of defrauded consumers by profiting from transactions while withholding reasonably available information.

The FTC has alleged a violation of § 5.

### 3. On-going or Imminent Misconduct

Even if the FTC has stated a claim under § 5, Walmart argues that the FTC's request for relief should be dismissed because the FTC hasn't alleged any ongoing misconduct. *See* [24] at 38–39. To remedy Walmart's unfair practices under § 5, the FTC seeks a permanent injunction, as authorized by 15 U.S.C. § 53(b). *See* [1] ¶ 121(A).[33] That portion of the Act says that:

Whenever the Commission has reason to believe—

---

[33] The FTC also asks for civil penalties for each violation of the TSR. *See* [1] ¶ 118; 15 U.S.C. § 45(m)(1)(A). Because the complaint fails to allege any TSR violations, the request for related civil penalties is dismissed without prejudice. I decline to decide whether Walmart knew or should have known that its conduct was prohibited by the rule. *See* 15 U.S.C. § 45(m)(1)(A).

46

> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—
>
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted ... *Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.

The parties seem to agree that the two requirements at the head of § 13(b)—a showing that someone "is violating, or is about to violate" a law enforced by the FTC and that an injunction would be in the public interest—also apply to requests for a permanent injunction authorized in the statute. *See* [24] at 38–39; [43] at 44.[34]

Walmart argues that past conduct is irrelevant to a request for a permanent injunction under § 13(b), relying on *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 155–59 (3d Cir. 2019). *See* [44] at 19–21. In *Shire*, the Third Circuit found that the FTC had to show that a wrongdoer "is violating" or "is about to violate" the law to secure an injunction. *See Shire ViroPharma, Inc.*, 917 F.3d at 156. The Third Circuit held that this requirement was antecedent to and separate from the common law

---

[34] *But see United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 773 (7th Cir. 2019) (noting that not every one of § 13(b)'s requirements apply to a request for a permanent injunction). Even if some of § 13(b)'s requirements don't apply to permanent injunctions, however, they "inform the meaning of 'injunction'" in the statute. *Credit Bureau Ctr.*, 937 F.3d at 773.

47

standard for an award of injunctive relief, and (relatedly) that a likelihood of recurrent illegal conduct wasn't relevant to whether a defendant "is violating" or "is about to violate" the law. *See id.* at 157.

I disagree with the Third Circuit's approach, and decline to distinguish between the requirements of § 13(b)(1) and the common law standard for injunctive relief. The requirement that a defendant "is violating" or "is about to violate" the law mirrors the common law requirement that a plaintiff seeking injunctive relief show that it will "suffer irreparable harm if a preliminary injunction is denied." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011); *see also Swanigan v. City of Chicago*, 881 F.3d 577, 583 & n.2 (7th Cir. 2018) (citations omitted) (noting that injunctions are forward-looking, and a plaintiff must show that the injury is certainly impending or that there is a substantial risk of harm). And a showing that illegal conduct is likely to recur is the same as showing that someone "is violating" or "is about to violate" the law. *See also FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (applying the common law likelihood of recurrence to a request for an injunction under § 13(b)); *FTC v. Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) (same); *FTC v. Lifewatch, Inc.*, 176 F.Supp.3d 757, 785–86 (N.D. Ill. 2016) (same); *FTC v. Roomster Corp.*, No. 22 Civ. 7389 (CM), 2023 WL 1438718, at *7 (S.D.N.Y. Feb. 1, 2023) (same); *FTC v. AdvoCare Int'l, L.P.*, CIVIL NO. 4:19-CV-715-SDJ, 2020 WL 6741968, at *5–6 (E.D. Tex. Nov. 16, 2020) (same).

Section 13(b) "focuses upon relief that is prospective, not retrospective." *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021); *see also Credit Bureau Ctr.,*

*LLC*, 937 F.3d at 772. Yet the power "to grant injunctive relief survives the discontinuance of the illegal conduct." *Accusearch Inc.*, 570 F.3d at 1201 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)) (applying the rule to a request for permanent injunctive relief under § 13(b)); *Lifewatch Inc.*, 176 F.Supp.3d at 785–86 (same); *Espenscheid v. Direct Sat USA, LLC,* 705 F.3d 770, 773 (7th Cir. 2013). To show that relief is needed when a violation has ceased, a party must demonstrate "some cognizable danger of recurrent violation," and the court should consider all of the circumstances, including "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of the past violations." *W.T. Grant Co.*, 345 U.S. at 898; *see also United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275–76 (7th Cir. 2009) (finding that voluntary cessation of wrongful conduct is a factor to consider when deciding if an injunction is necessary, and that the court may also consider what led to the cessation and how easily former practices may be resumed); *Wilk v. American Med. Ass'n*, 895 F.2d 352, 367 (7th Cir. 1990).

