**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:22-cv-03372 |
| WALMART INC., | Hon. Manish S. Shah |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>WALMART INC.'S MOTION TO DISMISS AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ...................................................................................................... 5

I.      THE TSR CLAIMS SHOULD BE DISMISSED ........................................ 5

      A.    The FTC Fails To Adequately Allege The Elements Of TSR Liability ................. 5

            1.    The FTC's Does Not Properly Allege Underlying TSR Violations ........... 6

            2.    The FTC Does Not Properly Allege That Walmart Knew Or Avoided Knowing That Specific Transactions Violated The TSR ........... 14

            3.    The FTC Does Not Properly Allege Substantial Assistance ..................... 19

      B.    The FTC's Claim For Penalties Should Be Dismissed .......................................... 24

II.    THE SECTION 5 CLAIM SHOULD BE DISMISSED .................................................... 25

      A.    The FTC Fails To Adequately Allege Ongoing Or Imminent Misconduct .......... 25

      B.    The FTC Fails To Adequately Allege An "Unfair" Act Or Practice .................... 27

      C.    Imposing Liability On Walmart Under Section 5 Would Violate Due Process ............................................................................................................... 33

III.   THE FTC LACKS CONSTITUTIONALLY VALID AUTHORITY TO INITIATE LITIGATION SEEKING MONETARY OR INJUNCTIVE RELIEF .......... 35

IV.   THE COURT SHOULD CERTIFY ANY ORDER DENYING DISMISSAL FOR INTERLOCUTORY APPEAL .......................................................................... 40

CONCLUSION ................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Fin. Servs. v. FTC*,
767 F.2d 957 (D.C. Cir. 1985) ............................................................... 31

*AMG Cap. Mgmt., LLC v. FTC*,
141 S. Ct. 1341 (2021) ........................................................................ 35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................ 5

*Barr v. American Ass'n of Pol. Consultants, Inc.*,
140 S. Ct. 2335 (2020) ............................................................... 37, 38, 39

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021) ........................................... 20, 21

*In re Borg-Warner Corp.*,
101 F.T.C. 863 (1983) .......................................................................... 35

*Bowsher v. Synar*,
478 U.S. 714 (1986) ....................................................................... 37, 38

*Chronister Oil Co. v. Unocal Ref. & Mktg.*,
34 F.3d 462 (7th Cir. 1994) .................................................................. 9

*Clark v. Robert W. Baird Co.*,
142 F. Supp. 2d 1065 (N.D. Ill. 2001) ................................................. 14

*Collins v. Yellen*,
141 S. Ct. 1761 (2021) ....................................................................... 39

*Damian v. Heartland Bank & Tr. Co.*,
2021 WL 5937153 (N.D. Ill. Dec. 15, 2021) ....................................... 22

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) ......................................................... 20, 30

*Domanus v. Lewicki*,
645 F. Supp. 2d 697 (N.D. Ill. 2009) ................................................... 11

*El Camino Res., Ltd., v. Huntington Nat'l Bank*,
722 F. Supp. 2d 875 (W.D. Mich. 2010) .............................................. 22

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)...................................................................................33

*In re First All. Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) ..................................................................22

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010)...................................................................................38

*FTC v. Chapman*,
    714 F.3d 1211 (10th Cir. 2013) ..............................................................15

*FTC v. Credit Bureau Ctr., LLC*,
    937 F.3d 764 (7th Cir. 2019) ..................................................................26

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986)...................................................................................33

*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010) ................................................................34

*FTC v. Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019)....................................................................26

*FTC v. Wells*,
    385 F. App'x 712 (9th Cir. 2010) ...........................................................34

*FTC v. WV Universal Mgmt., LLC*,
    877 F.3d 1234 (11th Cir. 2017) ..............................................................19

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3d Cir. 2015)..............................................................28, 35

*G&G Closed Cir. Events, LLC v. Castillo*,
    327 F. Supp. 3d 1119 (N.D. Ill. 2018) ...................................................25

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)............................................................................15, 18

*GMAC, LLC v. Hillquist*,
    2007 WL 9813068 (N.D. Ill. Oct. 19, 2007)...........................................14

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ..................................................................11

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Graue Mill Dev. Corp. v. Colonial Bank & Tr. Co. of Chi.*,
  927 F.2d 988 (7th Cir. 1991) .................................................................11

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935).................................................................36, 39

*Interactive Intelligence, Inc. v. KeyCorp*,
  546 F.3d 897 (7th Cir. 2008) .................................................................30

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*,
  559 U.S. 573 (2010).................................................................25

*Katharine Gibbs Sch. (Inc.) v. FTC*,
  612 F.2d 658 (2d Cir. 1979).................................................................33

*Kornea v. J.S.D Mgmt., Inc.*,
  366 F. Supp. 3d 660 (E.D. Pa. 2019) .......................................................7

*LabMD, Inc. v. FTC*,
  894 F.3d 1221 (11th Cir. 2018) .................................................25, 29, 34

*Lamm v. State St. Bank & Tr.*,
  749 F.3d 938 (11th Cir. 2014) .................................................................30

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*,
  478 U.S. 501 (1986).................................................................35

*Mayer v. Spanel Int'l Ltd.*,
  51 F.3d 670 (7th Cir. 1995) .................................................................32

*Michaelson v. CBE Grp., Inc.*,
  2015 WL 2449038 (N.D. Ill. May 21, 2015)...........................................8

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
  631 F.3d 436 (7th Cir. 2011) .................................................................12

*Rocha v. Rudd*,
  826 F.3d 905 (7th Cir. 2016) .................................................................11

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007).................................................................25

*Schatz v. Rosenberg*,
  943 F.2d 485 (4th Cir. 1991) .................................................................19

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Sears v. Likens*,
    912 F.2d 889 (7th Cir. 1990) ........................................................................11, 14

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)..........................................................................21, 22

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020)..........................................................................36, 37, 39

*United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*,
    486 F. Supp. 3d 1210 (N.D. Ill. 2020) ..................................................................23

*Spiegel, Inc. v. FTC*,
    540 F.2d 287 (7th Cir. 1976) ........................................................... *passim*

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)..........................................................................................39

*Tierney v. Advoc. Health & Hosps. Corp.*,
    797 F.3d 449 (7th Cir. 2015) ............................................................................7

*Twitter, Inc. v. Taamneh*,
    143 S. Ct. 1206 (2023)..............................................................................20, 30

*Tyler v. Residential Credit Sols., Inc.*,
    2020 WL 5630474 (N.D. Ill. Sept. 21, 2020) ......................................................13

*Ungaretti & Harris, LLP v. Servicemaster Co.*,
    2010 WL 2167532 (N.D. Ill. May 27, 2010) ......................................................11

*Uni\*Quality, Inc. v. Infotronx, Inc.*,
    974 F.2d 918 (7th Cir. 1992) ........................................................................11, 14

*United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*,
    2017 WL 2653070 (N.D. Ill. June 20, 2017)....................................................11, 12

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989)..........................................................................15

*United States v. Dish Network L.L.C.*,
    954 F.3d 970 (7th Cir. 2020) ........................................................................24, 25

*United States v. Jewell*,
    532 F.2d 697 (9th Cir. 1976) ..........................................................................15

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*United States v. L.E. Myers Co.*,
  562 F.3d 845 (7th Cir. 2009) ........................................................................18, 19

*United States v. Ladish Malting Co.*,
  135 F.3d 484 (7th Cir. 1998) ..............................................................................18

*United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes,
  Oneida Cty.*,
  965 F.2d 311 (7th Cir. 1992) ..............................................................................23

*Vesely v. Armslist LLC*,
  762 F.3d 661 (7th Cir. 2014) ..............................................................................30

*VMG Salsoul, LLC v. Ciccone*,
  824 F.3d 871 (9th Cir. 2016) ..............................................................................28

*Zablocki v. Merchants Credit Guide Co.*,
  968 F.3d 620 (7th Cir. 2020) ..............................................................................33

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 44 ...................................................................................................29

15 U.S.C. § 45(a) ........................................................................................27, 35

15 U.S.C. § 45(b) ...............................................................................................33

15 U.S.C. § 45(k) ...............................................................................................29

15 U.S.C. § 45(m) ..............................................................................................36

15 U.S.C. § 45(m)(1)(A) ...............................................................................2, 24

15 U.S.C. § 45(n) .........................................................................3, 28, 31, 32

15 U.S.C. § 53(b) .....................................................................................26, 27, 36

15 U.S.C. § 55 ...................................................................................................29

15 U.S.C. § 57 ...................................................................................................39

15 U.S.C. § 57a .................................................................................................33

15 U.S.C. § 57a(a)(1)(B) ....................................................................................33

## TABLE OF AUTHORITIES—Continued

Page(s)

15 U.S.C. § 57b ................................................................................................36

28 U.S.C. § 1292(b) .........................................................................................40

Pub. L. No. 75-447, 52 Stat. 111 (1938) ..........................................................39

16 C.F.R. § 310.2(dd) ........................................................................................6

16 C.F.R. § 310.2(ff) .......................................................................................6, 7

16 C.F.R. § 310.2(gg) ................................................................................ *passim*

16 C.F.R. § 310.2(n) ................................................................................. *passim*

16 C.F.R. § 310.3(b) ................................................................................. *passim*

60 Fed. Reg. 43,842 (Aug. 23, 1995) .........................................14, 15, 18, 19

80 Fed. Reg. 77,520 (Dec. 14, 2015) .....................................................14, 20

Fed. R. Civ. P. § 9(b) .........................................................................................5

Fed. R. Civ. P. § 12(b)(6) ...................................................................................5

## OTHER AUTHORITIES

FTC Statement of Policy on the Scope of the Consumer Unfairness Jurisdiction
   (Dec. 17, 1980), *appended to In re Int'l Harvester*, 104 F.T.C. 949, 1070 (1984) ..........31, 32

Restatement (Second) of Torts (1965) .............................................................30

Restatement (Third) of Torts: Liability for Economic Harm (2020) ............................21

S. Rep. No. 93-1408 (1974) ............................................................................34

S. Rep. No. 103-130 (1993) ............................................................................29

Randy Wyrick, *Long Arm of the Law Reaches Deep Into the Heart of Texas to Nab
   Alleged Scammer*, Vail Daily (Jan. 27, 2018), https://perma.cc/Z2EG-47E5. ......................23

## INTRODUCTION

Four months ago, this Court rejected the FTC's unprecedented effort to use the substantial-assistance provision of the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310.3(b), to impose novel liability on Walmart for processing money transfers at the request of customers who later claimed that they had been defrauded by third-party criminals. The Court's ruling was comprehensive, holding that the FTC failed to allege (1) underlying TSR violations by telemarketers; (2) that Walmart knew of (or consciously disregarded) those underlying TSR violations when processing its customers' money transfers; or (3) that Walmart's processing of money transfers constituted substantial assistance to the criminal fraudsters. *See* Memo. Opinion & Order 19-31 (ECF No. 52) (Op.). The FTC has filed an amended complaint (ECF No. 62) (AC) in an attempt to remedy those fundamental pleading deficiencies, but it fares no better than the original.

