**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-3372 |
| v. | ) | |
| | ) | Hon. Manish S. Shah |
| WALMART INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION
TO WALMART'S MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................. 3

       A.     THE TSR'S CASH-TO-CASH MONEY TRANSFER BAN ............................... 5

       B.     RED FLAGS AND SUSPICIOUS CHARACTERISTICS OF MONEY
              TRANSFERS THAT VIOLATE THE TSR ........................................................ 7

III.    LEGAL STANDARDS .................................................................................... 9

IV.    ARGUMENT ................................................................................................ 10

       A.     THE FTC HAS ADEQUATELY ALLEGED THAT WALMART HAS
              ASSISTED AND FACILITATED UNLAWFUL TELEMARKETING
              TRANSACTIONS. ...................................................................................... 10

            1.     The FTC Has Adequately Pled Underlying TSR Violations ..................... 11

                 a.     The Telemarketing Scams Alleged in the Amended Complaint
                      Are Covered by the TSR ................................................................. 11

                 b.     The FTC Has Alleged Underlying TSR Violations with
                      Particularity ................................................................................... 17

            2.     The FTC Has Sufficiently Alleged Walmart's Knowledge or
                 Conscious Avoidance of TSR Violations ................................................. 21

            3.     The FTC Has Alleged that Walmart Provided Substantial
                 Assistance ................................................................................................ 26

            4.     The TSR Allegations Support a Claim for Civil Penalties ........................ 29

       B.     THE FTC'S SECTION 5 UNFAIRNESS CLAIM REMAINS SUFFICIENT ..... 30

            1.     The Amended Complaint Meets the Section 5(n) Standard ..................... 31

                 a.     Walmart Has Caused Substantial Injury to Consumers ................ 32

                 b.     Consumers' Substantial Injury Was Not Reasonably Avoidable ... 32

                 c.     Walmart's Alleged Misconduct Came with No
                      Corresponding Benefits ................................................................. 33

            2.     The Amended Complaint Satisfies Section 13(b) .................................... 33

            3.     Walmart Had Ample Notice Its Alleged Misconduct Was Unfair ........... 35

       C.     THE FTC HAS THE AUTHORITY TO BRING THIS SUIT ............................. 35

       D.     THE APPEAL OF ANY ORDER DENYING WALMART'S MOTION TO
              DISMISS IS BEST TAKEN AFTER A FINAL JUDGMENT
              ON THE MERITS ...................................................................................... 40

V.      CONCLUSION ............................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AMREP Corp. v. FTC*,
  768 F.2d 1171 (10th Cir. 1985) .......................................................................13

*AnchorBank, FSB v. Hofer*,
  649 F.3d 610 (7th Cir. 2011) ...........................................................................9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................9, 33

*Barr v. American Ass'n of Pol. Consultants, Inc.*,
  140 S. Ct. 2335 (2020)....................................................................................37

*Bowsher v. Synar*,
  478 U.S. 714 (1986).............................................................................37, 38, 39

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
  761 F.3d 732 (7th Cir. 2014) ..........................................................................20

*CFPB v. ITT Educ. Services, Inc.*,
  219 F. Supp. 3d 878 (S.D. Ind. 2015) .............................................................31

*CFTC v. Yukom Commc'ns Ltd.*,
  No. 19-cv-05416, 2021 WL 4477874 (N.D. Ill. Sept. 30, 2021)................19, 20

*Chang v. JPMorgan Chase Bank, N.A.*,
  845 F.3d 1087 (11th Cir. 2017) ......................................................................27

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)........................................................................................16

*Collins v. Yellen*,
  141 S. Ct. 1761 (2021).........................................................................36, 37, 39

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010).............................................................................36, 37, 38

*FTC v. AFD Advisors, LLC*,
  No. 13-cv-6420, 2014 WL 274097 (N.D. Ill. Jan. 24, 2014)...........................10

*FTC v. AFS, Inc.*,
  No. 91-cv-979, Trade Reg. Rep. ¶ 22,986 (N.D. Ala. May 2, 1991)................13

**TABLE OF AUTHORITIES – Continued**

Page(s)

*FTC v. Alcazar Networks Inc.*,
    No. 20-cv-2200 (M.D. Fla.) ............................................................................15

*FTC v. Amy Travel Serv., Inc.*,
    875 F.2d 564 (7th Cir. 1989) ..........................................................................21

*FTC v. Chapman*,
    714 F.3d 1211 (10th Cir. 2013) .......................................................................24

*FTC v. Consumer Health Benefits Ass'n*,
    No. 10-cv-3551, 2011 WL 3652248 (E.D.N.Y. Aug. 18, 2011) ......................25

*FTC v. Cuban Exch., Inc.*,
    No. 12-cv-5890, 2014 WL 3756358 (E.D.N.Y. July 30, 2014).......................16

*FTC v. Day Pacer LLC*,
    No. 19-cv-1984, 2023 WL 5671618 (N.D. Ill. Sept. 1, 2023)..................25, 26

*FTC v. Dupont Model Mgmt., Inc.*,
    No. 90-cv-7695, Trade Reg. Rep. ¶ 69,694 (E.D. Pa. Jan. 22, 1992)..............13

*FTC v. Freecom Commc'ns, Inc.*,
    401 F.3d 1192 (10th Cir. 2005) .........................................................................9

*FTC v. HES Merch. Servs. Co., Inc.*,
    No. 6:12-cv-1618, 2014 WL 6863506 (M.D. Fla. Oct. 26, 2016)...................22

*FTC v. Kochava Inc.*,
    No. 22-cv-377, 2023 WL 3249809 (D. Idaho May 4, 2023).............................36

*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010) ...................................................................32, 33

*FTC v. Nudge, LLC*,
    No. 2:19-cv-867, 2021 WL 3145700 (D. Utah July 26, 2021).........................25

*FTC v. Oates*,
    No. 91-cv-3854, Trade Reg. Rep. ¶ 23,025 (C.D. Cal. Mar. 17, 1992)............13

*FTC v. Overseas Unlimited Agency Inc.*,
    No. 88-cv-6157, Trade Reg. Rep. ¶ 22,751 (C.D. Cal. Nov. 16, 1989)............13

*FTC v. Pac. First Benefit, LLC*,
    472 F. Supp. 2d 974 (N.D. Ill. 2007) ...............................................................16

iii

## TABLE OF AUTHORITIES – Continued

Page(s)

*FTC v. PHLG Enterprises LLC*,
    No. 17-cv-0220 (M.D. Fla.) ............................................................15

*FTC v. Promotion Specialists Inc*,
    No. 90-cv-479, Trade Reg. Rep. ¶ 22,853 (M.D. Fla. May 8, 1991)................................13

*FTC v. Roomster Corp.*,
    No. 22-cv-7389, 2023 WL 1438718 (S.D.N.Y. Feb. 1, 2023) .........................................36

*FTC v. Subscriberbase Holdings, Inc.*,
    No. 13-cv-1527, 2013 WL 5406225 (N.D. Ill. Sept. 24, 2013)...........................................9

*FTC v. Uni-vest Fin. Servs., Inc.*,
    No. 89-cv-6382, Trade Reg. Rep. ¶ 23,020 (S.D. Fla. Nov. 13, 1991) ............................13

*FTC v. US Sales Corp.*,
    785 F. Supp. 737 (N.D. Ill. 1992) ...................................................................................13

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236 (3rd Cir. 2015) ..........................................................................................31

*Gertz v. Robert Welch, Inc.*,
    680 F.2d 527 (7th Cir. 1982) ..........................................................................................30

*Goldberg v. Rush Univ. Med. Ctr.*,
    929 F. Supp. 2d 807 (N.D. Ill. 2013) .............................................................................19

*Harper v. Wexford Health Sources, Inc.*,
    No. 14-cv-04879, 2017 WL 2672299 (N.D. Ill. June 21, 2017)......................................30

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935)........................................................................................................39

*In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*,
    155 F. Supp. 3d 772 (N.D. Ill. 2016) ...........................................................10, 17, 21, 27

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
    237 F.R.D. 173 (N.D. Ill. 2006)......................................................................................10

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019).............................................................................................15, 16

*Kornea v. J.S.D Mgmt., Inc.*,
    366 F. Supp. 3d 660 (E.D. Pa. 2019) ..............................................................................17

## TABLE OF AUTHORITIES – Continued

**Page(s)**

*LabMD, Inc. v. FTC*,
    894 F.3d 1221 (11th Cir. 2018) ...................................................31

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)........................................................27

*Martin v. Occupational Safety & Health Rev. Comm'n*,
    499 U.S. 144 (1991)...................................................................16

*Michaelson v. CBE Grp., Inc.*,
    No. 13-cv-50228, 2015 WL 2449038 (N.D. Ill. May 21, 2015)........................17

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) ...........................................10, 17, 19, 21

*Santamarina v. Sears, Roebuck & Co.*,
    466 F.3d 570 (7th Cir. 2006) .......................................................35

*SEC v. Bluepoint Inv. Counsel, LLC*,
    No. 19-cv-809, 2021 WL 719647 (W.D. Wis. Feb. 24, 2021) .........................10

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020)....................................................36, 37, 38

*Southwest Sunsites, Inc. v. FTC*,
    785 F.2d 1431 (9th Cir. 1986) .....................................................13

*Spiegel, Inc. v. FTC*,
    540 F.2d 287 (7th Cir. 1976) ......................................................31

*Taha v. Int'l Bhd. of Teamsters, Local 781*,
    947 F.3d 464 (7th Cir. 2020) ....................................................9, 28

*United States v. Cancer Treatment Centers of Am.*,
    No. 99-cv-8287, 2003 WL 21504998 (N.D. Ill. June 30, 2003).......................19

*United States v. Dish Network, L.L.C.*,
    75 F. Supp. 3d 942 (C.D. Ill. 2014) ...............................................21

*United States v. Dish Network LLC*,
    954 F.3d 970 (7th Cir. 2020) ......................................................28

*United States v. Dish Network, L.L.C.*,
    667 F. Supp. 2d 952 (C. D. Ill. 2009) ............................................29

## TABLE OF AUTHORITIES – Continued

Page(s)

*United States v. Molina Healthcare of Ill., Inc.*,
  17 F.4th 732 (7th Cir. 2021) ...................................................................19, 27

*United States v. National Fin. Servs., Inc.*,
  98 F.3d 131 (4th Cir. 1996) ...............................................................................29

*United States v. One Parcel of Land*,
  965 F.2d 311 (7th Cir. 1992) .............................................................................28

*United States v. Prochnow*,
  No. 1:02-cv-0917-JOF, 2005 WL 8154273 (N.D. Ga. Dec. 2, 2005) ..............................29

