**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FEDERAL TRADE COMMISSION,

                Plaintiff,

       v.

WALMART INC.,

                Defendant.

Case No. 1:22-cv-03372

Hon. Manish S. Shah

**REPLY IN SUPPORT OF**
**WALMART INC.'S MOTION TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.      THE TSR CLAIMS SHOULD BE DISMISSED ........................................... 2

      A.      The FTC Fails To Plead Any Of The Elements Of TSR Liability ......... 2

            1.      The FTC Fails To Allege Underlying TSR Violations ............... 2

            2.      The FTC Fails To Allege Actual Knowledge Or Conscious Avoidance ................................................................................ 10

            3.      The FTC Fails To Allege Substantial Assistance ..................... 13

      B.      The FTC's Civil Penalty Allegations Fail ............................................ 14

II.     THE SECTION 5 CLAIM SHOULD BE DISMISSED .................................. 15

III.    THE FTC'S LITIGATION POWERS ARE CONSTITUTIONALLY VOID ................. 17

IV.    THE COURT SHOULD CERTIFY ANY ORDER DENYING DISMISSAL FOR INTERLOCUTORY APPEAL ..................................................................... 20

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bankers Tr. Co. v. Old Republic Ins. Co.*,
  959 F.2d 677 (7th Cir. 1992) ...................................................9

*Barr v. American Ass'n of Pol. Consultants, Inc.*,
  140 S. Ct. 2335 (2020)....................................................18, 19

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................14

*Bowsher v. Synar*,
  478 U.S. 714 (1986).........................................................18, 19

*CFTC v. Yukom Commc'ns Ltd.*,
  2021 WL 4477874 (N.D. Ill. Sept. 30, 2021) .........................9

*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988)...............................................................15

*Domanus v. Lewicki*,
  645 F. Supp. 2d 697 (N.D. Ill. 2009) ......................................9

*FTC v. Credit Bureau Ctr., LLC*,
  937 F.3d 764 (7th Cir. 2019) .................................................16

*FTC v. Day Pacer LLC*,
  2023 WL 5671618 (N.D. Ill. Sept. 1, 2023) ..........................11

*FTC v. HES Merch. Servs. Co., Inc.*,
  2014 WL 6863506 (M.D. Fla. Nov. 18, 2014) .......................11

*FTC v. Nudge, LLC*,
  2022 WL 2132695 (D. Utah June 14, 2022)...........................11

*FTC v. Shire ViroPharma, Inc.*,
  917 F.3d 147 (3d Cir. 2019)...................................................16

*Galvan v. Norberg*,
  678 F.3d 581 (7th Cir. 2012) .................................................15

*Goldberg v. Rush Univ. Med. Ctr.*,
  929 F. Supp. 2d 807 (N.D. Ill. 2013) ......................................8

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Goren v. New Vision Int'l, Inc.*,
  156 F.3d 721 (7th Cir. 1998) ..................................................................8

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935).............................................................................17

*Johnson v. Burken*,
  930 F.2d 1202 (7th Cir. 1991) ..........................................................15

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019)..........................................................................7

*LabMD, Inc. v. FTC*,
  894 F.3d 1221 (11th Cir. 2018) .........................................................17

*Nat'l Fed'n of the Blind v. FTC*,
  303 F. Supp. 2d 707 (D. Md. 2004), *aff'd*, 420 F.3d 331 (4th Cir. 2005) .................................2

*SEC v. Apuzzo*,
  689 F.3d 204 (2d Cir. 2012)...............................................................13

*United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*,
  486 F. Supp. 3d 1210 (N.D. Ill. 2020) ..............................................14

*Spiegel, Inc. v. FTC*,
  540 F.2d 287 (7th Cir. 1976) ........................................................16, 17

*Texas Children's Hosp. v. Burwell*,
  76 F. Supp. 3d 224 (D.D.C. 2014).....................................................12

*United States v. Dish Network L.L.C.*,
  954 F.3d 970 (7th Cir. 2020) .............................................................5, 6

*United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cty.*,
  965 F.2d 311 (7th Cir. 1992) ..............................................................14

## STATUTES, REGULATIONS, AND RULES

15 U.S.C. § 45(a) ....................................................................................6, 16

15 U.S.C. § 45(n) .........................................................................................16

15 U.S.C. § 53(b) .........................................................................................15

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

15 U.S.C. § 57 .................................................................................................19

28 U.S.C. § 1292(b) .........................................................................................20

16 C.F.R. § 310.2(aa) ........................................................................................6

16 C.F.R. § 310.2(dd) ........................................................................................2

16 C.F.R. § 310.2(ff) ..........................................................................................2

16 C.F.R. § 310.2(gg) .................................................................................. *passim*

16 C.F.R. § 310.2(n) ...............................................................................2, 3, 4, 7

16 C.F.R. § 310.3(a)(4) ......................................................................................5

16 C.F.R. § 310.3(b) ...................................................................................10, 13

16 C.F.R. § 310.4(a)(10) ...............................................................................5, 12

60 Fed. Reg. 43,842 (Aug. 23, 1995).............................................................5, 11

80 Fed. Reg. 77,520 (Dec. 14, 2015) .......................................................4, 6, 7, 12

**OTHER AUTHORITIES**

*American Heritage Dictionary* (3d ed. 1994) ......................................................3

S. Rep. No. 103-80 (1993) .............................................................................5, 6

**INTRODUCTION**

Walmart takes fraud against its customers seriously, and for years has implemented a robust anti-fraud program designed to defeat the various scams the FTC identifies in its complaint. The results are impressive:  The FTC does not dispute that the vast majority of money transfers—more than 99.9% overall—are legitimate.  MTD 2.  This case involves the tiny fraction of transfers in which third-party criminals trick customers into using Walmart's service to send them money. And when these isolated instances of criminal activity unfortunately occur, Walmart routinely partners with law enforcement to protect its customers and bring fraudsters to justice.  *Id.* at 23.

