UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>WALMART INC.,<br><br>    Defendant. | No. 22 CV 3372<br><br>Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

Many fraudsters use money transfers to obtain their ill-gotten gains from victims and Walmart offers money transfer services at its locations. The Federal Trade Commission is suing Walmart under the Federal Trade Act, 15 U.S.C. §§ 41 et seq., and the Telemarketing Sales Rule, 16 C.F.R. §§ 310.1 et seq., for executing money transfers made as part of a fraud scheme. [1].[1] Walmart moved to dismiss the complaint, [23], and after that motion was granted in part and denied in part, [52], the FTC filed an amended complaint. [62]. Walmart now moves to dismiss the amended complaint, [70], and that motion is granted in part and denied in part. The FTC has not alleged a claim against Walmart for providing substantial assistance to violators of the Telemarketing Sales Rule. I decline to reconsider my previous ruling that the FTC has stated a claim under Section 5 of the FTC Act.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of the filings.

## I.    Legal Standards

On a Rule 12(b)(6) motion to dismiss, the court accepts all well-pleaded factual allegations, draws all reasonable inferences in plaintiff's favor, and then asks whether that factual content allows the court to infer that the defendant is liable for the misconduct alleged, i.e., whether the plaintiff has stated a claim that is plausible on its face. *See Protect Our Parks, Inc. v. Buttigieg*, 97 F.4th 1077, 1094 (7th Cir. 2024).

Complaints alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This pleading standard requires the plaintiff to "plead the first paragraph of any newspaper story, i.e., the who, what, when, where, and how of the fraud." *Lanahan v. County of Cook*, 41 F.4th 854, 862 (7th Cir. 2022). "What gets included in that first paragraph may vary on the facts of a given case," as courts balance "the twin demands of detail and flexibility" made by the Federal Rules of Civil Procedure. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (cleaned up).

## II.    Background

Walmart offers financial services at its stores, including money transfers. [62] ¶ 14. The previous opinion in this case details Walmart's money transfer services, policies, and practices. *See F.T.C. v. Walmart Inc.*, 664 F.Supp.3d 808, 815–23 (N.D.

Ill. 2023). The facts at issue in this opinion, and the new allegations in the amended complaint, are about Walmart's alleged violations of the Telemarketing Sales Rule.

The Telemarketing Sales Rule prohibits deceptive and unfair acts in telemarketing. *See* 15 U.S.C. § 6102(a)(1)–(2). The rule defines telemarketing as the inducement of a sale of goods or services or a charitable contribution over interstate phone calls. *See* 16 C.F.R. § 310.2(hh). In 2016, the Commission amended the TSR to prohibit the use of money transfers to pay for any good or service or charitable contribution offered or solicited through telemarketing. *See* 16 C.F.R. § 310.4(a)(10); [62] ¶ 112. This prohibition applies to all telemarketing-related transactions, not just transactions induced by fraudulent telemarketing. [62] ¶ 112. The Statement of Basis and Purpose for the 2016 amendment (published in the 2015 Federal Register), explained that cash-to-cash money transfers "are used almost exclusively by perpetrators of telemarketing fraud … because this method of payment is a fast way to extract money anonymously and irrevocably from victims of fraud." [62] ¶ 113. The Statement of Basis and Purpose also noted that legitimate telemarketers do not rely on cash-to-cash money transfers to receive payment. *Id*. Beyond the telemarketers themselves, those who provide substantial assistance to telemarketers, knowing that the telemarketer is engaged in a practice that violates the rule, also violate the rule. *See* 16 C.F.R. § 310.3(b) (TSR substantial assistance provision).

## A. Money Transfers

Money transfers at Walmart are completed by companies like MoneyGram, Ria, and Western Union, but Walmart acts as their agent by providing the transfer

3

services at its physical locations. [62] ¶ 15. Walmart has been licensed as a money services business in the United States since December 2001 and offers money transfer services to customers in the United States and around the world. *Id*. A typical money transfer ranges from $250 to $400 and is usually sent to the same individuals once or twice a month. [62] ¶ 126.

In contrast, money transfers that are the product of fraud are often for high dollar amounts, between recipients that have no apparent relationship, send money out of the United States, or are completed through different money systems (for instance sending the money through MoneyGram and receiving the money through RIA). [62] ¶ 3. Fraudsters often also complete multiple transfers in relatively short periods of time, do back-to-back transfers, and pick up or send money using fake IDs, out-of-state IDs, multiple addresses, and variations on the same name. *Id*. Finally, the senders of fraudulently induced money transfers are often elderly or first-time users of money transfer systems at Walmart. *Id*. Walmart can track whether a consumer has sent a money transfer before through its point-of-sale system. [62] ¶ 127.

### B. Fraud Schemes

Many fraud schemes are perpetrated over the phone; fraudsters will initiate phone calls to consumers and make false or misleading statements to induce the consumers to send money, often via money transfer. [62] ¶¶ 122–25. The Commission alleges the following schemes as the basis for its claims that Walmart provided substantial assistance to telemarketers violating the Telemarketing Sales Rule.

### 1. Secret Shopper Scam

In November 2017, a Walmart associate in Beaumont, Texas, cashed out money transfers when no customer was present, in complicit furtherance of a scam perpetrated over the phone. [62] ¶ 131. An individual had responded to a purported "secret shopper" job opportunity over the phone. He was recruited to test Walmart's money transfer services by cashing a check—later proved to be fake—and sending most of the proceeds via money transfer at a Walmart location. *Id*.

### 2. Housing Rental Scam

For two months in 2018, fraudsters used money transfer services at a Nevada Walmart location to collect money from their fake housing rental scheme (inducing people to pay for nonexistent rental properties). [62] ¶ 132. The Nevada Walmart location processed multiple, back-to-back transfers for a money transfer recipient who used different addresses, telephone numbers, and out-of-state IDs; two of the transfers paid out by associates at the location were reported to MoneyGram as being part of a housing rental scam. *Id*. One victim lost $1,581 through a money transfer. *Id*.

### 3. Lottery Scam

In a lottery scam, telemarketers call consumers and tell them that they have won a lottery, prize, or sweepstakes but have to pay taxes, insurance, or some other processing fee in order to obtain their winnings. [62] ¶ 134. Those payments are often made through money transfers by elderly or first-time senders of money transfers;

after sending the money transfer, the victim never receives the promised good or money. *Id.*

A particular telephone lottery scam that resulted in a federal criminal case, *United States v. Smith*, Case No. 21-cr-0372 (M.D. Pa.), took place from October 2016 to July 2018, in and around Gulfport-Biloxi, Mississippi, and used Walmart money transfer services to execute the fraud. [62] ¶ 136. The coconspirators, Troy Smith and Michelle Greenwood, picked up money transfers from consumers who had been told by Jamaica-based telemarketers that they had to pay money for goods or services related to a sweepstakes prize they had won. *Id.*

Smith and Greenwood received money transfers using different spelling variations of their names, but with the same driver's license numbers. [62] ¶ 137. From August 2016 to July 2018, they picked up at least 128 money transfers totaling over $134,800 from 24 different individuals. *Id.* Smith also sent at least 130 money transfers totaling $76,360 to Jamaica over a one-year period. [62] ¶ 138.