The complaint says that Walmart is violating is or is about to violate § 5. [1] ¶ 105. And beyond that conclusory allegation, the FTC has plausibly alleged some likelihood that Walmart's unlawful conduct will recur. For instance, the complaint says that Walmart repeatedly failed to train its employees or institute robust fraud-prevention systems, despite waves of consumer complaints, repeated audits by its money transfer providers that reported deficiencies, and receipt of consent orders requiring more. *See id.* ¶¶ 35, 37–38, 40, 43, 46, 48–52, 105. While the complaint

doesn't date all of its allegations (suggesting that the underlying conduct continues), *see, e.g., id.* ¶¶ 40, 46, the FTC identifies problems with Walmart's inadequate fraud-prevention efforts as recently as 2019. *See id.* ¶¶ 15, 17, 56, 100. Walmart corrected some of its practices only after the FTC began investigating in 2017. *See id.* ¶¶ 57, 62, 64, 76, 85, 100, 105. And the company has opportunity and incentive to continue its lax security practices: Walmart still processes large amounts of money transfers and makes millions of dollars in related fees. *See id.* ¶¶ 8–14, 22.[35]

The FTC has shown some reason to believe that Walmart is or is about to violate § 5. If it prevails in this case, a permanent injunction may be available.

### 4. Due Process

Walmart argues that § 5 is unconstitutionally vague as applied in this case. *See* [24] at 48–50.[36] Under the Due Process Clause of the Fifth Amendment, "laws

---

[35] Walmart argues that the agency needed to allege that Walmart could resume "a specific act or practice" that the company ceased because of the FTC's investigation, not a general set of practices that violate the law. *See* [44] at 20–21 (citing *FTC v. Elec. Payment Solutions of America Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at *9–10 (D. Ariz. Aug. 28, 2019)). But violations of the law can include diffuse actions, and whether Walmart ceased its conduct because the FTC began investigating is just one relevant factor. That the court in *Electric Payment Solutions* considered a single scheme doesn't mean that only discrete actions can violate § 5. *See FTC v. Elec. Payment Solutions of America Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at *9–10 (D. Ariz. Aug. 28, 2019). The other cases cited by Walmart are distinguishable. Unlike in *Shire* and *Facebook*, the complaint says that Walmart's conduct continues to violate § 5 and that the company changed course only after the FTC intervened. *See FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159–60 (3d Cir. 2019); *FTC v. Facebook, Inc.*, 560 F.Supp.3d 1, 26–27 (D.D.C. 2021). This case isn't like the situation in *AdvoCare* because Walmart continues to process large numbers of money transfers, *see* [1] ¶¶ 8, 82, which means the "channels of misconduct utilized by" Walmart remain open. *FTC v. AdvoCare Int'l, L.P.*, CIVIL NO. 4:19-CV-715-SDJ, 2020 WL 6741968, at *6 (E.D. Tex. Nov. 16, 2020).

[36] A statute can be vague either facially—in the abstract—or as-applied, meaning "in light of the facts of the particular case." *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) and *United States v. Johnson*, 875 F.3d 360, 370 (7th Cir. 2017)). Generally, the constitutionality of a statute is determined as

which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Midwest Fence Corp. v. United States Dep't of Transp.*, 840 F.3d 932, 947 (7th Cir. 2016) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). Due Process doesn't mean "perfect clarity and precise guidance." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). But a statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 478–79 (7th Cir. 2012) (quoting *Fox Television Stations, Inc.*, 567 U.S. at 253).