At the threshold, the FTC still fails to sufficiently allege that the vast majority of transfers at issue in this case satisfy the TSR's definition of "telemarketing." 16 C.F.R. § 310.2(gg). Most of the alleged schemes do not involve "the purchase of goods or services"—despite this Court's rejection of the FTC's original TSR claim on precisely that ground. And the handful of isolated "telemarketing" allegations that arguably do satisfy that threshold requirement otherwise lack the particularity required under Rule 9(b).

Nor has the FTC fixed the other problems the Court identified with its TSR theory. The FTC still fails to allege "details about the majority of transactions in this case that would show that Walmart knew or consciously avoided knowing about underlying TSR violations." Op. 25. Its red-flag theory of conscious avoidance is still alleged in the abstract, divorced from the alleged transactions underlying its claims. The complaint also fails to state a claim that Walmart's conduct qualifies as "substantial assistance" under Section 310.3(b), which in this case requires *actual* knowledge of TSR violations. And the FTC has certainly not alleged that Walmart knew that its

1

own conduct violated the TSR, as required for civil penalties, 15 U.S.C. § 45(m)(1)(A).

For all these reasons, the FTC's TSR claims should again be dismissed—this time with prejudice. In addition, Walmart asks the Court to revisit its decision to allow the FTC to proceed on its Section 5 claim. The FTC's allegations do not reflect conduct traditionally classified as "unfair," either under *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976), or under Section 5(n). Moreover, because the Supreme Court upheld the FTC's independence on the ground that the agency in 1935 possessed no executive power, Congress's attempt in the 1970s to grant the FTC the executive power to file this suit was unconstitutional, void, and severable. At a minimum, because these issues are dispositive and readily debatable on the merits, if the Court adheres to its prior rulings on those two issues, it should certify its decision for interlocutory appeal.

## BACKGROUND

This Court is already familiar with Walmart's money transfer program and anti-fraud efforts. *See* MTD 5-8 (ECF No. 24). In short, Walmart offers customers a low-cost method of sending money transfers to other Walmart stores, and it has invested significant resources to develop an "anti-fraud and consumer protection program" designed "to educate, detect, investigate, respond, and deter consumer fraud against [its] customers." AC ¶¶ 58, 62. As the FTC acknowledges, only a tiny fraction of money transfers processed at Walmart—around 0.08%—is even *reportedly* the product of fraud. *See infra* at 20 n.6; MTD 1-2. Even so, Walmart has continually improved its anti-fraud program over the years, including through consumer warnings, training employees about identifying and preventing consumer fraud on both the send-side and the receive-side, and creating systems to detect and block potentially fraudulent money transfers. *See, e.g.*, AC ¶¶ 27, 30, 58-70, 76, 79, 83-87, 101-02, 164.

Despite Walmart's extensive anti-fraud efforts, in June 2022, a closely divided FTC voted to file this lawsuit, over dissents from Commissioners Phillips and Wilson. The FTC's original

complaint contended that Walmart "fail[ed] to take" certain anti-fraud measures that the FTC believes would have been more "timely, appropriate, and effective." Compl. ¶ 1 (ECF No. 1). The FTC asserted claims under Section 5 of the FTC Act, 15 U.S.C. § 45, and the substantial-assistance provision of the Telemarketing Sales Rule (TSR), 16 C.F.R. § 310.3(b). Walmart moved to dismiss, arguing that the FTC lacks constitutionally valid authority to institute this lawsuit and that the FTC did not state a valid claim under the TSR or Section 5. On March 27, 2023, this Court granted in part and denied in part Walmart's motion.

*First*, the Court dismissed the FTC's TSR claim, agreeing with Walmart that the FTC did not plausibly allege *any* of the three elements for imposing liability under Section 310.3(b) of the TSR. Op. 24-31. Specifically, the Court held that (1) the FTC's attempt to allege underlying TSR violations by telemarketers rested on "conclusory allegations" that lacked the particularity required by Rule 9(b), *id.* at 19-24; (2) the FTC failed to allege that Walmart had "actual knowledge" or "consciously avoided knowledge" of "an identifiable telemarketer's [unlawful] act or practice," *id.* at 24-26; and (3) the FTC failed to allege facts showing that Walmart's processing of routine money transfers amounted to "substantial assistance," *id.* at 26-31.

*Second*, the Court denied Walmart's motion to dismiss the Section 5 claim. *Id.* at 31-57. The Court held that the test set forth in Section 5(n), 15 U.S.C. § 45(n), governs whether an act or practice is "unfair" and overtakes the unfairness test set out in *Spiegel*. Op. 34-35. And under the Section 5(n) standard, the Court concluded that the FTC pleaded a claim by alleging (1) that Walmart's acts "cause or are likely to cause substantial injury to consumers," (2) that the consumer injury is "not reasonably avoidable by consumers themselves," and (3) that the consumer injury is "not outweighed by countervailing benefits to consumers or to competition." *Id.* at 41-46. The Court also held that the FTC's allegations satisfied Section 13(b)'s test for seeking injunctive

relief, which the Court said "mirrors" the "common law standard for injunctive relief" and thereby requires the FTC to allege only "some likelihood that Walmart's unlawful conduct will recur." *Id.* at 48-49. And the Court held that applying Section 5 to Walmart would not violate constitutional due process. *Id.* at 50-57.

*Third*, the Court rejected Walmart's argument that the FTC's litigation powers are constitutionally invalid. *Id.* at 57-62. The Court acknowledged that "[t]he litigation authority given to the FTC in the 1970s may have taken the Commission's for-cause protections past 'the outermost constitutional limits'" on restricting the President's removal power. *Id.* at 59. But the Court nevertheless declined to dismiss this suit, holding that the remedy for any constitutional flaw would not be "to strike the FTC's litigation authority," but rather "to strike the offending removal protections," which would not "void the FTC's action in this case." *Id.* at 59-61.

On June 30, 2023, the FTC filed its amended complaint, advancing the same basic theory of liability, albeit with new telemarketing allegations. *See* AC ¶¶ 122-63. The FTC identifies five categories of what it calls "typical telemarketing schemes": (1) "lottery, prize, and sweepstakes scams," (2) "advance-fee loan scams," (3) "impersonation scams," (4) "person-in-need, grandparent, and emergency scams," and (5) "other scams." *Id.* ¶¶ 125, 134-63. For each category, the FTC offers a generalized description of the scam, alleges a few examples, and tallies up how many "complaints" to money-transfer principals supposedly fall within the category. The FTC also alleges two incidents that fall outside of its five categories, one involving a "secret shopper employment scam" and the other involving a "housing rental scam." *Id.* ¶¶ 131-32. And the FTC separates its TSR claim into three different claims, reflecting the three TSR provisions serving as the predicates for the underlying TSR violations by telemarketers. *Id.* ¶¶ 170-83.

Shortly after the FTC filed its amended complaint, the Court denied Walmart's motion to

certify its original ruling for interlocutory appeal. Order (ECF No. 68). The Court agreed that the constitutional and Section 5 issues implicate "contestable controlling legal questions," but concluded that it would be "more orderly to wait" to certify until after reviewing the amended complaint, which "might lead to a clearer analysis and record for appellate review." *Id.* at 1-2.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," nor do "'legal conclusion[s] couched as . . . factual allegation[s].'" *Id.* Because the FTC's TSR allegations sound in fraud, they are subject to Federal Rule of Civil Procedure 9(b)'s requirement that fraud be alleged with "particularity," which means the FTC must "describe the 'who, what, when, where, and how' of the [alleged] fraud." Op. 20-21 (citation omitted).

## ARGUMENT

## I. THE TSR CLAIMS SHOULD BE DISMISSED

### A. The FTC Fails To Adequately Allege The Elements Of TSR Liability

The FTC's claims that Walmart violated the TSR (AC ¶¶ 170-83) should be dismissed with prejudice. Once again, the FTC seeks to impose secondary liability on Walmart based on its theory that Walmart knowingly and substantially assisted telemarketers who violated the TSR. *See* 16 C.F.R. § 310.3(b). To state a claim under Section 310.3(b), the FTC must plausibly allege facts showing that (1) a "seller or telemarketer" was "engaged in an[] act or practice that violates [the TSR]"; (2) Walmart provided "substantial assistance or support" to that "seller or telemarketer"; and (3) Walmart did so while "know[ing] or consciously avoid[ing] knowing that the seller or telemarketer [was] engaged" in the prohibited conduct. *Id.* As the TSR's text makes clear, the

FTC must satisfy these elements on a seller- or telemarketer-specific basis. In other words, the FTC can state a claim under Section 310.3(b) only if—and only to the extent that—it identifies telemarketing transactions that independently satisfy *all* three elements.[1]

### 1. The FTC's Does Not Properly Allege Underlying TSR Violations

This Court has explained that to allege "an underlying violation of the [TSR] by a seller or telemarketer," the FTC must plausibly allege facts that "hit all the elements of a TSR violation," including facts satisfying "the TSR's definitions of seller, telemarketer, and telemarketing." Op. 21-23. And because the FTC's TSR theory sounds in fraud, it must be alleged with "particularity." *Id.* at 20-21. The FTC's amended complaint flunks these pleading obligations in multiple respects.

**a.** Perhaps the most glaring deficiency—fatal to virtually all the FTC's TSR theories—is its continued failure to heed the TSR's definitions of "seller," "telemarketer," and "telemarketing." *Id.* at 22. The TSR defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration," 16 C.F.R. § 310.2(dd), and "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor," *id.* § 310.2(ff). Both definitions require the actor to engage in "telemarketing," which the TSR defines as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." *Id.* § 310.2(gg). And as relevant here, both definitions require the recipient of the call to be a "customer," which the TSR defines as "any person who is or may be required to pay for goods or services offered through telemarketing." *Id.* § 310.2(n). The FTC can survive dismissal only if—and to the extent that—

---

[1] For the Court's convenience, Walmart has attached an appendix reproducing the FTC's allegations describing each alleged scam, and noting why those allegations are insufficient.

"the [alleged] conduct fits within the meaning of [the defined] terms." Op. 23; *see Tierney v. Advoc. Health & Hosps. Corp.*, 797 F.3d 449, 451-52 (7th Cir. 2015).[2]

In its original complaint, the FTC failed this pleading obligation by "repeatedly using the words telemarketer, seller, and telemarketing" without alleging facts satisfying those defined terms. Op. 23. As noted above, in its amended complaint, the FTC separates its TSR allegations into various categories of scams. *Supra* at 4. And throughout those allegations, the FTC repeats a formulaic recitation of the definition of telemarketing. *See, e.g.*, AC ¶¶ 136, 144, 149, 158. But merely repeating the TSR's definitions is no better than repeating the words themselves. And despite the repetition, the FTC's allegations confirm that it (still) misunderstands those definitions. Indeed, aside from the allegations about advance-fee loan scams and a housing rental scam (which fail for other reasons, *see infra* at 10-14), *none* of the alleged scams satisfies the TSR's definitions.