*Vidimos, Inc. v. Wysong Laser Co., Inc.*,
  179 F.3d 1063 (7th Cir. 1999) ...........................................................................35

## STATUTES

15 U.S.C. §§ 41-58 (FTC Act).................................................................... passim

15 U.S.C. § 6101 (Telemarketing and Consumer Fraud and Abuse Prevention Act) ........... passim

## RULES, REGULATIONS, AND PUBLIC LAW

16 C.F.R. § 310.2(gg) ............................................................................11, 15

16 C.F.R. § 310.3(b) ...................................................................................10

16 C.F.R. 310.4(a)(10) .................................................................................27

60 Fed. Reg. 43,842 ....................................................................................13

60 Fed. Reg. 43,844 ....................................................................................13

68 Fed. Reg. 4,580 .....................................................................................14

68 Fed. Reg. 4,589 ..................................................................................12, 14

68 Fed. Reg. 4,656 .....................................................................................12

80 Fed. Reg. 77,520 ....................................................................................14

80 Fed. Reg. 77,544 ....................................................................................14

80 Fed. Reg. 77,547 ..............................................................................14, 20, 30

vi

## TABLE OF AUTHORITIES – Continued

**Page(s)**

80 Fed. Reg. 77,548 ...................................................................................................14

80 Fed. Reg. 77,551 ...................................................................................................27

80 Fed. Reg 77,552 ..............................................................................................27, 30

H.R. Rep. 103-20 .......................................................................................................13

S. Rep. No. 103-80.....................................................................................................13

Pub. L. 107-56, 115 Stat. 272 § 1011(b)(3) ..............................................................14

## I.     INTRODUCTION

The Federal Trade Commission ("FTC" or "Commission") filed this action seeking to address Walmart's years-long refusal to adequately secure its money transfer services, which has resulted in millions of dollars in consumer losses from illegal telemarketing and fraud-induced money transfers.  After Walmart moved to dismiss the FTC's original complaint, the Court rejected the bulk of Walmart's arguments in a thorough and soundly reasoned opinion.  It held that the Commission has the authority to bring this suit; its allegations regarding "a series of failings in Walmart's fraud prevention and mitigation systems" raised a plausible unfairness claim under Section 5 of the Federal Trade Commission Act ("FTC Act"); and that injunctive relief may be available if the FTC should prevail.  [52] at 43–46, 50, 62.[1]

As for the claim that Walmart assisted and facilitated violations of the Telemarketing Sales Rule ("TSR"), the Court concluded that the FTC needed to provide more detail about the underlying TSR violations and Walmart's knowledge or conscious avoidance of those violations. It dismissed this count and allowed the FTC to replead, noting that the FTC need not "allege the details of thousands of TSR violations"—it would be adequate to provide "examples of transactions" or describe "in more detail categories of fraud that hit all the elements of a TSR violation[.]" *Id*. at 23.  Heeding the Court's directive, the FTC filed an Amended Complaint that does exactly that: it includes detailed descriptions of several categories of telemarketing fraud that violate the TSR, and for each category, it provides fourteen specific examples of representative transactions executed through money transfers at Walmart stores.  Furthermore, the Amended Complaint describes the red flags and suspicious characteristics that clearly

---

[1]     Bracketed numbers refer to entries on the Court's docket, and page numbers correspond to those in the CM/ECF header on filings.

distinguish those categories of illegal transactions from routine money transfers, and it also identifies the specific red flags present in the representative examples. Processing such transfers in the face of those red flags and suspicious characteristics converts an "ordinary transaction" into an "extraordinary" one and qualifies as substantial assistance. *See id.* at 29–31.

Finally, the Amended Complaint provides additional details about Walmart's failure for years to do anything to attempt to comply with the TSR's ban on cash-to-cash money transfers in telemarketing transactions. That ban applies to all telemarketing transactions—not just those involving fraud. The TSR's ban imposes affirmative obligations on money transfer businesses to detect and prevent such transactions irrespective of whether they were induced by fraud.

In the face of the Commission's detailed allegations describing, with particularity, Walmart's knowledge and role in facilitating illegal telemarketing schemes, Walmart has again moved to dismiss the FTC's TSR claims, arguing that the Amended Complaint's allegations still are not enough. It attempts to raise the pleading bar even higher, nitpicking about a variety of purported deficiencies, and essentially demanding the FTC prove its claims at the pleading stage. The Court should reject each of Walmart's arguments and rule that the Commission has plausibly alleged a series of assisting and facilitating claims under the TSR.

The Court should similarly deny Walmart's renewed motion to dismiss the FTC's Section 5 claim, which merely rehashes the arguments raised and rejected by the Court in connection with the company's first motion to dismiss. Walmart does not offer any new reasons for reconsidering the previous rulings, which are now the law of this case.

Because the Amended Complaint includes comprehensive, detailed allegations that raise plausible claims that Walmart has violated the FTC Act and the TSR, the Court should deny Walmart's motion.

## II.     BACKGROUND

The FTC's response to Walmart's first motion to dismiss described the many allegations in the original complaint detailing the deficiencies in Walmart's anti-fraud program.  *See* [43] at 14–19.  With that factual backdrop, in its March 27 Order, [52] ("Order"), the Court properly found that the FTC's original complaint stated an unfairness claim under Section 5, because it plausibly alleged that "Walmart either didn't establish or failed to follow an effective antifraud program, didn't train or adequately supervise its employees, failed to adequately monitor suspicious activity. . . . and Walmart routinely either didn't warn consumers about fraud at all or provided insufficient warnings."  [52] at 43.  Based on those and other alleged failings, and because "Walmart withheld crucial information" from its customers, the Court found it "reasonable to infer that victims of fraud who used Walmart's services were not making fully informed choices."  *Id.* at 44, 46.  In reaching that conclusion, the Court also found that injunctive relief may be available to the Commission (*id.* at 50), that Walmart "had fair notice that lax fraud prevention that injured consumers was forbidden," (*id.* at 57), and that Walmart's novel constitutional argument seeking to invalidate the Commission's authority to bring this case must fail, (*id*. at 60–62).

With respect to the TSR claims the Court previously dismissed without prejudice, the FTC's Amended Complaint addresses each of the deficiencies identified in the Court's Order.  First, in response to the Court's guidance that the "agency could have plausibly alleged underlying TSR violations through examples of transactions that fit the TSR's definitions, or by describing in more detail categories of fraud that hit all the elements of a TSR violation perpetrated using Walmart's services[,]" [52] at 23, the FTC added detailed factual allegations doing exactly that.  For example, the Amended Complaint provides descriptions of the following

types of scams or "categories of fraud," and also includes individualized examples that allege all the elements of the underlying TSR violations:[2] (1) lottery, prize, and sweepstakes scams ([62] ¶¶ 134–40); (2) advance-fee loan scams (*id*. ¶¶ 142–45); (3) government imposter and utility scams (*id*. ¶¶ 147–54); and (4) person-in-need, grandparent, and emergency scams (*id*. ¶¶ 156–59). The Amended Complaint further describes other "categories of fraud" that violate the TSR, such as romance scams, tech support scams, Good Samaritan scams, elder abuse scams, and debt relief scams. *Id*. ¶¶ 161–63. Indeed, the Amended Complaint provides details from a recent romance scam victim who lost over $5,000 sending money from a Walmart location to Nigeria to help with the purchase of a replacement passport for a purported paramour. *Id*. ¶ 163. In addition, the Amended Complaint includes descriptions about two other "categories of fraud"—a housing rental scam (*id*. ¶ 132) and a secret shopper employment scam (*id*. ¶ 131)—that involved complicit or potentially complicit Walmart employees.

The Amended Complaint alleges that all of the above schemes violate the TSR because they involve telemarketers or sellers who initiate or receive telephone calls to or from a customer or donor in connection with a plan, program, or campaign to induce the purchase of goods or services, or to solicit charitable contributions, through the use of one or more telephones and which involve more than one interstate telephone call. *Id*. ¶¶ 123, 125, 129, 131–32, 136, 140, 144–45, 149–54, 158, 161, 163.

The factual allegations in the Amended Complaint demonstrate how these and other types of scams typically violate the TSR in one or more ways, including that the telemarketers or

---

[2] As indicated in the Amended Complaint, these are just *some* representative examples of money transfers that were sent from and/or received at Walmart locations and that Walmart knew or consciously avoided knowing were related to telemarketing schemes in violation of the TSR. [62] ¶¶ 141, 146, 155, 160.

sellers have: (1) accepted cash-to-cash money transfers as payments for goods or services offered or sold through telemarketing or for charitable contributions solicited or sought through telemarketing (16 C.F.R. § 310.4(a)(10) (Count II)); (2) made false or misleading statements to induce people to pay for goods, services, or charitable contributions (16 C.F.R. § 310.3(a)(4) (Count III)); and/or (3) requested or received advance fees for a loan or other extension of credit while guaranteeing or representing a high likelihood of success in obtaining a loan or extension of credit (16 C.F.R. § 310.4(a)(4) (Count IV)). *See also* [62] ¶¶ 122–25.

### A.    THE TSR'S CASH-TO-CASH MONEY TRANSFER BAN

In addition to assisting and facilitating the TSR's false and misleading claims prohibition (Count III) and advance-fee loan restrictions (Count IV), the Commission also alleges that Walmart assisted and facilitated violations of the TSR's cash-to-cash money transfer ban (Count II). Because Walmart failed to address that allegation in its initial motion to dismiss, and the Court's order therefore did not address the cash-to-cash ban in detail, the Amended Complaint includes an entirely new section addressing solely that violation. [62] at ¶¶112–21. The 2015 Statement of Basis and Purpose ("SBP") explained in detail that the Commission was amending the TSR to add the cash-to-cash money transfer ban because it had determined that such transfers were routinely used by perpetrators of telemarketing fraud—and not by legitimate telemarketers. *See id.* ¶ 113. As of June 2016, the TSR has prohibited all cash-to-cash money transfers in telemarketing transactions—*not just in transactions that are fraud-induced*. *Id.* ¶¶ 6, 112.

In amending the TSR, the Commission made it clear that businesses like Walmart—that provide money transfer services—must take affirmative steps to comply with the ban, such as by asking consumers questions about whether their transfers are related to telemarketing, the consumer's relationship with the receiver, and the reasons for sending the money, as well as

warning them that such transfers are illegal. *Id*. ¶¶ 115–16. Because the ban is not limited to transfers that otherwise violate the TSR, no red flags indicative of fraud are necessary to trigger these requirements. Indeed, the Commission declined to provide money transfer businesses like Walmart a safe harbor from the ban. *Id*. ¶ 115. As a result, to allege an underlying TSR violation for this type of claim, the FTC need only allege that Walmart improperly processed money transfers in connection with telemarketing transactions. The transaction need not display any red flags or even be fraud-induced; it need only involve telemarketing.