Despite these efforts, the FTC is set on blaming Walmart for the criminal misconduct of others.  But as this Court recognized in its first dismissal order, the Telemarketing Sales Rule (TSR) is not an all-purpose tool that can be wielded against companies offering legitimate services to the public, just because a small number of bad actors sometimes use those services to commit crimes.  Rather, as relevant here, TSR liability is carefully limited to entities that "*know*[*ingly*]" provide "*substantial assistance*" to "*seller*[*s*] *or telemarketer*[*s*]" defying the law.  And the Court rightly found that the FTC's initial complaint failed to satisfy any of these essential requirements.

The FTC's opposition brief confirms that nothing has changed.  The FTC's new complaint still fails to allege that Walmart's provision of everyday money-transfer services amounts to substantial assistance; it does not allege that Walmart knew the transactions at issue were illegal; and it does not even properly allege that the alleged scams qualify as "telemarketing" under the governing regulatory definitions.  For all these reasons, the FTC's TSR claims should again be dismissed, this time with prejudice.

Walmart also asks the Court to revisit its prior rulings on (1) the FTC's Section 5 claim, and (2) Walmart's constitutional challenge to the FTC's litigating authority.  If the Court adheres to those rulings, it should certify its decision for interlocutory appeal.

1

**ARGUMENT**

## I.     THE TSR CLAIMS SHOULD BE DISMISSED

Walmart shares the FTC's desire to protect innocent customers from predatory fraudsters. But just as with its initial complaint, the FTC has not pleaded any of the core elements of a TSR violation, and it comes nowhere close to alleging the actual knowledge required for civil penalties.

### A.     The FTC Fails To Plead Any Of The Elements Of TSR Liability

#### 1.     The FTC Fails To Allege Underlying TSR Violations

The FTC's TSR theories allege that criminal fraudsters are using a variety of scams to trick victims into sending them money via Walmart's money-transfer service.  Such scams are illegal and deplorable, but most of them do not satisfy the formal regulatory definitions of "telemarketing" set forth in the TSR.  And the ones that arguably do count as telemarketing fail on other grounds. Walmart is not liable for this third-party criminal misconduct.

**a.**     Most of the FTC's alleged scams do not qualify as underlying TSR violations by a "seller" or "telemarketer" as defined in the TSR.  16 C.F.R. § 310.2(dd), (ff).  To fall within the TSR, the caller must be engaged in "telemarketing," which requires, among other elements, (1) a "plan, program, or campaign," (2) that uses "more than one interstate telephone call," and (3) that is "conducted to induce the purchase of goods or services." *Id.* § 310.2(gg).  And the recipient of the call must be a "customer," defined as a person "who is or may be required to pay for goods or services offered through telemarketing." *Id.* § 310.2(n).[1]  The alleged impersonator scams (AC

---

[1] The definitions of "telemarketer" and "telemarketing" also reference "donor[s]" making "charitable contributions."  16 C.F.R. § 310.2(ff), (gg).  In a footnote, the FTC passingly suggests that "[e]mergency scams" might count as "charitable donations" because they "involve solicitations for 'gift[s] of money.'"  Opp. 12 n.5.  But the amended complaint describes emergency scams as involving only "the purchase of goods or services."  AC ¶ 158.  In any event, gifts of money are "charitable contributions" only if they are gifts to *charities*. *See Nat'l Fed'n of the Blind v. FTC*, 303 F. Supp. 2d 707, 719 (D. Md. 2004), *aff'd*, 420 F.3d 331 (4th Cir. 2005).

2

¶¶ 147-55), emergency scams (*id.* ¶¶ 156-60), lottery scams (*id.* ¶¶ 134-41), romance scam (*id.* ¶ 163), and secret-shopper scam (*id.* ¶ 131) do not satisfy these definitions. MTD 6-10.

These allegations share a common defect fatal to the FTC's TSR claims: The person receiving the call and sending the money is not a "customer" who has been "induce[d] [to] purchase" a good or service that was "offered through telemarketing." 16 C.F.R. § 310.2(n), (gg). In the impersonation scams, the person sends money to satisfy a past-due debt—which courts have squarely held falls outside the TSR. MTD 7-8.[2] In the lottery scams, the person sends money to collect something they purportedly already won. *Id.* at 8-9. In the secret-shopper scam, the person sends money as part of an alleged job testing money transfers. *Id.* at 9-10. And in the emergency and romance scams, the person sends money to a relative or friend so that the recipient can buy something from someone else. *Id.* at 8-9. No ordinary English speaker would describe these transfers as attempts to "purchase" goods or services "offered" by a telemarketer over the phone.

In arguing otherwise, the FTC offers a virtually boundless view of "the purchase of goods or services," claiming that it encompasses any transaction in which a person "is paying for something they are led to believe is valuable or necessary—whether it be an item of value or assistance addressing a need." Opp. 11. That view cannot be squared with the regulation's text. To fall within the TSR's scope, the caller must seek to induce not merely a payment, but "the *purchase* of goods or services." 16 C.F.R. § 310.2(gg) (emphasis added). To "purchase" ordinarily means "[t]o obtain in exchange for money or its equivalent; buy." *American Heritage*

---

[2] The FTC dismisses the cases holding that debt collection is not telemarketing because they involved "legitimate" debts whereas here the debts were "fake." Opp. 17. This distinction fails. As alleged, the callers in the impersonation scams induce victims to send money as "*past-due* payments" for back taxes and overdue utility bills. AC ¶ 147 (emphasis added). That the caller is lying is irrelevant; the point is that the scam itself does not involve telemarketing because the customer is not trying to purchase anything but is instead trying to satisfy a past-due debt.