Four elderly consumers submitted complaints to MoneyGram in April 2017 stating that they had lost money to a lottery scam where Smith picked up their transfer. [62] ¶ 137. MoneyGram provided those complaints to Walmart in May 2017. *Id.* One of the victims of the scam, who received more than one interstate phone call related to the scam, sent approximately 72 money transfers totaling $108,4000 over an eight-month period; the victim sent three transfers from the same Walmart location totaling approximately $9,887 in a single day. [62] ¶ 139. Another victim in Indiana received phone calls from the scammers telling him that he had won a prize

of $1.5 million dollars and a Mercedes automobile. [62] ¶ 140. This victim sent twelve of thirteen money transfers totaling approximately $5,864.18 from the same Walmart location; he told the employees that he was sending money transfers to obtain a prize. *Id.*

### 4. *Advance-fee Loan Scams*

In an advance-fee loan scam, a telemarketer calls consumers and tells them they are qualified for a loan or line of credit, but that they must pay an upfront fee to obtain the loan. [62] ¶ 142. The Commission alleges facts about two such schemes that used money transfers at Walmart locations. The first occurred from March 2017 to April 2019; telemarketers called consumers and told them that they had been approved for a loan but had to make an earnest money payment or initial installment payment on the loan via money transfer. [62] ¶ 144. At least two of the scheme's principals pled guilty to criminal fraud charges in *United States v. Parmar*, No. 19-cr-0160 (E.D. Va.). *Id.*

In 2022, an elderly consumer in South Carolin received multiple phone calls from a telemarketer who identified herself as being with Harborview Lenders in Seattle, Washington, and told the consumer that she would receive a $5,000 loan but had to pay an upfront fee of $487.50 to obtain it. [62] ¶ 145. The consumer was directed to go to the nearest Walmart location and send the fee as a money transfer. *Id.* When the consumer attempted to do so, MoneyGram blocked the first two transfers, but the Walmart employee allowed her to send the fee to another recipient through Western Union. *Id.* Walmart employees did not ask the consumer any

questions about the money transfer or provide her any warnings about fraud or the ban on cash-to-cash money transfers to pay for goods, services, or charitable contributions that were sold or induced through a phone call. *Id*. Advance-fee loan scams were one of the scams perpetrated by a group of fraudsters in 2015 and 2016, resulting in a suit against a Florida man and his companies. [62] ¶ 151.

### 5. Imposter Scams

Another group of fraud schemes that commonly uses money transfers are schemes in which a consumer receives a phone call from someone pretending to be an authority figure who tells the victim to send money immediately to either prevent dire consequences or obtain a government grant or refund. [62] ¶ 147.

From 2016 to 2017, three codefendants in *United States v. Gohil*, No. 17-cr-0212 (E.D. Wis.), ran an IRS impersonation scheme where callers based in India told consumers that they would be arrested if they did not pay their back taxes through a money transfer. [62] ¶ 149. The three codefendants picked up the money transfers from Walmart locations, using fake IDs to pick up multiple, high dollar transfers and immediately sent money out again. *Id*.

In a different scheme, from March 2017 to April 2019, callers told consumers that they were calling from the FBI, DEA, IRS, or Social Security Administration and that the consumers had to immediately send money to avoid being arrested or prosecuted, or to prevent loss of their Social Security benefits. [62] ¶ 150. Many victims used money transfers to send the money and the criminals picked up the transfers at Walmart locations. *Id*. A similar scheme that ran from July 2015 to

February 2016 involved runners picking up money transfers from the same Walmart locations, often picking up multiple transfers in the same day without being stopped. [62] ¶ 151.

In February and March 2016, a consumer in Kentucky was told over the phone that she was owed a large tax refund, but that she had to pay fees and taxes before she could receive the refund. [62] ¶ 152. She was directed by the fraudster to send MoneyGram transfers from her local Walmart; she sent $12,508 in total to multiple locations, sometimes sending multiple transfers in the same day. *Id*. No one at Walmart asked her any questions or provided her with any warnings. *Id*.

In November 2022, a victim in New Jersey was called by fraudsters impersonating her utility company; they told her that she had to send money to prevent her electricity from being disconnected. [62] ¶ 153. She sent $1,615 through a money transfer at Walmart and was not asked whether her transfer was related to telemarketing or given any warnings about fraud. *Id*. A victim of a similar scheme was told she had to pay $5,028 via money transfer to prevent her power from being disconnected and was directed to go to Walmart to execute the transfer. [62] ¶ 154. When she did so, no one at Walmart asked her why she was sending so much money or gave her warnings about telemarketing scams. *Id*.

### 6. *Person-in-Need and Grandparent Scams*

The final group of scams alleged in the complaint are "person-in-need" or "grandparent" scams. These entail calls from fraudsters who impersonate a family-member or loved one and say that they need money to avoid going to jail, make it

home, or avoid some kind of difficulty. [62] ¶ 156. There are three specific scams described in the complaint that relied on money transfers executed at Walmart.

First, in May 2022, an older man in Illinois received a call from someone impersonating his nephew who told him that he had been detained at an airport in Mexico and he needed $625 to pay a fee to be able to come home. [62] ¶ 158. The man was directed to go to Walmart to send the money via money transfer; while at Walmart, the victim, who had never sent a money transfer before, told the employee that he did not know the person to whom he was sending money. *Id*. Despite this, the employee processed the transfer and failed to provide any warnings about fraud or telemarketing. *Id*. The second scam occurred in May 2018, when an elderly couple in Florida lost $1,600 because they received calls from someone impersonating their grandson who told them he had been in a car accident and needed money to avoid going to jail. [62] ¶ 159. The couple sent the money via transfer services at their local Walmart. *Id*. Finally, a woman in Colorado was told over the phone by a man she had met on a dating site that he needed money to purchase a replacement passport because he had lost his. [52] ¶ 163. She sent two $2,500 transfers on consecutive days from her local Walmart and was not asked any questions about the transfers or given any warnings about fraud or the ban on cash-to-cash money transfers. *Id*.

## C.    **Walmart's Knowledge**

Walmart knew that fraudsters were being prosecuted for schemes that relied on money transfers executed at Walmart locations, including federal criminal prosecutions in 2016, 2017, 2019, 2020, and 2021. [62] ¶¶ 34–35.