"[T]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). Criminal statutes must be clearer than laws that carry only civil penalties, and laws must be clearest when constitutional rights are at stake. *See Vill. of Hoffman Estates*, 455 U.S. at 498–99; *Fuller ex rel. Fuller v. Decatur Public Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 667 (7th Cir. 2001). In deciding whether a statute is vague, courts look to the words of the law itself, the interpretations of other courts, "and, perhaps to some degree, to the interpretation of the statute given by those charged with

---

applied to a litigant. *Id.* (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) and *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973)).

enforcing it." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *United States v. Cook*, 970 F.3d 866, 874 (7th Cir. 2020) (considering an earlier construction of a statute by the Seventh Circuit in assessing a vagueness challenge); *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 995–96 (7th Cir. 2002) (quoting *Vill. of Hoffman Estates*, 455 U.S. at 494 n.5) (ruling that, in assessing vagueness "a federal court must, of course, consider any limiting construction that a state court or enforcement agency has offered").

Section 5 of the Act doesn't implicate any constitutional rights, regulates economic behavior, and is a civil statute (not a criminal one). *See* 15 U.S.C. § 45; *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015). That means that Walmart is entitled to the lowest level of notice under the Due Process Clause. *See Fuller ex rel. Fuller*, 251 F.3d at 667 (citing *Vill. of Hoffman Estates*, 455 U.S. at 497); *United States v. Walton*, 36 F.3d 32, 35 (7th Cir. 1994) (citations omitted). The statute sets up a cost-benefit analysis: regulated parties must compare a substantial injury that they have caused to consumers with "countervailing benefits to consumers or to competition," while also considering whether injuries were reasonably avoidable. 15 U.S.C. § 45(n); *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010); *American Fin. Services Ass'n v. FTC*, 767 F.2d 957, 975–76 (D.C. Cir. 1985); *Orkin Exterminating Co., Inc. v. FTC,* 849 F.2d 1354, 1365 (11th Cir. 1988) (citation omitted); *Wyndham Worldwide Corp.*, 799 F.3d at 255 (citations omitted). This flexible standard isn't unusual: laws often require people to correctly judge how a standard applies to their conduct, *see Benner v. Carlton*, 58 F.4th 923, 927 (7th Cir.

2023) (quoting *Johnson v. United States*, 576 U.S. 591, 603–04 (2015)), and flexible rules may still comply with the requirements of Due Process. *See Midwest Fence Corp.*, 840 F.3d at 947–48.

The complaint alleges that Walmart knew about a substantial injury to consumers. MoneyGram, Western Union, and Ria told Walmart repeatedly about the hundreds of thousands of complaints about fraud involving Walmart's money transfers, and about hundreds of millions of dollars in related consumer losses. *See* [1] ¶¶ 30–31, 43. While Walmart hasn't contested causation yet, it seems likely that not all of those losses were attributable to deficiencies in Walmart's anti-fraud programs. But it's reasonable to infer that some of these injuries *were* caused by Walmart's conduct. The complaint says that Walmart failed to take basic steps to prevent or mitigate fraud, such as implementing and maintaining effective policies and procedures, consistently training its employees, requiring IDs for all money transfer recipients, warning consumers about the risk of fraud, and communicating with its providers so that fraudsters would be blocked from making future transfers. *See, e.g., id.* ¶¶ 49, 51–54, 56, 70–80, 88–89, 95–101.

Walmart's as-applied challenge fails when considering the magnitude of the consumer injury at issue. Section 5 required to Walmart to weigh the benefits of non-existent or lax security measures against the substantial harm to consumers who were defrauded as a result. As a sophisticated corporation, defendant was well-positioned to conduct that analysis. The FTC alleges that Walmart knew that its customers were losing millions to fraudsters making use of it services, but the

company failed to implement and maintain its own policies and procedures and violated those of its money transfer providers. *See* [1] ¶¶ 16, 26, 30–31, 40, 43, 49, 50–51. As a result, consumers suffered millions of dollars in losses which were, as discussed above, not avoidable by the consumers themselves. Walmart hasn't argued that its conduct met the balancing test, and § 5 was clear enough as applied in this case to "provide a person of ordinary intelligence fair notice" that Walmart needed to do more. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Walmart argues that the FTC's complaint needed to tell the company what it had to do so as to avoid liability. *See* [24] at 49. "Do better," is not meaningful guidance. Fair enough. But plaintiff wasn't required to guide Walmart's conduct in its complaint. The FTC was required to articulate a plausible set of allegations demonstrating that Walmart engaged in a practice that caused substantial consumer injury, that consumers could not reasonably avoid, and that was not justified by a cost-benefit analysis. That much the FTC has done.