***Impersonation Scams.*** The "impersonation scams" (AC ¶¶ 147-55) do not satisfy the TSR's definitions of "telemarketing" or "customer," 16 C.F.R. § 310.2(n), (gg), as they do not involve an attempt to "induce the purchase of goods or services" (*id.* § 310.2(gg)) that were "offered through telemarketing" (*id.* § 310.2(n)). According to the FTC, in an "IRS impersonation scam," a caller "impersonates an IRS agent, telling consumers they owe money to the IRS for back taxes" that "must be paid immediately using a money transfer or the consumer will be arrested." AC ¶ 147; *see id.* ¶¶ 149-51 (examples). And in a "utility impersonation scam," a caller impersonates a utility provider, telling consumers "their service will be cut off immediately unless they make a past-due payment using a money transfer." *Id.* ¶ 147; *see id.* ¶¶ 153-54 (examples).

In both instances, the caller is purportedly trying to collect a past-due obligation—not to "induce the purchase of goods or services." 16 C.F.R. § 310.2(gg); *see, e.g., Kornea v. J.S.D*

---

[2] The FTC's allegations do not implicate "donor[s]" or "charitable contribution[s]" as referenced in the "telemarketer" and "telemarketing" definitions. 16 C.F.R. § 310.2(ff), (gg).

*Mgmt., Inc.*, 366 F. Supp. 3d 660, 668-69 (E.D. Pa. 2019) ("attempting to collect a debt from [a consumer]" does not "constitute telemarketing under the TSR" because it does not involve an attempt to "induce [the] purchase [of] goods or services"); *Michaelson v. CBE Grp., Inc.*, 2015 WL 2449038, at *4 (N.D. Ill. May 21, 2015) (same). Likewise, the recipient of the call is not being "offered" a good or service "through telemarketing," 16 C.F.R. § 310.2(n); the recipient is not "offered" anything at all. The IRS impersonation scams also fail because the subject of the calls—back taxes—are not even arguably "goods or services." And two of the impersonation-scam examples fail because the FTC does not allege "more than one *interstate* telephone call." *Id.* § 310.2(gg) (emphasis added); *see* AC ¶¶ 153-54 (failing to allege any interstate calls).

**Emergency Scams**. The FTC's allegations about "emergency scams" (AC ¶¶ 156-59) are also deficient. The FTC alleges that the caller in these scams "impersonate[s] family members or close friends, telling call recipients that they need money right away to pay for various services to help them get out of trouble." *Id.* ¶ 156. The FTC gives two examples: a person sending money to his nephew so the nephew can pay a fine to avoid detention by customs officers, *id.* ¶ 158, and a person sending money to his grandson so the grandson can pay money to avoid going to jail, *id.* ¶ 159. But these call recipients are not sending money to "purchase" any "goods or services" that were "offered through telemarketing." 16 C.F.R. § 310.2(n), (gg). They are not being "offered" anything by the caller, nor are they "purchas[ing]" anything by sending money; they instead are being told to send money to enable someone else (a purported relative) to make a payment. Moreover, in the FTC's examples, the object of the relative's payment—freedom from custody— is not even a "good[] or service[]." And for one of its emergency-scam examples, the FTC again fails to allege more than one interstate call. *Id.* § 310.2(gg); *see* AC ¶ 159.

**Lottery Scams**. The FTC's lottery scam allegations (AC ¶¶ 134-41) also lack a connection

to telemarketing. The FTC alleges that callers tell individuals that they "won a lottery, prize, or sweepstakes" but must send money to pay for taxes and fees in order to "collect their winnings." *Id.* ¶ 134; *see id.* ¶¶ 136, 139-40 (examples). The individuals are not sending money to "purchase" goods or services. 16 C.F.R. § 310.2(gg). Rather, they are trying to collect a prize they have already won. *Cf. Chronister Oil Co. v. Unocal Ref. & Mktg.*, 34 F.3d 462, 465 (7th Cir. 1994) ("You can't 'purchase,' whether in ordinary language or UCC speak, what you already own.").[3]

***"Other" Scams.*** The FTC's tacked-on category of "other scams, . . . such as romance scams, tech support scams, Good Samaritan scams, elder abuse scams, and debt relief scams" (AC ¶¶ 161-63) also fails. The only specific allegation provided by the FTC is a single example of a "romance scam" (*id.* ¶ 163); for the other scams, the FTC does not even describe them, let alone plausibly allege "the details of those scams" to show that they "fit[] the TSR's definitions." Op. 22. And the FTC's "romance scam" example does not fit the TSR's definition of telemarketing. In this example, the FTC alleges that a woman met a man on a dating website, and during their subsequent phone calls, the man scammed the woman into sending him money so he could buy a passport replacement. AC ¶ 163. While this woman may be a victim of fraud, she was not a "customer" being "offered" any goods or services "through telemarketing." 16 C.F.R. § 310.2(n). Nor did her money transfer reflect an attempt to "purchase" any such goods or services. *Id.* § 310.2(gg). Rather, she was sending money to enable someone else (the scammer) to purchase a passport replacement. And this example also fails because the FTC does not allege any facts suggesting that it involved a telemarketing "plan, program, or campaign." *Id.*

***Secret Shopper Employment Scam.*** The individualized allegation involving a "secret

---

[3] The same goes for the "twist on the IRS impersonation scam" in which a caller told an individual that she "was owed a large tax refund" but had to pay "fees and taxes" to "receive it." AC ¶ 152. No one would say that this individual was trying to "purchase" her tax refund.

shopper employment scam" (AC ¶ 131) also fails to satisfy the TSR's definitions. According to the FTC, this scam involved a college student who accepted a "job opportunity" and "was directed" over the phone "to cash a check—which later proved to be fake—and then send a majority of the funds from a Walmart location to evaluate Walmart's money transfer services." *Id.* The college student "was told to keep the remaining funds as compensation for acting as a secret shopper and evaluating the location's employees and money transfer services." *Id.* These allegations do not claim that the student was induced to "purchase" any "goods or services" that the caller had "offered through telemarketing." 16 C.F.R. § 310.2(n), (gg). The caller did not "offer[]" goods or services, and the student was not "customer" but rather an employee. This example, like the others discussed above, cannot support the FTC's TSR claims either.

      **b.**      The FTC's failure to plead facts satisfying the TSR's definitions requires dismissal of most of its TSR allegations, covering more than 76% of the "complaints" (and 83% of dollars) underlying its TSR claims. *See* AC ¶¶ 131, 135, 148, 157, 162. The only remaining allegations—involving "advance-fee loan" scams (*id.* ¶¶ 142-45), and a one-off "housing rental scam" (*id.* ¶ 132)—also fail.

      ***Housing Rental Scam.*** The alleged "housing rental scam" is not adequately pleaded. The FTC alleges that two transfers processed at a "Las Vegas, Nevada Walmart location" were "later reported to MoneyGram as being part of a housing rental scam," that "one victim had more than one interstate call related to a property supposedly for rent," and that this "victim lost $1,581 by paying for a non-existent rental property through a money transfer that was paid out at that Nevada Walmart location." *Id.* ¶ 132. But the FTC fails to allege facts showing a telemarketing "plan, program, or campaign." 16 C.F.R. § 310.2(gg). Instead, it conclusorily claims the existence of a "plan, program, or campaign" without elaboration. AC ¶ 132. That is insufficient. *See* Op. 23.

This allegation also lacks the particularity required by Rule 9(b), as the FTC does not "describe the 'who, what, when, where, and how' of the [alleged] fraud." *Id.* at 20-21. Most striking is the FTC's failure to allege the "who"—i.e., "the identities of the parties to the misrepresentation." *Graue Mill Dev. Corp. v. Colonial Bank & Tr. Co. of Chi.*, 927 F.2d 988, 993 (7th Cir. 1991). That includes "the identity of the person making the misrepresentation," *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016), as well as "the identity of the person to whom the misrepresentation was communicated," *Ungaretti & Harris, LLP v. Servicemaster Co.*, 2010 WL 2167532, at *4 (N.D. Ill. May 27, 2010) (citing *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)).

For the alleged housing rental scam, the FTC alleges no identities whatsoever. Instead, the FTC vaguely asserts that "one victim had more than one interstate call related to a [non-existent] property supposedly for rent." AC ¶ 132. This allegation does not even *mention* the person making the misrepresentation, let alone identify that person with particularity. That is insufficient under Rule 9(b). *See, e.g.*, *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923-24 (7th Cir. 1992) (allegations that "do not even hint at the identity of those who made the misrepresentations" fail Rule 9(b)). And as for the person to whom the misrepresentation was made, the FTC references a "victim" without any identifying information. That is also insufficient under Rule 9(b). *See, e.g.*, *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998) (allegations of fraud against unidentified "customers" fail Rule 9(b)); *United States v. Am. at Home Healthcare & Nursing Servs., Ltd.*, 2017 WL 2653070, at *12 (N.D. Ill. June 20, 2017) (same for allegations of fraud referencing "'a female patient'" and "another unidentified patient"); *Domanus v. Lewicki*, 645 F. Supp. 2d 697, 705 (N.D. Ill. 2009) (rejecting under Rule 9(b) allegations of "wrongful acts, described in highly general terms, committed by nonparties allegedly related in some fashion to

11

one or more defendants, against wholly unidentified third parties").[4]

Moreover, the FTC's assertion of fraud in this allegation impermissibly rests on "report[s] to MoneyGram." AC ¶ 132. As the Court has explained, to allege underlying TSR violations under Rule 9(b), the FTC must "allege[] with particularity" that "specific telemarketing fraud occurred *in fact*," not merely that "people complained about or were accused of telemarketing fraud." Op. 23 (emphasis added). That is because proving the existence of complaints or accusations would not "prove a TSR violation." *Id.* Mere "[a]llegations about allegations" are insufficient. *Id.* at 22-23; *accord Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (explaining that plaintiffs "generally cannot satisfy the particularity requirement of Rule 9(b)" with "allegations [that] are 'based on secondhand information'" or "allegations based on hearsay"). Here, the FTC's fraud allegation rests not on its own knowledge but on "report[s] to MoneyGram" from others. AC ¶ 132.

Indeed, the allegations-about-allegations problem pervades the FTC's complaint. Setting aside the specific examples (which fail for the reasons above), the FTC's allegations of underlying TSR violations rest entirely on "complaints about [the alleged] scams." *Id.* ¶¶ 135, 148, 157, 162. And the FTC makes no attempt to explain how it verified the accuracy of those complaints before including them in this lawsuit. The FTC's allegations do not suggest that it tried to verify them at all, but simply pulled them from "databases" maintained by the money-transfer principals. *Id.* ¶ 37. Rule 9(b) does not allow fraud to be pleaded this way.

---

[4] The FTC's failure to plead the identities of the parties to the alleged misrepresentations also extends to all the scams discussed above (at 7-10). For each of those scams, the FTC vaguely refers to the person making the alleged misrepresentation as an unidentified "telemarketer," "scammer," or "caller[]" (or describes them as "a man" or "someone"); and it vaguely refers to the person to whom the alleged misrepresentation was made as an unidentified "customer," "consumer," or "victim" (or describes them as "a woman"). AC ¶¶ 131, 134, 136-40, 147, 149-54, 156, 158-59, 163. The absence of any particularized identifying information in these allegations provides an independent reason for dismissing them. *See supra* at 11.