Just seven months after the cash-to-cash ban went into effect, the measures outlined in the SBP were incorporated into the *Western Union* order. *Id*. ¶¶ 6, 44, 117. Walmart received a copy of that order in January 2017. *Id*. ¶ 44. Even so, for years, Walmart did not take any steps to ensure that it was complying with that ban, including by instructing its associates to ask senders questions about whether their transfers were related to telemarketing and declining to process such transfers, and to warn consumers that the TSR prohibits cash-to-cash money transfers as a form of payment for telemarketing transactions. *Id.* ¶¶ 6, 44, 76, 87, 117, 140. Instead, Walmart did nothing whatsoever to comply with the TSR's cash-to-cash ban until at least March 2019. *Id*. ¶¶ 118–19. As a matter of law, that is substantial assistance of violations of the cash-to-cash ban.

Even after Walmart made some attempts to comply with the ban in March 2019, in some cases, Walmart's employees still do not ask senders whether their transfers are related to telemarketing or provide them with a clear and conspicuous warning that the TSR prohibits money transfers related to telemarketing—even though Walmart is required to do both under the *MoneyGram* and *Western Union* orders. *Id.* ¶¶ 7, 76, 120, 129, 145, 153–54, 158, 163; *see also* [52] at 9–10 & n.7. Indeed, the Amended Complaint includes recent examples of consumers

who sent banned transfers and were not asked the required questions or provided with the required warnings. *See, e.g.*, *id.* ¶¶ 153, 158, 163.

**B.     RED FLAGS AND SUSPICIOUS CHARACTERISTICS OF MONEY TRANSFERS THAT VIOLATE THE TSR**

The Amended Complaint also addresses the Court's concern that the original complaint "fail[ed] to allege either the knowledge or substantial assistance required to state a claim." [52] at 23–24. The Amended Complaint details the red flags and suspicious characteristics of fraud-induced transfers and provides examples of how Walmart knew about or consciously avoided knowing about those red flags in processing specific transfers. Indeed, for years, even when Walmart associates spotted the red flags and suspected fraud, they were instructed to still pay out the transfer.

A typical money transfer ranges from approximately $250 to $400 and is sent to the same family members or friends once or twice a month. [62] ¶ 126. By contrast, money transfers that are used in the schemes detailed in the Amended Complaint often involve much higher dollar amounts, multiple transfers in relatively short periods of time, back-to-back transfers, flipping, transfers to high-risk countries known for fraud (such as Nigeria or Jamaica), recipients of transfers using fake or out-of-state IDs, transfers between senders and receivers with no apparent relationship, the use of name or address variations, and/or switching between different money transfer systems. *Id.* ¶¶ 3, 74, 103, 126, 134, 136–140, 142, 145, 147, 149, 153, 156, 161, 163.

The Amended Complaint provides multiple examples, in connection with identified telemarketing schemes, of money transfers that exhibited red flags and highly unusual characteristics that still were processed by Walmart locations. One involves the money transfer activity in a Jamaica-based prize scam, which exhibited numerous red flags. *Id.* ¶¶ 136–40. First, the perpetrators were able to pick up at Walmart locations in the greater Biloxi, Mississippi

7

area 128 money transfers from August 2016 to July 2018 totaling over $134,800 that were sent by 24 different people, including 58 MoneyGram transfers. In many instances, they used the same driver's license numbers but with different spelling variations of their names. At least two of the victims, whose experiences are described in the Amended Complaint, sent an extraordinary amount of money to the perpetrators in a short period of time—also from Walmart locations. *Id.* ¶¶ 137, 139–40. One of those victims sent 72 money transfers totaling more than $108,400 from just a single Walmart location in an eight-month period. This included twelve transfers totaling over $47,845 in October 2016 alone, with an average transaction amount of $3,987, and three transfers totaling at least $9,887 in just a single day in February 2017. *Id.* ¶ 139. Another victim sent thirteen Walmart2Walmart transfers—including twelve money transfers from one Walmart location (sometimes more than one in a single day)—totaling at least $5,864.18 in a three-month period. *Id.* ¶ 140. In addition, from July 2017 to July 2018, one of the scheme's perpetrators sent at least 130 money transfers totaling $76,360, including suspicious high-dollar money transfers from Walmart stores in the greater Biloxi, Mississippi area, to more than three dozen different individuals in Jamaica—a country long known by Walmart to be high risk because of sweepstakes and lottery schemes operating there. *Id.* ¶ 138.

The Amended Complaint includes additional examples demonstrating on their face the extraordinary nature of certain telemarketing-related money transfers, such as the use of multiple fake IDs in picking up high-dollar transfers, including back-to-back transfers, amounting to millions of dollars (*id.* ¶¶ 34–35, 149–50), individuals sending extraordinarily large amounts of money (*id.* ¶¶ 131–32, 152–54, 159, 163), and individuals sending money transfers to high-risk countries known for fraud (*id.* ¶¶ 138, 153–54, 163). The Amended Complaint also includes examples where victim-senders made statements that should have alerted properly trained

Walmart associates of the underlying TSR violations, such as when a sender indicated that he was sending money to obtain a prize (*id*. ¶ 140) or to someone he did not know (*id*. ¶ 158).

These examples address the Court's concern that Walmart was not just processing "routine transactions," but instead was, at a minimum, consciously avoiding the red flags of underlying frauds. Of course, even if Walmart associates spotted red flags and suspected fraud, they were instructed to still pay out the transfers. *Id*. ¶¶ 4, 62–63, 68, 85, 133, 137, 144, 149–51, 161. This demonstrates both knowledge and substantial assistance.

## III.    LEGAL STANDARDS

In considering Walmart's motion to dismiss, the Court must read the complaint in the light most favorable to the FTC, accept all the factual allegations as true, and draw all reasonable inferences in the FTC's favor. *See Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). "A 12(b)(6) motion does not evaluate 'whether a plaintiff will ultimately prevail,' but, instead, whether the plaintiff is entitled to present evidence in support of the claims." *FTC v. Subscriberbase Holdings, Inc.*, No. 13-cv-1527, 2013 WL 5406225, at *1 (N.D. Ill. Sept. 24, 2013) (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011)).

Rule 8 only requires "facts showing a plausible . . . entitlement to relief." *Taha*, 947 F.3d at 469. It does not require "detailed factual allegations," and a claim is plausible on its face when factual allegations support a reasonable inference that the defendant is liable for the misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Rule 9(b), which the Court concluded applies to allegations of the underlying TSR violations,[3] [52] at 20–21, requires that allegations of fraud be plead with particularity; this

---

[3]    *But see FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005) (observing that Rule 8 applies to deception claims under the FTC Act, which are not fraud claims

"ordinarily" involves describing the "'who, what, when, where, and how' of the fraud," but the standard is flexible. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) ("[C]ourts and litigants often erroneously take an overly rigid view of the formulation"). In the Seventh Circuit, "a plaintiff who provides a 'general outline of the fraud scheme' sufficient to 'reasonably notify the defendants of their purported role' . . . satisfies Rule 9(b)." *In re Rust-Oleum Restore Mktg., Sales Practices & Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 812 (N.D. Ill. 2016) (St. Eve, J.) (quoting *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 237 F.R.D. 173, 175 (N.D. Ill. 2006)) (collecting cases).

## IV.     ARGUMENT

### A.     THE FTC HAS ADEQUATELY ALLEGED THAT WALMART HAS ASSISTED AND FACILITATED UNLAWFUL TELEMARKETING TRANSACTIONS.

The factual allegations in the Amended Complaint are more than sufficient to state plausible claims that Walmart assisted and facilitated violations of the TSR's cash-to-cash ban (Count II), false and misleading claims prohibition (Count III), and advance-fee loan restrictions (Count IV). To state its assisting and facilitating claims, the FTC must allege (1) underlying TSR violations, (2) that Walmart knew or consciously avoided knowing about these unlawful transactions, and (3) substantial assistance by Walmart. *See* 16 C.F.R. § 310.3(b). Per the Court's directive, the Commission pleads, with particularity, "categories of fraud," as well as a multitude of examples of specific TSR violations facilitated by Walmart. These allegations easily satisfy Rule 9(b). *See* [52] at 23; *see also SEC v. Bluepoint Inv. Counsel, LLC*, No. 19-cv-809, 2021 WL 719647, at *15 (W.D. Wis. Feb. 24, 2021) (for "a fraudulent scheme involving

---

because scienter, reliance, and injury are not elements); *FTC v. AFD Advisors, LLC*, No. 13-cv-6420, 2014 WL 274097, at *1 (N.D. Ill. Jan. 24, 2014) (applying Rule 8 to deception claims under the TSR).

numerous transactions over a period of years," the plaintiff "need not plead specifics with respect to every instance of fraud" and providing "representative examples" is adequate). Furthermore, for each of these representative violations, the FTC has set forth specific characteristics of these transactions and why properly trained Walmart associates should have identified them as unlawful money transfers. And despite this knowledge, Walmart continued to process these transfers, turning a blind eye to the obvious red flags and providing an essential service to fraudsters and telemarketing scammers. As the Court observed, "an ordinary transaction becomes extraordinary—and processing it can constitute substantial assistance—if a defendant knows enough about the underlying fraud." [52] at 29.

### 1. The FTC Has Adequately Pled Underlying TSR Violations.

The Amended Complaint sets forth several categories of unlawful money transfers that Walmart routinely processes, and it provides representative examples of such transactions involving lottery, prize, and sweepstakes scams ([62] ¶¶ 134–40); advance-fee loan scams (*id.* ¶¶ 142–45); government imposter and utility scams (*id.* ¶¶ 147–54); person-in-need, grandparent, and emergency scams (*id.* ¶¶ 156–59); romance scams (*id.* ¶ 163), housing rental scams (*id.* ¶ 132), and secret shopper employment scams (*id.* ¶ 131).