*Dictionary* 671 (3d ed. 1994). Thus, the person sending the money must seek to buy and obtain the good or service. And it cannot just be any good or service; the person must be a "customer" seeking to buy a good or service "offered" to them "through telemarketing." 16 C.F.R. § 310.2(n).

So while the victim of an IRS impersonator scam may believe she is sending "payments" as back taxes to "resolv[e] an issue with a government agency," Opp. 12, that person is not plausibly described as a "customer" of the IRS; nor is that person trying to "purchase"—i.e., buy for a price—a good or service offered by the IRS. 16 C.F.R. § 310.2(n), (gg). The same goes for persons who send money to extinguish past-due debts for an existing "utility service," collect a "tax refund" or already-won lottery "winnings," or fulfill a job responsibility by sending a "money transfer." Opp. 12. These scam victims are not trying to "purchase" any "offered" good or service; rather, they are trying to satisfy an obligation they believe they already owe (a debt or job duty) or obtain something to which they believe they are already entitled (winnings or a tax refund).

The FTC strays even further from the regulation's text with respect to the emergency and romance scams, which involve transferring money to a relative or friend so that the *recipient* of the transfer can subsequently buy something the *recipient* needs from someone else. The victims of these scams cannot plausibly be described as "customers" of their friends or relatives; nor are they trying to "purchase" a good or service being "offered" by their friends or relatives. 16 C.F.R. § 310.2(n), (gg). Indeed, the FTC's attempt to sweep in these scams directly contradicts its own preamble to the 2016 TSR amendment, 80 Fed. Reg. 77,520 (Dec. 14, 2015). There, the FTC described "personal remittances to family and friends" as "*non*-telemarketing transactions," stressing that transactions in which consumers "transfer money to friends, send money to family to pay tuition and medical bills, or remit money abroad to family" do not arise in the "telemarketing context." *Id.* at 77,550 (emphasis added). The FTC alleges precisely the opposite here with respect

to the emergency and romance scams. *See* AC ¶¶ 156-60, 163.[3]

The logical end point of the FTC's expansive theory of "telemarketing" is absurd. On that theory, if an out-of-state college student follows a plan of calling his mother each month to ask for grocery money, that student is a telemarketer. As a result, if the student uses the grocery money for something other than groceries or otherwise misleads his mother, he violates the TSR. *See* 16 C.F.R. § 310.3(a)(4). And even if he buys groceries, the student violates the TSR if his mother sent the money using a cash-to-cash money transfer. *See id.* § 310.4(a)(10). That cannot be right, and it underscores just how far the FTC is stretching the meaning of "telemarketing" in this case.

Without textual support, the FTC relies mainly on legislative and regulatory history. Opp. 12-14. But these materials cannot override the unambiguous regulatory text, *United States v. Dish Network L.L.C.*, 954 F.3d 970, 979 (7th Cir. 2020), and they do not help the FTC in any event.

The FTC cites the 1994 Telemarketing Act's legislative history to argue that the phrase "goods or services" in the statute should be construed "broadly," and notes its own statement in promulgating the TSR that "goods or services" in the TSR includes "tangible and intangible goods or services." Opp. 13 (quoting S. Rep. No. 103-80, at 8 (1993); 60 Fed. Reg. 43,842, 43,844 (Aug. 23, 1995)). These observations are immaterial: No matter how broadly "goods or services" is stretched, the scope of that phrase does not change the requirements that the call recipient be a *customer* trying to *purchase* a good or service *offered by the caller*. Debt satisfaction, prize collection, job fulfillment, and transfers to relatives do not satisfy these prerequisites.[4]

---

[3] The FTC tries to elide this distinction by cutting out the fraudster, claiming for instance that the *victim* of the romance scam "was induced to pay for a passport." Opp. 12. But the victim did not herself try to purchase the passport with her money transfer; she sent money so that the *fraudster* could purchase a passport from a third party. AC ¶ 163. Said otherwise, the victim was not a "customer" of the fraudster, nor was she trying to buy a passport "offered" by the fraudster.

[4] Although the FTC's cited materials reference a consumer's eligibility for a "prize or award,"

The pre-1994 enforcement actions that the FTC claims Congress "considered" when passing the 1994 Telemarketing Act (Opp. 13) are also inapposite. Those cases arose under Section 5 of the FTC Act, which prohibits "unfair or deceptive acts or practices," 15 U.S.C. § 45(a). The TSR necessarily has a far narrower reach than Section 5, so the cited enforcement actions are not relevant to determining the TSR's scope. Indeed, while Congress referenced the FTC's Section 5 enforcement history as a reason for further legislation, it stressed that, "[b]ecause of the unique nature of the problem addressed by" the Telemarketing Act, "[i]nterpretations of [that Act] should not impact or be affected by the FTC Act." S. Rep. No. 103-80, at 2-3.

The FTC also relies on the preamble to the 2016 TSR amendment, claiming that it references some of the scams alleged here. Opp. 14 (citing 80 Fed. Reg. at 77,544, 77,547-48). But the preamble merely recites various types of "fraud" scams that have "exploit[ed] cash-to-cash money transfers" while peppering in the word "telemarketing" without explanation. 80 Fed. Reg. at 77,544; *see id.* at 77,547-78. Because the preamble "does not purport to interpret" the TSR's telemarketing definition, "the [FTC]'s comments" in the preamble have no bearing on—and certainly cannot alter—the scope of that definition. *Dish Network*, 954 F.3d at 979 (rejecting argument based on FTC's comments in preamble). The preamble also contradicts the FTC's theory that sending money to family and friends amounts to telemarketing. *See supra* at 4.