In 2009, MoneyGram entered into a Stipulated Order for Permanent Injunction and Final Judgment in *FTC v. MoneyGram*, which charged MoneyGram with assisting and facilitating deceptive and abusive telemarketing acts and practices, as well as engaging in deceptive acts and practices in violation of Section 5 of the FTC Act. [62] ¶ 42; *see also id.*, No. 09-cv-06576, Docket No. 13 at 1 (N.D. Ill. Oct. 21, 2009). The order required MoneyGram and its agents to provide warnings to consumers about fraud, including telemarketing fraud, monitor and investigate activity at locations to detect and prevent fraud, and identify locations that are involved or complicit in frauds. [62] ¶ 42. Walmart acknowledged receipt of the order on February 1, 2010. *Id.*

In 2017, the FTC sued Western Union regarding fraudulent money transfers and the parties entered into a Stipulated Order and Final Judgment. *See F.T.C. v. Western Union*, No. 17-cv-0110 (M.D. Pa. Jan. 19, 2017). That order required Western Union and its agents to take similar anti-fraud precautions as detailed in the MoneyGram order, but also addressed compliance with the Telemarketing Sales Rule's prohibition of cash-to-cash money transfers. [62] ¶ 44. Specifically, the order required Western Union and its agents to ask consumers before they transfer money whether their transfers are to pay for goods or services offered or sold through telemarketing and decline to process such money transfers; Western Union and its agents had to warn consumers that it is illegal for any seller or telemarketer to accept money transfers for goods or services sold through telemarketing. *Id.* Western Union provided Walmart with a copy of the Order on January 17, 2017. *Id.*

11

The MoneyGram order was updated in 2018 to require MoneyGram and its agents to identify, prevent, and stop cash-to-cash money transfers being used to pay for a good or service offered or sold through telemarketing; Walmart acknowledged receipt of the updated order. [62] ¶ 45; *see also MoneyGram*, No. 09-cv-06576, Docket No. 20 at 7–8 (N.D. Ill. Nov. 13, 2018).

MoneyGram, Western Union, and Ria have provided information to Walmart about fraud-related money transfer activity at its locations, including fraud schemes perpetrated over the phone. [62] ¶¶ 53, 61, 87, 125. MoneyGram, Western Union, and Ria have all disciplined Walmart locations for continuing to process fraud-related money transfers, including fraud perpetrated over the phone. [62] ¶ 105.

## III. Analysis

### A. Violations of the Telemarketing Sales Rule

The FTC alleges that Walmart violated the Telemarketing Sales Rule by "provid[ing] substantial assistance or support to any seller or telemarketer when [Walmart] knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule." *See* 16 C.F.R. § 310.3(b) (TSR substantial assistance provision).[2] To allege a substantial assistance claim, the FTC must adequately allege (1) the underlying violation of the TSR, (2) Walmart's knowledge or conscious avoidance of knowledge of the underlying violation, and (3) "substantial assistance" by Walmart to help the

---

[2] The FTC alleges that Walmart assisted with violations of sections 310.4(a)(10) (ban of cash-to-cash money transfer to pay for good, service or charitable contribution induced through telemarketing), 310.3(a)(4) (making false or misleading statements), 310.4(a)(4) (advance-fee loan scheme) of the TSR. *See* [62] ¶¶ 178–82.

primary actor's underlying violation. *See F.T.C. v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240–41 (11th Cir. 2017) (TSR's substantial assistance claim and Second Restatement of Torts' aider and abettor rule share three basic elements: primary violation, substantial assistance or encouragement or support, and knowledge); *S.E.C. v. Apuzzo*, 689 F.3d 204, 206 (2nd Cir. 2012) (stating elements of a claim for aider and abettor in a securities civil enforcement action as (a) existence of securities law violation by primary party, (b) knowledge of this violation on the part of the aider and abettors, and (c) substantial assistance by the aider and abettor in the achievement of the primary violation). The TSR does not require a direct connection between the substantial assistance and the underlying violation, "causal or incidental" help is sufficient *See F.T.C. v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) (Noting the Commission rejected a rule that proposed a requirement that the "substantial assistance [be] related to the commission or furtherance of that act or practice.").

### 1.    *Is the alleged behavior telemarketing?*

For the FTC's complaint to state a claim for violation of the Telemarketing Sales Rule, the scams alleged in the complaint must include telemarketing, which is defined as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(hh); *see also* 15 U.S.C. § 6106(4) ("The term 'telemarketing' means a plan, program or campaign which is conducted to induce purchases of goods or services, or a charitable

contribution, donation, or gift of money or any other thing of value, by use of one or more telephones and which involves more than one interstate telephone call.").

For liability to attach for substantial assistance, Walmart must have supported "telemarketers" or "sellers" under the TSR. *See* 16 C.F.R. § 310.3(b). A telemarketer is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(gg). A seller is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. 310.2(ee). Because both definitions rely on the existence of a customer or donor, the complaint must also allege that the victim of the scam is a "customer" or "donor" as defined by the TSR. *See* 16 C.F.R. § 310.2(n) (A "customer" is a "person who is or may be required to pay for goods or services offered through telemarketing."); 16 C.F.R. § 310.2(p) (A "donor" is a "person solicited to make a charitable contribution.").

I consider "the text, structure, history, and purpose of a regulation" in order to determine its meaning as applied to a particular situation. *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019). Because nearly all of the representations made to consumers were false and made to induce payment of money—with no actual good, legitimate service, or charity behind the exchange—the application of the rule to the scams is a bit indirect. Given that the entire regulation is intended to police deception, the fact that the representations were false does not take the conduct out of the rule. I consider

the representations to the consumer and ask if the fraudster had actually delivered what was promised, whether the telephone call would be telemarketing.

Walmart does not dispute that the housing rental and advance-fee loan scams relied on telemarketing.

a.      Secret Shopper Scam

In the November 2017 scheme, fraudsters solicited people to act as a "secret shopper" by cashing a check (that turned out to be fake) and sending the funds via money transfer in order to evaluate Walmart's money transfer services. [62] ¶ 131. The fraudsters said the "shopper" could keep the remaining money as his compensation. [62] ¶ 131. The FTC argues that the fraudster used phone calls to induce the person to buy a service—the money transfer services at Walmart—and points out that the regulations do not require that the purchase or contribution occur during a telephone call. *See* [72] at 20. It's true that the good or service offered does not need to be purchased during the phone call, *see F.T.C. v. Day Pacer LLC*, 689 F.Supp.3d 609, 635 (N.D. Ill. 2023), but the allegation here is that the fraudsters offered the person a job opportunity, not a good or a service. Furthermore, to the extent the person was induced to purchase a service (the money transfer service), the allegation is that he did so with what he believed was the fraudsters' money, not his own money. The "shopper" believed he was accepting an offer of employment, made over the phone, and then did what his employer instructed him, over the phone, to do; this is a fraud scheme executed over the phone, but it is not a fraudulent telemarketing scheme.