Walmart also argues that the law didn't provide a sufficient standard against which the company was to compare its anti-fraud efforts. *See* [24] at 49. The FTC has targeted a set of practices, and Walmart argues that without more specific guidance, the company couldn't have known it would run afoul of § 5. *See id.* But in addition to the text of the statute, Walmart also had the benefit of cases considering similar issues and practices. *See Grayned*, 408 U.S. at 110 (holding that court interpretations of a statute are relevant to a void-for-vagueness analysis); *United States v. Plummer*, 581 F.3d 484, 488–89 (7th Cir. 2009). In *Wells*, the FTC alleged that defendants—a

payment processing company and an officer of that company—failed to follow security guidelines, ignored a high rate of expected fraud, ignored related consumer and bank complaints, and instead processed related transactions, causing harm to consumers. *See* Complaint ¶¶ 5–6, 8–17*, FTC v. InterBill Ltd. and Thomas Wells*, No 2:06-cv-01644-JCM-PAL, 2006 WL 4062458 (D. Nev. Dec. 26, 2006). The district court found that those allegations were supported by the uncontroverted evidence, and granted summary judgment to the FTC on its § 5 claim. *See FTC v. InterBill, Ltd.*, No. CV-S-06-01644-JCM-PA, 2009 WL 10267504, at *1 (D. Nev. April 30, 2009). The Ninth Circuit affirmed, noting that, when a defendant received reports of fraud and reversed transactions at "10 to 20 times" the generally permitted rates, failed to conduct "reasonable due diligence," ignored other red flags, and knew or should have known that transactions were unauthorized, carrying out the related transactions was an unfair practice. *FTC v. Wells*, 385 Fed. App'x. 712, 713 (9th Cir. 2010).

In *Neovi*, the FTC brought suit under § 5 against a software maker. *See FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010). Fraudsters took advantage of the defendant's vulnerable systems, leading to fraudulent transactions totaling more than $402,750,000 in losses. *See id.* at 1154. Despite receiving thousands of complaints, the software maker didn't effectively utilize its anti-fraud systems or otherwise solve the problem, and continued processing the fraudulent transactions, legitimizing them in the eyes of consumers. *See id.* at 1154–57. The Ninth Circuit affirmed a district court's grant of summary judgment to the FTC on the question of liability. *Id.* at 1153.

That the courts in *Neovi* and *Wells* found defendants liable under § 5 for a set of deficiencies in their anti-fraud programs and for allowing business to go forward as usual despite notice of significant consumer losses, is further reason to believe that Walmart had fair notice. *See FTC v. Wells*, 385 Fed. App'x. 712, 713 (9th Cir. 2010); *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015). While Walmart complains that it was surprised to find itself in hot water over such a broad set of practices, these cases and those filed against Walmart's money transfer providers (discussed below) should have alerted the company that a set of decisions and practices that, together, failed the cost-benefit analysis and substantially injured consumers, could be prohibited under § 5.[37]

As further reason to find that Due Process was met, the FTC cites the complaints it filed against MoneyGram and Western Union and the related consent orders it reached with those companies. *See* [43] at 35–36. While weaker evidence, these sources also suggest that Walmart had fair notice of what § 5 required.[38] Considering the complaints filed against Walmart's money transfer providers and the

---

[37] *LabMD, Inc.*, is distinguishable, because that case discussed the clarity required in a cease-and-desist order, not what was required to put a party on notice under the Due Process Clause. *See LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235–36 (11th Cir. 2018).

[38] Walmart is right that consent orders are not precedential and do not reflect merits determinations as to liability under § 5. But the complaints and consent orders in this case are relevant to what § 5 requires because they provide a signal of the FTC's interpretation of that law. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 256–58 & n.23 (3d Cir. 2015). Recall that the FTC is the only party that can bring an action under § 5, making its interpretation a signal to potential defendants.