*Advance-Fee Loan Scams.* The advance-fee loan scam allegations, which consist of a generalized description and two examples, *id.* ¶¶ 142-45, are not adequately alleged. Start with the example involving an unnamed "elderly consumer from South Carolina." *Id.* ¶ 145. The FTC does not allege "more than one interstate telephone call," thus failing to satisfy the definition of "telemarketing." 16 C.F.R. § 310.2(gg). This example also suffers from the particularity problem explained above: The FTC fails to identify the specific parties to the misrepresentation. Instead, it vaguely refers to the telemarketer as an unnamed "woman," and alleges that she falsely "identified herself" to an unnamed "consumer" "as being with Harborview Lenders in Seattle, Washington." AC ¶ 145. And the rest of the alleged facts in the example are just as vague: The FTC alleges that, after receiving calls from this unnamed "woman," the consumer unsuccessfully tried to transfer money to two unnamed "recipients in Canada" and then sent money to a third unnamed "recipient" in an unidentified location. *Id.* The most that can be gleaned about the parties to the fraud is that the sender was an "elderly consumer" from somewhere in "South Carolina," the caller was "a woman," and the unnamed "recipient" of the transfer *might* have been located somewhere "in Canada" (although even that is questionable given the FTC's failure to specify). Such non-particularized allegations do not satisfy Rule 9(b). *Cf. Tyler v. Residential Credit Sols., Inc.*, 2020 WL 5630474, at *3 (N.D. Ill. Sept. 21, 2020) ("[Plaintiffs] cannot clear the 9(b) threshold by alleging that some unknown person, at some point over the course of 11 years, somewhere in the state of Illinois, lied to them about their loan modification.").

The other advance-fee loan example—involving "call centers" "primarily in India" allegedly "owned" by "Shehzadkhan Khandadkhan Pathan" (AC ¶ 144)—is also deficient. The FTC vaguely references unnamed "consumers" who sent an unspecified number of money transfers to unspecified recipients at unspecified "Walmart locations" on unspecified dates

between "March 2017 [and] April 2019." *Id.* This falls far short of the particularity required by Rule 9(b). Not only does the FTC fail to identify the persons "to whom these misrepresentations were made," *Sears*, 912 F.2d at 893 (emphasis omitted), but the FTC also fails to allege the "when" and "where"—i.e., "the [date and] time the misrepresentations were made" and "the places at which the misrepresentations were made," *Uni*Quality*, 974 F.2d at 923-24. The FTC does not allege any location information at all. And "[f]or the 'when,' it is not enough to merely allege a period of months or years, or the duration of the activity," *Clark v. Robert W. Baird Co.*, 142 F. Supp. 2d 1065, 1072 (N.D. Ill. 2001), so the FTC's unadorned reference to a 25-month window is insufficient. *See, e.g.*, *GMAC, LLC v. Hillquist*, 2007 WL 9813068, at *3 (N.D. Ill. Oct. 19, 2007) (allegations of "misrepresentations at some point during [an] eight-month period" fail Rule 9(b)).

The remaining advance-fee loan allegations—in which the FTC generally describes advance-fee loan scams and then tallies up the number of complaints (AC ¶¶ 142-43)—lack the particularity required by Rule 9(b) for reasons described above. And like the other scam categories, they impermissibly rest on "*complaints* . . . about advance-fee loan scams." *Id.* ¶ 143 (emphasis added); *supra* at 12.

### 2. The FTC Does Not Properly Allege That Walmart Knew Or Avoided Knowing That Specific Transactions Violated The TSR

The TSR claims independently fail because the FTC still does not adequately allege that Walmart substantially assisted a telemarketer when it "kn[ew] or consciously avoid[ed] knowing" of the telemarketer's TSR violation. 16 C.F.R. § 310.3(b); *see* Op. 24-26. This element is rooted in standard aiding-and-abetting principles from tort and securities law, and it requires the FTC to show either "actual knowledge" of the TSR violation or "conscious avoidance" of such knowledge at the time of the substantial assistance. 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995); *see* 80 Fed. Reg. 77,520, 77,552 (Dec. 14, 2015).

14

The FTC has recognized that conscious avoidance of knowledge does *not* permit it to merely claim that a defendant "should [have] know[n]" of TSR violations. 60 Fed. Reg. at 43,852. Rather, conscious avoidance means "[t]aking *deliberate* steps to *ensure* one's own ignorance of a seller or telemarketer's [TSR] violations." Op. 24 (emphasis added) (quoting *FTC v. Chapman*, 714 F.3d 1211, 1219 (10th Cir. 2013)); *see* 60 Fed. Reg. at 43,852 (requiring "*deliberate* ignorance on the part of a person that the seller or telemarketer is engaged in an act or practice that violates [the TSR]" (footnote omitted)). That is consistent with the traditional aiding-and-abetting principles animating Section 310.3(b), which make clear that conscious avoidance requires the defendant to have "deliberately closed his eyes to what otherwise would have been obvious to him," *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1196 (2d Cir. 1989) (cited at 60 Fed. Reg. at 43,852 n.105), such that the lack of actual knowledge results "solely and entirely" from "a conscious purpose to avoid learning the truth," *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) (en banc) (cited at 60 Fed. Reg. at 43,852 n.105). Under this settled rule, the defendant must take "deliberate actions to avoid confirming a high probability of wrongdoing." Op. 24 (citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)).

The Court's dismissal order also made clear that the FTC must connect its allegations of knowledge or conscious avoidance to "an identifiable telemarketer's fraudulent act or practice." *Id.* at 25. That specificity requirement follows from the TSR's text, which provides for substantial-assistance liability only if the defendant knows or "consciously avoids knowing that '*the* seller or telemarketer' is violating the TSR." *Id.* (quoting 16 C.F.R. § 310.3(b)). Accordingly, the FTC cannot satisfy this element with generalized allegations of knowledge divorced from "particular transactions or subset of transactions," *id.* at 26 n.19—such as allegations about Walmart's "general awareness of criminal prosecutions involving money transfers at its stores, receipt of

15

consent orders, and the language in the TSR's preamble" noting "the general use of money transfers by telemarketers," *id.* at 26 n.18 (internal citations omitted). Instead, the FTC must allege "details about the majority of transactions in this case that would show that Walmart knew or consciously avoided knowing about underlying TSR violations." *Id.* at 25.

The FTC's new allegations fail to satisfy this element. Just as before, none of its allegations plausibly suggests that Walmart deliberately closed its eyes to obvious TSR violations as a way to avoid actual knowledge. The FTC still alleges precisely the opposite, admitting that Walmart has increasingly tried to *detect* and *prevent* misconduct by voluntarily implementing an "anti-fraud and consumer protection program" that dates back to at least November 2014. AC ¶ 58. And the FTC further admits that the "goal" of Walmart's program "was 'to educate, detect, investigate, respond, and deter consumer fraud against our customers.'" *Id.* ¶ 62. While the FTC claims that this program was not, in its view, perfectly "effective[]," *id.*, Walmart's various initiatives undermine any suggestion that it was deliberately seeking to avoid actual knowledge.

Rather than show conduct by Walmart deliberately seeking to avoid knowledge of TSR violations, the FTC mainly asserts that Walmart "should have" had knowledge because some money transfers exhibited "red flags" and "suspicious characteristics," such as high "dollar amounts," multiple transfers in "relatively short periods of time," and the use of "out-of-state IDs." *Id.* ¶¶ 126, 133. The FTC's red-flags theory fails for at least four reasons.

*First*, the alleged "red flags" do not themselves demonstrate inherently culpable conduct and thus do not show that Walmart was consciously avoiding actual knowledge of TSR violations. No law prohibits consumers from sending multiple money transfers or from using out-of-state IDs, and Walmart has no grounds to scrutinize customers who do so. Nor does Walmart have reason to interrogate customers sending money to individuals located in certain countries based on

stereotypes that an entire "countr[y]" presents a "high-risk" of "fraud." *Id.* ¶ 126. These unobjectionable characteristics do not establish conscious avoidance of knowledge.

*Second*, the FTC fails to heed this Court's admonition that it must allege "*details* about *the majority* of transactions in this case that would show that Walmart knew or consciously avoided knowing about underlying TSR violations." Op. 25 (emphasis added); *see id.* at 31 (noting the absence of allegations "about the vast majority of money transfers at issue in this case"). The Court was clear: Although the FTC alleged that "Walmart processed 'tens of millions of money transfers' each year" and that "hundreds of thousands of complaints were filed about Walmart's money transfers," the FTC failed to allege "how many of these transactions may have raised red flags." *Id.* at 25. Without that information, it was impossible to conclude that the red flags were so pervasive as to trigger "an inference of the requisite knowledge." *Id.* at 25-26.

The FTC's amended complaint does not fix this problem. The only change is that the FTC has broken up the "hundreds of thousands of complaints" into five categories, each with tens of thousands of complaints. *See* AC ¶¶ 135, 143, 148, 157, 162. But the core pleading deficiency remains: Even within those categories, the FTC fails to allege "*details* about *the majority* of [the] transactions" and "how many of [them] may have raised red flags." Op. 25 (emphasis added). Instead, the FTC just conclusorily asserts that some unspecified number of transactions "frequently exhibit one or more of the red flags." AC ¶¶ 134, 142, 147, 156, 161. That is not sufficient.

*Third*, as the FTC seems to admit, allegations about red flags show at most that Walmart *should have known* of unlawful conduct. *See id.* ¶ 126 (alleging that red flags "*should have* led Walmart to suspect fraud" (emphasis added)). But the FTC expressly disavowed a "should [have] know[n]" standard when promulgating the TSR, making clear that such a standard is not "appropriate" where "a person's liability to pay redress or civil penalties . . . depends upon the

wrongdoing of another person." 60 Fed. Reg. at 43,852. And that disavowal tracks the traditional rule—evidence showing "that a defendant reasonably should have had strong suspicions about the operative illegality is not sufficient" to create "an inference of 'deliberate ignorance.'" *United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th Cir. 2009); *see United States v. Ladish Malting Co.*, 135 F.3d 484, 488 (7th Cir. 1998) ("deliberate avoidance of knowledge" is not satisfied by "what a person 'should have known'"); *Global-Tech*, 563 U.S. at 770 (similar for willful blindness). Thus, absent allegations that the defendant deliberately acted to avoid knowledge, merely failing "to investigate a potential fraud," even "when faced with 'red flags,'" "does not constitute conscious avoidance." *In re Agape Litig.*, 773 F. Supp. 2d 298, 320 (E.D.N.Y. 2011).

*Fourth*, the FTC makes no effort to connect the alleged "suspicious characteristics" to actual *TSR violations*; instead, the FTC contends that these "characteristics . . . should have led Walmart to suspect *fraud*." AC ¶ 126 (emphasis added); *see also, e.g.*, *id.* ¶ 134 ("red flag of fraud"); *id.* ¶ 158 ("red flag for fraud"); *id.* ¶¶ 147, 153, 161 (referring to countries "known for fraud"). But as the Court explained, "[t]he TSR doesn't prohibit fraud generally" or even "all fraud involving phone calls." Op. 22. And nothing about these red flags reveals any unique connection to telemarketing as opposed to general fraud. That a money transfer had a "high[]" "dollar amount[]" (AC ¶ 126), for instance, would not indicate that the conduct inducing the transfer satisfied the elements of telemarketing. The FTC does not say otherwise; instead, it articulates the same kinds of "suspicious characteristics" elsewhere in the amended complaint as "indicators that the transfers were induced by fraud." *Id.* ¶ 103; *see id.* ¶ 3 ("characteristics" of "[f]raud-induced transfers"). These fraud-based red-flag allegations do not show "Walmart knew or consciously avoided knowing about underlying *TSR violations*." Op. 25 (emphasis added).