### a. The Telemarketing Scams Alleged in the Amended Complaint Are Covered by the TSR.

As a threshold matter, all of these transactions involved "telemarketing" under the TSR because they had the purpose of "induc[ing] the purchase of goods or services or a charitable contribution." *See* 16 C.F.R. § 310.2(gg). Every consumer making a payment in response to a telemarketing scheme described in the Amended Complaint is paying for something they are led to be believe is valuable or necessary—whether it be an item of value or assistance addressing a need. The housing scam, for example, induced payment of rent for a non-existent property. [62]

11

¶ 132. Romance, person-in-need, grandparent, and emergency scams typically involve inducement to pay for goods or services like hospital bills or plane tickets.[4]  In the romance scam example in the Amended Complaint, the consumer was induced to pay for a passport.  *Id*. ¶ 163.  In the grandparent scam examples, victims were induced to pay for services like bail or release from immigration detention.[5]  *Id*. ¶¶ 158–59.  Lottery and prize scams, like those described in the Amended Complaint, induce payment for sham services, such as insurance or shipping and handling to obtain winnings that do not exist.  *Id.* ¶ 134; *see also id.* ¶¶ 136–40.  Utility and imposter scams use threats to induce payments for other services—for example, continued utility service, resolving an issue with a government agency and avoiding arrest, or obtaining a tax refund.  *Id*. ¶¶ 147, 149–54.  Finally, the secret shopper scam alleged in the Amended Complaint induced payment for the very service at issue in this case: a Walmart money transfer.  [62] ¶ 131.  No consumer is simply making a payment for nothing at all—there is always a supposed valuable good or service that necessitates the payment.

Not only is it clear from the text of the TSR that these scams fall within the scope of this anti-fraud rule, but the legislative history of the enabling statute—the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), Pub. L. No. 103-297, 108 Stat. 1545 (15 U.S.C. § 6101 *et seq.*)—and the rulemaking record reinforce this point.  Congress passed the Telemarketing Act in 1994 to "offer consumers necessary protection from telemarketing deception and abuse," 15 U.S.C. § 6101(5), and defined "telemarketing" as a "plan, program, or campaign . . . conducted to induce purchases of goods or services."  Pub. L.

---

[4]     "[T]he definition of 'telemarketing' does not require the purchase be made during the telephone conversation.  The definition simply states that the call be 'conducted to induce the purchase of goods or services.'"  68 Fed. Reg. at 4,656.

[5]     Emergency scams also may involve solicitations for "gift[s] of money," which are "charitable donations" within the scope of the TSR.  *See* 68 Fed. Reg. at 4,589.

No. 103-297 § 7(3). Congress explained that "'goods or services' is to be broadly construed" to include the activities addressed by the FTC at that time, including "extensions of credit or eligibility for a prize or award." S. Rep. No. 103-80, at 8 (1993). The ninety-plus FTC enforcement actions considered by Congress when it passed the Telemarketing Act were directed to a broad swath of activities, including scams involving lotteries,[6] extensions of credit,[7] investment opportunities,[8] jobs,[9] real estate,[10] government imposters,[11] and even schemes falsely promising car auction information.[12] H.R. Rep. 103-20, at 3. Thus, when the Commission initially promulgated the TSR, it noted—consistent with congressional intent—that "goods or services" within the definition of telemarketing includes "any tangible and intangible goods or services, including, but not limited to, leases, licenses, and memberships." 60 Fed. Reg. 43,842, 43,844 (Aug. 23, 1995). It also specifically noted that prizes and awards are encompassed by this definition. *See* 60 Fed. Reg. at 43,844.

In 2001, Congress amended the Telemarketing Act to reinforce the statute's anti-fraud purpose and clarify that "telemarketing" includes a plan, program, or campaign to induce "a

---

[6] S. Rep. No. 103-80, at 2; *FTC v. Promotion Specialists Inc*, No. 90-cv-479, Trade Reg. Rep. ¶ 22,853 (M.D. Fla. May 8, 1991) (prize/award).

[7] *FTC v. AFS, Inc.*, No. 91-cv-979, Trade Reg. Rep. ¶ 22,986 (N.D. Ala. May 2, 1991).

[8] *FTC v. Uni-vest Fin. Servs., Inc.*, No. 89-cv-6382, Trade Reg. Rep. ¶ 23,020 (S.D. Fla. Nov. 13, 1991) (investment in precious metals).

[9] *FTC v. Overseas Unlimited Agency Inc.*, No. 88-cv-6157, Trade Reg. Rep. ¶ 22,751 (C.D. Cal. Nov. 16, 1989) (overseas employment opportunities); *FTC v. Dupont Model Mgmt., Inc.*, No. 90-cv-7695, Trade Reg. Rep. ¶ 69,694 (E.D. Pa. Jan. 22, 1992) (employment opportunities).

[10] *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1437-1439 (9th Cir. 1986) (sale of home sites); *see also AMREP Corp. v. FTC*, 768 F.2d 1171, 1175 (10th Cir. 1985) (affirming Commission's "jurisdiction to regulate interstate land sales").

[11] *FTC v. Oates*, No. 91-cv-3854, Trade Reg. Rep. ¶ 23,025 (C.D. Cal. Mar. 17, 1992) (defendants posing as the "Federal Telemarketing Agency").

[12] *FTC v. US Sales Corp.*, 785 F. Supp. 737, 744 (N.D. Ill. 1992).

charitable contribution, donation, or gift of money or any other thing of value." Pub. L. 107-56, 115 Stat. 272 § 1011(b)(3). Accordingly, the Commission then amended the definition of "telemarketing" to mirror that language. 68 Fed. Reg. at 4,580, 4,589 (Jan. 29, 2003).

More recently, in the Commission's 2015 SBP for the cash-to-cash money transfer ban, the Commission explained that the TSR is "fundamentally an anti-fraud rule that protects consumers from deceptive and abusive telemarketing practices." 80 Fed. Reg. 77,520 (Dec. 14, 2015). The 2015 SBP is then replete with descriptions of exactly the types of scams described in the Amended Complaint. For example, in pointing to comments supporting the ban on both cash-to-cash money transfers and cash reload mechanisms in telemarketing transactions, the SBP highlighted comments that perpetrators exploit cash-to-cash money transfers in relation to "419 scams from West Africa, lottery, loan, investment, and work-at-home schemes and 'the grandparent scam.'" *Id.* at 77,544. The Commission further referenced comments that cash reload mechanisms have "the same speed, irrevocability, and convenience as cash-to-cash money transfers" and were increasingly being used in telemarketing schemes, such as "advance fees on bogus loans, 'processing' fees for government grants, taxes on purported lottery or sweepstakes winnings, and claims of money owed to the IRS." *Id.* at 77,544, 77,548. Importantly, the Commission relied on prior law enforcement actions—that are just like the many examples described in the Amended Complaint—to shed light on "the high risk to consumers and widespread injury caused by fraud-induced money transfers and cash reload mechanisms in telemarketing." *See id.* at 77,547. And the Commission highlighted the following types of scams, thereby putting to rest any argument over whether they fall within the TSR's scope: fake foreign lottery or sweepstakes scams, phony mystery shopper scams, and work-at-home opportunity scams. *Id.* at 77,547 & nn.345–47.

14

Thus, the plain text of the TSR, the legislative history of the Telemarketing Act, and the related SBPs all confirm that the Rule is intended to cover exactly the types of scams described in the Amended Complaint. The FTC's TSR enforcement actions over the past two decades further reinforce that the underlying telemarketing scams in the Amended Complaint violate the TSR.[13]

In arguing that many of the scams detailed in the Amended Complaint do not involve the purchase of a tangible, legitimate good or service, Walmart ignores the directives of Congress and the Commission as to the scope of the Rule, as well as the Commission's TSR enforcement record. But as discussed, the text, structure, history, and purpose of the TSR—an anti-fraud regulation—all reveal that the definition of "telemarketing" unambiguously includes all manner of schemes "conducted to *induce* the purchase of goods or services or a charitable contribution." *See* 16 C.F.R. 310.2(gg) (emphasis added). There is nothing to suggest that the definition is limited only to legitimate, tangible goods or services to the exclusion of intangible ones, such as continued utility service, avoiding arrest, or obtaining a tax refund.

Even if the scope of the TSR's "telemarketing" definition is somehow ambiguous, which it is not,[14] the Court should defer to the Commission's reasonable interpretation—as articulated in the SBPs and reflected in years of prior TSR enforcement actions—that "goods or services"

_____

[13]    *See, e.g.*, *FTC v. PHLG Enterprises LLC*, No. 17-cv-0220 (M.D. Fla.) (IRS impersonation scam) ([62] ¶ 151), and *FTC v. Alcazar Networks Inc.*, No. 20-cv-2200 (M.D. Fla.) (substantial assistance in spoofed calls displaying 911 as the caller ID where "scammers may scare or deceive consumers into believing they are the government, police, or law enforcement to fraudulently obtain money").

[14]    Courts should generally defer to agencies' interpretations of their own ambiguous regulations, although this deference is triggered only if a regulation is "genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411, 2415 (2019). "[T]he text, structure, history, and purpose" of the TSR all indicate that the definition of "telemarketing" is not genuinely ambiguous. *See id.* at 2415.

covers all manner of "tangible and intangible goods or services" regulated under the FTC Act. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (deference applies even when interpretations are advanced in a legal brief).[15]  In assessing whether the Commission's interpretation is reasonable and therefore entitled to deference, a Court should look to the text, structure, history, and purpose of the regulation, *see Kisor*, 139 S. Ct. at 2415–16, and these all support the FTC's interpretation.

Notably, Walmart does not engage with any of these interpretive tools to support its position that many of the scams detailed in the Amended Complaint are not "telemarketing" because they do not involve the sale of legitimate, tangible goods or services.[16]  Many fraudulent telemarketing schemes do not.  Instead, perpetrators of these schemes commonly reference a fake good, service, or charitable need to induce consumers to part with their money.  *See, e.g.*, *FTC v. Cuban Exch., Inc.*, No. 12-cv-5890, 2014 WL 3756358, at *2, *4 (E.D.N.Y. July 30, 2014) (scheme to solicit bank account information "to expedite refund payments that defendants falsely claim consumers are entitled to receive" violated the TSR); *FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974, 977, 980 (N.D. Ill. 2007) (deceptively pitching credit repair services and sending consumers "an essentially worthless packet of materials" violated the TSR). Limiting the scope of the rule to only legitimate, tangible "goods or services," as Walmart

---

[15]  These interpretations are not merely "convenient litigating position[s]" or "post hoc rationalization[s]" that do not receive deference.  *See Kisor*, 139 S. Ct. at 2417.  Instead, the FTC's broad definition of telemarketing is entitled to deference in part because it reflects "fair and considered judgment"—it is set forth in SBPs issued under rulemaking authority delegated by Congress.  *See Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 157 (1991) (deference appropriate when interpretation is product of "delegated lawmaking powers"). Furthermore, it is a longstanding view reflected in years of prior enforcement actions.  *Kisor*, 139 S. Ct. at 2417–18 (no deference to "new interpretation").

[16]  Walmart does not dispute that housing rental and advance-fee loan scams are activities that meet the TSR's definitions.  *See* [71] at 15.

suggests, would exclude entire swaths of fraudulent conduct and undermine the core anti-fraud purposes of the Telemarketing Act and TSR.