The FTC next asks the Court to defer to its "interpretation . . . that 'goods or services' covers all manner of 'tangible and intangible goods or services.'" Opp. 15-16. But no one disputes

---

Opp. 13 (quoting S. Rep. No. 103-80, at 8), that does not include an attempt to collect a prize already won (as in the alleged lottery scams). Rather, in referring to prizes and awards, Congress had in mind circumstances in which "the purchaser is told that he or she will receive a valuable prize if something is purchased, but the purchaser th[e]n in fact does not receive such a prize." S. Rep. No. 103-80, at 2; *cf.* 16 C.F.R. § 310.2(aa) (defining "prize" in the TSR to mean an item offered or given "by chance" that is not identified at the time of the offer).

that "goods or services" can be tangible or intangible. Nor is there any dispute that "goods or services" can be "legitimate" or "fake." *Id.* at 16.[5]

The dispute here is over the FTC's theory that the "purchase of goods or services" that are "offered through telemarketing," 16 C.F.R. § 310.2(n), (gg), means any transfer of money that might ultimately be used for something the sender deems "valuable or necessary"—for example, as a gift to a relative to buy groceries. Opp. 11-12. Because the text forecloses that understanding, "there is no plausible reason for deference." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Indeed, the FTC's argument is a "new interpretation" advanced as a "'convenient litigating position,'" which also precludes deference. *Id.* at 2417-18. The FTC cannot identify a single case, enforcement action, or guidance document interpreting the TSR's definitions as broadly as here. Worse still, the FTC's new theory contradicts its prior assertion that transfers for "personal remittances" (such as those involved in the alleged romance and emergency scams) are "*non*-telemarketing transactions." 80 Fed. Reg. at 77,550 (emphasis added). No deference is warranted.

Finally, the FTC entirely ignores that several of its examples do not satisfy the TSR's other definitional requirements. The FTC does not seriously respond to Walmart's argument that extinguishing back taxes and securing freedom from detention—the object of the payments in the IRS impersonator and emergency scam examples (AC ¶¶ 149-51, 158-59)—are not "goods or services" under any conceivable understanding of those words. MTD 8. Nor does the FTC grapple with its failure to allege that its romance scam example (AC ¶ 163) was part of a "plan, program, or campaign," MTD 9; or its failure to allege that two of its utility impersonation scam examples (AC ¶¶ 153-54) involved "more than one *interstate* telephone call," MTD 8. These examples do

---

[5] To make relevant its observations about the scope of "goods or services," the FTC repeatedly mischaracterizes (and then refutes) Walmart's "position" as limiting "telemarketing" to only "legitimate, tangible goods or services." Opp. 15-16. That is not Walmart's argument.

not meet "all the elements of a TSR violation."  Op. 21.  For all these reasons, the FTC's alleged impersonation, emergency, lottery, romance and secret-shopper scams are not telemarketing transactions capable of establishing underlying TSR violations.

     **b.**     The FTC's housing rental scam example (AC ¶ 132) also fails.  MTD 10-12.

*First*, the FTC fails to allege facts connecting this example to any "plan, program, or campaign."  16 C.F.R. § 310.2(gg); MTD 10.  The FTC does not respond to that argument at all.

*Second*, the FTC's allegations do not satisfy the Seventh Circuit's rule that, under Rule 9(b), the plaintiff must allege the identity of the persons (1) making the misrepresentation and (2) to whom the misrepresentation was made.  MTD 11 (citing cases).  The FTC tries to circumvent this Seventh Circuit precedent by citing cases in which the plaintiff omitted "specific names" but alleged "other details with specificity."  Opp. 19.  The FTC's arguments lack merit.

As for the parties to whom the alleged misrepresentations were made (the consumers), the FTC's only argument is that it did not identify them to "protect their privacy."  *Id.*  The only case the FTC cites to justify this argument is one where the complaint omitted the names of medical patients to protect confidentiality.  *See Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 819-20 (N.D. Ill. 2013).  But those patients were not the persons to whom the misrepresentations were made; *Goldberg* involved false claims made to the government.  And, of course, this case does not involve medical patients or confidentiality concerns.  *Cf. Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998) (allegations of unidentified "customers" fail Rule 9(b)).

As for the identities of the persons making the alleged misrepresentations (the alleged telemarketers), the FTC seeks an exemption from Rule 9(b) because it does not know who they are.  Opp. 19-20.  The FTC identifies no authority for that exception.  Indeed, in the only case the FTC cites in which the complaint arguably failed to identify the person who made the misrepresentation, the corporate defendant was the alleged fraudster, and the complaint simply

omitted the name of the specific corporate director who made the statement. *See CFTC v. Yukom Commc'ns Ltd.*, 2021 WL 4477874, at *5 (N.D. Ill. Sept. 30, 2021). Here, by contrast, the omitted identities are third-party criminals with no affiliation to Walmart. *Cf. Domanus v. Lewicki*, 645 F. Supp. 2d 697, 705 (N.D. Ill. 2009) (rejecting under Rule 9(b) allegations of fraud committed by "nonparties" against "unidentified third parties"). And while the FTC complains that it cannot satisfy Rule 9(b) because it does not know who the alleged telemarketers are, that is not a reason for dispensing with Rule 9(b). Indeed, the FTC says that it has no plans to *ever* "track[] down" the telemarketers purportedly underlying its TSR claims. Opp. 21. Walmart cannot fairly defend against an aiding-and-abetting claim without knowing whom it supposedly aided and abetted.

*Third*, the FTC's assertions of fraud in the housing rental scam example impermissibly rest on "report[s] to MoneyGram" (AC ¶ 132); indeed, like many of the complaint's other allegations, they are merely "allegations about allegations" that cannot establish a TSR violation. Op. 23; *see* MTD 12. The FTC asserts that a plaintiff can rely on "secondhand information to plead fraud" if "the facts are not otherwise accessible to the plaintiff and the plaintiff provides the grounds for his suspicions." Opp. 21 n.19. But to invoke this exception, the plaintiff must show that the "facts [are] inaccessible to the plaintiff" because they are instead "within the [defendant's] exclusive control." *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir. 1992). The FTC does not try to satisfy this test—and the facts underlying the FTC's allegations are certainly not within Walmart's exclusive control.