15

The FTC argues that Congress intended for "goods and services" to be construed broadly. And when Congress authorized the FTC to promulgate the TSR, it had the FTC's prior enforcement actions in mind, including against telemarketing scams that involved job offers over the phone. *See* [72] at 21. But the cases cited by the FTC are distinguishable because the fraudsters represented that they could help victims obtain employment by selling them a good, (a model photograph) or a service (employment matching services). *See F.T.C. v. DuPont Model Mgmt., Inc.*, No. 90-cv-7695, 1992 WL 13077, at **2–4, 1992-1 Trade Cases ¶ 69,694 (E.D. Pa. Jan. 22, 1992) (modeling agency induced sales of photographs over the phone by promising consumers that it would consider hiring them as models and circulate their photos to clients); *F.T.C. v. Overseas Unlimited Agency Inc.,* No. 88-cv-2583 WJR (GX), Trade Reg. Rep. (CCH) ¶ 22,751 (C.D. Cal. 1989) (fraudulent telemarketing scheme that promised to match customers with at least three prospective employers for a fee).

The hook of selling a good or service to obtain employment is also present in fact patterns that courts have recently found constituted telemarketing under the TSR. *See F.T.C. v. Money Now Funding LLC*, No. CV-13-01583-PHX-ROS, 2015 WL 11120847, at *2, 5 (D. Ariz. July 1, 2015) (finding at default judgment that alleged scheme in which defendants lured consumers to purchase products in order to start a business referring potential customers to a lending company, and later inducing the consumers to purchase a list of "leads," was telemarketing); *F.T.C. v. Medical Billers Network, Inc.*, 543 F.Supp.2d 283, 293, 315–19, (S.D.N.Y. 2008) (Defendants ran telemarketing scheme that violated the TSR when they offered consumers "what they

16

needed to get started in medical billing" for a fee of between $200 and $295 and misrepresented amount and nature of fee for access to "network" of doctors who needed medical billing).[3] In this case there is no purchase of a good or service offered by the telemarketer or seller to the "shopper"; the fraudsters are posing as an employer and that does not fall within "telemarketing" as defined by the TSR.

> b.    Lottery Scam

The next scam alleged is one in which fraudsters called victims and told them they had won a prize, but that they had to pay a fee to get the prize. [62] ¶¶ 136, 140. The Telemarketing Sales Rule defines a "prize promotion" as "an oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize." 16 C.F.R. § 310.2(cc). It is a deceptive telemarketing act or practice for a seller or telemarketer to fail to disclose, before a customer consents to pay for a good or service: that no purchase or payment is required to participate in a prize promotion or the no-purchase/no-payment method of participating in the prize promotion; or all material costs or conditions to receive a prize that is the subject of the prize promotion. *See* 16 C.F.R. §§ 310.3(a)(1)(iv), (v). It is also a deceptive telemarketing practice to misrepresent, in the sale of goods or services, any material aspect of a prize promotion. *See* 16 C.F.R. § 310.3(a)(2)(v).

---

[3] The default judgment order in *F.T.C. v. USS Elder Enterprises, Inc.*, No. 04-cv-1039, (C.D. Cal. 2005), cited by the FTC in its Statement of Basis and Purpose for the 2015 amendments to the TSR and cited here by the FTC to support the assertion that employment opportunity scams are telemarketing scams, says that defendant was engaged in "advertising, offering for sale, and sale of work-at-home business opportunities." *Id.*, Docket No. 36 at 3, 7–8 (C.D. Cal. Jul. 26, 2005). That language suggests the hook of an initial sale of a good or service to get the consumer started in a "work-at-home" job, which is different than the mystery shopper scheme alleged here.

The FTC alleges that the fraudsters represented to victims that they had won a prize but had to pay to obtain the prize. *See* [62] ¶¶ 136, 140. But the allegations do not specify the goods or services being sold or offered, as required by 16 C.F.R. 310.3(a)(1) and (2). *See id.* (making it a deceptive act or practice to (a)(1) fail to disclose "before a customer consents to pay for goods or services offered" and (a)(2) misrepresent "in the sale of goods or services" the relevant information).

This does not mean, as Walmart argues, that a misrepresentation that the consumer has already won a prize cannot be telemarketing. *See* [73] at 9, 10 n.4. At least two courts have found misrepresentations that a person has won a prize and must pay money to obtain the prize to be a telemarketing scam. *See F.T.C. v. Universal Premium Servs., Inc.*, No. CV 06-0849 SJO (OPx), 2006 WL 8442134, at **2, 4 (C.D. Cal. Mar. 14, 2006) (finding at issuance of TRO that calls offering gift certificates and other free items, and then fraudsters obtain bank account information to pay for shipping and handling and use the information to make unauthorized withdrawals is telemarketing); *see also F.T.C. v. City West Advantage*, No. 2:08-CV-00609-BES-GWF, 2008 WL 2844696, at **3–5 (D. Nev. July 22, 2008) (finding at preliminary injunction stage that calls representing that consumer won $1,000 shopping spree but had to pay for shipping and handling for the items was telemarketing). But in both cases the scammers represented that the consumer had won a prize and needed to purchase another good or service—for example, shipping and handling or a processing fee—to fall within the language of the TSR.

The FTC points to the Senate Report on the TSR's enabling statute, which states "'goods or services' is intended to include, but not be limited to, extensions of credit or eligibility for a prize or award." [72] at 21 (citing S. REP. NO. 103-80, at 8 (1993)). I am not convinced that "eligibility for a prize" encompasses being told one has won a prize but must pay money to obtain it, without an allegation of the purported reason for the fee. All of the cases applying the TSR, and the FTC's own brief, explain that the lottery and prize scams are telemarketing because they "induce payment for sham services, such as insurance or shipping and handling to obtain winnings that do not exist." [72] at 20. The FTC's complaint does not state what sham service the specific consumers were paying for, it just states that they were told they had to pay to obtain winnings. *See* [62] ¶¶ 139–40. The general allegation that Jamaica-based telemarketers contacted United States consumers "and induced them to send money transfers to pay for goods or services related to a sweepstakes prize they supposedly had won," [62] ¶ 136, is simply a re-statement of the elements of telemarketing.

Because the complaint does not contain an allegation that the fraudsters were requiring the consumers to pay for a good or service to obtain their prize, the allegations do not fall within the definition of "telemarketing" under the TSR.

### c.    Government or Utility Debt Scams

In these schemes, scammers called consumers and told them they owed money to the IRS or that they were the subject of a criminal investigation and would be arrested, prosecuted, or lose their Social Security benefits if they did not immediately pay the scammers. *See* [62] ¶¶ 149–51. Similar scams involved the fraudsters posing

as utility companies and threatening disconnection without immediate payment via money transfers. *See* [62] ¶¶ 153–54.