56

resulting consent orders, the FTC alleged similar theories of liability under § 5, suggesting that the agency itself thought that lax security practices related to money transfers could fail the test. *See* [1] ¶¶ 35, 37–38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 1, 13, 20 (N.D. Ill. Oct. 19, 2009); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 1, 12 (M.D. Pa. Jan. 19, 2017); *see also* 16 C.F.R. § 3.11(a) (The FTC Commissioners must vote on whether to issue a complaint.).

Walmart failed to take basic steps to prevent fraud in its money transfers, despite knowledge of enormous consumer losses. While § 5 sets up a flexible rule, considering the economic context, the balancing test set up by § 5(n), and cases imposing and suggesting liability under similar circumstances, Walmart had fair notice that lax fraud prevention that injured consumers was forbidden.

## C. Removal Protections and Agency Authority

Walmart argues that the Commission, by virtue of the removal protections for its commissioners, is unconstitutionally exercising executive power with this complaint. *See* [24] at 18–23. Defendant identifies a potentially unconstitutional limit on the President's removal authority, but that's not a reason to dismiss plaintiff's claims.

The FTC is led by a commission of five members, who are appointed by the President and confirmed by the Senate. *See* 15 U.S.C. § 41; *Humphrey's Ex'r v. United States*, 295 U.S. 602, 619–20 (1935). No more than three of the FTC's members can come from the same political party, and the Commissioners' staggered, seven-year terms enable the agency to accumulate technical expertise that outlasts changes in

leadership. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2198–99 (2020) (quoting *Humphrey's Ex'r*, 295 U.S. at 624); 15 U.S.C. § 41. The President can remove a Commissioner—a principal officer of this independent agency—but only for good cause: "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41; *see Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010) (discussing *Humphrey's Ex'r*, 295 U.S. at 620).

The Commissioners' for-cause protections stand in contrast to the general rule: the President may remove most executive officials from office for any reason. *See* Art. II, §§ 1, 3 ("The executive Power shall be vested in a President" who must "take Care that the Laws be faithfully executed."); *Seila Law LLC*, 140 S. Ct. at 2197–98 (citing *Myers v. United States*, 272 U.S. 52, 163–64 (1926) and *Free Enter. Fund*, 561 U.S. at 483). The Court has recognized two exceptions, however. *See Seila Law LLC*, 140 S. Ct. at 2198–2200. The first exception—at issue here—applies to "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199–2200.

In *Humphrey's Executor*, the Court upheld for-cause removal protection for the FTC's Commissioners. 295 U.S. at 631–32. The *Humphrey's Executor* Court reasoned that the Commission was an administrative body that performed executive functions as part of its "quasi-legislative or quasi-judicial powers." *Id.* at 628. The Court also stressed the Commission's non-partisan and staggered term structure, and saw the agency as exercising "no part of the executive power." *Id.* at 624, 628; *see Seila Law LLC*, 140 S. Ct. at 2199.

Decades after *Humphrey's Executor* was decided, Congress granted the FTC new powers, which the agency has invoked in this case. *See* 15 U.S.C. §§ 45(m), 53(b), 57b. These provisions allow the FTC to seek permanent injunctive relief (without agency adjudication) and civil penalties in federal court. *See id.* While the FTC's removal protections were lawful in 1935 (when *Humphrey's Executor* was decided), Walmart argues that the subsequent grant of litigation authority took the FTC out of the *Humphrey's Executor* exception. *See* [24] at 18–23. Walmart reasons that the litigation authority granted to the Commission is substantial executive power that wasn't considered in *Humphrey's Executor*. *See id.*

The litigation authority given to the FTC in the 1970s may have taken the Commission's for-cause protections past "the outermost constitutional limits" on the President's removal power. *See Seila Law LLC*, 140 S. Ct. at 2199–2200 (quoting then-Judge Kavanaugh's dissent in *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 196 (D.C. Cir. 2018)) (noting that the power to seek monetary penalties against private parties on behalf of the United States is "a quintessentially executive power not considered in *Humphrey's Executor*").[39] But it doesn't follow that plaintiff cannot pursue this lawsuit.