Aside from its red-flag allegations, the FTC offers a handful of other theories of knowledge

that may be quickly dispensed with. The FTC relies on its (misleading) assertion that "for years Walmart's policy or practice was to pay out transfers even if its employees suspected fraud"—indeed, the FTC repeats it verbatim six times. AC ¶¶ 133, 137, 144, 149, 150, 151. This Court already rejected that theory: "That Walmart associates were told to process certain suspicious transactions doesn't show that the company knew that those transactions were violating the TSR" and "isn't evidence of conscious avoidance of TSR violations." Op. 26 & n.18 (internal citation omitted). The FTC also adds a series of paragraphs reciting from the preamble to the 2016 TSR amendment, AC ¶¶ 112-21, but the Court made clear that "the language in the TSR's preamble" is insufficient to demonstrate knowledge, Op. 26 n.18. And the FTC's repeated refrain that Walmart employees failed to ask questions about its consumers' transfers, AC ¶¶ 128-30, 133, is insufficient as a matter of law. "Failing to display curiosity" or uncover wrongdoing "is not enough" to "support an inference of 'deliberate ignorance.'" *L.E. Myers*, 562 F.3d at 854. Rather, "the defendant must affirmatively 'act *to avoid learning the truth*.'" *Id.* (emphasis altered). Absent that, "Walmart's failure to ask questions . . . isn't evidence of conscious avoidance of TSR violations." Op. 26 (citing *L.E. Myers*, 562 F.3d at 854).

### 3. The FTC Does Not Properly Allege Substantial Assistance

Finally, the FTC fails to adequately allege that Walmart's conduct—processing money transfers for its customers—amounts to giving "substantial assistance" to telemarketers under the TSR. 16 C.F.R. § 310.3(b). This Court has already held that the "substantial assistance" element incorporates standard aiding-and-abetting principles from tort and securities law. Op. 28 (citing 60 Fed. Reg. at 43,851-52 & nn.96-98; *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017)). As explained in the lead case the FTC cited in promulgating the TSR, "substantial assistance" requires "*actively* participat[ing]" in the unlawful conduct. *Schatz v. Rosenberg*, 943 F.2d 485, 497 (4th Cir. 1991) (emphasis added) (cited at 60 Fed. Reg. at 43,851

19

n.97).  Or as the Supreme Court recently held, the "conceptual core" of aiding-and-abetting liability requires "that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'"  *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1223 (2023).

Drawing on those principles, this Court explained that "[p]rocessing routine transactions isn't substantial assistance."  Op. 29.[5]  That rule fully controls here.  The FTC still rests its substantial assistance theory on Walmart having "process[ed]" money transfers for consumers victimized by unlawful third-party telemarketers.  *See* AC ¶¶ 6, 122.  But as the FTC acknowledges, money transfers are generally routine and legitimate transactions, used by "'millions of customers'" to send money "around the world."  *Id.* ¶¶ 14, 89.  Customers use money transfers for "numerous reasons," including to "pay their rent," to "send money to family to pay tuition and medical bills," to "transfer money to friends," and even to "help victims in areas devastated by disasters."  80 Fed. Reg. at 77,545, 77,550.  Further, the FTC itself alleges that only a tiny fraction of money transfers processed by Walmart is even reported as "fraud-induced," with an even smaller fraction falling within the FTC's (overbroad) categories of "telemarketing."[6]  And as the FTC appears to recognize, Walmart processed the allegedly unlawful transfers at issue on the same terms—and in the same way—that it processed transfers for other customers.  In all cases,

---

[5] That understanding aligns with settled precedent holding that "[t]he provision of routine banking services to alleged fraudsters, even if it aids in the commission of the fraud, simply does not qualify as substantial assistance."  *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 416 & n.35 (S.D.N.Y. 2021) (collecting cases).  And that precedent reflects the broader point, explained by Judge Easterbrook for the Seventh Circuit and recently endorsed by the Supreme Court, that providing routine intermediary services to consumers does not fall within the "general[]" understanding of "culpable" conduct qualifying as substantial assistance.  *Twitter*, 143 S. Ct. at 1226 (citing *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003)).

[6] *Compare* AC ¶ 89 (alleging that Walmart processes "tens of millions of money transfers" *each year*, including "approximately 43 million money transfers" in 2016), *with id.* ¶¶ 37, 50 (alleging 226,679 "fraud-induced" complaints over *six-year* period); *id.* ¶¶ 135, 143, 148, 157, 162 (alleging 68,228 complaints over *six-year* period within the FTC's categories of telemarketing).

Walmart merely followed the directions of its customers.

Under standard tort principles, Walmart's processing of routine money transfers is precisely the sort of transactional conduct that is "patently insufficient to plead substantial assistance." *Berdeaux*, 561 F. Supp. 3d at 416. Indeed, the Third Restatement illustrates this point with a hypothetical example that serves to exculpate Walmart:

> Swindler establishes a fraudulent investment firm. Customer, unaware of the fraud, wires money to Swindler in hopes of making a profit. Swindler disappears with Customer's money. Customer sues Bank for aiding and abetting Swindler's misconduct. Customer offers evidence that Bank had documents revealing that Swindler's enterprise was fraudulent, and that Bank nevertheless processed customer's wire transfer. ***Customer's claim fails because Bank's possession of revealing documents is not "knowledge," and because processing a routine wire transfer, without more, is not substantial assistance of Swindler's wrongdoing.***

Restatement (Third) of Torts: Liability for Economic Harm § 28 illust. 5 (2020) (emphasis added). If anything, Walmart's alleged conduct here is even less culpable than that of the hypothesized Bank, which possessed documents specifically showing that the specific Swindler's enterprise was unlawful. The FTC alleges nothing like that here.[7]

In its prior decision, the Court held that to overcome this well-established body of precedent, the FTC would have to plausibly allege that Walmart's "knowledge" of the underlying TSR violations "transform[ed] the processing of money transfers" into "something other than routine." Op. 29-31. In the cases cited by the Court, the nature of the substantial assistance tended to involve far more than merely processing a customer's transaction. In *SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012), for example, the defendant CFO negotiated and drafted documents in

---

[7] The FTC's allegations that Walmart provided substantial assistance "[b]y *failing* to have [certain] policies, procedures, and practices," AC ¶¶ 63, 129 (emphasis added), are legally insufficient. As Walmart explained in its prior motion to dismiss (in an argument the FTC did not refute), the "failure to act may not serve as the basis for claiming that the defendant provided substantial assistance" as a matter of law. *Berdeaux*, 561 F. Supp. 3d at 417; *see* MTD 20-22.

connection with a series of fraudulent "sale-leaseback transactions." *Id.* at 212-14. But more fundamentally, the reasoning in all these cases rests on the defendant's "high degree of *actual knowledge* of the primary violation." *Id.* at 214 (emphasis added).[8]

The FTC's amended complaint does not clear that high bar. Indeed, setting aside conclusory assertions about what Walmart "knew or consciously avoided knowing," *e.g.*, AC ¶¶ 8, 141-42, not one factual allegation in the amended complaint states that Walmart processed a specific money transfer with actual knowledge of an underlying TSR violation. If anything, the FTC alleges the opposite, given that it criticizes Walmart for *not* affirmatively "determin[ing] whether a consumer's money transfer" violates the TSR. *See id.* ¶¶ 6-8.

Moreover, while the Court invited the FTC to specifically identify "stores where a large majority of money transfers were fraudulent," Op. 30-31, the FTC makes no attempt to do so. That is unsurprising—as far as Walmart is aware, no such store exists. The Court's invitation appeared to stem from an allegation in the original complaint that, at some unspecified point in time, certain unspecified locations "had fraud rates of more than 25 percent, 50 percent, or even 75 percent of their money transfer activity (based on the number or dollar amount of transactions) when taking into account confirmed fraud and linked or potential fraud." Compl. ¶ 46. Remarkably, the FTC repeats this cryptic allegation in the amended complaint, AC ¶ 53, but offers no elaboration or any facts to substantiate it. And it bears repeating that, across stores, the number of complaints reflect a vanishingly small percentage of transactions. *See supra* at 20 n.6.

The Court also suggested that Walmart "may have crossed the culpability line" "[w]hen

---

[8] *See Damian v. Heartland Bank & Tr. Co.*, 2021 WL 5937153, at *11 (N.D. Ill. Dec. 15, 2021) (explaining that a bank's conduct could amount to substantial assistance only "if [the bank] *actually knew*" of the underlying legal violation (emphasis added)); *In re First All. Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006) (same); *El Camino Res., Ltd., v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 914 (W.D. Mich. 2010) (same).

Walmart *employees* actively participated in fraud," but that the FTC would have to allege those transactions "with particularity."  Op. 31 n.23 (emphasis added).  The FTC has added three paragraphs in its amended complaint referencing Walmart employees.  AC ¶¶ 131, 132, 159.  In two of them, the FTC cannot even bring itself to allege that the employees were *in fact* complicit in fraud, and instead speculates that the employees *might* have been "potentially" complicit.  *Id.* ¶ 132; *see id.* ¶ 159 (referencing mere "accus[ation]").  And the single instance in which the FTC alleges that an employee was in fact "complicit," *id.* ¶ 131, does not demonstrate Walmart's culpability.  As the FTC well knows, Walmart *assisted* law enforcement to identify and stop this employee.  *See* Randy Wyrick, *Long Arm of the Law Reaches Deep Into the Heart of Texas to Nab Alleged Scammer*, Vail Daily (Jan. 27, 2018), https://perma.cc/Z2EG-47E5.

In any event, knowledge possessed by these employees cannot be imputed to Walmart. Such imputation is proper only if an employee "acquire[d] knowledge while 'acting within the scope of [the] employment' and 'with intent to benefit [the] employer.'"  *United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 486 F. Supp. 3d 1210, 1219 (N.D. Ill. 2020) (quoting *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cty.*, 965 F.2d 311, 316 (7th Cir. 1992)).  The FTC does not allege that any of these allegedly complicit (or potentially complicit) employees acted to benefit Walmart.  To the contrary, the whole thrust of the allegations is that the employees were blatantly violating Walmart's policies while "try[ing] to avoid detection" by Walmart.  AC ¶ 97.  There is no basis for imputing their knowledge to Walmart.  *See, e.g.*, *Sibley*, 486 F. Supp. 3d at 1219-20 (refusing to impute knowledge "when a rogue employee, acting in concert with [other fraudsters], acted to benefit himself").

The bottom line is that the FTC has added nothing to the amended complaint bearing on Walmart's "specific knowledge about the vast majority of money transfers at issue in this case."

Op. 31. It therefore fails to allege any "details" showing that "Walmart knew that the majority of transactions at issue were extraordinary" so as to "transform the processing of money transfers into substantial assistance." *Id.* For this reason too, the FTC's TSR claims should be dismissed.