Finally, in arguing that collecting debts falls outside the scope of "telemarketing," Walmart cites cases involving the collection of legitimate debts[17]—not the fake debt collection schemes described in the Amended Complaint and targeted under the cited provision of the TSR. *See* [71] at 15–16. Even if calls about legitimate, overdue bills may not be calls to induce a *purchase*, imposter scam calls to collect fake debts are: they typically involve threats to induce a payment, such as preventing imminent arrest or keeping the lights on, for which a consumer has not yet agreed to pay the seller.

For these reasons, the scams described in the Amended Complaint all satisfy the TSR's "telemarketing" definition.

### b. The FTC Has Alleged Underlying TSR Violations with Particularity.

The Amended Complaint includes details about the types of TSR violations Walmart facilitated, with examples that provide the names of specific fraudsters, store locations, exact transaction amounts, time periods during which the conduct occurred, identifying characteristics of defrauded consumers, and the mechanics of the schemes. These are more than adequate under Rule 9(b)'s heightened but flexible pleading standard. *See Pirelli*, 631 F.3d at 442. These allegations provide "a 'general outline of the fraud scheme' sufficient to 'reasonably notify'" Walmart. *In re Rust-Oleum*, 155 F. Supp. 3d at 812. They also meet the Court's own directive to include "examples of transactions that fit the TSR's definitions" or "categories of fraud that

---

[17]    *Kornea v. J.S.D Mgmt., Inc.*, 366 F. Supp. 3d 660, 668–69 (E.D. Pa. 2019); *Michaelson v. CBE Grp., Inc.*, No. 13-cv-50228, 2015 WL 2449038, at *4 (N.D. Ill. May 21, 2015).

hit all the elements of a TSR violation perpetrated using Walmart's services," without the necessity of alleging "the details of thousands of TSR violations." [52] at 23.

In conjunction with alleging "categories of fraud" that include all the TSR's elements, the Commission's Amended Complaint also pleads with particularity fourteen representative examples of telemarketing schemes that violated the TSR and that were facilitated through money transfers at Walmart locations: a secret shopper scam ([62] ¶¶ 131), a housing rental scam (*id.* ¶ 132), a prize and sweepstakes scam (*id.* ¶¶ 136–40), two advance-fee loan scams (*id.* ¶¶ 144–45), four government imposter scams (*id.* ¶¶ 149–52), two utility scams (*id.* ¶¶ 153–54), two grandparent scams (*id.* ¶¶ 158–59), and a romance scam (*id.* ¶ 163).

For example, the Amended Complaint sets forth precise details about a representative prize and sweepstakes scam, including the names of the perpetrators, the time period, the location of Walmart stores at which money transfers were received, two Walmart locations where transfers were sent, the specific misrepresentations made to one victim to induce the transfers, and details of transfers sent by several of the scheme's victims. *Id*. ¶¶ 136–40. The Commission also details Walmart's own role in facilitating these scams by continuing to allow the perpetrators to pick up the illegal money transfers despite multiple complaints about this specific scam and other red flags, such as the amount and frequency of transfers and spelling variations of the perpetrators' names on an out-of-state ID used to pick up the transfers. *Id*. ¶¶ 137, 140. The Commission also alleges that even if Walmart's employees had spotted the red flags of fraud in these transactions, Walmart's policy "was to pay out transfers even if its employees suspected fraud." *Id*. ¶ 137. This is more than sufficient under Rule 9(b).

Despite this level of detail, Walmart still complains that the allegations sometimes do not include the identities of the parties to the misrepresentations. [71] at 19, 20 n.4, 21. But, "[t]he

obligation to set out the 'who, what, when, where, and how' of the fraud does not require such granular detail." *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 741 (7th Cir. 2021); *see also Pirelli*, 631 F.3d at 442; *CFTC v. Yukom Commc'ns Ltd.,* No. 19-cv-05416, 2021 WL 4477874, at *5 (N.D. Ill. Sept. 30, 2021) (allegations sufficient where complaint lacked details including "who made fraudulent statements and to whom" and "the methods of communications used" but pled other details with specificity); *United States v. Cancer Treatment Centers of Am.*, No. 99-cv-8287, 2003 WL 21504998, at *1 (N.D. Ill. June 30, 2003) (allegations sufficient despite lack of "specific names or dates"). The Amended Complaint does not fall short under Rule 9(b), as Walmart suggests, simply because the Commission has chosen to protect the privacy of victims of telemarketing schemes by omitting their names in a public filing. *See Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 819 (N.D. Ill. 2013) (finding Medicare fraud allegations sufficient where names of specific patients were omitted to protect confidentiality, but other details were adequate to inform defendants of the claims against them). Walmart will have every opportunity to confirm the identifies of victims in discovery after an appropriate protective order is entered.

Nor is it insufficient under Rule 9(b) to sometimes not allege the identity of the person making the misrepresentations. For example, the allegations involving a South Carolina victim include that the telemarketer identified herself as an affiliate of Harborview Lenders in Seattle, Washington, and also include the time period, the exact dollar amount of the promised loan and advance fee demanded, the caller's precise instructions about going to the nearest Walmart to send the money transfer, and details about red flags when the consumer did ultimately go to a

19

Walmart store to send the fee. [62] ¶ 145.[18]  Surely those allegations are not somehow deficient under Rule 9(b) simply because the perpetrator of the telemarketing scheme was successfully able to keep her identity secret.  The caller's precise identity is not central to Walmart's own actions in facilitating the described scheme.

And the allegations of the other advance-fee loan scam (*id.* ¶ 144), are likewise sufficient, despite the lack of names of specific consumers who were called or the dates and times of specific misrepresentations.  Again, those particular details are not required to meet the Rule 9(b) standard.  *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014); *Yukom Commc'ns Ltd.*, 2021 WL 4477874, at *5.  The FTC has provided other details, including the names of the fraudsters at the helm of the scheme, the time period, the foreign location of the call center, the method of the calls (robocalls and live telemarketing), details of the representations telemarketers made to consumers such as the instruction in the script to pay via money transfers, and the range of dollar amounts for the transactions at issue.  [62] ¶ 144.

Similarly, with respect to the housing rental scam described in the Amended Complaint, although the Commission cannot identify the specific perpetrators, it alleges the two-month time period of the scheme, the precise location of the Walmart store, the exact dollar amount one of the victims lost, and the overview of at least one of the schemes involved in the telemarketing plan or campaign: soliciting payment for a non-existent rental property.  *Id.* ¶ 132.  That is sufficient.  As noted in the 2015 SBP and the Amended Complaint, money transfer transactions provide fraudsters with the cover of anonymity.  *See* 80 Fed. Reg. at 77,547; [62] ¶¶ 33, 113.

---

[18]     Although Walmart contends that the FTC failed to allege that this scam involved more than one interstate call, the allegations state that a consumer in South Carolina received multiple phone calls from a caller who identified herself as being from Seattle, Washington.  [62] ¶ 145.  Read in the light most favorable to the FTC, this is an allegation of more than one interstate call from Washington to South Carolina.

Thus, in many cases, the FTC simply does not have access to all fraudsters' names or identities, but that does not insulate Walmart from liability. The FTC should not be required to spend months or years tracking down thousands of anonymous scammers throughout the world to hold Walmart accountable for its role. The Commission can use "alternative means of injecting precision and . . . substantiation into [its] allegations of fraud." *Pirelli*, 631 F.3d at 442. That is precisely what the Commission has done here.[19] [62] ¶ 132.

In sum, the Commission's allegations about the underlying TSR violations satisfy the requirements of Rule 9(b), "reasonably notify[ing] [Walmart] of [its] purported role." *See In re Rust-Oleum*, 155 F. Supp. 3d at 812.

### 2. The FTC Has Sufficiently Alleged Walmart's Knowledge or Conscious Avoidance of TSR Violations.

In its Order, the Court recognized that Walmart may have "provided an essential service to fraudsters by delivering the proceeds of their misconduct," but indicated that to demonstrate Walmart's knowledge or conscious avoidance of the underlying TSR violations, the FTC had to provide more details about how the money transfers should have raised red flags for Walmart and its associates. [52] at 24–26, 31. The Court explained that "an ordinary transaction becomes

---

[19]     Walmart also is wrong in suggesting that the Commission's allegations related to the housing rental scam "impermissibly rest[] on reports to MoneyGram," as the Amended Complaint also includes considerable detail about a consumer victimized in that scam. *See* [62] ¶¶ 37, 125. Regardless, the Seventh Circuit has explained that plaintiffs can rely on secondhand information to plead fraud where, as here, the facts are not otherwise accessible to the plaintiff and the plaintiff provides the grounds for his suspicions. *Pirelli*, 631 F.3d at 442–43. In addition, courts regularly find that such complaints have sufficient guarantees of trustworthiness to be admitted into evidence. *See, e.g.*, *United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942, 968 (C.D. Ill. 2014). And to the extent the complaints, which were shared with Walmart, show the company's knowledge of telemarketing scams, including scams in which its employees were complicit, they are not hearsay. *See FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 576 n.11 (7th Cir. 1989).

extraordinary—and processing it can constitute substantial assistance—if a defendant knows enough about the underlying fraud." *Id.* at 29 (citations omitted); *see also FTC v. HES Merch. Servs. Co., Inc.*, No. 6:12-cv-1618, 2014 WL 6863506 at *8 n.5 (M.D. Fla. Oct. 26, 2016) (holding a payment processor and its president's failure to follow up on "red flags" was "enough to show, at a minimum, that [the president] consciously avoided knowing about the [telemarketers'] TSR violations."). Again, the Commission's Amended Complaint adequately addresses these concerns.

First, as detailed above, the Amended Complaint describes with particularity the types of red flags and suspicious characteristics that distinguish fraud-induced transfers from ordinary transfers. [62] ¶¶ 3, 74, 103, 126, 134, 136–140, 142, 145, 147, 149, 153, 156, 161, 163. It then provides examples of how those red flags presented themselves in specific transactions involving underlying TSR violations, but where Walmart associates still processed the transfers. *Id.* ¶¶ 131–32, 136–40, 144–45, 149–53, 158–59, 163. It also alleges how Walmart's practice was to pay out transfers even if its employees spotted the red flags and suspected fraud. *Id.* ¶¶ 4, 62–63, 68, 85, 133, 137, 144, 149–51, 161. These allegations plausibly allege that Walmart knew or consciously avoided knowing about the underlying violations.