**c.** The advance-fee loan scam allegations (AC ¶¶ 142-46) likewise fail. MTD 13-14.

As to the example involving an "elderly consumer from South Carolina" (AC ¶ 145), the FTC does not allege more than one *interstate* phone call, as required by the definition of "telemarketing." MTD 13. The FTC asks the Court to ignore that problem and infer that the calls originated from Washington because the caller identified herself as a lender from Washington.

Opp. 20 n.18.  But the FTC itself alleges that this was a *scam*, so the inference is difficult to credit.  AC ¶ 145.  This example also flunks Rule 9(b) for failure to allege the identities of the parties to the alleged misrepresentations.  MTD 13.  Although the FTC notes that it alleged other details about the transfers, Opp. 19, the only information about the parties to the misrepresentations is that they involved an elderly consumer from somewhere in South Carolina and a woman who falsely stated that she was a lender in Seattle, Washington.  That is insufficient.  MTD 13.

The FTC takes a similar tack with respect to the other example involving call centers in India (AC ¶ 144).  That example lacks specificity as to the persons to whom, where, or when the alleged misrepresentations were made.  MTD 13-14.  The FTC again points out that it offered "other details" about the transfers, Opp. 20, without addressing the shortcomings identified by Walmart or the cases cited by Walmart holding that such shortcomings are fatal under Rule 9(b).

### 2.    The FTC Fails To Allege Actual Knowledge Or Conscious Avoidance

The FTC also does not plausibly allege that Walmart substantially assisted a telemarketer while it actually "kn[ew] or consciously avoid[ed] knowing" of the telemarketer's TSR violation.  16 C.F.R. § 310.3(b); *see* MTD 14-19.

a.    The FTC leans heavily on its red-flags theory of conscious avoidance.  Opp. 22-24.  Walmart identified several independent reasons why the FTC's red-flag allegations are insufficient as a matter of law, MTD 16-18, and the FTC ignores nearly all of them.

*First*, the FTC fails to heed this Court's admonition that it must allege "*details* about the *majority* of transactions in this case that would show that Walmart knew or consciously avoided knowing about underlying TSR violations."  Op. 25 (emphasis added).  As Walmart explained, the FTC's allegations do not come close to satisfying the Court's decision, MTD 17, and the FTC does not even try to argue otherwise.  Instead, the FTC rehashes its allegations abstractly describing types of possible red flags and its examples that allegedly involved some (or one) of these red

10

flags. Opp. 22-24. These allegations are not qualitatively different from those the Court deemed insufficient last time around; the FTC still fails to allege "details about the *majority* of [the] transactions" and "how many of [them] may have raised red flags." Op. 25 (emphasis added).

*Second*, the FTC fails to connect the alleged red flags with actual *TSR violations*— transactions that satisfy the TSR's definition of "telemarketing"—as opposed to general fraud. MTD 18. To the contrary, the FTC continues to conflate the two, asserting that its alleged red flags "often distinguish *fraud-induced* money transfers from ordinary money transfers." Opp. 22 (emphasis added). But even if that were true, that distinction would not show that Walmart "knew or consciously avoided knowing about *underlying TSR violations*." Op. 25 (emphasis added).

*Third*, the FTC cannot deny that its allegations about red flags show, at most, that Walmart *should have known* of unlawful conduct. MTD 17-18. Indeed, the FTC acknowledges as much, claiming that, because of the alleged red flags, Walmart "*should have* identified [transfers] as unlawful." Opp. 11 (emphasis added). But as the FTC itself made clear when promulgating Section 310.3(b)—and as courts have long held in the traditional aiding-and-abetting context—a "should [have] know[n]" standard is insufficient to establish conscious avoidance. 60 Fed. Reg. at 43,852; *see* MTD 17-18. Rather, as the FTC ultimately admits, conscious avoidance means "'taking *deliberate* steps to ensure one's own ignorance'" of an underlying TSR violation. Opp. 24 (emphasis added). The FTC does not, because it cannot, allege that Walmart's conduct was a *deliberate* effort to *avoid* knowledge of any TSR violations. *See* MTD 15-16.[6] And it is hardly

---

[6] The allegations in this case are thus unlike those in the FTC's cited cases, which involved defendants that (1) paid and worked alongside specific telemarketers, *FTC v. Day Pacer LLC*, 2023 WL 5671618, at *20 (N.D. Ill. Sept. 1, 2023); (2) worked "closely" with the telemarketer to "monitor and improve" its telemarketing operation, *FTC v. Nudge, LLC*, 2022 WL 2132695, at *57 (D. Utah June 14, 2022); or (3) had "detailed awareness of red flags related to particular sets of accounts and transactions," Op. 26 n.19 (citing *FTC v. HES Merch. Servs. Co., Inc.*, 2014 WL 6863506, at *8 n.5 (M.D. Fla. Nov. 18, 2014)).

plausible that Walmart was deliberately avoiding knowledge of TSR violations when the FTC does not refute that Walmart adopted many measures to prevent and detect suspicious money transfers, and Walmart routinely partners with law enforcement when fraud is discovered.

      **b.**     The FTC's reliance on the 2016 TSR amendment prohibiting "seller[s]" and "telemarketer[s]" from accepting cash-to-cash money transfers for "telemarketing" transactions is misplaced. 16 C.F.R. § 310.4(a)(10); *see* Opp. 5-6, 24-26. The FTC first claims that, for purposes of Section 310.4(a)(10), "no red flags indicative of *fraud* are necessary." Opp. 6 (emphasis added). That is true but irrelevant: The FTC must allege Walmart's knowledge or conscious avoidance of an *underlying TSR violation*. If the underlying TSR violation is a violation of Section 310.4(a)(10), the FTC would have to allege (at least) red flags indicating that the cash-to-cash transfer involved *telemarketing*, which it has failed to do here. *See supra* at 11.