Walmart argues that inducing payment for a cost already incurred is not inducing payment for goods or services. [71] at 15–16. The time that a consumer agrees to incur a cost is not as important as the relationship between the consumer and the caller—if the caller is seeking to collect payment on a good or service that the caller originally offered or sold through the phone, then the phone call may be telemarketing under the TSR's definition. A court has found that when a scammer used the phone to obtain payment for a good or service that the consumer already "purchased," the calls were telemarketing. *See F.T.C. v. Instant Response Sys., LLC*, No. 13-cv-00976-ILG-VMS, 2015 WL 1650914, at **1–3, 7 (E.D.N.Y Apr. 14, 2015) ("The FTC has established there is no genuine dispute of material fact that Defendants, in an effort to induce payment, made misleading statements that consumers had ordered the IRS medical alert services and owed money."). The cases cited by Walmart dealt with calls from a third-party debt collector, an area that is already regulated by the Fair Debt Collection Practices Act and the Telephone Consumer Protection Act. *See Kornea v. J.S.D. Mgmt., Inc.*, 366 F.Supp.3d 660, 668–69 (E.D. Pa. 2019) (calls made by debt collector to collect on business debt are not telemarketing) *and Michaelson v. CBE Group Inc.*, No. 13-cv-50228, 2015 WL 2449038, at *4 (N.D. Ill. May 21, 2015) (third-party debt collector was not a telemarketer under the TSR because not inducing purchase of goods or services or a charitable contribution).

As long as the caller is a seller or telemarketer under the regulation, the definition of "telemarketing" does not exclude a call to induce payment for a good or service, even where the customer already agreed to pay for the good or service. Where the fraudster is not acting as a "seller," i.e., the fraudster is not purporting to sell a good or service or arranging for the consumer to purchase the good or service from another, then phone calls to induce payment do not fall into the bucket of activity governed by the TSR.

This distinction means that the IRS impersonation back-taxes schemes would not constitute telemarketing because the IRS never acted to sell a good or a service to the consumer. The utility service impersonation schemes could constitute telemarketing because the caller is using the phone to induce payment for a service to the consumer. *See* [52] ¶ 153 (caller told victim she had to make a payment for her electricity service, or her service would be disconnected). Walmart points out that the utility impersonation scams can't be the basis for a substantial assistance claim because the victim was not originally offered the utility service through telemarketing, so the victim is not a customer under the TSR. *See* [73] at 9; *see also* 16 C.F.R. 310.2(n). I agree being a customer is a necessary condition and the complaint does not allege how the victims in the scam originally signed up for their utility service; furthermore, neither utility impersonation scam in the Amended Complaint contains allegations that the scammers made interstate phone calls, so they do not comprise telemarketing. *See* [62] ¶¶ 153–54.

The FTC argues that Congress's intent was to include government impersonation scams in the activity to be regulated by the TSR, the Statement of Basis and Purpose for the 2015 amendment to the TSR clearly references government impersonation scams, and the FTC has taken enforcement actions against telemarketing schemes involving government impersonation. *See* [72] at 21–23.

The Senate Report on the passage of the Telemarketing and Consumer Fraud and Abuse Prevention Act states that "'goods or services' is to be broadly construed so as not to exclude activities currently addressed by the FTC." S. REP. NO. 103-80, at 8 (1993). The FTC points out that in 1993, when the report was written, the FTC was prosecuting cases against fraudsters who impersonated the government over the phone. [72] at 21 (citing *F.T.C. v. Oates*, No. 2:91-cv-03854-ER, Trade Reg. Rep. (CCH) ¶ 23,025 (C.D. Cal. 1991)). That case involved a company that represented it was associated with the federal government and offered its services to help consumers obtain a prize they had been previously promised by other telemarketing companies. *See* Trade Reg. Rep. ¶ 23,025. The defendant offered the sale of its services over the phone, conduct that falls within the definition of "telemarketing." The Senate Report's nod to then-existing FTC efforts does not suggest that Congress intended to include every impersonation of the government over the phone within the definition of "telemarketing."

Similarly, the mention of fraudsters posing as the IRS in the Statement of Basis and Purpose for the 2015 Amendments to the TSR does not mean that all schemes involving IRS or government impersonation are telemarketing fraud

22

schemes. While Statements of Basis and Purpose can be helpful in discerning the meaning of an ambiguous provision, the document does not trump the language of the regulation. *See United States v. Dish Network L.L.C.*, 954 F.3d 970, 979 (7th Cir. 2020). Furthermore, the case cited in the Statement of Basis and Purpose is an FBI alert about an IRS telephone scam, not a legal case in which another court has interpreted the TSR to govern IRS impersonation scams. *See Telemarketing Sales Rule*, 80 Fed. Reg. 77,520, 77,548 n. 367 (Dec. 14, 2015).

The FTC also points to two TSR enforcement actions it recently took against scammers who posed as the government, police, or law enforcement as part of their scheme. *See* [72] at 23 (citing *F.T.C. v. PHLG Enterprises LLC*, No. 17-cv-0220 (M.D. Fla.) and *F.T.C. v. Alcazar Networks Inc.*, No. 20-cv-2200 (M.D. Fla.)). The complaint in *PHLG Enterprises* alleges violations of both Section 5 of the FTC Act and the TSR based on defendants' employment of "runners" who picked up money transfers for India-based callers who made a variety of false representations to consumers including that the consumers owed back taxes, that consumers qualified from a grant from the federal government and had to pay fees or taxes in order to receive the grant, or that consumers qualified for an advance-fee loan. *See PHLG Enterprises*, No. 17-cv-0220, Docket No. 1 at 4–5 (M.D. Fla.). That case was resolved through a stipulated order for permanent injunction and monetary judgment. *See id.*, Docket No. 11 (M.D. Fla. Feb. 9, 2017). The order enjoins defendants from facilitating money transfers as payments for goods or services offered or sold through telemarketing *and* accepting or facilitating money transfers as payment for goods or services offered or sold

through non-telemarketing, which suggests that the defendant's unlawful behavior encompassed more than just violations of the TSR. *See id.*, Docket No. 11 at 3–4. Furthermore, because the case was resolved through a stipulated order, no court analyzed which parts of the defendants' fraud scheme constituted a fraudulent telemarketing scheme.

*Alcazar Networks* is a substantial assistance case where the defendants provided Voice over Internet Protocol services to Derek Bartoli, who was the subject of an FTC enforcement action for violating the TSR by placing calls to numbers on the National Do Not Call Registry, delivering pre-recorded messages, and displaying spoofed caller ID numbers, including 911. *Alcazar Networks Inc.*, No. 20-cv-2200, Docket No. 1 at 5, 8–9 (M.D. Fla.). The complaint alleged that Alcazar Networks also provided substantial assistance to telemarketers who made calls that displayed "911" as the caller. *Id.* at 13–15. This case was resolved by a stipulated final order for permanent injunction and monetary judgment, so there was no analysis to determine what actions alleged in the complaint were violations of the TSR. *See Alcazar Networks,* Docket No. 21. Both cases are evidence of what the FTC interprets to be telemarketing fraud, but the FTC's interpretation of the TSR is not determinative if the language of a regulation is clear. *See Kisor*, 588 U.S. at 573. My reading of the TSR is that no matter whether a caller is impersonating the government, if the caller is not inducing the sale of goods or services or a charitable contribution, then the call is not telemarketing.