---

[39] There's reason to believe that the FTC may still fall within the exception. The *Humphrey's Executor* exception is premised not only on the amount of executive power an agency wields but also on organizational features that show an agency to be non-executive. *See Humphrey's Executor v. United States*, 295 U.S. 602, 624 (1935). And, even after *Seila Law*, it's not clear how much executive power is too much, such that the removal protections of an independent agency, formed like the FTC, offend Article II. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2199–2200 & nn.2, 4 (2020). That the Supreme Court has repeatedly declined to overturn *Humphrey's Executor*, even after the agency was granted additional litigation authority by Congress, may also show that the agency's removal protections continue to fall under the exception.

The Act includes a severability clause, which means Congress didn't want it to rise or fall on any single provision, absent strong evidence to the contrary. *See* 15 U.S.C. § 57; *Seila Law LLC*, 140 S. Ct. at 2209 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987)). Since the agency's structure was lawful before Congress granted it the litigation powers invoked in this case, Walmart argues that the solution is to strike the FTC's litigation authority, rather than the removal protections. *See* [24] at 23 (citing *Barr v. American Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2353 (2020) and *Bowsher v. Synar*, 478 U.S. 714, 734–35 (1986)). But the constitutional problem at issue centers on the interaction of the Commissioners' removal protections with the subsequent litigation authority given to the agency, not an unconstitutional amendment to an earlier law. *Cf. Barr*, 140 S. Ct. at 2353. In other words, the grant of executive power to the FTC, standing on its own, isn't unconstitutional: executive agencies often have power to sue for penalties or injunctive relief. *See, e.g.,* 7 U.S.C. § 13a-1(b), (d) (Commodity Futures Trading Commission); 15 U.S.C. § 78u(d) (Securities Exchange Commission); *see also Free Enter. Fund*, 561 U.S. at 508–09 (holding that an agency's regulatory authority didn't violate the separation of powers, but the removal protections for its officers did). The real problem here is a potentially unconstitutional limit on the President's removal power. The best solution would be to target that limit.

In cases when the Court has confronted similar issues, the remedy has been to strike the offending removal protections. *See Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508–09 (2010); *Seila Law LLC v. Consumer Fin. Prot.*

*Bureau*, 140 S. Ct. 2183, 2207–11 (2020); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1787–88 & n.23 (2021) ("Settled precedent ... confirms that the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the ... responsibilities of his office.").[40] That makes sense, given that "when confronting a constitutional flaw in a statute," courts should "try to limit the solution to the problem." *Free Enter. Fund*, 561 U.S. at 508 (quoting *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–29 (2006)).

Another reason not to strike the agency's litigation authority is that it might not resolve the issue. As Walmart notes, the *Humphrey's Executor* Court may not have accurately assessed the FTC's executive powers as they existed in 1935. *See* [24] at 23; *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2198–00 & nn.2, 4 (2020). Striking the FTC's ability to sue for injunctive and monetary relief, then, might not be enough. The sure solution, as in *Seila Law*, would be to target the offending removal provision. *See Seila Law LLC*, 140 S. Ct. at 2209 ("If the Director were removal at will by the President, the constitutional violation would disappear.").

The Commissioners were constitutionally appointed, and an unconstitutional removal restriction isn't a reason to void the FTC's action in this case. *See* U.S. Const.

---

[40] Walmart argues that *Seila Law* and *Collins* are distinguishable because those cases considered agencies that had executive powers from the outset, and so accompanying removal restrictions were never enforceable. *See* [24] at n.3 (discussing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2207–11 (2020) and *Collins v. Yellen*, 141 S. Ct. 1761, 1788–89 & n.23 (2021)). But those cases are helpful insofar as they considered—and remedied—statutes that unconstitutionally limited the President's removal power. That the potential removal problem in this case began with a grant of litigation authority doesn't change the underlying problem, which is about the President's removal power, not about a principal officer's use of executive power.

art. II, § 2, cl. 2; *Collins*, 141 S. Ct. at 1787–88 & n.23. The FTC has authority to bring this suit.

## IV.  Conclusion

Defendant's motion to dismiss, [23], is granted in part and denied in part. Count One is not dismissed. Count Two is dismissed without prejudice.[41]

ENTER:

_____

Manish S. Shah
United States District Judge

Date:  March 27, 2023

---

[41] Ordinarily a plaintiff should be given at least one opportunity to amend a complaint. *See Saint Anthony Hosp. v. Eagleson*, 40 F.4th 492, 517 (7th Cir. 2022) (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015)).