### B. The FTC's Claim For Penalties Should Be Dismissed

Because the Court dismissed the FTC's prior TSR claim on the merits, it had no need to address the FTC's request for civil monetary penalties in connection with that claim. *Id.* at 46 n.33. The Court can follow the same course here given that the FTC's TSR claims remain deficient. But the FTC's request for civil penalties is independently flawed. Thus, even if the FTC is permitted to proceed on any of its TSR allegations, the penalties claim should be dismissed.

The FTC seeks "monetary civil penalties for each violation of the TSR" pursuant to Section 5(m)(1)(A) of the FTC Act. AC ¶ 1. That provision authorizes the FTC to seek civil penalties against anyone who "violates any rule under this subchapter . . . with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive *and is prohibited by such rule*." 15 U.S.C. § 45(m)(1)(A) (emphasis added). Thus, the FTC would need to allege not only Walmart's knowledge or deliberate ignorance of an underlying TSR violation—which it fails to do as explained above—but also that Walmart acted "with actual knowledge or knowledge fairly implied on the basis of objective circumstances" that its *own* conduct violated the TSR's substantial-assistance provision. *Id.* In other words, the FTC cannot seek penalties without showing that Walmart *knowingly* violated the law.

The amended complaint does not come close. As the Seventh Circuit has explained, "knowledge" of a legal violation is "fairly implied" under Section 5(m) only when the defendant "should have known [its] act was unlawful" based on "the text" of the law itself. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 978-79 (7th Cir. 2020). The FTC cannot satisfy that requirement: None of the supposed deficiencies in Walmart's anti-fraud program is mentioned in,

24

or directly implied by, "[t]he [TSR's] text." *Id.* at 979. And as the FTC has previously acknowledged, the agency cannot "impose a monetary penalty" unless the law provided the defendant with notice of "the *specific . . . measures* it needed to take [to comply]." FTC Br. 20, *LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018), 2017 WL 562771 (emphasis added).

Moreover, the arguments above showing that Walmart's conduct did not qualify as substantial assistance—and that Walmart did not possess the requisite degree of knowledge of underlying TSR violations—refute any fair implication that Walmart knew it was violating the law. *See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583-84 (2010) (confirming that uncertainty as to the law precludes penalties). As the Supreme Court has noted, when "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007). Thus, even if the FTC could somehow shoehorn its theory into the TSR's substantial-assistance provision, it cannot plausibly allege that Walmart knew or should have known, based on the TSR's text, that its failure to undertake the myriad measures identified by the FTC to root out telemarketing-based transactions was unlawful. At the very minimum, the FTC's claim for civil penalties under the TSR should be dismissed.

## II.    THE SECTION 5 CLAIM SHOULD BE DISMISSED

Although this Court's prior opinion allowed the FTC's Section 5 claim to proceed, the Court may revisit that conclusion in connection with this motion to dismiss. *See G&G Closed Cir. Events, LLC v. Castillo*, 327 F. Supp. 3d 1119, 1134 n.15 (N.D. Ill. 2018). Walmart respectfully submits that the Court should do so and dismiss the Section 5 claim as well.

### A.    The FTC Fails To Adequately Allege Ongoing Or Imminent Misconduct

The FTC's allegations do not satisfy the requirements for injunctive relief under Section

13(b) of the FTC Act, 15 U.S.C. § 53(b).  That provision allows the FTC to obtain an injunction only if the defendant "*is violating*, or *is about to violate*, any provision of law enforced by the [FTC]."  *Id.* (emphasis added).  In its prior opinion, the Court held that the FTC's allegations satisfied Section 13(b) after construing the statute to "mirror[]" the "common law standard for injunctive relief," under which the FTC can point to past conduct and show "some likelihood that Walmart's unlawful conduct will recur."  Op. 48-49.

As the Third Circuit has explained, that construction conflicts with the "plain language of Section 13(b)," which "authorizes the FTC to obtain injunctions" *and* requires the FTC to show "that a party 'is' violating or 'is about to violate' the law."  *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156-57 (3d Cir. 2019).  Interpreting Section 13(b) to mirror "the common law standard for an award of injunctive relief" ignores the "is violating, or is about to violate" language; the statute's reference to "injunctions" already incorporates the "likelihood of recurrence" standard from "the common law."  *Id.* at 157-58.  Accordingly, as the Seventh Circuit has cautioned, Section 13(b)'s requirement that the defendant "'is violating' or 'is about to violate'" the law requires "*ongoing or imminent* unlawful conduct."  *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772-73 (7th Cir. 2019) (emphasis added); *see also id.* at 774 (noting Section 13(b)'s "predicate requirement[]" that "a violation is ongoing or imminent"); *id.* at 783 (FTC must show "ongoing or imminent violation" to invoke Section 13(b)).  And as the FTC has acknowledged, the "ongoing or imminent" standard establishes a "higher threshold" than the "likelihood of recurrence standard"; the FTC must show "*imminent* recurrence."  FTC Br. 17, 35, *Shire*, *supra*, 2018 WL 3101438 (emphasis added).

Here, the FTC does not adequately allege an "ongoing or imminent" violation of Section 5.  15 U.S.C. § 53(b).  Instead, most of the FTC's allegations about Walmart's anti-fraud program

concern *past* conduct—specifically, Walmart's alleged failure to take certain specific anti-fraud measures years ago. *See* AC ¶¶ 58-111. To be sure, the FTC tacks on a general allegation that it "has reason to believe that Walmart is violating or is about to violate laws enforced by the FTC because, among other things, it engaged in its unlawful acts and practices repeatedly for several years." *Id.* ¶ 164. But this conclusory assertion ignores the "significant" structural improvements Walmart has embedded into its anti-fraud program over the years. *Id.*; *see, e.g.*, *id.* ¶¶ 64, 69, 71, 82. The FTC offers no reason to believe Walmart is about to abandon those improvements.

The FTC's new complaint adds a handful of allegations involving more recent money transfers and generally alleges that "even today, in some instances, Walmart employees" do not ask consumers questions about telemarketing or provide clear warnings. *Id.* ¶ 120; *see id.* ¶¶ 145, 153, 158, 163 (citing January 2022 example from South Carolina store, November 2022 example from New Jersey store, February 2023 example from a Florida store, and March 2023 example from a Colorado store). These few isolated instances—out of the "tens of millions of money transfers" Walmart processes each year, *id.* ¶ 89—do not establish an "ongoing or imminent" violation justifying sweeping injunctive relief.

### B. The FTC Fails To Adequately Allege An "Unfair" Act Or Practice

The FTC also fails to plausibly allege a Walmart "act or practice" that qualifies as "unfair" under Section 5(a). 15 U.S.C. § 45(a). As the Seventh Circuit has held, "a practice is unfair" for purposes of Section 5(a) "[1] when it offends established public policy and [2] when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel*, 540 F.2d at 293. *Spiegel* controls the analysis in this case, and the FTC does not adequately allege facts satisfying either of its prongs.

1.     In its prior ruling, the Court agreed that "*Spiegel* remains good law," but held that *Spiegel* merely "paraphrased the FTC's then-approach to [Section] 5," and that its interpretation

27

of Section 5(a) has been overtaken by Congress's 1994 enactment of Section 5(n). Op. 34-35. In the Court's view, Section 5(n) now "sets the standard for unfairness" under Section 5(a). *Id.* at 35.

Treating Section 5(n) as the exclusive test for unfairness under Section 5(a) misapprehends its text. As the Court acknowledged, Section 5(n) is "not an explicit definition of unfairness under [Section] 5(a)." *Id.* Instead, Section 5(n) is phrased as a negative limitation on the FTC's authority, providing that the FTC "shall have *no* authority" to deem a practice unfair "*unless*" it satisfies the statutory criteria. 15 U.S.C. § 45(n) (emphases added). In other words, Section 5(n)'s requirements are necessary rather than sufficient conditions of unfairness: In addition to satisfying those requirements, the practice must still be "unfair" as that term has been traditionally understood in Section 5(a). *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 259 (3d Cir. 2015).

To reach the contrary conclusion, the Court inverted Section 5(n)'s negative limitation into a positive authorization, reasoning that "[o]ne implication" of the "restriction" in Section 5(n) is that "when the conditions under [Section] 5(n) *are* met, the FTC *has* the power to find unfairness," and that the act or practice is "also unfair under [Section] 5(a)." Op. 36; *see also id.* at 40 (stating that by expressly listing various requirements in Section 5(n), "Congress excluded additional requirements"). That interpretation of the statute rests on a logical fallacy. As the Ninth Circuit has explained, "[a] statement that rights do *not* extend to a particular circumstance does not automatically mean that the rights [*do*] extend to all other circumstances. In logical terms, it is a fallacy to infer the inverse of a conditional from the conditional." *VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 884 (9th Cir. 2016) (emphasis added). In ordinary speech, if a law student is told she cannot obtain a degree unless she studies torts, contracts, and civil procedure, that does not mean those classes are the *only* requirements for graduation.

Section 5(n)'s history confirms that it was "intended" to provide only "a statutory *limitation*

28

on unfair acts or practices." S. Rep. No. 103-130, at 12 (1993) (emphasis added). Had Congress wanted to enact a comprehensive definition of "unfair," surrounding provisions of the FTC make clear that Congress knew how to do so. *See* 15 U.S.C. § 44 ("Definitions"); *id.* § 55 ("Additional definitions"); *id.* § 45(k) (defining terms using traditional definitional language). But Section 5(n) does *not* purport to set forth a comprehensive definition of "unfair," nor does it override limitations imposed by the term's ordinary meaning or prior interpretations of Section 5(a). Walmart accordingly asks the Court to reconsider its conclusion that Section 5(n)'s limitations on the FTC's authority to declare a practice "unfair" supplant the ordinary meaning of "unfair."

**2.** *Spiegel*'s interpretation of "unfair" thus still controls. And under that interpretation, the FTC's claim should be dismissed, because the FTC's theory of unfairness in this case has no support in "established public policy." *Spiegel*, 540 F.2d at 293. As the Eleventh Circuit has held, an "act or practice's 'unfairness' must be grounded in" a "well-established legal policy" embodied in a "statute, judicial decisions—i.e., the common law—or the Constitution." *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 (11th Cir. 2018). "An act or practice that . . . lacks such grounding is not unfair within Section 5(a)'s meaning." *Id.*

The FTC's theory is that Walmart's conduct is "unfair" because it provides intermediary money-transfer services allowing consumers to send money to recipients of their choice without implementing a sufficiently "effective" anti-fraud program. AC ¶¶ 1, 167-69. Even in its amended complaint, the FTC identifies no "'clear and well-established' polic[y] that [is] expressed in the Constitution, statutes, or the common law." *LabMD*, 894 F.3d at 1231.

To the extent that the FTC grounds its theory in "negligence," Op. 42, the common law only weakens its position. Under traditional negligence principles, an actor has no duty to guard against intentional or criminal misconduct of others unless (1) there is a special responsibility owed

to the victim created through a relationship of trust, or (2) the actor's own affirmative act created or exposed the victim to a high degree of risk of harm. *See* Restatement (Second) of Torts § 302B cmt. e (1965).