For example, as described above (*see* Section II.B, *supra*), the Amended Complaint details many obvious red flags that often distinguish fraud-induced money transfers from ordinary money transfers and describes how those red flags presented themselves in specific, representative transactions, including the following:

- Transfers involving unusually high dollar amounts that exceed the typical transfer amount to a friend or family member ([62] ¶¶ 131–32, 138–39, 140, 144, 149–50, 152–54, 159, 163);

22

- Multiple money transfers in relatively short periods of time (132, 136–37, 139, 151-52), including back-to-back transfers (*id.* ¶ 132, 149) or multiple transfers on the same day at the same location (*id.* ¶¶136–37, 139, 151–52);

- High-dollar transfers to high-risk countries known for fraud, such as Jamaica (*id.* ¶ 138), the Dominican Republic (*id.* ¶¶ 153–54), or Nigeria (*id.* ¶ 163);

- Recipients of money transfers using fake IDs (*id.* ¶¶ 34, 144, 149–50, 159) or out-of-state IDs—sometimes with name or address variations (*id.* ¶¶ 104–05.a, 132, 137);

- Recipient receiving money from multiple senders (*id.* ¶¶ 35, 136–37);

- Customer informing Walmart employees that he was sending money because he won a prize (*id.* ¶ 140); and

- Complaints from other scam victims (*id.* ¶ 137).

In addition, the Amended Complaint alleges that many victims of telemarketing scams are older consumers (*see, e.g.*, ¶¶ 35, 134, 137, 142, 144–45, 147, 156, 158–59, 161), who sometimes have not sent a money transfer before (*see, e.g.*, ¶ 158).[20] Walmart has the ability to identify first-time users of its money transfer system because its point-of-sale system automatically populates information for repeat customers. *Id.* ¶¶ 27, 127. Nevertheless, even in recent transactions, Walmart has processed suspicious transfers by first-time senders without even a question or warning about illegal telemarketing and scams. *See, e.g.*, *id.* ¶¶ 158, 163.

For example, in one situation involving an elderly, first-time sender victimized in an emergency scam, the Walmart employee completed the transfer even after being told that the sender did not know the person to whom he was sending the money—an obvious red flag for fraud. *Id.* ¶ 158. And in another situation involving an elderly consumer who lost almost $500 in an advance-fee loan scam, the Walmart employee permitted the victim to switch money

---

[20] And Walmart's own training reflects that it knows elderly consumers are often targeted in telemarketing schemes. *Id.* ¶ 128.

transfer systems after the victim's first two transfers to different individuals in Canada were blocked by MoneyGram. *Id*. ¶ 145. Despite those obvious red flags of fraud, the same Walmart employee did not ask questions or provide warnings and instead allowed the consumer to transfer the funds to a third individual in Canada using Western Union's system. *Id*.

The Amended Complaint also includes multiple other examples of transfers by victims of telemarketing schemes who were not asked *required* questions about the nature of their transfers or provided with *required* warnings about telemarketing and scams—even though their transfers also exhibited red flags and suspicious characteristics. *Id*. ¶¶ 140, 145, 153–54, 158, 163. Indeed, given Walmart's responsibility as a money transfer business to avoid facilitating violations of the TSR's cash-to-cash ban, it should have been asking the required questions and providing the required warnings in every instance, not just when red flags were present. *See* Section II.A, *supra.*

Moreover, as noted previously, Walmart's policy for many years was to pay out transfers even if its employees spotted the red flags and suspected fraud. *Id*. ¶¶ 4, 62, 68–69, 85, 133, 137, 144, 149–51, 161. The existence of such a policy on its own demonstrates Walmart's knowledge or conscious avoidance of knowledge. Indeed, Walmart continued this practice even after MoneyGram warned Walmart that it expected the company not to pay out money transfers to suspected fraudsters. *Id*. ¶ 62.

Overall, these representative examples support a reasonable inference that Walmart knew or took deliberate actions to avoid knowing about the underlying TSR violations. As noted in *FTC v. Chapman*—and recognized by this Court ([52] at 24)—"'taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability.'" 714 F.3d 1211, 1219 (10th Cir. 2013) (quoting FTC's Compliance Guide,

*Complying with the Telemarketing Sales Rule*, available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (Feb. 2011)); *see also FTC v. Day Pacer LLC*, No. 19-cv-1984, 2023 WL 5671618, at *20 (N.D. Ill. Sept. 1, 2023) ("'Knowledge or conscious avoidance of knowledge may be inferred when the person providing assistance receives complaints about violations.'") (quoting *FTC v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011)); *FTC v. Nudge, LLC*, No. 2:19-cv-867, 2021 WL 3145700, at *5 (D. Utah July 26, 2021) (same).

Walmart attempts to downplay its role in facilitating the telemarketing schemes alleged in the Amended Complaint by taking the astounding position that it has no obligation to act on red flags and suspicious activities. *See* [71] at 24–25 ("No law prohibits consumers from sending multiple money transfers or from using out-of-state IDs, and Walmart has no grounds to scrutinize customers who do so," and Walmart has "no reason to interrogate customers sending" money transfers to high-risk countries known for fraud.) Walmart's callous attitude toward fraud prevention would no doubt come as a shock to its customers, as it did to MoneyGram. [62] ¶ 61 (MoneyGram criticized Walmart for "not reject[ing] potential consumer fraud related transactions on the receive end.") Indeed, as detailed in the Amended Complaint, the son of an elderly Florida couple who lost money at Walmart to a grandparents scam even wrote Walmart's CEO to complain about the company's lack of controls and safeguards that contributed to his parents being scammed. *Id.* at ¶ 159.

Walmart's position also ignores the fact that the TSR's cash-to-cash ban actually *did* make certain transactions illegal, and Walmart was required to take steps to avoid assisting those violations, including by asking certain questions, such as whether consumers' transfers are to pay for goods or services offered or sold through telemarketing and *declining* to process such money

transfers.[21]  *Id.* ¶¶ 40–42, 44–46.  It also is required to warn consumers about scams and telemarketing, including that it is illegal for any seller or telemarketer to accept money transfers as payment for goods or services sold through telemarketing.  *Id.*  Walmart has the obligation to ask those questions and provide those warnings in all transactions, but its obligations are heightened when the red flags of fraud also are present.  Walmart long has known that these and other fraud prevention measures are required under the law.[22]

### 3. The FTC Has Alleged that Walmart Provided Substantial Assistance.

Substantial assistance "does not impose a demanding standard" and requires something "more than casual or incidental help" to a seller or telemarketer.  *Day Pacer LLC*, 2023 WL 5671618, at *20; [52] at 26.  There must be "some link" between the defendant's actions and the underlying violations, "but not necessarily a direct connection."  [52] at 27.  This standard is easily met where, as here, Walmart—through its complicit employees—actively participated in illegal telemarketing schemes (*see id.* at 31 n.23; [62] ¶¶ 131–32), and also continued to process illegal money transfers in the face of glaring red flags and suspicious characteristics.  Although processing "routine transactions" alone does not amount to substantial assistance, "an ordinary transaction becomes extraordinary—and processing it can constitute substantial assistance—if a defendant knows enough about the underlying fraud" or unlawful telemarketing transaction.

---

[21]    Indeed, the Commission's 2015 SBP provided "bright line guidance" regarding the important role businesses like Walmart play in educating consumers about the cash-to-cash ban by asking questions about whether the transfer involves telemarketing, about the consumer's relationship with the receiver, and reasons for sending the money, as well as providing a clear and concise warning to consumers about the illegal money transfers.  *Id.* ¶ 116.

[22]    Walmart received copies of the 2009 *MoneyGram* order, the 2017 *Western Union* order, and the 2018 *MoneyGram* order, which included these types of requirements.  *Id.* ¶¶ 6, 20, 42, 44–45, 117.  In addition, as a money services business, Walmart is required by the federal Bank Secrecy Act to have an effective Anti-Money Laundering program to guard against money laundering, including by guarding against the flow of funds derived from fraud.  *Id.* ¶ 46.

[52] at 29.  As described in detail above, the FTC has alleged that Walmart has known, or consciously avoided knowing, about red flags indicative of unlawful money transfers.[23]  *See* Section IV.A.2, *supra.*

Not surprisingly, Walmart gives short shrift in its motion to its facilitation of violations of the TSR's cash-to-cash ban—likely because for years Walmart did nothing whatsoever to avoid facilitating violations of that ban.  [62] ¶¶ 118–19.  In some cases, moreover, Walmart is still not ensuring that its employees are complying with the ban by asking the required questions and providing the required warnings.  *Id.* ¶¶ 7, 76, 120, 129, 145, 153–54, 158, 163.  The ban applies to all telemarketing transactions for goods, services, or charitable donations—not just those that involve fraud—and requires entities that provide money transfer services to detect and prevent such transactions.  *See* 16 C.F.R. 310.4(a)(10); 80 Fed. Reg. at 77,551–52.  Walmart has provided substantial assistance for these types of banned transfers by processing them while "deliberately ignoring[] signs that the transfer[s] [are] related to telemarketing."  *See* 80 Fed. Reg. at 77,552; *see also Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1098 (11th Cir. 2017) ("'Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'") (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)).

---

[23]    Additionally, the FTC has alleged that Walmart continued to process money transfers at locations where a large proportion of the transactions involved fraud (*see* [62] ¶ 53), indicating that it had the requisite knowledge for its participation to rise to the level of substantial assistance.  *See* [52] at 30–31.  Contrary to Walmart's contentions, at the pleading stage, the FTC need not identify specific stores at issue.  It has alleged that MoneyGram and Western Union reported *to Walmart* the identities of specific stores with fraud rates at particular thresholds— above 25 percent, 50 percent, or 75 percent—and these details are more than adequate to put Walmart on notice of its role.  *See In re Rust-Oleum*, 155 F. Supp. 3d at 812.  The Commission need not "literally prove [its] case in the complaint."  *See Molina Healthcare of Ill., Inc.*, 17 F.4th at 741.

Despite the Court's observation that allegations of Walmart employees' participation in fraud schemes can show knowledge indicating that Walmart has "crossed the culpability line" ([52] at 31 n.23), Walmart tries to escape liability by attempting to distance itself from its own complicit employees' conduct. *See* [71] at 31. But Walmart cannot disclaim responsibility for vetting, training, and overseeing its own employees who have either actively participated in or substantially assisted obviously illegal activities. *See* [62] ¶¶ 41, 77–78, 91, 97, 130, 131–32, 136–40, 144–45, 149–54, 158–59, 163. As the Seventh Circuit recognized in *United States v. Dish Network LLC*, a corporation is vicariously responsible for the acts of its employees. 954 F.3d 970, 978 (7th Cir. 2020) ("Longstanding principles require treating the employer and its employees as one entity" under the TSR.). And the complicit and potentially[24] complicit employees described in the Amended Complaint ([62] ¶¶ 97, 131–32) were acting within the scope of their employment when processing money transfers on behalf of Walmart. Contrary to Walmart's claims, it benefits from *all* the transactions at its stores—even if they involve illegal activities.[25] *See* [62] ¶¶ 14, 29, 50. Given Walmart's longstanding policy or practice of instructing its employees to pay out transfers even when they suspected fraud, it cannot claim to be surprised that some of its employees have done so. Ultimately, Walmart is liable for its own employees' conduct.[26]

---

[24]     Whether or not the employee was *actually* as opposed to likely complicit is a question to be answered after discovery—not at this stage, where the allegations are to be taken as true and read in the light most favorable to the FTC. *See Taha*, 947 F.3d at 469.