      The FTC also points to the preamble, which it says obligated Walmart to ask specific questions and provide warnings. Opp. 5, 24-26 & n.21. But this Court already held that the preamble is insufficient to demonstrate Walmart's knowledge or conscious avoidance. Op. 26 n.18. Indeed, a "preamble does not create law; that is what a regulation's text is for." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 237 (D.D.C. 2014). Section 310.4(a)(10)'s text imposes obligations on "seller[s]" and "telemarketer[s]," not Walmart. And, in any event, the FTC distorts the preamble, which mentions anti-fraud measures implemented by some money-transfer providers, *see* 80 Fed. Reg. at 77,551, but does *not* say that money-transfer providers "must" take specific "affirmative steps," such as asking "consumers questions about whether their transfers are related to telemarketing," Opp. 5-6. Indeed, some commenters expressly urged such a requirement, *see* 80 Fed. Reg. at 77,544-45, but the FTC did not adopt it.

      **c.**     The FTC also continues to rely on a hodgepodge of other points that this Court squarely rejected, including (1) its misleading theory that "Walmart's practice was to pay out

12

transfers even if its employees spotted the red flags and suspected fraud" (Opp. 22, 24); (2) the MoneyGram and Western Union consent decrees (*id.* at 25-26); and (3) its repeated refrain that employees failed to ask questions (*id.* at 24). As the Court explained, none of these allegations provides "evidence of conscious avoidance of TSR violations." Op. 26 & n.18; *see* MTD 18-19.

### 3.    The FTC Fails To Allege Substantial Assistance

The TSR claims also independently fail because the FTC does not allege that Walmart's conduct—processing money transfers for its customers—amounts to "substantial assistance" to telemarketers or other bad actors. 16 C.F.R. § 310.3(b); *see* MTD 19-24.

**a.**    The FTC once again glosses over this Court's prior ruling, which made clear that "[p]rocessing routine transactions isn't substantial assistance" as a matter of law—and that, to survive dismissal, the FTC would have to allege "details" showing that "Walmart *knew* that the majority of [the] transactions at issue were extraordinary" instead of routine. Op. 29, 31. As stressed in the cases cited by the Court (none of which the FTC mentions), crossing that line requires a "high degree of *actual knowledge* of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 214 (2d Cir. 2012) (emphasis added); *see also* MTD 21-22 & n.8.

The FTC's allegations do not clear that actual-knowledge bar, and the FTC does not seriously argue otherwise. Instead, it simply repeats—indeed, cross-references—the same arguments it previously deployed for the knowledge element, asserting that "Walmart has known, or consciously avoided knowing, about red flags indicative of unlawful money transfers," and that Walmart is giving "short shrift" to the preamble to the 2016 TSR amendment. Opp. 27. For the reasons explained above, those arguments do not even show conscious avoidance of knowledge. But they are certainly insufficient to show a "*high* degree of *actual* knowledge." *Apuzzo*, 689 F.3d at 214 (emphasis added). And the FTC undeniably fails to allege Walmart's "specific knowledge about the *vast majority* of money transfers at issue in this case." Op. 31 (emphasis added).

The FTC also admits it failed to "identify specific stores" where "a large proportion of the transactions involved fraud," Opp. 27 n.23—despite this Court's directive to do exactly that, Op. 30-31; *see* MTD 22, and a multi-year FTC investigation. Rather, the FTC claims that its allegation that unspecified "locations" had fraud rates "above 25 percent, 50 percent, or 75 percent" shows "knowledge" amounting to "substantial assistance." Opp. 27 n.23 (citing AC ¶ 53). But that allegation is exactly what the Court rejected the first time. *See* Op. 30-31 (citing Compl. ¶ 46).

**b.** The FTC's handful of allegations involving Walmart employees are unavailing. MTD 22-23. As for the "potentially[] complicit" employees, the FTC argues that determining whether an employee was "actually" complicit can await discovery. Opp. 28 & n.24. But a plaintiff must plead facts, not mere "'suspicion[s]'" of a possible legal violation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is especially true when the complaint follows a years-long investigation by an agency armed with vast investigative powers. And as for the employee in the secret-shopper scam, the FTC does not dispute that Walmart assisted law enforcement in swiftly *stopping* this employee. MTD 23. That is not "culpab[le]" conduct. Op. 31 n.23.

The employee allegations also fail because, as the FTC admits, an employee's knowledge is imputed to the employer only if his "actions [were] 'motivated at least in part by an intent to benefit the corporation.'" Opp. 28 n.25 (citing *United States v. One Parcel of Land Located at 7326 Highway 45 N., Three Lakes, Oneida Cty.*, 965 F.2d 311, 316 (7th Cir. 1992)). Here, the FTC does not even try to allege that the employees were motivated by an intent to help Walmart— nor could it given Walmart's sustained efforts to combat fraud. It follows that any knowledge of TSR violations harbored by these "rogue employee[s]" cannot be imputed to Walmart. *United States ex rel. Sibley v. Univ. of Chi. Med. Ctr.*, 486 F. Supp. 3d 1210, 1219-20 (N.D. Ill. 2020).

**B.    The FTC's Civil Penalty Allegations Fail**

Finally, the FTC's claim for civil penalties under Section 5(m)(1)(A) should be dismissed,

as the FTC still fails to plausibly allege that Walmart acted with actual knowledge or knowledge fairly implied that its own conduct violated the TSR.  MTD 24-25.