24

Calls to collect a debt can be telemarketing if the caller is seeking payment on a good or service that was previously offered over the phone, but the facts of the government debt or utility scams alleged here do not meet the definition of telemarketing. The calls were made to induce payment for something other than goods or services or a charitable contribution, the original service was not offered through telemarketing, or no interstate phone calls were alleged.

d.     Impersonation Scams Involving Grants and Refunds

A different twist on the government impersonation scam is when fraudsters represent that the consumer is eligible for some kind of benefit from the government such as a grant or a large tax refund but that the consumer must pay a fee in order to obtain the benefit. The Amended Complaint alleges one such scheme where a consumer was told she was owed a large tax refund but had to pay fees and taxes to obtain it. *See* [62] ¶ 152. The representation that a consumer must pay a fee to obtain the fraudster's help in receiving a government grant, a tax refund, or settlement from a government lawsuit has been found to be telemarketing. *See F.T.C. v. Cuban Exchange, Inc.*, No. 12-CV-5890 (NGG) (RML), 2014 WL 3756358, at **2, 8 (E.D.N.Y. July 30, 2014) (finding on default that scam involving phone calls to solicit consumers to sign up for scammer's "services" in speeding up refunds from "FTC consumer redress lawsuits" is telemarketing); *F.T.C. v. Affiliate Strategies, Inc.*, 849 F.Supp.2d 1085, 1094–95, 1114 (D. Kan. 2011) (scam where representations made to consumer over the phone included statement, "Congratulations, you have just taken your first step to receive $25,000 or more in free government grant money, guaranteed," and scammers proceeded to "sell" the customer a "Grant Guide" constituted telemarketing

25

under the TSR); *see also Oates*, Trade Reg. Rep. (CCH) ¶ 23,025 (July 23, 1991) (describing scam).

The FTC alleges that the Kentucky-based victim received multiple calls from a D.C. or New York phone number wherein she was told that she was due a large tax refund but had to pay fees and taxes to the caller to receive the refund. [62] ¶ 152. This meets the definition of telemarketing because the consumer received multiple interstate phone calls in which the caller was seeking to sell its services to help the consumer obtain the tax refund.

### e. Grandparent, Person-in-Need, and Romance Scams

The final type of scam alleged in the Amended Complaint is one in which fraudsters pose as someone important to the consumer and ask for the consumer's money to help them out of an emergency situation. *See* [62] ¶¶ 158–59, 163. The FTC argues that these scams fall within the TSR because the scammers are inducing payment for goods or services (such as a passport or a fee to fly back to Mexico) over the phone. But a situation in which one individual calls another and asks for money so that he can purchase something from a third party is beyond of the reach of "telemarketing." The caller is not acting as a "seller" as defined by the TSR because he is not offering goods or services *to the* consumer. *See* 16 C.F.R. § 310.2(dd); *see also Telemarketing Sales Rule*, 60 Fed. Reg. 43,842, 43,844 (Aug. 23, 1995) (noting that definition of "seller" is broad, but in all cases the seller is setting in motion a process whereby goods or services are provided *to the customer*). And the consumer is not

26

paying for goods or services offered through the call, so she does not fall under the TSR's definition of "customer." *See* 16 C.F.R. § 310.2(n).

It's a closer call whether these schemes fall under the definition of telemarketing because they were phone calls to induce a charitable contribution. A charitable contribution is defined as "any donation or gift of money or any other thing of value." 16 C.F.R. § 310.2(h). In all of the scams alleged, the fraudsters are asking for a gift of money, but the common understanding of "charitable contribution" does not include gifts of money to family members or loved ones. The FTC seemed to recognize this distinction in its 2015 Statement of Basis and Purpose when it called transfers to friends and family to pay bills or remittances to family abroad as "non-telemarketing transactions." *Telemarketing Sales Rule*, 80 Fed. Reg. at 77,550. Based on the ordinary meaning of "charitable contribution," the "person-in-need" scams do not fit the definition of telemarketing and cannot serve as the basis of an underlying TSR violation.

### 2.    *Has the FTC alleged the behavior with sufficient particularity?*

The housing rental scam, advance-fee loan scams, and the access to tax refund scam involved telemarketing, but the FTC must plead those claims with particularity under Rule 9(b).

"[T]he identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. That is all Rule 9(b) requires." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 944 (7th

Cir. 2024) (internal citation omitted). A court should not take an "overly rigid view of the [who, what, when, where, and how] formulation" without consideration of the facts of the case, for instance who has access to what information. *See Pirelli*, 631 F.3d at 442. Instead, a court should consider whether the plaintiff has "inject[ed] precision and some measure of substantiation into their allegations of fraud." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016).

Walmart says the Amended Complaint fails to meet Rule 9(b)'s requirements because (1) the specific identity of the victims or perpetrators are not always alleged and (2) the allegations refer to periods of time in which the scams occurred, not precise times. *See* [71] at 19, 21–22; [73] at 13.

The point of Rule 9(b)'s specificity requirement is to ensure that the plaintiff has done sufficient investigation before accusing a defendant of fraud and prevent plaintiffs from bringing suits based on nothing more spite. *See Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). Walmart has not articulated why alleging the victims' identities is necessary to effectuate that principle if there are other factual allegations about the fraud scheme that provide precision and substantiation. Many of the cases upon which Walmart relies are RICO cases in which the identity of victims other than the plaintiff is necessary to show that other victims actually existed, and that the predicate unlawful (fraudulent) acts have been alleged. *See Goren v. NewVision Int'l, Inc.*, 156 F.3d 721, 729 (7th Cir. 1998) (plaintiff failed to allege facts about second fraud perpetuated by defendant); *Uni*Quality, Inc.*

*v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992); *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 992–93 (7th Cir. 1991). In this case, the specific identity of the victims is not necessary to substantiate that the victims exist and other allegations about the fraudulent schemes can verify that the schemes existed (and relied upon Walmart money transfers). Furthermore, using information other than a name to describe the victim can be sufficient to establish their existence.

The identity of the perpetrator of a fraud is a standard Rule 9(b) requirement. *See Appvion, Inc.*, 99 F.4th at 944. On the other hand, the fraudsters here are not the defendants in the case and are often part of quasi-criminal enterprises interested in hiding their identity. *See Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim, and that is most likely to be the case where, as here, the plaintiff alleges a fraud against one or more third parties."). The FTC needs to allege descriptive details about the perpetrators but does not need to allege their names.