Although Walmart has voluntarily gone to great lengths to help its customers avoid fraud, it has no responsibility to protect against the criminal conduct of third parties. *See, e.g.*, *Interactive Intelligence, Inc. v. KeyCorp*, 546 F.3d 897, 901 (7th Cir. 2008) (noting that "a commercial relationship" with a customer "'does not create a special relationship'"). Nor did Walmart—by allowing customers to transfer money to others—affirmatively risk harming consumers. "[S]imply enabling consumers to use a legal service" does not create a risk of harm or give rise to a duty to protect consumers from such harm. *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) (rejecting liability of online retailer for selling firearms later used in criminal activities). For these reasons, courts have regularly held that intermediary services are not "liable for [the] failure to detect" third-party criminal activity. *GTE*, 347 F.3d at 659-61.[9] These cases refute any suggestion that Walmart's alleged conduct violated settled public policy.

**3.** The FTC also fails to allege that Walmart's conduct satisfies *Spiegel*'s additional requirement that Section 5 "unfair" conduct be either (1) "immoral, unethical, oppressive, unscrupulous," or (2) "substantially injurious to consumers." 540 F.2d at 293.

When defending its original complaint from dismissal, the FTC "waived argument that Walmart's fraud-prevention practices were immoral, unethical, oppressive, or scrupulous." Op.

---

[9] *See, e.g.*, *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947-48 & n.7 (11th Cir. 2014) (noting that an "unequivocal line of authority" holds that banks "have no independent duty to supervise transactions on a customer's account" or "to investigate transactions made by authorized agents of the account holder"); *Agape*, 773 F. Supp. 2d at 323 (collecting cases establishing that a bank has "no affirmative duty to detect and thwart [a customer's] fraud" "even where . . . the bank receives an explicit report of the fraud"); *see also Twitter*, 143 S. Ct. at 1227 ("[P]laintiffs identify no duty that would require . . . communication-providing services to terminate customers after discovering that the customers were using the service for illicit ends.").

42.  For good reason—no such blameworthy conduct is alleged here.  The FTC still does not allege that Walmart tricks or lies to consumers, nor that Walmart acts unjustly or corruptly.   Indeed, the FTC does not dispute that each money transfer processed at Walmart is authorized by the sender and is—on its face—legitimate and legal.  And the FTC concedes the alleged fraud occurs before consumers set foot into a Walmart location.  *See* AC ¶ 36 ("By the time they come to Walmart to send money transfers, [consumers] have already been deceived by fraudulent schemes.").

Nor does the FTC properly allege that Walmart's conduct is "substantially injurious to consumers."  *Spiegel*, 540 F.2d at 293.  Section 5(n) clarifies this requirement, limiting the FTC's authority to declare conduct unfair "unless the act or practice [1] causes or is likely to cause substantial injury to which is [2] not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).

Here, the FTC has failed to adequately plead that the "substantial injury" allegedly suffered by consumers is "not reasonably avoidable by consumers themselves."  *Id.*  As the FTC has explained, this requirement ensures that "consumer choice—the ability of individual consumers to make their own private purchasing decisions without regulatory intervention—[will] govern the market."  FTC Statement of Policy on the Scope of the Consumer Unfairness Jurisdiction (Dec. 17, 1980), *appended to In re Int'l Harvester*, 104 F.T.C. 949, 1070, 1074 (1984) (*1980 Policy Statement*).  Liability for "unfair" acts thus requires "some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision-making."  *Id.*; *see Am. Fin. Servs. v. FTC*, 767 F.2d 957, 976 (D.C. Cir. 1985) (an injury is "reasonably avoidable" if consumers can make a "free and informed" choice to avoid it).

The FTC fails to plausibly allege that the alleged injury is not "reasonably avoidable" by consumers.  15 U.S.C. § 45(n).  Nowhere does the FTC claim that Walmart's conduct "creates" an

"obstacle to the free exercise of consumer decision-making." *1980 Policy Statement*, 104 F.T.C. at 1074. To the contrary, the FTC's core theory is that Walmart did not sufficiently *inhibit* consumer decision-making by blocking customers from sending or receiving money transfers.

Nor does the FTC allege that Walmart "*takes advantage of* an obstacle to the free exercise of consumer decision-making." Op. 45 (quoting *1980 Policy Statement*, 104 F.T.C. at 1074). Although the Court suggested that Walmart has "t[aken] advantage of" the "scams that caused consumers . . . to send money to fraudsters," *id.* at 45-46, that is belied by Walmart's extensive efforts to root out those very scams. The FTC does not—because it cannot—allege that Walmart obtains any advantage by allowing its consumers to be defrauded by third-party criminals. To the contrary, the FTC claims that Walmart offers money-transfer services as a way to "driv[e] customer traffic to Walmart stores, thereby generating significant retail sales." AC ¶ 14. Deliberately letting its own customers be defrauded would undermine those efforts, alienate customers, and harm Walmart's bottom line.

It is deeply unfortunate that even a tiny percentage of Walmart customers are reportedly tricked into sending money to criminal fraudsters, despite Walmart's anti-fraud measures. Ultimately, though, the scam-inflicted harms detailed in the FTC's complaint are "reasonably avoidable by consumers themselves." 15 U.S.C. § 45(n).[10] By insisting that Walmart is liable, the FTC ignores the statute's emphasis on consumer choice and penalizes Walmart for not second-

---

[10] This Court's prior opinion cited precedent relieving plaintiffs from having to take "precautions" against "intentional" fraud. Op. 44 (quoting *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995)). But the tort of intentional fraud *lacks* a reasonable-investigation requirement; by contrast, Section 5(n) specifically imposes such a requirement on consumers, who must "reasonably avoid[]" injuries. 15 U.S.C. § 45(n). *Mayer* thus necessarily cabined its rule to claims of fraud *against the fraudster*, who must possess the intent to commit fraud. "Indeed," the court explained, "it is precisely *because* fraud has a mental-state requirement that it lacks a reasonable-investigation requirement." *Mayer*, 51 F.3d at 675. When, by contrast, the claim is not against a *fraudster*, but is instead against a *third party* under a statute that lacks that a mental-state requirement, consumers cannot be relieved of their duty of reasonable investigation.

guessing customers and blocking transfers they have freely chosen to undertake when it is the customers—not Walmart—who possess superior information about suspicious circumstances in which they are being asked to send money. The FTC's failure to satisfy Section 5(n)'s "reasonably avoidable" element provides yet another independent reason to reject its Section 5 claim.

### C. Imposing Liability On Walmart Under Section 5 Would Violate Due Process

Applying the FTC's broad theory of "unfair" conduct to Walmart in this case would violate the fair notice requirement of the Fifth Amendment's Due Process Clause. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This principle forbids finding a legal violation "if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited.'" *Id*. And for regulatory agencies enforcing broad statutory commands, "the [agency's] policy" must provide private parties with "fair notice" that the conduct at issue will be treated as "a violation of [the statute] as interpreted and enforced by the agency." *Id.* at 254.

Neither Section 5 nor any FTC regulation or guidance provided fair notice that Walmart's money-transfer practices are "unfair" simply because its anti-fraud program is, in the FTC's view, insufficiently protective. After all, "statutory terms like 'unfair'" are "'as vague as they come.'" *Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 625-26 (7th Cir. 2020) (citation omitted). Because the statutory term "unfair" is "elusive," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986), Congress gave the FTC the authority to develop its meaning through rulemaking and agency adjudication, *see* 15 U.S.C. §§ 45(b), 57a. Indeed, Congress wanted the FTC to promulgate "rules which define *with specificity* acts or practices which are unfair," *id.* § 57a(a)(1)(B) (emphasis added), precisely because of Section 5's uncertain breadth. *See Katharine Gibbs Sch. (Inc.) v. FTC*, 612 F.2d 658, 662 (2d Cir. 1979) (vacating FTC rule for not defining unfair acts

with specificity); S. Rep. No. 93-1408, at 31 (1974) (Conf. Rep.). Yet the FTC has not done so. The FTC has failed to provide fair notice that the term "unfair" encompasses the alleged shortcomings in Walmart's anti-fraud program.

Nothing in any statute or rule gave Walmart notice that these supposed "deficiencies"—which criticize, for instance, the specific content on Walmart's eMSAR interface, the length and specificity of its employee training programs, the specific content and size of the warnings provided to consumers—violate the FTC Act (which is silent as to each point). The FTC thus is trying to overhaul Walmart's anti-fraud program "to meet an indeterminable standard of reasonableness" without identifying any law that would have given Walmart notice "of what constitutes a 'reasonably designed' [anti-fraud] program." *LabMD*, 894 F.3d at 1236.

Nor was such notice created by either case cited in the Court's prior opinion. Op. 54-55. In *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010), the defendant, which operated a website for creating checks, "expected the site would be used for fraudulent purposes" and was "on notice as to the high [nearly 50%] rate of fraud," yet affirmatively "made [the checks] appear legitimate and credible in the eyes of consumers" "without proper verification" or any other safeguards. *Id.* at 1155-57. And in *FTC v. Wells*, 385 F. App'x 712 (9th Cir. 2010), the defendant "process[ed] debit transactions to consumers' bank accounts" even though the transactions "were unauthorized by consumers" and even though the defendant "received immediate reports of fraud" indicating "10 to 20 times the rates generally permitted for credit card and direct deposit transactions." *Id.* at 713. These allegations of direct knowledge are different in kind from the facts alleged here. These cases did not give Walmart fair notice that the alleged misconduct—which resulted in fraud reports for less than 0.08% of total transfers—would violate the FTC Act.

Because the due process question asks whether Walmart had sufficient notice of what *the*

*law* proscribes, the negotiated consent orders between the FTC and MoneyGram and Western Union are not sufficient to create notice either. Such orders do not adjudicate facts and are by definition *not* the law. To the contrary, in a consent order, "it is the agreement of the parties, rather than the force of the law upon which the complaint was originally based, that creates the obligations embodied in [the order]." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 522 (1986); *see Wyndham* 799 F.3d at 257 n.22 ("[C]onsent orders, which admit no liability and which focus on prospective requirements on the defendant, [are] of little use to it in trying to understand the specific requirements imposed by § 45(a)."); *In re Borg-Warner Corp.*, 101 F.T.C. 863, 939 n.27 (1983) ("[C]onsent orders are the product of negotiation and compromise and do not establish the criteria against which litigated cases are to be measured.").

At most, the orders reflect *the FTC's view* of what the FTC Act requires. But the FTC has never adopted that view in a regulation with the force of law. And the FTC's consistently self-serving interpretation of the Act is not a reliable guide to its true meaning. *See, e.g.*, *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348 (2021). That interpretation cannot provide the constitutionally required fair notice. For this reason, too, the Section 5 claim fails.

## III.    THE FTC LACKS CONSTITUTIONALLY VALID AUTHORITY TO INITIATE LITIGATION SEEKING MONETARY OR INJUNCTIVE RELIEF

Because the Supreme Court upheld the FTC's independence based on the view that the agency in 1935 exercised no executive power, it was unconstitutional for Congress in the 1970s to grant the FTC litigation authority that is quintessentially executive. This Court's prior opinion acknowledged the constitutional concern, but held that the proper remedy would be to sever the FTC's removal protections. *See* Op. 59-60 & n.39. Respectfully, that gets things backwards: The proper remedy is to void and sever the newly granted executive litigation authority that created the constitutional problem, not to invalidate preexisting removal protections that the Supreme Court

has upheld. The FTC thus lacks valid authority to bring this action.