[25]     Walmart is wrong to suggest that only acts that are exclusively for the benefit of the employer fall within the scope of employment. Employee conduct is within the scope of employment when actions are "motivated at least in part by an intent to benefit the corporation." *United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992).

[26]     In one such example of active participation—that even Walmart acknowledges involved a complicit employee ([71] at 31)—a Walmart employee who worked at a Texas store cashed out at least 28 money transfers totaling $22,472.50 in November 2017—when no customer was even

In sum, the allegations of Walmart's knowledge regarding the unlawful transfers it was processing and the allegations of complicit activity by its own employees all support a reasonable inference that Walmart is liable for substantially assisting TSR violations.

### 4.    The TSR Allegations Support a Claim for Civil Penalties.

As described above, the FTC's allegations support a reasonable inference that Walmart "knew or should have known that its [telemarketing-related failures] were prohibited by the [TSR]," and thus supports the FTC's request for civil penalties. *See* [52] at 46 n.33.  Pursuant to Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), a defendant is liable for civil penalties for a rule violation when it has, "actual knowledge or knowledge fairly implied on the basis of objective circumstances" that such act is unfair or deceptive and is prohibited by such rule.  In other words, civil penalties are warranted "where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *United States v. National Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996) (cleaned up) (noting it was "undisputed that the defendants were aware of the relevant provisions of the [relevant rule] and had extensive interaction with the FTC concerning how to comply with it"); *see also United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 962–63 (C. D. Ill. 2009) (denying motion to dismiss penalties claim); *United States v. Prochnow*, No. 02-cv-0917, 2005 WL 8154273, at *6 (N.D. Ga. Dec. 2, 2005) (evidence of actual knowledge and knowledge reasonably imputed to defendant regarding consent decree and TSR violations supported penalties).

---

present—in furtherance of a telemarketing scheme involving a secret shopper employment scam ([62] ¶ 131).  This employee later admitted to Walmart that she understood the transfers to be fraudulent and had given the money to a man she believed was from Nigeria.  *Id.*

The FTC has plausibly alleged Walmart's awareness that its routine failure to prevent telemarketing-related transfers would run afoul of the TSR. For example, the 2015 SBP confirmed that businesses like Walmart are subject to liability for assisting and facilitating cash-to-cash transfers for telemarketing transactions. *See* 80 Fed. Reg. at 77,547, 77,552. The prevention measures outlined in the 2015 SBP were then incorporated into the *Western Union* order, which Walmart received, yet Walmart did ***nothing whatsoever*** in response to the cash-to-cash ban for ***years*** thereafter. [62] ¶¶ 37, 118–19. Walmart also clearly knew that it could be responsible for assisting and facilitating other TSR violations because the Commission had previously held both MoneyGram and Western Union liable for similar violations. *Id*. ¶¶ 44–45. The Commission's claim for civil penalties should stand.

### B. THE FTC'S SECTION 5 UNFAIRNESS CLAIM REMAINS SUFFICIENT.

In its Order, the Court properly held that the FTC's initial complaint "alleged a violation of [Section] 5," and correctly denied Walmart's motion to dismiss the corresponding Count I of the initial complaint. *See* [52] at 46. The Amended Complaint similarly states a Section 5 unfairness claim, as it simply bolsters the facts supporting a claim the Court already found adequate. Walmart's recycled, rejected arguments warrant no further consideration. *See Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir. 1982) ("[A] court ordinarily will not reconsider its own decision . . . absent clear and convincing reasons to reexamine the prior ruling."). Where an initial complaint survived a "motion to dismiss while alleging fewer facts" than an amended pleading, "the court need not reexamine that which it has already decided." *Harper v. Wexford Health Sources, Inc.*, No. 14-cv-04879, 2017 WL 2672299, at *2 (N.D. Ill. June 21, 2017) (rejecting renewed motion to dismiss more extensive amended complaint). The Court should

therefore simply deny that aspect of Walmart's motion. To the extent the Court again entertains Walmart's arguments, however, the same result should follow.

### 1. The Amended Complaint Meets the Section 5(n) Standard.

The Court properly applied the statutory standard enunciated by Congress in Section 5(n) of the FTC Act to the FTC's unfairness claim. As the Court recognized, its conclusion that Section 5(n) sets the operative standard for unfairness claims is consistent with other district court decisions in this circuit that have addressed the same statutory framework. *See* [52] at 34–35 (citing, *e.g.*, *CFPB v. ITT Educ. Services, Inc.*, 219 F. Supp. 3d 878, 903 (S.D. Ind. 2015)). The Court's application of Section 5(n) is also consistent with the overwhelming majority of courts outside this circuit. *See* [52] at 34, 38 (citing, *e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244–45, 255–56 (3rd Cir. 2015)). Neither *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976),[27] nor *LabMD, Inc. v. FTC*, 894 F.3d 1221 (11th Cir. 2018), impact the Court's decision. *See* [52] at 34–38 & n.27.

Under Section 5(n), an act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers themselves, and is not outweighed by countervailing benefits to consumers or to competition. *See* [52] at 41. As before, the Amended Complaint properly alleges facts supporting all of these requirements.

---

[27] Although the FTC need only allege facts satisfying the Section 5(n) factors, Walmart's decision to pay out money transfers even when the Walmart associate suspected fraud certainly "offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc.*, 540 F.2d at 293–94. As Walmart is well aware, once such a transaction is complete, it is extremely unlikely that the consumer will be able to reverse it and retrieve their money. *See* [52] at 43–44.

### a. Walmart Has Caused Substantial Injury to Consumers.

In its Order, the Court found the FTC adequately pled that consumers suffered substantial injury as a result of fraud-induced money transfers at Walmart stores. Indeed, "[c]onsumers complained of nearly $200 million they lost through fraud-related money transfers processed at Walmart, and there's reason to believe that the total harm may have been much higher." [52] at 43; *see also* [62] ¶¶ 2, 50. The allegations in the Amended Complaint further connect those staggering losses directly to Walmart's conduct. As with the original, the Amended Complaint "lays out a series of failings in Walmart's fraud prevention and mitigation systems." *See* [52] at 43. For example, the FTC's allegations indicate that "Walmart either didn't establish or failed to follow an effective antifraud program, didn't train or adequately supervise its employees, failed to adequately monitor suspicious activity, and didn't adequately report fraud to others." *See id.*; *see also* [62] ¶¶ 57, 97, 102–03. At a minimum, it continues to be "reasonable to infer," that at least "some of th[o]se injuries *were* caused by Walmart's conduct." *See* [52] at 53; *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (holding check provider liable for unfair practices even though its users contributed to the creation and delivery of the unauthorized checks).

### b. Consumers' Substantial Injury Was Not Reasonably Avoidable.

The Court correctly concluded that the Commission adequately alleged that consumers' injuries were not reasonably avoidable. For example, "Walmart routinely either didn't warn consumers about fraud at all or provided insufficient warnings." [52] at 43–44; *see also* [62] ¶¶ 75, 106–08. Walmart also "didn't do enough to stop fraudsters from picking up money, and the company didn't communicate well with its money transfer providers (which meant fraudsters weren't effectively blocked from using money transfer systems)." [52] at 44; *see also* [62]

¶¶ 62–72, 101–03, 111.  As a result, "[i]t's reasonable to infer that victims of fraud who used Walmart's services were not making fully informed choices."  [52] at 44.  Furthermore, Walmart not only has the "opportunity," but also the "incentive to continue its lax security practices: Walmart still processes large amounts of money transfers and makes millions of dollars in related fees."  *Id.* at 50.

Walmart nevertheless unjustly continues to blame its own customers for the company's failures.  *See* [71] at 40.  But injury is not reasonably avoidable unless consumers have the information they need to prevent it and nonetheless choose not to.  *See Neovi*, 604 F.3d at 1158. The Amended Complaint details the myriad ways Walmart failed to provide its customers with such information and did not take other simple steps to prevent its customers' staggering losses. Their injury was not reasonably avoidable.

### c.    Walmart's Alleged Misconduct Came with No Corresponding Benefits.

The FTC alleges that Walmart's misconduct provided no "benefits to consumers or competition that has outweighed the harm suffered by defrauded consumers."  [62] ¶ 57. Walmart makes no meaningful argument to the contrary, nor could it given the present posture on a motion to dismiss, where all facts regarding "the magnitude of the consumer injury at issue" must be taken as true.  *See Iqbal*, 556 U.S. at 678; *see also* [52] at 1–2, 53.  Nothing in the Amended Complaint suggests Walmart's deficient anti-fraud program could have produced benefits that outweigh the hundreds of millions of dollars of harm to consumers caused by Walmart's failure to implement and maintain a comprehensive and effective anti-fraud program.

### 2.    The Amended Complaint Satisfies Section 13(b).

The Court's ruling that a permanent injunction may be available under Section 13(b) because "[t]he FTC has shown some reason to believe that Walmart is or is about to violate

33

[Section] 5" also remains sound. [52] at 50. Section 13(b) of the FTC Act authorizes a permanent injunction against anyone who "is violating, or is about to violate, any provision of law" that the Commission enforces.[28] 15 U.S.C. § 53(b). As the Court noted, the FTC's original complaint detailed Walmart's repeated failure "to train its employees or institute robust fraud-prevention systems, despite waves of consumer complaints, repeated audits by its money transfer providers that reported deficiencies, and receipt of consent orders requiring more." [52] at 49. And Walmart corrected some of its practices only after the FTC began investigating in 2017. *Id.* at 50; *see also* [62] ¶ 164.

The Amended Complaint provides additional details about the impact of Walmart's failures on consumer victims—including recent victims—who lost substantial amounts of money through fraud-induced money transfers at Walmart locations. Indeed, the Amended Complaint provides examples of victims who lost substantial sums through transfers at Walmart just before—and even after—the FTC filed this lawsuit. *See, e.g.*, [62] ¶¶ 145, 154, 158. In all of these cases, the victims were not asked required questions about whether their transfers were related to telemarketing or provided with required warnings about telemarketing and scams.