The FTC's only argument on this point is its assertion that Walmart knew that "businesses like Walmart are subject to liability for assisting and facilitating cash-to-cash transfers for telemarketing transactions" and "other TSR violations."  Opp. 30.  This shows—at most—a general awareness that the TSR's substantial-assistance provision exists.  But as the FTC acknowledges, to obtain penalties, the FTC must show not only Walmart's knowledge "'of the existence of the provision,'" but also that its specific conduct "'*violated* that provision.'"  Opp. 29 (emphasis added).  The FTC does not point to any allegation in the amended complaint that would support that conclusion.  Particularly given the absence of any TSR text dictating specific measures for money-transfer providers, as well as the extremely weak basis for imposing liability on Walmart under Section 310.3(b), the FTC's request for civil penalties should be dismissed.

## II.     THE SECTION 5 CLAIM SHOULD BE DISMISSED

The FTC does not dispute that the Court may revisit its prior ruling on the Section 5 claims.  To the extent that the FTC suggests that Walmart must satisfy a heightened "'clear and convincing'" threshold, Opp. 30, that is wrong:  Judges may "reexamin[e] their prior rulings in a case on the basis of new information or argument, or just fresh thoughts, without excogitating a 'clear and convincing' reason for their change of heart."  *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir. 1991); *see Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012) (law-of-the-case doctrine is "discretionary").  The FTC's Section 5 claim warrants reexamination on several grounds.  MTD 25-35.

*First*, the FTC does not allege ongoing or imminent misconduct.  The FTC's Section 5 claim is limited by Section 13(b) of the FTC Act, which permits injunctive relief only when the defendant "is violating, or is about to violate," the law.  15 U.S.C. § 53(b).  This provision

15

"requir[es] the [FTC] to allege an ongoing or imminent violation." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 773 (7th Cir. 2019) (citing *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019)). Although the Court's prior ruling adopted a test that "mirrors" the "common law standard for injunctive relief," Op. 48-49, it should instead apply the "plain language of Section 13(b)," which supports the ongoing-or-imminent test. *Shire*, 917 F.3d at 156-58; *see* MTD 26.

The FTC's allegations do not satisfy that test. MTD 25-27. Those allegations focus primarily on past conduct from years ago. Opp. 34. Although the FTC alleges that "Walmart corrected some of its practices only after the FTC began investigating in 2017," *id.*, that argument—even if true—would not override the ongoing-or-imminent requirement demanded by Section 13(b)'s text. *See Credit Bureau*, 937 F.3d at 772-73, 782 (stressing that Section 13(b)'s text controls). The text simply does not authorize relief for past conduct, full stop. And while the FTC also points to a handful of allegations involving more recent money transfers, Opp. 34-35, these few isolated instances do not establish an ongoing or imminent violation that would justify a sweeping injunction governing Walmart's entire anti-fraud program. MTD 27.

*Second*, the FTC fails to allege "unfair" conduct under Section 5(a), 15 U.S.C. § 45(a). The Seventh Circuit has interpreted that term to mean a practice that (1) "offends established public policy" and (2) "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976). *Spiegel*'s interpretation of Section 5(a) was not overtaken by Section 5(n), 15 U.S.C. § 45(n). MTD 27-29. Section 5(n) is not a complete definition of Section 5(a)'s statutory term "unfair," but rather a negative limitation on the FTC's authority. It imposes a necessary condition, not a sufficient one. And while other courts have treated Section 5(n) as providing the exclusive test for unfairness, Opp. 31, they have offered no persuasive textual analysis supporting that view. This Court should apply *Spiegel*.

The FTC does not seriously contend that its Section 5(a) claim is grounded in "established

public policy," *Spiegel*, 540 F.2d at 293—let alone policy "expressed in the Constitution, statutes, or the common law," *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1231 (11th Cir. 2018); *see* MTD 29-30. Nor does it plausibly allege that processing money transfers voluntarily initiated by customers is "immoral, unethical, oppressive, [or] unscrupulous." *Spiegel*, 540 F.2d at 293; *see* MTD 30-31.

*Finally*, applying Section 5 in this case would violate Walmart's due process right to fair notice. MTD 33-35. The FTC relies on this Court's assertion that Walmart had such notice based on "'cases imposing and suggesting liability in similar circumstances.'" Opp. 35. But as Walmart has explained, those cases—which involved defendants engaged in or facilitating conduct that was entirely unauthorized by consumers—are different from the conduct alleged here, and therefore cannot have provided fair notice that Walmart's conduct violated Section 5. MTD 34. This FTC's Section 5 claim should be dismissed in full.

## III. THE FTC'S LITIGATION POWERS ARE CONSTITUTIONALLY VOID

Other than reiterating its flawed law-of-the-case objection, the FTC offers little to refute Walmart's showing that Congress's attempt to grant an independent agency executive litigation powers was invalid and severable. MTD 35-40. Most of Walmart's points go unaddressed, and the FTC's few rejoinders are wrong.

*First*, Walmart's motion explained that because the Supreme Court upheld the FTC's independence from Presidential removal on the ground that the FTC in 1935 exercised no substantial executive powers, *see Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935), Congress in the 1970s could not constitutionally grant this independent agency the quintessential executive power to sue for monetary and injunctive relief. MTD 36. Walmart also refuted the reasons for thinking otherwise that this Court tentatively suggested in a footnote. *Id.* at 36-37. The FTC provides no substantive response to any of this, focusing exclusively on the appropriate remedy assuming there is a constitutional problem.

17

*Second*, in arguing that the proper remedy would be to sever the agency's original removal protections rather than its newer litigation powers, the FTC dismisses Walmart's showing that the contrary conclusion is compelled by *Barr v. American Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020), and *Bowsher v. Synar*, 478 U.S. 714 (1986). Although the FTC continues to try to distinguish those cases as "involv[ing] an amendment to an earlier law that—independent of the statutory scheme—was unconstitutional" (Opp. 37), that claim has not improved.