Finally, Rule 9(b) does not require the FTC to allege the exact days on which a particular victim was defrauded. The gist of the FTC's claims is that Walmart helped fraudsters execute their scams by processing money transfers. Details about the money transfers themselves may help the FTC to substantiate its claim or may even be necessary to properly allege "substantial assistance," but because the underlying fraud schemes were ongoing for months or years at a time, the exact dates of transfers or a particular victimization are not necessary.

a.  Housing Rental Scam

The Amended Complaint alleges that "[a]s part of a telemarketing plan, program, or campaign …. one victim had more than one interstate call related to a property supposedly for rent" and "lost $1,581 by paying for a non-existent rental property through a money transfer that was paid out at [a particular] Nevada Walmart location." [62] ¶ 132. The Amended Complaint describes how, over two months in 2018, associates at the same Nevada Walmart location regularly paid out money transfers to an unnamed individual who made back-to-back transfers using different personal information, and that two transactions made by those particular Walmart associates to the unnamed individual were reported as being part of a housing rental scam. [62] ¶ 132. But the complaint does not connect that unnamed individual to the scam that cost the victim $1,581. *See id*. All that connects the two fact patterns are that the victim's money was paid out at the same Nevada location. *Id*. Furthermore, the allegations do not include what was told to the victim, by whom, or when the victim was contacted and paid the money. These allegations do not meet Rule 9(b)'s requirement of particularity.

b.  Advance-fee Loan Scams

The Amended Complaint describes three advance-fee loan schemes. *See* [62] ¶¶ 144–45, 151. The first is a scheme perpetuated by Pradipsinh Dharmendrasinh Parmar and others from March 2017 to April 2019, wherein people in foreign call centers owned by a co-conspirator would call and tell consumers that they had been approved for a loan but had to make an advance payment to receive the loan. [62] ¶ 144. The script for the scheme directed the consumers to use money transfers,

including Walmart2Walmart transfers to send the payment *Id*. These allegations meet the requirements of Rule 9(b) because they describe the requisite first paragraph of the newspaper story: who—Parmar and co-defendants calling elderly victims; what—informing consumers that they were approved for a loan but had to pay an initial fee; when—March 2017 to April 2019; and how—by sending money transfers, including money transfers at Walmart.

The second scheme is that in January 2022, "an elderly consumer from South Carolina received multiple telephone calls over the course of a four-day period from a woman who identified herself as being with Harborview Lenders in Seattle, Washington." [62] ¶ 145. The scammer represented that the victim was eligible for a $5,000 loan but would have to pay an upfront fee of $487.50 by money transfer at the nearest Walmart location. *Id*.[4] Because alleging "identity" does not require alleging the name of the perpetrator, I accept "a woman who identified herself as being with Harborview Lenders in Seattle" as a sufficient pleading of who made the misrepresentation. The what, where, how, and when are also included—a misrepresentation that the victim was eligible for a loan, through a phone call received in South Carolina and purportedly made in Washington in January 2022. [62] ¶ 145.

---

[4] Walmart argues that these facts are insufficient to show telemarketing because there is no way to know if the calls were truly interstate calls. I agree with the FTC that at this stage I can make the inference, from the representation about Harborview in Seattle, Washington, that the telemarketers were in a different state than the South Carolina victim.

The final advance-fee loan scam fails to meet Rule 9(b)'s pleading requirement. The allegation is that "telemarketers at another call center in India targeted consumers in … an advance-fee loan scam, using false or misleading statements to induce people to send a money transfer to pay … for an advance-fee loan. From at least July 2015 until at least February 2016, many of these money transfers were picked up by runners at Walmart locations." [62] ¶ 151. A Florida man named Joel Treuhaft and his company were prosecuted by the FTC for his part in the scheme. *Id*. "[T]elemarketers at another call center in India" is too broad to provide the precision required by Rule 9(b). There are no other details alleged to substantiate the claim— the content of the misrepresentations is not alleged and there are no descriptive details of the scam's victims. One specific detail is that the scam was somehow connected to Joel Treuhaft, but the complaint does not explain Treuhaft's role in the scheme. These allegations fail to meet Rule 9(b)'s standards.

c.      Tax Refund Scam

The tax refund scam is alleged as follows "in February and March 2016, telemarketers contacted a consumer in Kentucky by telephone—typically from a telephone number with a Washington, D.C. or New York area code—telling her she was owed a large tax refund, but in order to receive it, she would have to pay associated fees and taxes." [62] ¶ 152. The consumer sent $12,508 from her local Walmart location to recipients in other states, including multiple transfers in a single day. *Id*. Put together, these allegations convey that a particular fraud occurred to a victim in Kentucky during a two-month span by telemarketers who used certain telephone numbers and who made specific misrepresentations to the victim. If

proved, these allegations would be sufficient to show that a fraud occurred. The FTC has provided sufficient substantiation of the tax-refund fraud scheme to pass muster under Rule 9(b).

### 3. Has the FTC alleged substantial assistance under the TSR?

The Federal Trade Commission alleges that Walmart provided substantial assistance to sellers or telemarketers whom Walmart knew or consciously avoided knowing were violating the Telemarketing Sales Rule, which constitutes a violation of the TSR. *See* 16 C.F.R. § 310.3(b). Walmart's knowledge that the money transfers executed at its stores were connected to telemarketing or part of fraudulent telemarketing schemes is critical to two parts of this claim.

First, the regulation requires Walmart to have known or consciously avoided knowing that the transfers were related to telemarketing or telemarketing fraud. *See* 16 C.F.R. § 310.3(b). A person consciously avoids knowing about a violation when "there are facts and evidence that support an inference of deliberate ignorance." *Telemarketing Sales Rule*, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995); *see also United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th Cir. 2009); *F.T.C. v. Chapman*, 714 F.3d 1211, 1219 (10th Cir. 2013) (quoting Fed. Trade Comm'n, *Complying with the Telemarketing Sales Rule*, (Feb. 2011), https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule) ("[T]aking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability.").

Second, because Walmart's acts—processing money transfers—are not necessarily tied to telemarketing (like, say, writing telemarketing scripts), Walmart's

knowledge that the transfers were payment for a telemarketing purchase or were made in furtherance of a telemarketing fraud scheme is necessary to allege the "assistance" part of the claim. *See Apuzzo*, 689 F.3d at 214–15 ("[A] high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*."); *see also Chapman*, 714 F.3d at 1217 (10th Cir. 2013) (finding substantial assistance when defendant "provided the services and products [the fraudsters] marketed to consumers" and analogizing to FTC's example of "a fulfillment house that ships only inexpensive prizes on behalf of a telemarketer about whom it receives numerous complaints."). Put another way, there is nothing inherently deceptive or unfair about processing money transfers. To show that Walmart's processing of money transfers provided substantial assistance to the wrongdoers, the FTC must allege that there were enough warning signs about the specific money transfers to show that Walmart knew or consciously avoided knowing that the transfers were payment for telemarketing or connected to fraudulent telemarketing schemes, and Walmart proceeded with the transactions anyway.

Walmart's general knowledge that its money transfer services were being used by fraudsters to execute their schemes is relevant, but not determinative, of this inquiry. *See Chapman*, 714 F.3d at 1217–18 (defendant's knowledge of state attorney generals' inquiries into the fraudsters' practices was relevant to whether she knew or consciously avoided knowing about the underlying violations). First, the FTC has alleged that Walmart knew, as of 2016, that it was a violation of the TSR to use cash-

34

to-cash money transfers to pay for any telemarketing-related cost; and because Walmart received notice of the stipulated orders between the FTC and Western Union and MoneyGram, it was on notice that a money transfer provider could be held liable for failing to prevent cash-to-cash money transfers for telemarketing sales or contributions. [62] ¶¶ 43–45. If the facts support the inference that Walmart knew that a money transfer was related to telemarketing, then Walmart knew the transfer was in furtherance of a violation of the TSR.