      **1.**      Given the prior briefing and decision, the constitutional problem here can be quickly summarized. The "general rule" is that the President must have "unrestricted . . . power" to remove principal executive officers, with a lone "exception[]" for "multimember expert agencies that do not wield substantial executive power." *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2198-2200 (2020). And the Supreme Court has explained that "the FTC (as it existed in 1935)" fell within that exception *only* because it was "viewed . . . as exercising 'no part of the executive power,'" just "'quasi-legislative or quasi-judicial powers.'" *Id.* at 2198 (quoting *Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935)); *see* MTD 9-10. But in the 1970s, Congress purported to grant the FTC the power to sue in federal court for monetary and permanent injunctive relief. *See* 15 U.S.C. § 53(b) (1973); 15 U.S.C. §§ 45(m), 57b (1975). Such litigation powers are "quintessentially executive power[s] not considered in *Humphrey's Executor*." *Seila Law*, 140 S. Ct. at 2200; *see* MTD 10-13. Each of these grants of litigation authority is thus incompatible with the FTC's status as a valid independent agency: Because the FTC is protected from the President's removal power, it cannot constitutionally wield indisputably executive law-enforcement powers.

      This Court recognized that "[t]he litigation authority given to the FTC in the 1970s may have taken the Commission's for-cause protections past []the outermost constitutional limits." Op. 59. And insofar as the Court briefly suggested that "[t]here's reason to believe that the FTC may still fall within the exception" of *Humphrey's Executor*, *id.* at 59 n.39, those reasons cannot be reconciled with *Seila Law*. Although the *Humphrey's Executor* exception rested in part on the FTC's "organizational features," *id.* (citing 295 U.S. at 624), *Seila Law* makes clear that the exception is limited to "multimember expert agencies that *do not wield substantial executive power*," 140 S. Ct. at 2199-2200 (emphasis added). And while *Seila Law* questioned whether the

FTC wielded "too much" executive power even back in 1935, Op. 59 n.39 (citing 140 S. Ct. at 2199-2200 & nn.2, 4), it decided that the authority to bring enforcement suits "against private parties on behalf of the United States in federal court" is "a quintessentially executive power" that cannot be vested in an independent agency, *see* 140 S. Ct. at 2200. Finally, the *Humphrey's Executor* exception cannot be *extended* to allow the independent FTC to wield the post-1935 litigation powers, because it is not "a freestanding invitation for Congress to impose additional restrictions on the President's removal authority." *Id.* at 2206; *see* MTD 12-13.

**2.** The proper remedy for Congress's violation of the constitutional rule in *Seila Law* is to invalidate the improper granting of executive litigation powers to the otherwise-validly independent FTC, not to nullify the agency's preexisting removal protections that were upheld in *Humphrey's Executor*. Every relevant severability principle supports this result.

*First*, "an unconstitutional statutory amendment 'is a nullity' and 'void' when enacted, and for that reason has no effect on the original statute." *Barr v. American Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2353 (2020) (plurality op.); *see Bowsher v. Synar*, 478 U.S. 714, 734-35 (1986). Contrary to this Court's suggestion (Op. 60), this established rule applies even when, as here, the amendment would not be unconstitutional standing alone but is unconstitutional based on its interaction with the existing statutory scheme.

For example, in *Bowsher*, Congress initially created the Comptroller General as an officer who assisted Congress in its legislative functions and was removable by Congress. 478 U.S. at 728-32. Several decades later, Congress purported to grant the Comptroller General executive powers over federal spending. *Id.* at 732-34. As here, this created a constitutional problem because Congress granted executive powers to an officer who could not constitutionally exercise them given the preexisting removal restrictions. *Id.* at 727-32. In *Bowsher*, if the scheme from the

outset had made the Comptroller General removable by the President, then it would have been perfectly constitutional for the new law to grant him executive powers. Indeed, for that very reason, the parties disputed how to remedy the constitutional problem: Just as in this case, the government sought nullification of the old removal provisions, while the challengers requested invalidation of the new executive powers. *Id.* at 734. And the Court agreed with the challengers, deeming the newly granted executive powers "invalid[]" and declining to "[r]ecast the Comptroller General as an officer of the Executive Branch" "at this late date." *Id.* at 734-35.

So too in *Barr*. There, Congress originally enacted a content-neutral ban on robocalls to cell phones. 140 S. Ct. at 2344. Twenty years later, Congress amended the statute to exempt certain calls regarding the collection of government debt. *Id.* at 2344-45. By itself, the latter law would pose no constitutional concern. The First Amendment prohibits laws abridging speech, and the exemption instead *eliminated* an abridgement of speech about government debt. The reason the exemption nevertheless created a constitutional "issue" was because it *converted the preexisting ban* into a content-based restriction on all other robocalls. *Id.* at 2346-47, 2352-53. Thus, once again, the parties disputed the proper remedy: This time, the challengers sought nullification of the old restriction on all robocalls, while the government sought invalidation of the new exemption. *Id.* at 2349. And as in *Bowsher*, the *Barr* plurality decided to "treat[] the original, pre-amendment statute" as valid and to invalidate and sever the amendment so that "the original law stands." *Id.* at 2353 (citations omitted). The same remedial approach is warranted here.

*Second*, "when confronting a constitutional flaw in a statute," courts "try to limit the solution to the problem." Op. 61 (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 508 (2010)). Preventing the FTC from suing for monetary or injunctive relief is precisely tailored to the problem Congress created by vesting that executive power in an otherwise-valid, existing independent

agency.  In contrast, a remedial holding allowing the President to remove FTC Commissioners at will would be massively overbroad because it would destroy the agency's independence even with respect to its original, quasi-legislative, quasi-judicial powers, such as agency adjudications.

*Third*, after *Humphrey's Executor* but before the FTC was granted the litigation powers at issue, Congress enacted a severability clause instructing that, "[i]f any provision of [the FTC] Act . . . is held invalid, the remainder . . . shall not be affected thereby."  15 U.S.C. § 57 (enacted in Pub. L. No. 75-447, § 4, 52 Stat. 111, 114, 117 (1938)).  Under that clause's plain text, the subsequent invalid addition of executive litigation powers *shall not affect* the previously valid removal restrictions.  Even apart from that clause, "congressional intent" is evident here, *without* needing to imagine "a prior Congress's hypothetical intent," by "zero[ing] in on the precise statutory text." *Barr*, 140 S. Ct. at 2349-50.  Walmart's proposed remedy is simply to restore the FTC as Congress originally established it (independent but with no executive powers), rather than to create an FTC that *no Congress has ever blessed* (non-independent and vested with executive powers).[11]

*Finally*, this Court may not use severability to effectively overrule *Humphrey's Executor*. Whatever doubts *Seila Law* may have created about the validity of the FTC's removal protections *ab initio*, *see* Op. 61, *Humphrey's Executor* remains binding precedent upholding those protections.  *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).  Severing them cannot be reconciled with that precedent because it would eliminate the agency's independence even with respect to its

---

[11] By contrast, where an agency *from the outset* has been granted both executive powers and incompatible removal protections, courts necessarily must hypothesize whether Congress would have preferred an agency whose members are removable by the President or *no agency at all*—unsurprisingly, they have rejected the latter position and severed the removal protections. *See, e.g.*, *Seila Law*, 140 S. Ct. at 2207-11; *Collins v. Yellen*, 141 S. Ct. 1761, 1788 n.23 (2021). Likewise, while such agencies' actions are not necessarily tainted by the mere existence of the unconstitutional but severable removal protections, *see Collins*, 141 S. Ct. at 1788-89, this case presents the converse scenario:  Because the FTC's removal protections are *constitutional* under *Humphrey's Executor*, the FTC never "lawfully possess[ed]" the severable litigation powers that Congress invalidly granted it in the 1970s, and so this action is "void," *see id.* at 1787-88.

pre-1935 powers. At this rung of the judicial hierarchy, the only available remedy for Congress's unconstitutional amendments is to restore the state of affairs upheld in *Humphrey's Executor*, not to render that precedent a dead letter by converting the FTC into an arm of the President.

## IV. THE COURT SHOULD CERTIFY ANY ORDER DENYING DISMISSAL FOR INTERLOCUTORY APPEAL

To the extent that the Court adheres to its prior decisions regarding Walmart's Section 5 and constitutional arguments, the Court should certify its decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). As the Court explained in resolving Walmart's prior certification motion, these fundamental questions about the FTC's legal authority and the proper interpretation of the FTC Act reflect "contestable controlling legal questions," Order at 1-2 (ECF No. 68), and their "answers would affect the course of this litigation, by limiting if not outright jettisoning the FTC's Section 5 claim," *id.* at 2. The Court declined to certify its prior decision, however, because the FTC "filed an amended complaint and is trying again to state a distinct claim under the Telemarketing Sales Rule." *Id.* The Court concluded that it would "be more orderly to wait" to certify until the Court considered the allegations in the amended complaint, which "might lead to a clearer analysis and record for appellate review on both the TSR and Section 5 claims." *Id.*

In the interest of avoiding unnecessarily duplicative briefing, Walmart incorporates its prior arguments supporting Section 1292(b) certification and requests that, to the extent that any portion of this lawsuit survives dismissal, the Court certify its order for interlocutory appeal.

## CONCLUSION

For these reasons, the FTC's claims against Walmart should be dismissed with prejudice.

Dated: August 11, 2023

Respectfully submitted,

/s/ Sean M. Berkowitz

| | |
|---|---|
| Roman Martinez (*pro hac vice*) | Sean M. Berkowitz (ARDC No. 6209701) |
| Drew R. Wisniewski (ARDC No. 1016351) | Johanna M. Spellman (ARDC No. 6293851) |
| Jessica L. Saba (*pro hac vice*) | LATHAM & WATKINS LLP |
| Blake E. Stafford (*pro hac vice*) | 330 North Wabash Avenue |
| LATHAM & WATKINS LLP | Suite 2800 |
| 555 Eleventh Street, N.W. | Chicago, IL 60611 |
| Suite 1000 | (312) 876-7700 |
| Washington, D.C. 20004 | sean.berkowitz@lw.com |
| (202) 637-2200 | johanna.spellman@lw.com |
| roman.martinez@lw.com | |
| drew.wisniewski@lw.com | Hashim M. Mooppan (*pro hac vice*) |
| jessica.saba@lw.com | Krista Perry Heckmann (*pro hac vice*) |
| blake.stafford@lw.com | JONES DAY |
| | 51 Louisiana Avenue, N.W. |
| | Washington, DC 20001 |
| | (202) 879-3939 |
| | hmmooppan@jonesday.com |
| | kperryheckmann@jonesday.com |

*Counsel for Defendant Walmart Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 11, 2023, I filed the foregoing document with the Court through the Court's electronic filing system. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.

 */s/ Sean M. Berkowitz*
Sean M. Berkowitz