The Amended Complaint therefore simply adds to the Commission's already sufficient allegations of Walmart's ongoing misconduct, identifying issues that post-date the filing of the original complaint. Indeed, Walmart concedes that the FTC has added allegations "involving more recent money transfers and generally alleges that 'even today, in some instances, Walmart employees' do not ask consumers questions about telemarketing or provide clear warnings."

---

[28]     Section 19 of the FTC Act, 15 U.S.C. § 57b, which governs the FTC's TSR claims, contains no such language, and provides an alternative source of authority for injunctive relief in this matter.

[71] at 35.  The Amended Complaint, like the original complaint, sufficiently alleges that Walmart is violating or is about to violate the law, and thereby confirms the Court's prior ruling.

### 3.    Walmart Had Ample Notice Its Alleged Misconduct Was Unfair.

Nor has anything changed regarding Walmart's awareness that its alleged misconduct could be deemed unfair in violation of Section 5.  The Court succinctly explained its reasons for rejecting that argument in its Order:

> Walmart failed to take basic steps to prevent fraud in its money transfers, despite knowledge of enormous consumer losses.  While [Section] 5 sets up a flexible rule, considering the economic context, the balancing test set up by [Section] 5(n), and cases imposing and suggesting liability under similar circumstances, Walmart had fair notice that lax fraud prevention that injured consumers was forbidden.

[52] at 57.  Walmart provides no basis for the Court to reconsider its well-supported conclusion.

### C.    THE FTC HAS THE AUTHORITY TO BRING THIS SUIT.

In its Order, the Court applied binding Supreme Court precedent to reject Walmart's challenge to the FTC's litigation authority, and Walmart points to nothing new that would cause the Court to reconsider its prior ruling.  [71] at 43.  Indeed, the Court's prior ruling on this legal issue is law of the case, making it inappropriate for reconsideration absent "a compelling reason, such as a change in, or clarification of, law that makes clear the earlier ruling was erroneous." *See Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571–72 (7th Cir. 2006).  This doctrine bars reconsideration of a prior decision based on exactly the sort of argument Walmart makes here: one that cites the same cases and relies on legal theories that were available when it first argued the issue.  *See Vidimos, Inc. v. Wysong Laser Co., Inc.*, 179 F.3d 1063, 1065 (7th Cir. 1999).

The Court correctly concluded previously that the Commission has the authority to bring this suit because the agency's Commissioners were constitutionally appointed. [52] at 59–62.[29] It explained that in the event of a potentially unconstitutional interaction between a removal restriction and an agency's enforcement authority, the Supreme Court has instructed that the proper remedy would be to strike the removal restriction—the root of the potential constitutional infirmity. *Id.* at 60–61 (citing *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508–09 (2010); *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2207–11 (2020); *Collins v. Yellen*, 141 S. Ct. 1761, 1787–88 & n.23 (2021)). As the Court explained, "the grant of executive power to the FTC, standing on its own, isn't unconstitutional: executive agencies often have power to sue for penalties or injunctive relief." [52] at 60. Applying *Collins*, then, the Court correctly concluded that a potentially unconstitutional removal restriction is not a reason to void an otherwise valid agency action, meaning that the Commission has the authority to bring the present lawsuit. *Id.* at 61–62.

Dissatisfied with this ruling, Walmart attempts to repackage and rehash its argument that the proper remedy for a potentially unconstitutional interaction between the Commission's litigation authority and removal protections is to invalidate the enforcement powers, because they were enacted later. [71] at 45–47. But the Court already directly addressed and rejected this argument, concluding correctly that the chronology is not the relevant issue—the "real problem here is a potentially unconstitutional limit on the President's removal power." [52] at 60. Walmart does not point to any change in law that would warrant revisiting the Court's prior

---

[29]    Other district courts recently presented with the identical issue have likewise declined to dismiss the FTC's enforcement suits, finding that its litigation authority is constitutionally valid. *See FTC v. Kochava Inc.*, No. 22-cv-377, 2023 WL 3249809, at *11-12 (D. Idaho May 4, 2023); *FTC v. Roomster Corp.*, No. 22-cv-7389, 2023 WL 1438718, at *9 & n.9 (S.D.N.Y. Feb. 1, 2023).

ruling. Indeed, Walmart's argument does not even address the reasoning in the Supreme Court decisions the Court applied in finding that the proper remedy here would be to strike the removal restriction. [52] at 60–61 (citing *Free Enter. Fund*, 561 U.S. at 508–09; *Seila Law*, 140 S. Ct. at 2207–11; *Collins*, 141 S. Ct. at 1787–88 & n.23).

Instead, Walmart simply revives its previously rejected argument that chronology alone determines the remedy. According to Walmart, when a later-enacted provision gives rise to an unconstitutional interaction, a Court should focus solely on the dates of enactment of the two provisions and strike the most recent. But neither *Barr v. American Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020), nor *Bowsher v. Synar*, 478 U.S. 714 (1986)—the cases Walmart cited previously and continues to cite now—actually support its remedy argument.[30] As the Court previously explained, both cases involved an amendment to an earlier law that— independent of the statutory scheme—was unconstitutional, unlike the grant of executive power to the FTC, which "standing on its own, isn't unconstitutional." [52] at 60. In *Barr*, the Supreme Court struck an amendment to a statute that prohibits robocalls to cell phones because the amendment, which exempted calls related to government debt from the prohibition, was a content-based restriction on speech that violated the First Amendment. 140 S. Ct. at 2347. The Court then applied "ordinary severability principles," which require "sever[ing] unconstitutional provisions from the remainder of the law rather than razing whole statutes," to narrowly invalidate the unconstitutional amendment, leaving the rest of the statute intact. *Id.* at 2349–52. The Court did not consider the chronology of enactment to determine the remedy—it focused on the constitutionality of the substantive provision. *See id.*

---

[30] The argument also cannot be reconciled with the Supreme Court's statement in *Collins* that "the constitutionality of removal restrictions" does not hinge on "the relative importance of the regulatory and enforcement authority of disparate agencies." *Collins*, 141 S. Ct. at 1785.

37

Similarly, in *Bowsher*, the Supreme Court invalidated a grant of executive authority to the Comptroller General—an officer who was "removable only at the initiative of Congress" and was therefore "an officer of the Legislative Branch." 478 U.S. at 727–31, 734. The Court concluded that the delegation of executive authority to a legislative officer violated separation of powers principles. *Id.* at 734. In those circumstances, the Court declined to strike the removal restriction because that would transform a legislative officer into an executive officer, undermining Congressional intent in establishing the office. *Id.* at 734–36. Here, again, the Court chose to strike the provision that, standing on its own, was unconstitutional—it did not strike the provision because it was later enacted. *See id.*

Apart from its misplaced reliance on *Barr* and *Bowsher*, Walmart makes a final plea that the Court disregard the FTC Act's severability clause, 15 U.S.C. § 57, and subsequent amendments to the Act to strike the Commission's litigation authority rather than its removal protections. Walmart hypothesizes that Congress would prefer to have an agency where the Commissioners have removal protections instead of an agency with powers to seek permanent injunctive relief and civil penalties in federal court. [71] at 47. But as the Supreme Court has explained, when a statute includes a severability clause, "[t]here is no need to wonder what Congress would have wanted" if a provision is found to be unconstitutional "because it has told us: 'the remainder of th[e] Act' should 'not be affected.'" *Seila Law*, 140 S. Ct. at 2209. Indeed, in *Seila Law*, the Supreme Court invalidated the CFPB's removal restriction but declined to void other statutory provisions granting powers to the CFPB, explaining that "nothing in the text or history of the . . . Act . . . demonstrates that Congress would have *no* CFPB to a CFPB supervised by the President." *Id.*; *see also Free Enter. Fund*, 561 U.S. at 481.

Walmart offers no support for its position that Congress would have preferred an FTC with removal protections to an agency lacking litigation authority. A ruling invalidating the Commission's powers to seek civil penalties and injunctive relief would directly contradict Congressional intent and Supreme Court authority and would effect a major regulatory disruption in the consumer protection arena, causing untold harm to consumers nationwide. *Cf. Bowsher*, 478 U.S. at 734 (declining to invalidate the Comptroller General's removal protections in part because striking the 65-year-old provision would "significantly alter the Comptroller General's office," potentially "[r]ecasting the [position] as an officer of the Executive Branch").

Finally, Walmart argues that the Court's remedy ruling, which allows this enforcement action to proceed because it was brought by constitutionally appointed officers, "effectively overrule[s]" *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which held that the FTC's structure is constitutional and remains good law today. [71] at 47. But the Court's remedy ruling did not assess the constitutionality of the modern FTC's structure, nor did it need to do so. Even if the post-*Humphrey's* grant of litigation authority gave rise to any constitutional issue—which it did not—"it doesn't follow that [the FTC] cannot pursue this lawsuit" brought by properly appointed Commissioners. *See* [52] at 59–62. "[T]he unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the . . . responsibilities of his office[.]" *Collins*, 141 S. Ct. at 1788 n.23. And Walmart cannot identify any harm traceable to the President's inability to remove the Commissioners at will. *See id.* at 1788-89.

For these reasons, the Court should summarily dismiss Walmart's rehashed constitutional arguments and stand by its earlier ruling.

**D. THE APPEAL OF ANY ORDER DENYING WALMART'S MOTION TO DISMISS IS BEST TAKEN AFTER A FINAL JUDGMENT ON THE MERITS.**

If the Court denies Walmart's motion in whole or in part, it should refuse to certify its order for immediate appeal for all the reasons stated in the FTC's opposition to Walmart's prior motion for certification. *See* [60]. As alleged in the Amended Complaint, Walmart's ongoing violations continue to cause consumers substantial injury, and further delaying this case will only result in additional harm, particularly if the Court or the Seventh Circuit were inclined to continue the current stay of discovery. The parties will have ample opportunity to seek review at the conclusion of this matter. Walmart's renewed request for certification should be denied.

## V. CONCLUSION

The Amended Complaint's TSR allegations remedy the deficiencies identified in the Court's Order and are more than adequate to meet the Rule 9(b) pleading standard. Walmart's other challenges to the Court's prior rulings also do not provide any compelling reasons to revisit those sound conclusions. Walmart's Motion to Dismiss the Amended Complaint and alternative request to certify any ruling denying dismissal for interlocutory appeal should be denied.

Dated: September 15, 2023                    Respectfully submitted,

                                            */s/ Karen D. Dodge*
                                            KAREN D. DODGE
                                            PURBA MUKERJEE
                                            MATTHEW G. SCHILTZ
                                            RACHEL F. SIFUENTES
                                            Attorneys for Plaintiff
                                            Federal Trade Commission
                                            230 South Dearborn Street, Suite 3030
                                            Chicago, Illinois 60604
                                            (312) 960-5634 (telephone)
                                            (312) 960-5600 (facsimile)