The FTC asserts that *Barr* severed a 2015 statutory amendment that was an unconstitutional "content-based restriction on speech." *Id.* To the contrary, the 2015 amendment did not "restrict" speech at all: It *exempted* calls regarding the collection of government debt from the statutory ban on robocalls to cellphones. Thus, the constitutional problem was that it transformed the original preexisting speech restriction from content-neutral to content-based, and yet the Court severed the later speech exemption rather than voiding the original speech restriction. MTD 38.

Likewise, the FTC asserts that *Bowsher* severed a statutory amendment that unconstitutionally granted "executive authority to the Comptroller General" despite his being "an officer of the Legislative Branch." Opp. 38. But the Comptroller General was a legislative officer only because of the removal provisions in the original law: If he had been removable by the President rather than Congress, then he would have been an executive officer instead. Thus, the constitutional problem with granting him executive powers was caused by the original law's vesting removal power in Congress, and yet the Court severed the later executive powers rather than voiding the original removal provision. MTD 37-38.

Accordingly, just as in *Bowsher*, the FTC's removal protections here were constitutional as originally enacted, and what was unconstitutional was Congress's later vesting of executive power in this independent agency. And so the applicable severability rule is *Barr*'s holding that "an unconstitutional statutory amendment 'is a nullity' and 'void' when enacted, and for that

18

reason has no effect on the original statute." 140 S. Ct. at 2353 (plurality op.).[7]

*Third*, the FTC gets Walmart's position about the FTC's severability clause exactly backwards. The FTC asserts that Walmart is asking this Court to "disregard" that clause, Opp. 38, when in fact Walmart asked this Court to enforce it, MTD 39. The FTC simply ignores that the severability clause was added to the statute in 1938, after the removal protections were enacted in 1914 and before the litigation powers were granted in the 1970s. *See id.* Thus, because the severability clause expressly instructs that the rest of the FTC Act "shall not be affected" by any provision "held invalid," 15 U.S.C. § 57, Congress has made clear that the litigation powers unconstitutionally granted in the 1970s must be severed, rather than "affect[ing]" the removal protections that the Supreme Court had upheld in 1935.

As for what Congress "would have preferred" as a remedy (Opp. 39), the FTC disregards Congress's own laws. For the first sixty years of the agency's existence, Congress was content with an independent FTC that operated through adjudication rather than litigation, and Congress has never blessed subjecting the FTC's litigation powers and adjudication powers to Presidential control. MTD 39. So whatever "regulatory disruption" may occur from limiting the FTC to the powers it wielded for most of its existence, Opp. 39, that pales in comparison to "significantly alter[ing]" the FTC and "making [it] subservient to the [President]" through "severance at this late date of the removal provisions" enacted and upheld roughly a century ago, *Bowsher*, 478 U.S. at 734. Likewise, the FTC ignores that severing the litigation powers rather than destroying the agency's independence even for its original adjudication powers implements the severability principle that the solution should be limited to the problem. MTD 38-39.

---

[7] By contrast, in other Supreme Court removal-power cases, the removal protections were unconstitutional when the agency was created, which presented the very different question whether to have no removal protection or no agency at all. MTD 39 n.11.

*Finally*, the FTC never refutes Walmart's showing that instead of following *Humphrey's Executor* as it must, this Court's remedial ruling instead violates *Humphrey's Executor* by asserting that the correct remedy would be to deem the FTC's removal protections unenforceable. *Id.* at 39-40. Unless the Supreme Court rules otherwise, *Humphrey's Executor* is still good law, and *Humphrey's Executor* plainly held that the removal protections are enforceable, given the FTC's lack of executive powers at the time. It was the addition of executive litigation powers that created the post-*Humphrey's Executor* constitutional defect, and thus it is the addition of those powers that should be deemed unenforceable. The FTC tries to avoid dealing with the logical implication of this Court's remedial ruling by demurring that this Court "did not assess the constitutionality of the modern FTC's structure." Opp. 39. But that is no answer to the problem Walmart identified with the ruling.

## IV. THE COURT SHOULD CERTIFY ANY ORDER DENYING DISMISSAL FOR INTERLOCUTORY APPEAL

If the Court adheres to its prior rulings on the Section 5 and constitutional issues, it should certify its decision for interlocutory appellate review. MTD 40. Allowing the Seventh Circuit to resolve these purely legal issues now rather than later would be efficient and serve judicial economy, as their resolution will dictate the course and scope of this litigation and may terminate it altogether. And while the FTC refers to its prior arguments against certification, Opp. 40, this Court already indicated that these issues satisfy 28 U.S.C. § 1292(b)'s threshold requirements. *See* Order, ECF No. 68.

## CONCLUSION

The FTC's claims against Walmart should be dismissed with prejudice.

Dated: October 9, 2023

Roman Martinez (*pro hac vice*)
Drew R. Wisniewski (ARDC No. 1016351)
Jessica L. Saba (*pro hac vice*)
Blake E. Stafford (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004
(202) 637-2200
roman.martinez@lw.com
drew.wisniewski@lw.com
jessica.saba@lw.com
blake.stafford@lw.com

Respectfully submitted,

*/s/ Sean M. Berkowitz*

Sean M. Berkowitz (ARDC No. 6209701)
Johanna M. Spellman (ARDC No. 6293851)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, IL 60611
(312) 876-7700
sean.berkowitz@lw.com
johanna.spellman@lw.com

Hashim M. Mooppan (*pro hac vice*)
Krista Perry Heckmann (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
hmmooppan@jonesday.com
kperryheckmann@jonesday.com

*Counsel for Defendant Walmart Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 9, 2023, I filed the foregoing document with the Court through the Court's electronic filing system. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.

　　　　　　　　　　　　　　　 */s/ Sean M. Berkowitz*　　　　　　
　　　　　　　　　　　　　　　 Sean M. Berkowitz