Second, the FTC alleges that Ria "has provided information to Walmart about fraud-induced money transfers involving telemarketing, including that from January to September 2018, the source of approximately 83 to 88 percent of fraud-induced money transfers through Walmart were schemes perpetrated over the phone[.]" [62] ¶ 87. Finally, the FTC lists about twelve criminal prosecutions of telemarketing fraud schemes in which the fraudsters used Walmart money transfer services. *See* [62] ¶¶ 34–35. In a case involving a sophisticated actor like Walmart, it's reasonable to infer that Walmart was aware of these criminal prosecutions and at least some of the details about how the fraudsters used its money transfer systems. These allegations are insufficient to show Walmart's knowledge with regard to a specific money transfer, but it does provide a context to infer that Walmart was on notice that any money transfers related to telemarketing violated the TSR, and that *its* money transfer services were being used, and how, as part of some telemarketing fraud schemes.

a.     Advance-fee Loan Scam

The first advance-fee loan scheme was committed by Parmar and others from March 2017 to April 2019. *See* [62] ¶ 144. But there are no allegations about how Walmart would have known that the money transfers at issue were part of a fraudulent telemarketing scheme. The FTC alleges that the script directed the victims to send money transfers and that the fraudsters "often used Walmart locations to obtain high-dollar money transfers using fake IDs from the scheme's victims." *Id*. While high-dollar money transfers can be an indicator of fraud generally, *see* [62] ¶ 126, nothing in the allegations support the inference that Walmart knew these transfers were in furtherance of *telemarketing* fraud. And the allegation about the fake IDs does not elaborate whether Walmart knew the IDs were fake or were somehow connected to a telemarketing fraud. Finally, there is no argument about how the facts alleged would give rise to an inference that Walmart knew the transfers were payment for a transaction induced through a phone call, i.e., that the transfers were related to telemarketing. These allegations are insufficient to show Walmart's knowledge of the underlying TSR violations, or that Walmart continued to process the orders with that knowledge so as to provide substantial assistance to the scheme.

The second advance-fee loan scam is about the elderly consumer in South Carolina; the FTC alleges that she was directed to go to the nearest Walmart to pay her fee and while there, it took three attempts to pay the fee. [62] ¶ 145. MoneyGram blocked the first two transfers to two different recipients in Canada, but the Walmart associate allowed the consumer to send money again, this time to a third recipient through Western Union. *Id*. The FTC does not allege whether MoneyGram

36

communicated its reason for blocking the first two transfers nor whether the consumer communicated anything to the Walmart associate. The complaint does not allege whether she was a first-time user of money transfers. Without more, there are insufficient factual allegations to support an inference that Walmart knew or consciously avoided knowing the transaction was prohibited by the TSR.

### b. Tax Refund Scam

For the tax refund scam, the FTC alleges that the victim sent ten MoneyGram transfers totaling $12,508 from her local Walmart, sometimes requesting multiple transfers in the same day. [62] ¶ 152. Requesting multiple transfers for high amounts is an indication that the transfers are the product of fraud, but the FTC has not alleged that those characteristics are particular to telemarketing or telemarketing fraud. The FTC notes that no one at Walmart affirmatively asked the victim about the transfers or provided her any warnings, but that is not required by the TSR.[5]

The FTC has not stated a claim for substantial assistance based on the schemes alleged in the Amended Complaint, so the TSR claim is dismissed.

Walmart often argues that the schemes could never fit within the definition of "telemarketing," and although I disagree with that conclusion, the FTC focuses on the fact that these fraudulent schemes harm consumers and then jumps to the

---

[5] The Stipulated Orders for Permanent Injunction and Final Judgments in the Western Union and MoneyGram cases require those entities and their agents, including Walmart, to provide affirmative warnings and ask consumers whether their transfers are to pay for goods or services offered or sold through telemarketing. *See* [62] ¶¶ 42, 44–45; *F.T.C. v. Western Union*, 17-cv-0110, Docket No. 12 at 6–10 (M.D. Pa. Jan. 20, 2017); *F.T.C. v. MoneyGram*, 09-cv-06576, Docket Nos. 5-2 at 5–6, 20 at 8–10 (N.D. Ill). But the FTC has not pointed to a similar affirmative duty in the TSR itself, and its claims are not based on violations of the court orders.

conclusion that the schemes violate the Telemarketing Sales Rule. This glosses over the need to describe the schemes in enough detail to substantiate that they involve the inducement of a sale of goods or services or charitable contribution over the phone, i.e., to substantiate that they fall within the confines of the TSR, or, in the alternative, the necessary inference that the Walmart employees knew the money transfers were related to telemarketing. The TSR claim is dismissed with prejudice.

### B.    Section 5 of the FTC Act

Walmart renews its arguments that the FTC has not pled a claim for relief under Section 5 of the Federal Trade Commission Act. It's true that a court may revisit its ruling on a motion to dismiss after an amended complaint has been filed, but it usually does so based on new arguments. *See Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) ("Because a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmatives defenses."). Walmart has not pointed to any change in the underlying allegations or law that would change my analysis and it does not bring fundamentally different arguments as in its last brief. I decline to reconsider my opinion that the FTC properly pled a Section 5 claim.[6]

---

[6] Walmart doesn't need to make a clear and convincing showing of new evidence or law because judges retain the right to reexamine their rulings. [73] at 20 (citing *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir. 1991)). But there ought to be a good reason to change my mind and, having considered the same arguments once before in the same case, I am content to let the earlier opinion stand as my take on the issues presented. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (as a rule courts should be loathe to revisit prior decisions in the absence of extraordinary circumstances).

The FTC filed notice of supplemental authority on the issue of the FTC's authority to bring enforcement actions. *See Illumina, Inc. v. F.T.C.*, 88 F.4th 1036 (5th Cir. 2023). Both parties argue that *Illumina* supports their stance on the FTC's authority, but I do not read the opinion to change the legal landscape such that my earlier opinion is wrong. The Fifth Circuit concludes, "although the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer." *Id*. at 1047. Although Walmart argues that striking the FTC's litigation authority and dismissing the complaint would not amount to overruling *Humphrey's Executor*, I continue to disagree. If there is a constitutional problem, it's in the removal restriction and the remedy would lie in the removal provisions, not the litigation authority. That requires overruling *Humphrey's Executor* and would be for the Supreme Court to decide.

Walmart's motion to dismiss the FTC's Section 5 claim is denied.

## IV. Conclusion

Walmart's motion to dismiss, [71], is granted as to the FTC's TSR claims and denied as to the Section 5 claim.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: July 3, 2024

39